**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____
                                            )
**In re**                                   )
                                            )   **Chapter 11**
**THE EDUCATION RESOURCES INSTITUTE, INC.,** )   **Case No. 08-12540 (HJB)**
                                            )
    **Debtor.**                             )
                                            )
_____)

**MOTION OF DEBTOR FOR ORDER (A) PURSUANT TO SECTION 365
OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO
REJECT CERTAIN CONTRACTS WITH THE FIRST MARBLEHEAD
CORPORATION AND (B) PURSUANT TO SECTION 363 OF THE
BANKRUPTCY AUTHORIZING THE DEBTOR TO ENTER INTO A
TRANSITION SERVICES AGREEMENT**

The Education Resources Institute Inc., the debtor and debtor in possession in the above-captioned case (the "Debtor" or "TERI") respectfully submits this motion (the "Motion") for order pursuant to sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") authorizing (A) the Debtor to reject certain contracts with The First Marblehead Corporation ("FMC"), First Marblehead Education Resources, Inc. ("FMER"), and/or TERI Marketing Services, Inc. ("TMSI" and together with FMC and FMER, referred to herein collectively as "FMC Entities"), effective as of May 31, 2008 and (B) the Debtor to enter into a Transition Services Agreement with FMC. Subject to the reservation of rights set forth in paragraph 8 below, the FMC Entities will not object to this Motion. In support of this Motion, the Debtor respectfully states as follows:

**SUMMARY OF RELIEF REQUESTED**

1. The Debtor is party to several contracts with one or more of the FMC Entities, including (i) the Master Servicing Agreement, dated as of July 1, 2001 (the "MSA"), (ii) the

1

Master Loan Guaranty Agreement dated as of February 2, 2001 (the "Guaranty Agreement"), (iii) Database and Sale and Supplemental Agreement dated as of June 20, 2001 (the "Database Agreement") and (iv) the Marketing Services Agreement, dated as of July 1, 2001 (the "Marketing Agreement") and, together with the MSA, Guaranty Agreement, Database Agreement and Marketing Agreement (the "FMC Contracts"). The Debtor has determined, in the exercise of its business judgment, that it is not in the best interests of the Debtor, its estate, or its creditors to continue to operate under the terms of the FMC Contracts. By this motion, the Debtor seeks to reject the FMC Contracts pursuant to section 365 of the Bankruptcy Code, and to have the effective date of the rejection be set as of May 31, 2008. The Debtor also seeks authority to enter into a Transition Services Agreement pursuant to section 363 of the Bankruptcy Code, substantially in the form of the attached Exhibit A (the "TSA"), which will govern the terms and conditions pursuant to which one or more of the FMC Entities will provide certain services to TERI for a brief period of time. In support of this Motion, the Debtor expects to file an Affidavit at least 5 days prior to the hearing which outlines the benefit of entering into the TSA with FMC.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicate for the relief requested in this Motion is section 363 and 365 of the Bankruptcy Code. Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") apply to this Motion.

## BACKGROUND

3.    On April 7, 2008 (the "Petition Date"), the Debtor commenced its bankruptcy

2

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

4. The official committee of unsecured creditors (the "Creditors' Committee") was appointed on April 30, 2008. No trustee, examiner has been appointed in this Chapter 11 Case.

5. The Debtor is operating its business and managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. Founded in 1985, TERI is a nonprofit organization incorporated under Massachusetts General Laws, chapter 180, located in Boston, Massachusetts. TERI provides education opportunities for all through its college access and loan guarantee activities. TERI is a national leader in promoting strategies for improving college access. The Debtor manages college access programs that target low-income individuals and those who are the first generation in their families to attend college. These programs are designed to raise student and adult aspirations to include college and other post-secondary education and to provide guidance and information directly to students and their families on planning and paying for college. TERI is also the managing director of the Pathways to College Network, an alliance of over 30 nonprofit organizations and funders committed to advancing college access and success for underserved students.

7. TERI's loan guarantee programs help students close the gap between education costs and their other resources such as financial aid, federal student loans, savings and family support. TERI is the oldest and largest guarantor of private (non-government) student loans with more than $18 billion in outstanding guarantees. TERI brings together lenders, schools, students and families to make available low-cost, high quality financing for postsecondary education.

**RELIEF REQUESTED**

8. By this Motion, the Debtor seeks authority under sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 to reject the FMC Contracts effective as of May 31, 2008 and to enter into the TSA with FMC. The Debtor has reviewed the terms of each of the FMC Contracts and has determined that the burdens of these contracts, including the significant costs to which the Debtor is subjected thereunder, greatly outweigh the benefits to the Debtor under the contracts. Under the current cost structure, the "burn rate" of the FMC contracts is approximately $8-16 million per month. Given the substantially reduced loan volume that now exists, with little proportional reduction in monthly costs, it has quickly become apparent that the Debtor cannot continue to operate under the FMC Contracts. After intensive negotiations and meetings, FMC and TERI have agreed on arrangements for one or more of the FMC Entities to provide TERI with essential services, at reduced costs, while TERI transitions its operations away from the FMC Entities to provide those services in house or through third party service providers. TERI and FMC have agreed that the rejection of the FMC Contracts should be effective as of May 31, 2008 and from such date forward, the relationship of the parties should be governed by the TSA. The FMC Entities' limited assent to this Motion is not a consent to rejection of the FMC Contracts or a novation, amendment or other modification of the FMC Contracts. Nothing in this Motion or the TSA will limit or otherwise affect the claims, rights or remedies of FMC, FMER, TMSI, or any of their affiliates arising from or in connection with the rejection of the FMC Contracts, all of which claims, rights and remedies are preserved.

A. *The Basis for the Rejection of the FMC Contracts*

9. Section 365(a) of the Bankruptcy Code provides that the Debtor, subject to the Court's approval, may assume or reject any prepetition executory contract. 11 U.S.C. §365(a).

The Debtor may make this decision at any time prior to the confirmation of a reorganization plan, unless the Court orders otherwise upon the request of the nondebtor contracting party. 11 U.S.C. §365(d)(2). This flexibility allows a debtor the opportunity to determine which contracts are beneficial to the estate and should be assumed, and, correspondingly, which contracts are burdensome to the estate and should be rejected. See In re FBI Distrib. Corp., 330 F.3d 36, 42 (1st Cir. 2003), quoting Pub. Serv. Co. of N.H. v. N.H. Elec. Cooperative, Inc. (In re Pub. Serv. Co. of N.H.), 884 F.2d 11, 15-16 (1st Cir.1989) (The Code "afford[s] breathing space to decide which contracts they wish to assume [or reject]"). The decision to assume or reject a contract is not one to be taken lightly as it "is vital to the basic purpose to [sic] a chapter 11 reorganization because [it] can release the debtor's estate from burdensome obligations that can impede a successful reorganization." See FBI Distrib. Corp., 330 F.3d at 42, quoting NLRB v. Bildisco v. Bildisco, 465 US 513, 528 (1984). Thus, allowing a debtor to shed burdensome contracts furthers a primary purpose of the Code: giving debtors "a fresh start." Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.), 360 F.3d 291, 296 (1st Cir. 2004) quoting In re Corp., 340 F.3d 15, 25 (1st Cir. 2003).

10. The debtor's decision to assume or reject an executory contract is subject to approval by the Bankruptcy Court. The standard by which a Bankruptcy Court traditionally considers such a request is the "business judgment" standard. See Bildisco & Bildisco, 465 U.S. at 523 (noting that the "traditional standard" applied to a debtor's request to assume or reject an ordinary executory contract is the business judgment standard). When rejecting a contract, in order to satisfy this standard, the debtor must show that rejection is in the best interests of its estate and need not prove that the contract in question is actually burdensome to its estate. See In re A.J. Lane & Co., 107 B.R. 435, 439, 440 (Bankr. D. Mass. 1989). In examining a debtor's

5

decision to reject the executory contracts pursuant to section 365 of the Bankruptcy Code, the Bankruptcy Court should defer to the debtor's decision "that rejection of a contract would be advantageous unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." <u>Butler v. Resident Care Innovation Corp.</u>, 241 B.R. 37, 47 (Bankr. D.R.I. 1999), citing <u>In re Sundial Asphalt Co., Inc.</u>, 174 B.R. 72, 83-84 (E.D.N.Y. 1992). As demonstrated below, the rejection of the FMC Contracts, which are extremely costly to the Debtor, is in the best interests of the Debtor and its estate and crucial to the Debtor's ability to reorganize as a viable going concern.

### 1. Rejection of the Master Servicing Agreement is in the Best Interests of the Debtor, its Estate, and its Creditors

11.  There can be little doubt that the rejection of the MSA is in the best interests of the Debtor, its estate and its creditors. As described to this Court in previous motions, many of the "back office" operations of the Debtor are managed by FMER under the MSA. This management costs the Debtor millions of dollars per month (pre-petition the monthly costs were in excess of $10 million). While the FMER costs to TERI were substantial, they were manageable until the securitization markets froze in September 2007 in light of the failure of the housing market and the general economic downturn. The cash flow that TERI received on securitization of students loans stopped at that time, and the FMER costs then exceeded revenues; payment of those costs contributed to the erosion of TERI's capital that ultimately led to the filing of the Chapter 11 Case.

12.  Since the Petition Date most of the services provided by FMC and/or FMER have been reduced but, even at reduced levels, the costs of the services exceed TERI's current revenues. Since the Petition Date, as lenders have suspended or reduced their TERI-related loan originations, its revenues have fallen further but the cost reductions have not offset the pre-

petition and post-petition revenue reductions. Although the Debtor has sufficient cash on hand to continue its current operations on a post-petition basis, it has become clear that rejecting the FMC Contracts and entering into the TSA are in the best interests of estate.

### 2. Rejection of the Guaranty Agreement is in the Best Interests of the Debtor, its Estate, and its Creditors

13. The Guaranty Agreement is an integral component of the contractually-related suite of FMC Contracts. It is a contract between FMC and TERI pursuant to which TERI (a) guaranteed or agreed to guaranty FMC-facilitated private student loans underwritten by certain lenders that were parties to note purchase agreements with FMC, (b) agreed that TERI would issue a new guaranty to the owners of to which TERI-guaranteed loans were transferred in securitization transactions and (c) obligated TERI to take various actions to facilitate securitization transactions. Under the Guaranty Agreement, TERI receives fees for guaranteeing these loans at certain points during the life of the loan, including at the time of the securitization.

14. As noted above, the securitization market shut-down in the fall of 2007 and has not yet revived. In light of the filing of the Chapter 11 Case, TERI cannot timely honor its obligations under the Guaranty Agreement nor would it be prudent to seek to do so, as FMC cannot currently securitize the underlying loans. TERI is diligently working with its advisors to formulate a new business plan and business model in this challenging economic environment, and promptly relieving itself of the burdens of the Guaranty Agreement is in the best interests of TERI, its estate and its creditors.

### 3. Rejection of the Database Agreement is in the Best Interests of the Debtor, its Estate and its Creditors

15. The Database Agreement is a contract pursuant to which TERI (i) transferred certain of its information regarding loans and loan default rates to FMC in exchange for a lump

7

sum payment and monthly installment payments and (ii) agreed to update the information and respond to certain information requests from FMC regarding the information in exchange for a monthly payment for the life of the contract. The Debtor seeks to reject the Database Agreement. Going forward, the TSA will govern the parties' obligations with respect to the Loan Database (as defined in the Database Agreement). The Debtor believes that the "Data Transfer" section of the TSA addresses and fairly resolves the cost implications to each of the parties in a way that matches their benefits.

### 4. Rejection of the Marketing Agreement is in the Best Interests of the Debtor, its Estate and its Creditors

16. The Marketing Agreement is between TERI and FMER, as assignee of TMSI, a wholly owned subsidiary of FMER, pursuant to which FMER provides certain marketing-related services for TERI-guaranteed loan programs. This includes the development of marketing strategies, plans, and materials. TERI reimburses FMER for the actual costs of these services in accordance with an agreed-to budget between TERI and FMER . As it continues to formulate its business plan, in light of the new economic realities facing the student loan market, TERI has determined that it is no longer cost-efficient to continue the Marketing Agreement with FMER. Following rejection, TERI will be able to market its own loan programs directly to lenders and schools on a more cost-efficient basis than it has been able to do with TMSI under the Marketing Agreement. TERI believes that it is vital to its post-petition business development that relationships with schools and lenders continue to be cultivated and managed directly by TERI employees. For these reasons, the Debtor has determined, in the exercise of its business judgment to reject the Marketing Agreement with FMER.

*B. The Effective Date of the FMC Contracts Should Be May 31, 2008*

17.     After extensive negotiations among FMC and TERI, the parties have agreed to the terms for the continued provision of certain services by FMC and/or FMER following the rejection of the FMC Contracts as of May 31, 2008.  As a court of equity, under section 365 of the Bankruptcy Code, a Bankruptcy Court can enter an order approving rejections of contracts (other than contract for the lease of non-residential real property) effective as of a date that is earlier than the date of the Order approving such rejection, if the "balance of the equities preponderates in favor of such remediation."  In re Thinking Machines Corp., 67 F.3d 1021, 1028 (1st Cir. 1995).  Such relief lies within the discretion of the Bankruptcy Court and, if granted, must be consistent with the principles of section 365.  See id.  There should be little doubt that the equities favor a retroactive rejection of the FMC Contracts.  In addition, (a) FMC has assented to the retroactive effective date of the rejection, subject to approval of the TSA, and (b) the cost savings during the period from the effective date until the date of entry of an order approving the Motion will greatly enhance TERI's prospect for reorganization.

*C. The Transition Services Agreement*

18.     The Debtor and FMC have agreed to the principal terms of the TSA pursuant to which FMC and/or FMER will provide certain services to TERI following the rejection of the FMC Contracts.  A redacted copy of the TSA is attached as Exhibit A.  As the TSA contains certain proprietary pricing information, we believe it is critical to the Debtor's operations that such pricing information remain confidential.

9

19. The TSA provides that it will have a term of approximately 60 days (June 1, 2008 through July 31, 2008), although TERI will have the right to further extend the TSA (1) for one additional 30 day period if it provides FMC with notice of such election to extend no later than July 15, 2008 and (2) for a second 30 day period subject to the consent of FMC (which consent will not be unreasonably withheld) if TERI provides FMC with notice of such election to further extend no later than August 12, 2008.  TERI will have the right, upon 10 business days' notice to FMC, to cancel and terminate any specific service (or all services) without effect on any other service to be provided by the applicable FMC Entity to TERI pursuant to the TSA.  FMC may, upon three (3) business days notice to TERI, terminate the TSA in the event of breach of payment obligations by TERI if such breach is not cured within three (3) business days of TERI's receipt of such notice.

20. The TSA provides, *inter alia,* that FMC and/or FMER shall provide the following services to TERI:

(A) **Loan Origination Services:** FMER will continue to collect, evaluate, administer, approve or deny and fund any approved loan applications until the earlier of (i) the termination of the TSA and (ii) 60 days from the date all lenders suspend or terminate loan programs with TERI. FMER shall charge TERI a fee equal to the amount of the origination fee that TERI is entitled to receive under the pertinent loan program for providing these services. Because FMER is charging TERI the same amount TERI will receive from the lender, this service is essentially cash flow neutral to TERI. However, it provides an essential function (one that TERI could not presently provide without significant costs) and ensures that no student borrowers are disrupted or severely inconvenienced as a result of TERI's chapter 11 filing.

(B) **Multiple Loan Disbursements:** A portion of certain student loans is disbursed in multiple segments (e.g., at the start of each semester or at the start of each school year). Tracking and ensuring that multiple disbursements are made is critical to the student borrowers of such loans. TERI does not currently have the capability to track the multiple disbursements and make the disbursements from its own accounts. FMER has agreed to provide this service with respect to (i) any loan which had its first disbursement prior to May 31, 2008 and (ii) any loan with an application received after May 31, 2008 for which FMER receives the fee described in the previous paragraph of this Motion. FMER will provide such services to TERI at no cost.

(C) **Collection Efforts:** Pursuant to the terms of the MSA, FMER has served as TERI's primary contact with all collection agencies engaged by TERI to pursue collections of student loans that have either missed a payment or for which TERI has purchased the loan pursuant to the applicable Guaranty Agreement.

1. **Claims Processing and Review:** As part of the services provided, when a Guaranty Event occurs, thereby triggering TERI's obligation to purchase a defaulted student

loan, FMER reviews the claims package to verify that a Guaranty Event has occurred, that there are no available defenses and that the applicable lender has complied with all of its obligations with regard to the servicing and origination of the loan.  After that review, TERI would, prior to the Petition Date, purchase the loan and then seek to collect on the loan through various collection strategies.  FMER has agreed to provide claims review services on a per claim basis.  While TERI is not purchasing defaulted loans from its general funds during the Chapter 11 case, this service is nonetheless necessary to validate defaults to enable recovery actions.  FMER has agreed to provide its claims review services for claims arising with respect to loans securitized in an FMC-sponsored securitization ("Securitized Loans") at no out of pocket cost but subject to certain offsets described in the Motion to Pay Trust Claims.

        2.      **Default Prevention:**  Default prevention, as its moniker suggests, is designed to prevent a loan from defaulting.  Typically, after a student borrower misses one to two payments, the collection effort is transferred to a collection agency so that the agency can try to induce the borrower to begin paying on its loan again.  Under the existing agreement, TERI reimbursed FMER for costs of administration regarding the default prevention work plus the cost charged by the Collection Agency if it was able to "cure" the default.  Pursuant to the TSA, TERI has agreed to pay FMER a fixed dollar amount per cure for administering this function for loans other than Securitized Loans and TERI will continue to pay the costs charged by third party collection agents.  This represents a substantial savings to TERI because it will only be required to pay FMER the costs associated with those loans that actually begin repayment in contrast to the existing relationship which has TERI paying all default prevention costs regardless of whether such efforts were successful.  FMER has agreed to provide TERI its default prevention management services with respect to the Securitized Loans at no cost to

12

TERI, subject to certain offsets set forth in the Motion to Pay Trust Claims set forth in paragraph 23 hereof.

    3.    **Post-Default Collections:**  Once a Guaranty Event has occurred, and TERI becomes obligated to purchase the loan, the defaulted loan is purchased and various collection strategies are used to collect the defaulted loan, including litigation with borrowers, bankruptcy of borrowers and probate of borrowers' estates.  There are costs associated with oversight and administration of the efforts to collect the defaulted loans.  Although the majority of the costs are incurred as fees owed by TERI directly to the collection agencies, FMER employs a collections staff who are devoted to oversight and administration of claims.  Pursuant to the TSA, TERI has agreed to pay FMER a fixed percentage of the gross amount of the dollars recovered with respect to loans that are not Securitized Loans.  This arrangement allows TERI to pay only for services to the extent they are successful on a unit cost basis in contrast to the existing arrangement pursuant to which TERI pays for all costs associated with FMER collections (e.g., salary, benefits, space, etc.).  Subject to paragraph 23 below, FMER has agreed to provide TERI its post-default oversight and administration services with respect to the Securitized Loans at no cost to TERI, provided that TERI remit to FMER the same percentage of recoveries that it would otherwise have retained with respect to those loans.

    (D)    **Infrastructure:**  FMC has agreed to provide TERI with certain support to enable TERI to improve its infrastructure.  Examples of the services to be provided by FMC include, but are not limited to:  (1) continued availability of current internal and external network connectivity, (2) continued availability of current Window's domain, services and server applications supporting user authentication, printing, file storage, intranet, email, backups and electronic fax, (3) continued availability of existing user workstations (and/or laptops), (4)

13

continued availability, including maintenance of existing interfaces for, finance and accounting software for transactions, reporting and budgeting, (5) continued availability, including maintenance of existing interfaces for, Human Resources and payroll transactions, (6) agreements for Human Resources and payroll services, finance and accounting software, sales contract management software, and (7) delivery in machine readable format of all file-server based TERI end-user electronic files and all SharePoint based TERI end-user electronic files.

21.     For each of the services described above, FMC will provide services which will allow TERI to independently complete selected activities and smoothly transition activities from the FMC Entities to TERI. These services will include meetings with TERI management, assisting in moving accounts, and data and other items to TERI owned systems in addition to general assistance during the transition. Unless specifically priced within the TSA, TERI will not be charged for these additional services.

22.     Moreover, it is important to note that simultaneously with the filing of this Motion, the Debtor has filed a Motion for Order Pursuant to Sections 105, 362, and 363 of the Bankruptcy Code authorizing Debtor to honor certain of the guaranty obligations and purchase defaulted loans using cash in certain Pledged Accounts established for the benefit of the trusts (the "Motion to Pay Trust Claims"). Approval of the Motion to Pay Trust Claims is a condition precedent to the TSA becoming effective.

23.     As more fully described in the Motion to Pay Trust Claims, FMC has agreed to bear all of TERI's out-of-pocket costs (i.e. costs other than those amounts payable by TERI to the collection agencies for post-default collection activities and for collection activities on loans that are rehabilitated, each of which categories is "cost-neutral" to TERI) of collection efforts associated with the Securitized Loans subject to a right of reimbursement from the residual

interest in the trust. Currently, the trusts represent the lion's share of collection costs.

24. The Debtor believes that it is in the best interest of its estate and creditors that it be permitted to enter into the TSA with FMC. The TSA will provide the Debtor with essential functions at substantially reduced costs.

25. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale or disposition of a debtor's assets, many courts have construed this section, to require that the decision be based upon the sound business judgment of the debtor. See In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) ("Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession may use, sell or lease property other than in ordinary course when a sound business purpose justifies such action"); In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

26. The Debtor believes that the TSA is a vital building block for TERI to be able to emerge from Chapter 11. Moreover, given the substantially reduced costs agreed to between TERI and FMC, it alleviates concerns voiced by the Creditors' Committee that the Debtor's relationship with FMC had become prohibitively expensive. For all of these reasons we urge the Court to approve the rejection of the FMC Contracts and authorize the Debtor to enter into the TSA.

15

### **Waiver of Rule 6004(h)**

27. The Debtor seeks an Order immediately approving the relief sought in this Motion and, therefore, requests that the 10 day stay of order imposed pursuant to 6004(h) be waived.

### **Notice**

28. The Debtor has served notice of this Motion on (a) the Office of the Attorney General for the State of Massachusetts, (b) the Office of the United States Trustee for the District of Massachusetts, (c) proposed counsel for the Creditors' Committee (d) FMC and (e) each of the Creditors listed on the Debtor's Top 20 Unsecured Creditors List. In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

LIBC/3312886.4

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as <u>Exhibit B</u> authorizing the Debtor to reject the FMC Contracts as of May 31, 2008, authorizing the Debtor to enter into the Transition Services Agreement, substantially in the form of the attached Exhibit A and granting the Debtor such other and further relief as is just and proper.

    Respectfully submitted,

    THE EDUCATION RESOURCES INSTITUTE, INC.

    By its attorneys,

    s/Gina Lynn Martin
    Daniel M. Glosband (BBO No. 195620)
    Gina Lynn Martin (BBO No. 643801)
    Goodwin Procter LLP
    Exchange Place
    Boston, Massachusetts 02109
    Telephone: (617) 570-1000
    Facsimile: (617) 523-1231

    E-mail: dglosband@goodwinprocter.com
           gmartin@goodwinprocter.com

    *Attorneys for the Debtor and Debtor in Possession*

June 5, 2008