> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) Case No. 08-12540 (HJB) |
| | ) |
| Debtor. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

GOODWIN PROCTER  LLP
Daniel M. Glosband
Gina Lynn Martin
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

DUANE MORRIS LLP
Jeffrey D. Sternklar
470 Atlantic Avenue
Boston, MA 02210
(857) 488-4216

Dated: February 25, 2010
         Boston, Massachusetts

LIBC/3667825.11

## DISCLAIMER

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "PLAN"). THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ ALL OF THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. A COPY OF THE PLAN IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT (AS DEFINED BELOW). THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR-IN-POSSESSION IN THIS CASE.

# TABLE OF CONTENTS

**Page**

| | | | | |
|---|---|---|---|---|
| **I.** | **INTRODUCTION AND SUMMARY OF THE PLAN** | | | 1 |
| | A. | THE PLAN OF REORGANIZATION | | 1 |
| | | **1.** | Introduction | 1 |
| | | **2.** | Restructuring Transactions | 2 |
| | | **3.** | Plan Overview | 3 |
| | | **4.** | Key Components of the Plan | 21 |
| | B. | OVERVIEW OF CHAPTER 11 | | 32 |
| | C. | SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN | | 33 |
| | D. | PURPOSE, LIMITATIONS, AND STRUCTURE OF THIS DISCLOSURE STATEMENT | | 36 |
| | E. | VOTING ON THE PLAN | | 38 |
| | | **1.** | Classes Entitled to Vote | 38 |
| | | **2.** | Voting Instructions | 39 |
| | | **3.** | Tabulation of Votes | 40 |
| | F. | CONFIRMATION HEARING | | 41 |
| | | **1.** | Confirmation Hearing Date | 41 |
| | | **2.** | Plan Objection Deadline | 41 |
| **II.** | **BACKGROUND TO THIS CHAPTER 11 CASE** | | | 42 |
| | A. | THE DEBTOR'S BUSINESS | | 42 |
| | | **1.** | College Access Programs | 42 |
| | | **2.** | Student Loan Guarantees | 43 |
| | | **3.** | Employees | 44 |
| | | **4.** | Charitable Gifts and Other Restricted Funds | 44 |
| | B. | SUMMARY OF SIGNIFICANT PREPETITION LIABILITIES | | 47 |
| | | **1.** | Guaranty Obligations | 47 |
| | | **2.** | The Debtor's Pension Plan | 47 |
| | | **3.** | FMC Contracts | 48 |
| | C. | EVENTS LEADING TO THIS CHAPTER 11 CASE | | 49 |
| **III.** | **THE CHAPTER 11 CASE** | | | 49 |
| | A. | FILING AND FIRST DAY ORDERS | | 49 |
| | | **1.** | Certain First Day Orders | 49 |
| | | **2.** | Retention of Debtor's Professionals | 50 |
| | | **3.** | The Creditors' Committee | 50 |
| | | **4.** | Claims Bar Date | 50 |
| | B. | OTHER DEVELOPMENTS | | 50 |
| | | **1.** | Rejection of FMC Contracts | 50 |
| | | **2.** | Stipulations With Certain Creditors | 51 |
| | | **3.** | The Nellie Mae Adversary Proceeding | 53 |
| | | **4.** | Plan Proponents' Negotiations | 54 |

IV.  SUMMARY OF THE PLAN ........................................................................................**54**
  A.  ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ...........................54
    1.  Administrative Claims ................................................................ 54
    2.  Pre-Effective Date Professional Fees and Expenses................................. 55
    3.  United States Trustee Quarterly Fees and Other Statutory Fees............... 55
    4.  Priority Tax Claims...................................................................... 55
  B.  CLASSIFICATION AND TREATMENT OF CLAIMS .................................55
    1.  Summary of Classification and Treatment of Claims............................ 55
    2.  Classification and Treatment of Claims and Interests ............................ 56
  C.  PROVISIONS REGARDING VOTING AND DISTRIBUTION UNDER
       THE PLAN ...........................................................................................58
    1.  Voting of Claims......................................................................... 58
    2.  Acceptance by Impaired Class................................................... 59
    3.  Presumed Acceptances of the Plan ............................................ 59
    4.  Nonconsensual Confirmation.................................................... 59
    5.  Method of Distributions Under the Plan .................................... 59
  D.  MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN ........62
    1.  Reorganized TERI ..................................................................... 62
    2.  Compromise and Settlement...................................................... 62
    3.  Plan Trust ................................................................................. 71
    4.  Closing of the Chapter 11 Case ................................................ 76
  E.  PROCEDURES FOR RESOLVING AND TREATING DISPUTED
       CLAIMS ...............................................................................................76
    1.  No Distribution Pending Allowance........................................... 76
    2.  Resolution of Disputed Claims ................................................. 76
    3.  Estimation ................................................................................ 77
    4.  Allowance of Disputed Claims .................................................. 77
    5.  Disallowance of Claims Without Further Order of the Bankruptcy
         Court ........................................................................................ 77
    6.  No Distribution in Respect of Disallowed Claims....................... 77
  F.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
       LEASES ................................................................................................77
    1.  Assumption or Rejection of Executory Contracts and Unexpired
         Leases....................................................................................... 77
    2.  Approval of Assumption or Rejection of Executory Contracts and
         Unexpired Leases...................................................................... 78
    3.  Inclusiveness ............................................................................ 78
    4.  Return of Guaranty Fees ........................................................... 79
    5.  Bar Date for Filing Proofs of Claim Relating to Executory
         Contracts and Unexpired Leases Rejected Pursuant to the Plan............... 79
    6.  Insurance Policies ..................................................................... 80
    7.  Compensation and Benefit Programs.......................................... 80
    8.  Retiree Benefits......................................................................... 80
  G.  CONDITIONS PRECEDENT TO THE ENTRY OF THE
       CONFIRMATION ORDER ....................................................................81
  H.  EFFECTIVENESS OF THE PLAN .........................................................81

iii

|   |   | 1. | Conditions Precedent to the Effective Date | 81 |
|   |   | 2. | Waiver of Conditions | 82 |
|   |   | 3. | Reduction in Retained Cash | 82 |
|   | I. | | EFFECTS OF CONFIRMATION | 82 |
|   |   | 1. | Vesting of Assets. | 82 |
|   |   | 2. | Binding Effect | 82 |
|   |   | 3. | Discharge | 83 |
|   |   | 4. | Releases | 83 |
|   |   | 5. | Release of Assets | 85 |
|   | J. | | RETENTION OF JURISDICTION | 85 |
|   |   | 1. | Jurisdiction of Bankruptcy Court | 85 |
|   | K. | | MISCELLANEOUS PROVISIONS | 86 |
|   |   | 1. | Post-Confirmation Date Fees and Expenses | 86 |
|   |   | 2. | Dissolution of the Creditors' Committee | 87 |
|   |   | 3. | Plan Supplement | 87 |
|   |   | 4. | Plan Controls Disclosure Statement; Confirmation Order Controls Plan | 87 |
|   |   | 5. | Modification of the Plan. | 87 |
| V. | | | **CONFIRMATION PROCEDURES** | **88** |
|   | A. | | **VOTING PROCEDURES AND SOLICITATION OF VOTES** | 88 |
|   | B. | | **CONFIRMATION HEARING** | 88 |
|   | C. | | **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** | 88 |
|   |   | 1. | Best Interests of Creditors/Liquidation Analysis | 90 |
|   |   | 2. | Feasibility | 91 |
|   |   | 3. | Acceptance by Impaired Classes | 93 |
|   |   | 4. | Confirmation Without Acceptance by All Impaired Classes | 93 |
| VI. | | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** | **95** |
|   | A. | | CONSEQUENCES TO THE DEBTOR AND REORGANIZED TERI | 97 |
|   | B. | | CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2a – 2p, 3a – 3q, 4a-4k, 5 AND 6 | 97 |
|   | C. | | CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASS 5. | 97 |
|   |   | 1. | The Plan Trust | 97 |
|   | D. | | INFORMATION REPORTING AND WITHHOLDING | 101 |
| VII. | | | **RISK FACTORS** | **101** |
|   | A. | | CERTAIN BANKRUPTCY CONSIDERATIONS | 101 |
|   | B. | | MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS | 102 |
|   | C. | | RISK THAT CLAIMS WILL BE HIGHER THAN ESTIMATED | 102 |
|   | D. | | RISK THAT THE CLAIMS OF FMC AND ITS SUBSIDIARIES WILL NOT BE SUBSTANTIALLY REDUCED BY THE COURT | 102 |
|   | E. | | RISK THAT THE PLAN TRUSTEE WILL NOT ACHIEVE PROJECTED RECOVERIES IN RESPECT OF DEFAULTED LOANS | 102 |

F.    LITIGATION RISKS ................................................................................103

**VIII.  CONCLUSION AND RECOMMENDATION** .........................................................**103**
**EXHIBITS**

EXHIBIT A    Plan
EXHIBIT B    Decoder
EXHIBIT C    Best Interest Test
EXHIBIT D    Reorganized TERI Financial Statements

LIBC/3667825.11

# I.    INTRODUCTION AND SUMMARY OF THE PLAN

The Education Resources Institute, Inc. ("TERI"[1] or the "Debtor") and the Official Committee of Unsecured Creditors (the "Creditors' Committee," and together with the Debtor, the "Plan Proponents") jointly submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtor.[2] The Plan Proponents have prepared this Disclosure Statement in connection with the solicitation of votes to accept or reject the Second Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors (as the same may be amended from time to time, the "Plan"), which was filed by the Plan Proponents with the United States Bankruptcy Court for the District of Massachusetts, Eastern Division (the "Bankruptcy Court") on February 25, 2010. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

For the reasons described in greater detail below, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code on April 7, 2008 (the "Commencement Date"). The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case. On April 30, 2008, the United States Trustee for the District of Massachusetts appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.

## A.    THE PLAN OF REORGANIZATION

### 1.    Introduction

A principal goal of a chapter 11 bankruptcy is to reorganize a debtor's business for the benefit of itself and its creditors. The plan of reorganization is the blueprint by which these goals are accomplished. It provides the rules and procedures pursuant to which a debtor's creditors will be paid and lists the steps a debtor will take to reorganize.

As described in greater detail below, prior to the Chapter 11 Case, the Debtor was (1) a guarantor of private student loans and (2) a not for profit corporation focused on providing college access services to underserved or first generation to college students through a variety of outreach and other services. After substantial review of the Debtor's business and, in consultation with the Creditors' Committee, the Debtor focused on formulating a plan of reorganization that would enable it to make distributions to holders of Allowed Claims as soon as practicable, terminate its existing guaranty business and emerge focused on its not for profit, college access mission and ancillary student loan-related services. The Plan accomplishes this objective by providing for: (i) a compromise and settlement of guaranty Claims; (ii) rejection of

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition in the Plan shall control.

[2]    There are no holders of equity interests in TERI for bankruptcy purposes. TERI is a nonprofit corporation organized under the laws of the State of Massachusetts, and no one owns its residual economic interest above liabilities.

1

most executory contracts to which the Debtor is a party; (iii) creation of a Plan Trust that will receive most of the assets of the Debtor and will effectuate distributions due under the Plan; and (iv) retention of certain Restricted Funds and other assets on behalf of Reorganized TERI so that it can continue its college access and loan servicing activities.

The Plan compromises and settles the Debtor's various Claims by dividing the Creditors into six separate Classes (and sub-classes within the Classes of Secured Claims) and distributing assets and interests in assets to creditors within these Classes. When a debtor lacks sufficient funds to pay all its creditors in full, it must provide for the rights of secured creditors in specific assets and distribute its unencumbered assets pursuant to the priority scheme set forth in the Bankruptcy Code. Thus, Classes of Secured Claims will be paid in full, while the Class of General Unsecured Claims will likely receive only a portion of their Allowed Claims. A description of each class and the expected recovery for each class is set forth below.

In addition, the Debtor will reject all executory contracts and unexpired leases upon confirmation of the Plan, with certain minor exceptions. A list of the executory contracts the Debtor will seek to assume pursuant to Section 365 of the Bankruptcy Code will be set forth in the Plan Supplement to be submitted to the Bankruptcy Court prior to the Confirmation Hearing in accordance with the terms of the Plan.

The majority of the Debtor's assets and liabilities will be transferred to the Plan Trust and the Plan Trustee will take control of the process of liquidating and winding up the Debtor's estate and distributing assets to Creditors.

The Plan also provides that any Causes of Actions will be assigned to the Plan Trust. Under the Plan, all Causes of Action, whether known or unknown, are preserved, except that the Trust Adversary Proceeding commenced by the Creditors' Committee against the "National Collegiate Trusts" will be dismissed with prejudice and all other claims and Causes of Action released as to any Securitization Trust that accepts the Securitization Trust Settlement if the Plan is confirmed and becomes effective. A description of the Securitization Trust Settlement is described further below.

## 2.    Restructuring Transactions

The Plan provides for the reorganization of the Debtor upon consummation of the Plan and the resolution of outstanding Claims against the Debtor pursuant to sections 1123, 1129, and 1141 of the Bankruptcy Code. Of the approximately 200 Claims filed against the Debtor, nearly 150 consist of contingent Claims resulting from TERI's activities as a guarantor of student loans. Such Claims must be estimated using a methodology that takes into account various factors described in greater detail below. The Plan offers the Make and Wait Lenders, Make and Hold Lenders, holders of Securitization Trust Claims and holders of KeyCorp Trust claims a compromise and settlement of the amount of such contingent Claims based on a methodology developed by the Creditors' Committee and acceptable to the Debtor as part of a comprehensive compromise and settlement. In addition, the Plan offers to certain affected Secured Creditors a compromise and settlement of issues relating to the validity, perfection and post Commencement Date effect of their security interests. Each Creditor that is offered a compromise and settlement has two options: (1) the Creditor can accept the Plan, and thereby accept the amount, allowance,

2

priority, and treatment of such Creditor's Claim under the compromise and settlement; or (2) the Creditor can reject the Plan, and thereby elect to litigate the amount of such Creditor's Claim at an evidentiary hearing to be held after entry of the Confirmation Order.

**3.      Plan Overview**

To understand the treatment of Claims and the compromise and settlement of contingent Claims arising from the Debtor's guaranty of student loans, it is important to understand, generally, the Debtor's pre-petition operations and its relationship with The First Marblehead Corporation. The following provides certain useful background information and summarizes the Plan's major features regarding the Debtor's various creditor groups:

a)      *Background Regarding The Collateral Accounts*

The Debtor was a processor and guarantor of private student loans. Through a series of contracts with The First Marblehead Corporation and one or more of its corporate affiliates, including First Marblehead Education Resources, Inc. (collectively, "FMC"), the Debtor processed student loan applications, administered student loans, and provided guarantees in respect of such loans. When a lender funded a student loan, the lender deposited the funds into one of the Debtor's loan origination accounts and FMC, acting as TERI's agent, issued the check or initiated the appropriate transfer to the borrower or the applicable educational institution at which the borrower was enrolled.

At the time that the student loan was funded (and in some instances, thereafter as well), the Debtor was paid a Guaranty Fee in consideration for issuing a guaranty of the loan. Prior to the Commencement Date, most (but not all) lenders were parties to Note Purchase Agreements with FMC which gave FMC the right to purchase TERI-guaranteed loans through special purpose entities ("SPEs") that, in turn, would sell certificates evidencing obligations of the SPEs that would be paid with proceeds of the loans. This process is known as securitization. Those lenders that made loans in anticipation of securitization required that a significant portion of the Guaranty Fees in respect of those loans be placed in a segregated collateral account (the "Segregated Fees") to secure TERI's guaranty payment obligations. When loans that had been funded were awaiting securitization, the Segregated Fees related to those loans were placed in a so-called Pool Account. When the loans were securitized, TERI's guaranty continued to guaranty the loans as now owned by the SPE and the Segregated Fees were transferred from the Pool Account to a Pledged Account pledged to the SPE to secure TERI's guaranty obligations.

Prior to January 1, 2008, FMC, acting on behalf of TERI, administered the Pool Accounts and Pledged Accounts, including tracking amounts held in such accounts and investments made in respect of such accounts. On January 1, 2008, the administration of the accounts was transferred to TERI.

Historically, each of the lenders had its own Pool Account subject to a deposit and security agreement among TERI, FMC, the lender and U.S. Bank, N.A. (including its predecessor in interest State Street Bank and Trust Company, the "Bank") under which TERI granted the lender a security interest in the Pool Account held at the Bank (the "DSA Security Documents"). The DSA Security Documents were intended to provide the lenders with control

3

over the Pool Accounts for purposes of perfection of the security interest in the account. Historically, the Pool Accounts were held at the Bank, which was designated as the "bank" or "agent" of the Lender pursuant to the DSA Security Documents. Either TERI (or its agent) or the particular lenders also filed UCC-1 financing statements with the Massachusetts Secretary of State in respect of the Pool Accounts and additional collateral described in the DSA Security Documents.

As of the Commencement Date, each of the following lenders had its own Pool Account at the Bank: (1) J.P. Morgan Chase Bank, N.A. ("Chase"); (2) Bank of America, N.A. ("Bank of America"); (3) Sun Trust Bank; (4) HSBC Bank USA, N.A. ("HSBC Bank"); (5) First National Bank Northeast; (6) Ally Bank (f/k/a GMAC Bank ("GMAC")); (7) National City Bank; (8) Manufacturers & Traders Trust Company (formerly All First-MedBest Program ("M&T Bank")) and (9) The Huntington Bank ("Huntington Bank").

For reasons unknown to the Debtor, but apparently for ease of administration, some lenders became part of a Joint Pool Account into which their Segregated Fees were deposited and in which they had a *pari passu* interest. As of the Commencement Date, the following lenders shared in the Joint Pool Account: (1) Comerica Bank, N.A.; (2) Insurbanc; (3) KeyBank National Association ("KeyBank"); (4) M&T Bank; (5) PNC Bank, N.A. ("PNC Bank"); (6) Sovereign Bank; (7) TCF National Bank ("TCF") and (8) U.S. Bank. Each of these lenders was party to a Security Agreement with TERI and a Control Agreement with the Bank and FMC (the "Joint Security Documents"). The Joint Security Documents were intended to provide the lenders with control over the Joint Pool Account for purposes of perfection of the security interest in the account. Either TERI (or its agent), or the particular lenders also filed UCC-1 financing statements with the Massachusetts Secretary of State in respect of the Pool Accounts and additional collateral described in the Security Agreements.

RBS Citizens, N.A. ("Citizens Bank") and Union Federal Savings Bank, N.A. ("UFSB") had been parties to the Joint Pool Account but on or about March 31, 2008 directed the Debtor and U.S. Bank, N.A. to transfer each lender's pro rata portion of the Joint Pool Account's Collateral to a new Pool Account held at each of such lender's respective financial institution.

b)    *Secured Creditors*

The Debtor's Secured Creditors fall into three categories.[3] The first category of Secured Creditors consists of the Make and Wait Lenders, which are lenders that made student loans that were to be sold to and securitized by FMC, but which instead have been retained by the Make and Wait Lenders due to the disruption of the securitization markets. Depending on whether the lender had its own Pool Account or shared the Joint Pool Account, a portion of the Guaranty Fees paid to TERI for guaranteeing such loans were deposited in either (1) the Pool Accounts which are specific to each Make and Wait Lender and in which each Make and Wait Lender holds a security interest or (2) held in the Joint Pool Account, in which several lenders have a *pari passu* security interest.

---

[3]    Section 506 of the Bankruptcy Code provides that a Claim is treated as a Secured Claim to the extent of the value of the Collateral and a General Unsecured Claim to the extent that it is a Deficiency Claim.

4

The second category of holders of Secured Claims consists of certain Securitization Trusts administered by First Marblehead Data Services ("FMDS") and sometimes referred to as "The National Collegiate Trusts." These National Collegiate Trusts hold loans guaranteed by TERI. TERI's guarantee obligations to the Securitization Trusts are secured by, among other things, Pledged Accounts.

The third category of holders of Secured Claims consists of KeyBank (other than in its capacity as a Make and Wait Lender) and certain securitization trusts administered by KeyBank. Key Corp Trusts hold loans guaranteed by TERI. TERI's guarantee obligations to KeyBank (other than in its capacity as a Make and Wait Lender) and the Key Corp Trusts are secured by KeyBank's and such Trust's allocable share of the funds as of the Commencement Date in the Victory Fund maintained by KeyBank.

c)    <u><i>Determination of Make and Wait Lenders' Claims</i></u>

During the Chapter 11 Case, both the Debtor and the Creditors' Committee performed a thorough analysis of contingent guaranty Claims, engaged in extensive negotiations regarding the Debtor's potential liability to each Secured Creditor and came to an agreement regarding the estimates to utilize in offering a compromise and settlement of each Secured Creditor's Claim.

The Debtor and Creditors' Committee have agreed to offer the Make and Wait Settlement to each Make and Wait Lender based on the Creditors' Committee's Claim estimation assumptions and methodology, which the Creditors' Committee has denominated the "Decoder." A summary of the Decoder is discussed in Section I.A.4.b.1 below. If Make and Wait Lenders elect to accept the compromise and settlement amount, they will have an Allowed Secured Claim equal to the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" and an Allowed – Unsecured Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" Column of <u>Schedule A</u> attached to the Plan.

(1)    Make and Wait Lender's Treatment Under Plan[4]

If, under the Decoder, the estimate of potential liability (the "Liability Estimate") to a certain Make and Wait Lender exceeds the funds in the Collateral Account in which it holds a security interest, such Make and Wait Lender, if it accepts the Plan, will be paid the entire amount of the funds in the Collateral Account in which it holds a security interest, and will receive a Deficiency Claim to be treated in accordance with the Plan's treatment of General Unsecured Claims.

If the Liability Estimate to a certain Make and Wait Lender does not exceed the funds in the Collateral Account in which it holds a security interest, then such Make and Wait Lender, if it accepts the Plan, will be paid the funds from the Collateral Account equal to the Liability Estimate, and will not receive a Deficiency Claim. In that case, the remaining funds in the

---

[4]    Subject to further adjustment under the Plan (as discussed in Section A(3)(c)(2) below) with respect to certain Make and Wait Lenders that may have defects in security documents.

5

Collateral Account will be retained by the Debtor for distribution to the Plan Trust for the benefit of Creditors who hold General Unsecured Claims.

If a Make and Wait Lender rejects the Plan but the Plan is ultimately confirmed, then the Make and Wait Lender will litigate the amount of its Secured Claim and its Deficiency Claim (if any) in the Bankruptcy Court after the entry of the Confirmation Order. Such Make and Wait Lender will be paid funds from its Collateral Account to the extent of the Allowed amount of its Secured Claim as determined by the Bankruptcy Court in a Final Order. In the same Final Order, the Bankruptcy Court will set the Allowed amount of such Creditor's Deficiency Claim, if any, which will be treated in accordance with the Plan's treatment of General Unsecured Creditors. In the event a Make and Wait Lender rejects the Plan, the Plan Trustee will request Allowance of such Make and Wait Lender's Claim on any appropriate basis as determined by the Plan Trustee, including the "Base Case". A summary of the Base Case is discussed in greater detail in Section I.A.4.b.2. Using the Debtor's Base Case, no Make and Wait Lender holds a General Unsecured Deficiency Claim.

> (2)    Treatment Under Plan of Make and Wait Lenders That
> May Have Defects in Security Documents Granting Such
> Creditor A Security Interest In the Joint Pool Account

Certain Make and Wait Lenders that are or were just prior to the Commencement Date, secured by the Joint Pool Account, including Citizens Bank, InsurBanc, M&T Bank and PNC Bank, had a Control Agreement and Security Agreement that the Debtor and the Creditors' Committee believe did not properly identify the Joint Pool Account as Collateral.[5] It is unclear whether this deficiency would ultimately deprive such Secured Creditors of their security interest in the Joint Pool Account or, in the case of Citizens Bank, which transferred its account within ninety (90) days of the Commencement Date, whether such transfer would be deemed a preferential transfer pursuant to Section 547 of the Bankruptcy Code. As a result of the potential challenge to the security interests, the Plan Proponents propose to settle this Make and Wait Lien Dispute, as well as the underlying Secured Claim Amount by agreeing to a settlement and compromise that provides that 5% of such Make and Wait Lender's Collateral in the Joint Pool Account (or, in the case of Citizens Bank, its Collateral Account) be transferred to the Plan Trustee, free and clear of all liens, claims and encumbrances. No other adjustment will be made to the Allowed Secured Claims or Allowed Deficiency Claims of the Secured Creditors affected by the Make and Wait Lien Dispute if they accept the settlement proposal.

Specifically, the holders of Make and Wait Claims that also have a Make and Wait Lien Dispute will be offered the following compromise and settlement pursuant to Bankruptcy Rule 9019:

---

[5]    UFSB was similarly situated but was party to a compromise approved by the Bankruptcy Court that resolved this and other issues.

| MAKE AND WAIT LENDERS WITH MAKE AND WAIT LIEN DISPUTE | | |
|---|---|---|
| **LENDER** | **COLLATERAL ACCOUNT (AS OF 12/31/08)** | **5% REDUCTION** |
| Citizens Bank | $48,488,139 | $2,424,407 |
| Insurbanc | $16,233 | $812 |
| M&T Bank | $678,383 | $33,919 |
| PNC Bank | $8,025,823 | $401,291 |

If a Make and Wait Lender with a Make and Wait Lien Dispute rejects the Plan but the Plan is ultimately confirmed, then such Make and Wait Lender will litigate the amount of its Secured Claim and its Deficiency Claim, if any, in Bankruptcy Court after entry of the Confirmation Order. The Plan Proponents, and the Plan Trustee, also reserve the right to assert any other ground or objection to such Lender's Claim. In the Final Order with respect to any such dispute, the Bankruptcy Court will set the Allowed amount of such Creditor's Claim and determine whether the Make and Wait Lender has a valid security interest in such lender's Collateral Account. In the event a Make and Wait Lender rejects the Plan, the Plan Trustee will request Allowance of such Make and Wait Lender's Claim at such amount as determined by the Plan Trustee, including the Debtor's Base Case. No release of Collateral will be made to a Make and Wait Lender that has rejected the Plan until there is a Final Order regarding the determination of the Allowed amount of such Make and Wait Lender's Secured Claim and Deficiency Claim and the Make and Wait Lien Dispute.

The following chart sets forth the claims of the Make and Wait Lender, including the "Payment to Accepting Make and Wait Lender from Collateral Account" and "Make and Wait Lender Decoder Deficiency Claim (If Any)" as provided for in the Plan.

LIBC/3667825.11

| Class | Make and Wait Collateral Account Funds (as of 12/31/08) A | Make and Wait Lien Dispute Amount (5% of Collateral Account Funds) A*5%=B | Make and Wait Lender Base Case Equity (If Any) C | Make and Wait Lender Decoder Equity (If Any) D | Make and Wait Lender Payment Amount (If Any)[1] B+D=E | Payment to Accepting Make and Wait Lender from Collateral Account[2] A-E=F | Make and Wait Lender Decoder Deficiency Claim (If Any)[3] G |
|---|---|---|---|---|---|---|---|
| Class 2a Citibank | $0 | $0 | $0 | NA | NA | NA | NA |
| Class 2b Comerica Bank | $379,951 | $0 | $164,345 | $41,582 | $41,582 | $338,368 | $0 |
| Class 2c First National Bank Northeast | $790 | $0 | $0 | NA | NA | NA | NA |
| Class 2d GMAC Bank | $5,906,949 | $0 | $782,057 | $0 | $0 | $5,906,949 | $941,904 |
| Class 2e HSBC Bank USA, N.A. | $861,764 | $0 | $627,147 | $320,702 | $320,702 | $541,061 | $0 |
| Class 2f Huntington National Bank | $831,333 | $0 | $325,854 | $0 | $0 | $831,333 | $2,126 |
| Class 2g Insurbanc | $16,233 | $812 | $8,650 | $2,098 | $2,910 | $13,323 | $0 |
| Class 2h KeyBank National Association | $856,777 | $0 | $92,883 | $0 | $0 | $856,777 | $159,860 |
| Class 2i Manufacturers and Traders Trust Company | $678,383 | $33,919 | $524,891 | $215,499 | $249,418 | $428,965 | $0 |
| Class 2j National City Bank | $3,973,170 | $0 | $1,140,016 | $0 | $0 | $3,973,170 | $206,358 |
| Class 2k PNC Bank, N.A. | $8,025,823 | $401,291 | $3,026,789 | $0 | $401,291 | $7,624,532 | $448,989 |
| Class 2l RBS Citizens, N.A. | $48,488,139 | $2,424,407 | $8,857,767 | $0 | $2,424,407 | $46,063,732 | $7,803,433 |
| Class 2m Sovereign Bank | $537,888 | $0 | $265,002 | $64,848 | $64,848 | $473,040 | $0 |
| Class 2n SunTrust Bank | $437,566 | $0 | $250,542 | $110,277 | $110,277 | $327,289 | $0 |
| Class 2o TCF National Bank | $129,172 | $0 | $76,941 | $23,996 | $23,996 | $105,177 | $0 |
| Class 2p U.S. Bank, N.A. | $2,795,334 | $0 | $1,143,599 | $88,198 | $88,198 | $2,707,136 | $0 |

[1] This is the sum of the "Make and Wait Lien Dispute Amount (5% of Collateral Account Funds)" and "Make and Wait Lender Decoder Equity (if any)". The balance of the funds in the Collateral Account, including accrued interest, shall be payable to the applicable Accepting Make and Wait Lender.

[2] For purposes of the Plan, payment to accepting Make and Wait lender from collateral account is net of any equity calculated with the Decoder methodology described in the Plan Supplement. Amounts in the collateral account will be adjusted on the date of transfer.

[3] Under the Base Case, no Make and Wait Lender holds a Deficiency Claim

8

d)   *The Securitization Trusts*

First Marblehead Data Services ("FMDS"), a wholly-owned subsidiary of FMC, structured and administered the securitization of student loans into Securitization Trusts that are special purpose entities created to hold a pool of student loans. The Securitization Trusts issued bonds collateralized by the student loans. Since 2001, FMDS has structured approximately 17 securitizations of pooled student loans, where a majority of such underlying loans are guaranteed by TERI. U.S. Bank National Association, is the Indenture Trustee or successor Indenture Trustee of each of the Indentures under which the bonds were issued.

Specifically, the following securitization trusts were created:

> National Collegiate Master Student Loan Trust I
> National Collegiate Student Loan Trust 2001-CP1
> National Collegiate Student Loan Trust 2002-CP1
> National Collegiate Student Loan Trust 2003-1
> National Collegiate Student Loan Trust 2004-1
> National Collegiate Student Loan Trust 2004-2
> National Collegiate Student Loan Trust 2005-1
> National Collegiate Student Loan Trust 2005-2
> National Collegiate Student Loan Trust 2005-3
> National Collegiate Student Loan Trust 2006-1
> National Collegiate Student Loan Trust 2006-2
> National Collegiate Student Loan Trust 2006-3
> National Collegiate Student Loan Trust 2006-4
> National Collegiate Student Loan Trust 2007-1
> National Collegiate Student Loan Trust 2007-2
> National Collegiate Student Loan Trust 2007-3
> National Collegiate Student Loan Trust 2007-4

U.S. Bank is also the Indenture Trustee of bond issuances that securitized "TERI-Guaranteed" student loans that were either not structured or administered by FMDS or did not have an associated Collateral Account. All of such Trusts (referred to in the Plan as "Other Trusts") are not included in the Securitization Trust Settlement described below but rather the Claims of such Other Trusts are treated as General Unsecured Claims.

Pursuant to the terms of the Solicitation Procedures Order, the holders of Notes issued pursuant to the applicable Indentures (other than Indentures that have a "Control Party" or "Credit Provider" and such Control Party or Credit Provider elects to exercise Voting Authority on behalf of such Trust) will have the right to cause the holders of the Trust's Claims to vote to accept or reject the Plan. If the noteholders in respect of a Securitization Trust cause a Trust to be deemed to vote to accept the Plan, then that Trust will be deemed to have voted to accept the Plan and the "Securitization Trust Settlement" The Securitization Trust Settlement, described in detail later in this Disclosure Statement, resolves all issues related to the amount of each Trust's Claims and issues related to the perfection of liens claimed by each Trust.

The Settlement With NCSLT 2001-CP1 and NCSLT 2002-CP1.

LIBC/3667825.11

The Plan Proponents have agreed to a settlement in principle with NCSLT 2001-CP1 and NCSLT 2002-CP1 and expect to submit a motion seeking approval of such settlement pursuant to Rule 9019 of the Bankruptcy Rules in the near term.  The Plan Proponents expect that settlement with NCSLT 2001-CP1 and NCSLT 2002-1 will include the following terms:

1.    On the Effective Date, all defaulted loans (whether purchased prior to or following the Commencement Date), will be transferred to the Plan Trustee;

2.    NCSLT 2001-CP1 will have an Allowed General Unsecured Claim of $300,000;

3.    NCSLT 2002- CP1 may continue to direct the Debtor to purchase defaulted loans from its Pledged Account until the funds in such account are exhausted; and

4.    On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed, with prejudice as to NCSLT 2001-CP1 and NCSLT 2002- CP1.

The Securitization Trust Settlement for each of the other "National Collegiate Trusts" is summarized as follows:

(1)    Each Securitization Trust that accepts Plan, and, thereby, the Securitization Trust Settlement will have an Allowed Secured Claim in the amount of the Securitization Trust Collateral, which generally includes the amount held in such Securitization Trust's Collateral Account.  However, pursuant to the Decoder NCSLT 2007-3 and NCSLT 2007-4 and are oversecured and therefore their Collateral Account will be returned to the Applicable Securitization Trust less $1,600,000 and $700,000, respectively that shall be paid to the Plan Trustee.

As of December 31, 2008, the balances of the Securitization Trust Collateral Accounts were as follows:

| National Collegiate Trust | Balance of Collateral Account (as of December 31, 2008) |
|---|---|
| National Collegiate Student Loan Trust 2003-1 | $540,788 |
| National Collegiate Student Loan Trust 2004-1 | $505,430 |
| National Collegiate Student Loan Trust 2004-2 | $788,078 |
| National Collegiate Student Loan Trust 2005-1 | $632,914 |
| National Collegiate Student Loan Trust 2005-2 | $395,825 |
| National Collegiate Student Loan Trust 2005-3 | $1,809,447 |

| | |
|---|---|
| National Collegiate Student Loan Trust 2006-1 | $472,236 |
| National Collegiate Student Loan Trust 2006-2 | $225,021 |
| National Collegiate Student Loan Trust 2006-3 | $51,161,652 |
| National Collegiate Student Loan Trust 2006-4 | $20,967,919 |
| National Collegiate Student Loan Trust 2007-1 | $31,632,569 |
| National Collegiate Student Loan Trust 2007-2 | $38,018,657 |
| National Collegiate Student Loan Trust Master Trust | $906,902 |
| National Collegiate Student Loan Trust 2007-3 | $65,493,625 |
| National Collegiate Student Loan Trust 2007-4 | $64,615,864 |
| National Collegiate Student Loan Trust 2001-CP1* | $404 |
| National Collegiate Student Loan Trust 2002-CP1* | $906,902 |

(2)    According to the Creditors' Committee Decoder, if a Securitization Trust's Collateral excluded defaulted loans purchased by TERI post-petition, but included prepetition defaulted loans and funds in its Collateral Account then its Deficiency Claim would be as set forth below:[6]

| | |
|---|---|
| NCSLT 2003-1 | $13,500,000 |
| NCSLT 2004-1 | $12,300,000 |
| NCSLT 2004-2 | $21,200,000 |
| NCSLT 2005-1 | $13,900,000 |
| NCSLT 2005-2 | $12,700,000 |
| NCSLT 2005-3 | $32,800,000 |
| NCSLT 2006-1 | $24,500,000 |
| NCSLT 2006-2 | $24,600,000 |
| NCSLT 2006-3 | $15,700,000 |
| NCSLT 2006-4 | $22,000,000 |
| NCSLT 2007-1 | $14,200,000 |
| NCSLT 2007-2 | $10,400,000 |
| NCSLT Master Trust | $16,200,000 |
| NCSLT 2007-3 | $0 |
| NCSLT 2007-4 | $0 |

(3)    In full and final settlement of the Trust Adversary Proceeding (described in Section 4(a) below) with respect to each Securitization Trust that accepts the Plan, and,

---

[6]    These Deficiency Claims are subject to further reduction as described in subparagraph (3).

11

thereby, the Securitization Trust Settlement, such Trusts will (a) waive any claim to security interests in loans purchased by TERI on or after the Commencement Date and on recoveries on such loans, including recoveries received prior to the date hereof and (b) in full and final settlement of the Trust Adversary Proceeding[7] with respect to each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement, the Trusts will agree to reduce the amount of their Allowed Deficiency Claim as part of the Securitization Trust Settlement. The resulting Allowed Deficiency Claim, after applying such reduction for each Securitization Trust is equal to the following amounts (each a "Securitization Trust Settlement Claim"):

| | |
|---|---|
| NCSLT 2003-1 | $6,600,000 |
| NCSLT 2004-1 | $5,600,000 |
| NCSLT 2004-2 | $14,200,000 |
| NCSLT 2005-1 | $8,700,000 |
| NCSLT 2005-2 | $9,300,000 |
| NCSLT 2005-3 | $27,600,000 |
| NCSLT 2006-1 | $21,800,000 |
| NCSLT 2006-2 | $22,900,000 |
| NCSLT 2006-3 | $14,000,000 |
| NCSLT 2006-4 | $21,100,000 |
| NCSLT 2007-1 | $13,900,000 |
| NCSLT 2007-2 | $10,200,000 |
| NCSLT Master Trust | $5,900,000 |
| NCSLT 2007-3 | $0 |
| NCSLT 2007-4 | $0 |

(4)   On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed, with prejudice as to (i) each Securitization Trust receiving the treatment provided by the Securitization Trust Settlement, (ii) the administrator with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (iii) the owner trustee of each such Securitization Trust accepting the Plan and the Securitization Trust Settlement and (iv) U.S. Bank National Association in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, including as indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and

---

[7]   The Trust Adversary Proceeding is described in greater detail in Section IV.D.2.C.

12

accepted the Plan and Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities only.

(5)     On the Effective Date, for each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement, the Debtor will transfer or cause to be transferred, free and clear of all liens, claims and encumbrances, to the indenture trustee (or such other party as directed by the indenture trustee) under the indentures with the respective Securitization Trust (a) all funds, monies, and other assets in the applicable Collateral Account created and maintained for the applicable Securitization Trust (except that NCSLT 2007-3 and NCSLT 2007-4 will be required to remit $1,600,000 and $700,000, respectively, of the balance of each of their Collateral Accounts to the Plan Trustee as a result of the Securitization Trust Settlement providing, in part, that their Collateral Accounts are oversecured by that amount), (b) all defaulted loans that were purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust prior to the Commencement Date, and (c) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to prepetition defaulted loans and (d) the proceeds from the sale by the Debtor of such prepetition defaulted loans to a Securitization Trust at any time following rehabilitation.

(6)     All defaulted loans that were purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust after the Commencement Date shall be transferred free and clear of all liens, claims and encumbrances to the Plan Trust and the applicable Securitization Trust shall have no security interest in, or Claim to such defaulted loans or recoveries obtained in respect thereof.   The following chart shows the approximate face amount of defaulted loans purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization   Trust both prior to and after the Commencement Date.

LIBC/3667825.11

| Applicable Trust | Purchased Pre-Petition | Purchased Post-Petition |
|---|---|---|
| NCSLT 2003-1 | $50,100,000 | $800,000 |
| NCSLT 2004-1 | $49,700,000 | $1,300,000 |
| NCSLT 2004-2 | $47,700,000 | $10,000,000 |
| NCSLT 2005-1 | $35,100,000 | $14,800,000 |
| NCSLT 2005-2 | $21,200,000 | $10,700,000 |
| NCSLT 2005-3 | $34,500,000 | $43,300,000 |
| NCSLT 2006-1 | $17,700,000 | $26,000,000 |
| NCSLT 2006-2 | $11,100,000 | $19,000,000 |
| NCSLT 2006-3 | $10,700,000 | $37,600,000 |
| NCSLT 2006-4 | $5,500,000 | $24,400,000 |
| NCSLT 2007-1 | $2,000,000 | $18,300,000 |
| NCSLT 2007-2 | $1,400,000 | $12,400,000 |
| NCSLT Master Trust | $77,200,000 | $1,800,000 |
| NCSLT 2007-3 | $500,000 | $5,000,000 |
| NCSLT 2007-4 | $500,000 | $5,800,000 |

(7)     The Plan Proponents, using a recovery rate of 48% of paid defaults and using a 5% discount rate over an 11 year period, have ascribed the following net present value to the loans purchased by or on behalf of the Debtor after the Commencement Date:

| | |
|---|---|
| NCSLT 2003-1 | $300,000 |
| NCSLT 2004-1 | $500,000 |
| NCSLT 2004-2 | $4,000,000 |
| NCSLT 2005-1 | $5,900,000 |
| NCSLT 2005-2 | $4,200,000 |
| NCSLT 2005-3 | $17,100,000 |
| NCSLT 2006-1 | $10,300,000 |
| NCSLT 2006-2 | $7,500,000 |
| NCSLT 2006-3 | $14,900,000 |
| NCSLT 2006-4 | $9,700,000 |
| NCSLT 2007-1 | $7,300,000 |
| NCSLT 2007-2 | $4,900,000 |
| NCSLT Master Trust | $700,000 |
| NCSLT 2007-3 | $2,000,000 |
| NCSLT 2007-4 | $2,300,000 |

14

(8)     The Securitization Trust Settlement is not a waiver or release of the rights, if any, of the Debtor or any other party to receive a portion (if any) of the Residuals with respect to any and all of the Securitization Trusts.[8]

In the event that any Securitization Trust rejects the Plan or is deemed to reject the Plan, such Securitization Trust shall be deemed to opt out of the Securitization Trust Settlement, and as to Claims in such rejecting Classes (A) the Allowed amount of the Secured Claim (if any) of the Claims in such rejecting Class will be determined by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code, and the Plan Trustee will seek to have such Secured Claim (if any) determined on any appropriate basis determined by the Plan Trustee, including the Base Case, (B) the Trust Adversary Proceeding against the holders of Claims in such rejecting classes will proceed in the Bankruptcy Court, (C) the Collateral Accounts allegedly securing the Claims in such rejecting Classes will not be released to the Indenture Trustee (or its servicers or any other representative) on behalf of the holder of such claim in such rejecting Class (or such other party as Indenture Trustee may designate) unless the Court determines pursuant to one or more Final Orders that such holders hold Allowed Secured Claims, in which event, such holder's Collateral Account, if any, shall be released to such holder to the extent of available funds and to the extent necessary to satisfy such Allowed Claim, with the excess, if any, released to the Plan Trustee and (D) such Securitization Trust reserves the right in the Trust Adversary Proceeding to contest the Debtor's assertion that it acquired title to defaulted loans sold or transferred to the Debtor or its agent as a result of such sale or transfer.

On the Effective Date (or as soon thereafter as reasonably practicable) with respect to a Securitization Trust that rejects or is deemed to reject this Plan and is thereby deemed to opt out of the Securitization Trust Settlement, the funds in the Pledged Account (whether earned or accrued) as of the Effective Date shall be transferred to U.S. Bank National Association ("U.S. Bank") and held by U.S. Bank in escrow pursuant to the terms of one or more escrow agreements among U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee. The escrow agreement(s) shall be mutually acceptable to U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee and shall provide that (i) the funds shall be held by U.S. Bank in the applicable escrow account to be released upon the earlier of (1) one or more Final Orders of the Bankruptcy Court (as applicable to such Trust), or (2) pursuant to joint written instruction of the Plan Trustee, the applicable Securitization Trust and indenture trustee for such Trust, (ii) the funds shall be invested by U.S. Bank in accordance with such written instructions, and that investment earnings on such funds shall be added to the fund and released as provided above, and (iii) such other matters as shall be agreed to by the parties to such agreement (including payment of customary fees and other bank charges). Notwithstanding such transfer of funds to the escrow account or accounts, each of the Plan Trustee, Securitization Trustee and indenture trustee reserve all rights, and such transfer(s) to the escrow account or accounts are subject to the rights of the Plan Trustee, Securitization Trustee and indenture trustee, with respect to recoveries and other funds transferred by the Debtor to the applicable Pledged Account on or after the Commencement Date, together with any interest or other earnings thereon, including,

---

[8]   The Residuals are discussed in greater detail in Sections I.A.4e and VII.E. hereof.

without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

In the event that any Securitization Trust rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claims of such Securitization Trust determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case. The Debtor's Base Case (if applied by the Court) with respect to the Securitization Trusts would yield the following Claim amounts:

| Securitization Trust | Securitization Trust Base Case Equity | Securitization Trust Base Case Claim |
|---|---|---|
| NCSLT 2003-1 | - | $12,214,990 |
| NCSLT 2004-1 | - | $10,696,106 |
| NCSLT 2004-2 | - | $12,884,635 |
| NCSLT 2005-1 | - | $5,219,602 |
| NCSLT 2005-2 | - | $5,575,091 |
| NCSLT 2005-3 | - | $6,015,971 |
| NCSLT 2006-1 | - | $6,761,746 |
| NCSLT 2006-2 | - | $11,186,298 |
| NCSLT 2006-3 | $14,690,347 | $0 |
| NCSLT 2006-4 | - | $2,175,723 |
| NCSLT 2007-1 | $2,680,796 | $0 |
| NCSLT 2007-2 | $4,331,492 | $0 |
| NCSLT Master Trust | - | $14,954,201 |
| NCSLT 2007-3 | $20,234,263 | $0 |
| NCSLT 2007-4 | $19,264,504 | $0 |
| NCSLT 2001-CP1 | $0 | $0 |
| NCSLT 2002-CP1 | $0 | $0 |

e)    *Key Corp Trusts*

KeyBank structured and administered the securitization of student loans into trusts that are special purpose entities created to hold a pool of student loans. KeyBank (excluding in its capacity as a Make and Wait Lender) also continues to hold loans that were not securitized. The trusts issued bonds collateralized by student loans. Specifically, KeyBank created the following trusts:

16

| Key Corp Student Loan Trust | 1999-A |
|---|---|
| Key Corp Student Loan Trust | 1999-B |
| Key Corp Student Loan Trust | 2000-A |
| Key Corp Student Loan Trust | 2000-B |
| Key Corp Student Loan Trust | 2000-B |
| Key Corp Student Loan Trust | 2001-A |
| Key Corp Student Loan Trust | 2002-A |
| Key Corp Student Loan Trust | 2003-A |
| Key Corp Student Loan Trust | 2004-A |
| Key Corp Student Loan Trust | 2005-A |
| Key Corp Student Loan Trust | 2006-A |

Pursuant to the terms of the Plan, if the Key Corp Trusts and KeyBank (excluding in its capacity as a Make and Wait Lender) accept the Plan, then they will be paid their allocable share of the Victory Fund Collateral Account as of the Commencement Date held by KeyBank and will receive a Deficiency Claim to be treated in accordance with the Plan's treatment of General Unsecured Claims, and they shall cause their allocable share of the postpetition deposits into the Victory Fund to be transferred to the Plan Trustee free and clear of any liens or claims of KeyBank or the KeyCorp Trusts. If KeyBank and the Key Corp Trusts elect to accept the Key Access Program Settlement, the Debtor and Creditors' Committee have agreed to offer the Key Access Program Settlement based on the Committee's Decoder. If any of the Key Corp Trusts or KeyBank (other than in its capacity as a Make and Wait Lender) elects the Key Access Program Election and thereby rejects the Plan, then the Plan Trustee will seek to allow such Key Corp Trust Claim or the Claim of KeyBank (other than in its capacity as a Make and Wait Lender) at any appropriate basis determined by the Plan Trustee, including the Base Case.

The Key Access Program Settlement Amount and Base Case are set forth below:

| Key Corp Trust | Allocable Share of Victory Fund | Program Decoder Settlement Claim | Base Case |
|---|---|---|---|
| KeyBank National Association | $17,572 | $4,183,461 | $2,990,666 |
| KCSLT 1999-A | $5,304 | $1,182,942 | $845,309 |
| KCSLT 1999-B | $4,426 | $1,227,168 | $1,025,614 |
| KCSLT 2000-A | $2,777 | $482,156 | $365,040 |
| KCSLT 2000-B | $4,989 | $1,477,086 | $1,266,274 |

17

| KCSLT 2001-A | $3,055 | $1,168,802 | $951,496 |
| KCSLT 2002-A | $3,278 | $1,352,056 | $1,158,829 |
| KCSLT 2003-A | $1,122 | $623,586 | $492,155 |
| KCSLT 2004-A | $2,053 | $803,372 | $586,767 |
| KCSLT 2005-A | $1,358 | $377,533 | $263,483 |
| KCSLT 2006-A | $65 | $362,215 | $301,180 |

If a KeyCorp Trust or KeyBank (other than in its capacity as a Make and Wait Lender) rejects the Plan and is thereby deemed to opt out of the Key Access Program Settlement, then such KeyCorp Trust or KeyBank (other than in its capacity as a Make and Wait Lender) will have (i) the Allowed amount of its Claim determined by the Bankruptcy Court by Final Order, following appropriate notice and an opportunity to be heard, in accordance with the Key Access Program Election; (ii) the funds in the Victory Fund as of the Commencement Date shall be paid to KeyBank and held in escrow until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, the proper method for distributing such funds; and (iii) the recoveries and other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon, shall be transferred to the Plan Trustee but shall not be distributed to any Creditor until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, whether any KeyCorp Trust or KeyBank has a first priority perfected security interest in all or any part of such funds and, to the extent necessary, whether the Key Access Program Deficiency Claims must be adjusted to reflect the distributions of the funds in the Victory Fund required pursuant to the Bankruptcy Court's Order.[9]

    f)    *General Unsecured Creditors*

Holders of unsecured Claims against the Debtor fall into four categories. The first category of holders of General Unsecured Claims are the Convenience Class Claims. Convenience Class Claims consist of General Unsecured Claims that are greater than $0 and less than or equal to $1,500 in Allowed amounts, or General Unsecured Claims for which the holder of such claim elects to reduce its Claim to an amount equal to or less than $1,500. Such Allowed Claims will be paid in full from Available Cash. However, pursuant to the terms of the Plan, in the event that the aggregate amount of Convenience Class Claims exceeds $250,000, the Plan Trustee and/or the Plan Proponents, as appropriate, in its or their sole discretion, can reject an election made by a creditor to reduce its Allowed General Unsecured Claim to $1,500. In the event that the Plan Trustee and/or the Plan Proponents, as appropriate reject any such election, then such Creditor's Claim will be treated as a General Unsecured Claim.

---

[9]    The Debtor believes that the approximately $1,000,000 in funds transferred by the Debtor to the Victory Fund on or after the Commencement Date was in error and that pursuant to Section 542 of the Bankruptcy Code such funds should be returned to the Debtor's estate.

18

(1)    Make and Hold Lender's and Non-Collateralized Trusts
Claims

The second category of holders of General Unsecured Claims consists of the Make and Hold Lenders which are lenders that made student loans that are held by each lender on its balance sheet without having been held for planned securitization or securitized with no collateral account, as well as the claims of certain unsecured trust structures like TFSI, Knowledgeworks and National Collegiate Student Loan Trust 2006-A. Such loans, unlike the loans made by Make and Wait Lenders, are not secured by Collateral Accounts. Under the Plan, each Make and Hold Lender is offered a Make and Hold Settlement of the Allowed amount of its General Unsecured Claim based on the Decoder methodology agreed to between the Debtor and the Creditors' Committee. If the Make and Hold Lender accepts the Plan, the Make and Hold Lender will receive the General Unsecured Claim Distribution based on the Make and Hold Settlement amount.

The Debtor and the Creditors' Committee have agreed to offer the Make and Hold Settlement based on the Committee's Decoder or the Debtor's Base Case (whichever is higher). Specifically, pursuant to the Decoder, the Make and Holder Lenders, if they elect to accept the Make and Hold Settlement amount, will have Allowed Claims in the amounts set forth on the chart below in the column "Make and Hold Lender Settlement Claim".

If a Make and Hold Lender rejects the Plan, then the Plan Trustee will seek to allow such Make and Hold Lender's Claim at any appropriate basis determined by the Plan Trustee, including the Base Case. The Make and Hold Base Case for Make and Holder Lenders is set forth on the chart below in the column "Make and Hold Lender Base Case".

19

| Make and Hold Lender | Base Case Claim | Decoder Claim | Hold Main Settlement Claim |
|---|---|---|---|
| Brazos Student Finance Corporation | See Star Bank Claim | See Star Bank Claim | See Star Bank Claim |
| California Bank & Trust | $ 864 | $ 866 | $ 866 |
| CHELA Financial USA/Inc. (n/k/a Nelnet) | $ 63,612 | $ 54,890 | $ 63,612 |
| Citibank | $ 48,946 | $ 42,538 | $ 48,946 |
| Comerica Bank | $ 407,313 | $ 430,720 | $ 430,720 |
| Corus Bank, N.A. | $ 9,207 | $ 9,509 | $ 9,509 |
| Deutsche Bank | $ 420,994 | $ 355,277 | $ 420,994 |
| HealthMarkets, Inc. (f/k/a UICI) | $ 2,526,339 | $ 2,404,978 | $ 2,526,339 |
| HSBC Bank USA | $ 1,079 | $ 1,824 | $ 1,824 |
| Keystone (Pheaa) | $ 1,148,081 | $ 1,052,911 | $ 1,148,081 |
| Maine Education Services (f/k/a MELA) | $ 6,466 | $ - | $ 6,466 |
| Manufacturers and Traders Trust Company | $ 98,304 | $ 117,110 | $ 117,110 |
| Members 1st Federal Credit Union | $ 134,120 | $ 166,089 | $ 166,089 |
| National City Bank | $ 101,766 | $ 256,320 | $ 256,320 |
| Nellie Mae Education Foundation | $ 191,419 | $ 193,249 | $ 193,249 |
| NelNet, Inc. | See CHELA Claim | See CHELA Claim | See CHELA Claim |
| Penn Security Bank and Trust | $ 171,099 | $ 212,035 | $ 212,035 |
| PNC Bank, N.A. | $ 235,207 | $ 289,677 | $ 289,677 |
| RBS Citizens, N.A. | $ 12,480,953 | $ 14,664,444 | $ 14,664,444 |
| Rhode Island Student Loan Authority | $ 167 | $ - | $ 167 |
| Richland State Bank | $ 3,463 | $ 2,471 | $ 3,463 |
| Sallie Mae ECFC | $ 490,918 | $ 477,360 | $ 490,918 |
| Sallie Mae Academic Management Services | $ 348,074 | $ 338,461 | $ 348,074 |
| Southwest Student Services Corp. | $ - | $ - | $ - |
| Star Bank | $ 1,375,226 | $ 1,851,476 | $ 1,851,476 |
| Student Loan Funding Corp (KnowledgeWorks) | $ 17,630 | $ 43,352 | $ 43,352 |
| TFSI | $ 80,067 | $ 116,805 | $ 116,805 |
| Wachovia Bank of Delaware, N.A. | $ 37,391,156 | $ 48,849,269 | $ 48,849,269 |
| Zions First National Bank | $ 714 | $ 750 | $ 750 |

(1) Base Case is provided for illustrative purposes. The Base Case Claim amounts were determined in accordance with the Debtor Base Case methodology described in the Disclosure Statement. If any Make and Hold Lender rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claim for such Make and Hold Lender determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case.

(2) The Decoder Case Claim amounts were determined in accordance with the Decoder methodology described in the Plan Supplement. Decoder Case Claim reflects Allowed General Unsecured Claim for Accepting Make and Hold Lenders.

(3) Greater of Base Case and Decoder Claim

20

A Make and Hold Lender that rejects the Plan will litigate the Allowed amount of its Claim (if any) in the Bankruptcy Court after entry of the Confirmation Order. Such Make and Hold Lender will receive the General Unsecured Claim Distribution based on the Allowed amount of its unsecured Claim as set by the Bankruptcy Court in a Final Order.

(2)    Other General Unsecured Creditors

The third category of holders of General Unsecured Claims consist of holders of Other General Unsecured Claims, which includes the Allowed Deficiency Claims of Make and Wait Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), KeyCorp Trusts and Securitization Trusts. Such creditors will receive the General Unsecured Claim Distribution.

The fourth category of holders of General Unsecured Claims consist of Claims of trade creditors, parties to rejected executory contracts and other miscellaneous Creditors. Such creditors holding Allowed Claims will receive the General Unsecured Claim Distribution.

(3)    Distribution to General Unsecured Creditors

The General Unsecured Claim Distribution consists of a Pro Rata share of the beneficial interests in the Plan Trust. The Plan Trust will be funded with the Plan Trust Assets, as described in further detail below. The Plan Proponents expect that the General Unsecured Claim Distribution will result in a recovery of approximately 40% to 60% to holders of Allowed General Unsecured Claims. No holder of an Allowed General Unsecured Claim will be able to collect on its Claim other than from the Plan Trust, pursuant to the Plan.

4.    **Key Components of the Plan**

The Plan, if accepted by the various classes (and subclasses) will resolve certain pending litigation against the Securitization Trusts as well as establish a methodology regarding the valuation of contingent guaranty claims. Below is a description of the Trust Adversary Proceeding and reasons why the settlement is in the best interest of the Debtor, its estate and its creditors. This section also describes the competing valuation methodologies, as well as the "Most Favored Nations" provision contained in the Plan.

a)    *The Trust Adversary Proceeding*

On January 30, 2009, the Creditors' Committee, on behalf of itself and derivatively on behalf of the Debtor and the bankruptcy estate, commenced an adversary proceeding against the aforementioned 17 Trusts (Adversary No. 09-01040). The named defendants include the 17 Trusts, Wilmington Trust Company, as owner-trustee, U.S. Bank National Association, as indenture trustee, U.S. Bank National Association as custodian and First Marblehead Data Services, Inc., as Administrator. The Trusts Adversary Proceeding challenges the Trusts' asserted liens with respect to two broad categories of assets.

(1)    Prepetition Defaulted Loans. One category encompasses the so-called "prepetition defaulted loans". These would be the defaulted loans purchased by TERI from the Trusts prior to the Commencement Date using money in the

21

Pledged Accounts and which TERI still owned as of the Commencement Date.[10]   The assets under this category include the defaulted loans themselves, the agreements evidencing the student loan borrowers' indebtedness, the money paid and to be paid by the borrowers on account of the loans and the proceeds from the resale of such loans back to the Trusts when they become "rehabilitated". Money paid by the student loan borrowers and cash proceeds from the resale of such loans are referred to as "Recoveries" in the governing contract documents.  As of the Commencement Date, these prepetition defaulted loans (cumulatively for all of the Securitization Trusts) had an aggregate face value of approximately $322 million.  The Plan Proponents estimate that the present value of the prepetition defaulted loans (net of costs of collection) is $144 million.

(2)   <u>Postpetition Defaulted Loans</u>.   The second category encompasses the so-called "postpetition defaulted loans." These are defaulted loans purchased by TERI from the Trusts postpetition using money in the Pledged Accounts pursuant to an order entered by the Court on June 23, 2008. Similar to the prepetition defaulted loans, the postpetition defaulted loans include the loans themselves, the agreement evidencing the borrowers' indebtedness, and the so-called "Recoveries" (as defined in the governing contract documents).   As of the time the Trusts stopped selling defaulted loans to the Debtor (in or around January, 2009), the postpetition defaulted loans owned by TERI had an aggregate face value of approximately $230 million, with an estimated present value of $92 million.

*Nature of Underlying Dispute*.

(1)   <u>Position of the Creditors Committee</u>.   The Creditors' Committee contends that the Trusts have no valid lien on any of the assets in either the prepetition or postpetition category.   More specifically, the Creditors' Committee contends the applicable Deposit and Security Agreements expressly disclaim the grant of a security interest in the defaulted loans.  The Deposit and Security Agreements do

---

[10]   The issue of whether the loans were "purchased" by TERI or "transferred" to TERI may be a litigated issue in the Trust Adversary Proceeding.  Nothing in this Disclosure Statement shall affect the rights of the defendants to the Trust Adversary Proceeding to contest the Plan Proponents' assertion that TERI acquired title to defaulted loans sold or transferred to the Debtor or its agent as a result of such sale or transfer.

LIBC/3667825.11

purport to grant the Trusts liens on the Recoveries. The Creditors' Committee contends, however, that the Trusts failed to properly perfect their liens due to the omission in the financing statements of reference to Recoveries before they are deposited in a Pledged Account. In addition, the Creditors' Committee contends that Recoveries are after-acquired property that are excluded from the Trusts' liens pursuant to Section 552(a) of the Bankruptcy Code. Because Recoveries are not "proceeds" of anything the Trusts had a security interest in as of the Commencement Date, the Creditors' Committee contends Recoveries do not fall within the Section 552(b) exception to the general exclusion of after-acquired property. Accordingly, even if the Trusts' purported security interests in Recoveries were properly perfected, the Recoveries are excluded as after-acquired property.

(2)    <u>Position of Trusts</u>. The Trusts contend that the defaulted loans are not property of the estate, that TERI does not own the defaulted loans but holds them "for collection purposes only." If TERI does own the defaulted loans, the Trusts contend that they have a security interest in the defaulted loans, or at least in the Recoveries, and that such interests have been duly perfected by filing financing statements. If there is a mistake in the description of the collateral in the financing statements, the Trusts contend such mistake is not fatal because the financing statements should not be read so literally as to exclude Recoveries not yet deposited in a Pledged Account. The Trusts also contend that they are perfected without the financing statements by the so-called "automatic perfection" rules of the Uniform Commercial Code, Art. 9-309(2). Further, the Trusts contend that Recoveries are proceeds of defaulted loans, or at least proceeds of "the right to receive Recoveries" which the Trusts contend they had a security interest in as of the Commencement Date. Therefore, at least with respect to the prepetition defaulted loans, the Trusts contend that the Recoveries fall within the Section 552(b) exception to the general rule of Section 552(a) excluding after-acquired property. The Trusts also contend that "post-petition loans were perfected pursuant to the Trust Order and that the Trusts have an administrative claim for violation of the Trusts Order."

23

*Status of Adversary Proceeding*.  The Trusts and other defendants
filed motions to dismiss on certain procedural grounds and
objected to the standing of the Creditors' Committee.  On
September 29, 2009, a hearing was held to consider the Motions to
Dismiss filed by the various defendants.  The Bankruptcy Court
denied the Motions to Dismiss.  The issue on whether the
Creditors' Committee has standing to bring the Adversary
Proceeding was appealed to the Bankruptcy Appellate Panel by the
Trusts and other defendants to the Trust Adversary Proceeding.
The Bankruptcy Appellate Panel affirmed the Bankruptcy's
Court's Order denying the Motions to Dismiss.  There has been no
formal discovery or other formal briefing of the merits.  The Trusts
and other defendants filed answers to the Trust Adversary
Proceeding complaint on October 19, 2009.

*Valuation of Adversary Proceeding*.  The Plan Proponents have
undertaken a valuation of the claims asserted in the Trusts
Adversary Proceeding.  As noted above, the Plan Proponents
estimate that the postpetition defaulted loans have a present value
of $92 million and the prepetition defaulted loans have an
estimated present value of $144 million.  If the Creditors'
Committee were to prevail, $236 million would be added to the
estate.  Pursuant to the Decoder, most of the Trusts are
undersecured,  As a result, in the event the Trusts lost the
Adversary Proceeding, there would be an increase in the
Securitization Trusts' Deficiency Claims of an amount equal to the
$236 million value.  Consequently, a substantial portion of the
$236 million that might be won in the litigation, and other assets
otherwise available to pay general unsecured claims, will be paid
over to the Trusts in the form of a dividend on account of their
increased general unsecured claims.  Viewing the Trusts in the
aggregate, the "true" value of winning the litigation to the
non-Trust general unsecured creditors, on behalf of whom the
litigation is brought, is the amount by which the estate would be
enhanced for the benefit of such creditors – that is – the additional
present value dollars available to pay to non-Trust creditors on
account of their general unsecured claims.  This value is estimated
based upon the following assumptions: (i) all guaranty claims are
determined according to the so-called Decoder and allowed trade
claims do not exceed $40 million; (ii) the present value of cash
proceeds available for distribution to general unsecured creditors
(without regard to the Trusts' disputed Collateral) is approximately
$88 million; and (iii) the defaulted loans at issue have the values
ascribed above.  From these assumptions, the Plan Proponents
have calculated that the present value to the Non-Securitization
Trust General Unsecured Creditors of winning the dispute over the

24

postpetition defaulted loans is approximately $22 million, and the incremental present value of winning the prepetition defaulted loan dispute is approximately $20 million. Thus, the total present value of the Trusts Adversary Proceeding to the portion of the estate represented by the Non-Securitization Trust General Unsecured Creditors is approximately $42 million.

*Economics of the Securitization Trust Settlement.* If one assumes, among other things, a distribution of 50%, the Securitization Trust Settlement produces the economic equivalent of the estate winning the postpetition lien dispute and splitting 50/50 the prepetition lien dispute. More specifically, the estate retains (i) 100% of the postpetition defaulted loans and Recoveries thereon free and clear of the liens and other claims of the Trusts, plus (ii) the economic equivalent of half the value of winning the dispute over the prepetition defaulted loans, or $10 million (based on assumptions regarding value). The former is accomplished by a simple declaration of the ownership status of the defaulted loans purchased from such Trust since the Commencement Date (*i.e.*, the Plan Trust will own the postpetition defaulted loans and Recoveries in respect thereof free of the liens of the Trusts). The latter has been achieved by reducing the Allowed Deficiency Claims of each of the Securitization Trusts by 36.5% of the net present value of the prepetition defaulted loans applicable to such Trust. The prepetition defaulted loans will be returned to the Trusts free of the claims of TERI and the estate in exchange for reduction in the Allowed General Unsecured Claims of the Trusts. The "Securitization Trust Settlement Claim" is shown on Schedule B to the Plan.

*Position of the Debtor.* The Debtor believes the proposed Securitization Trust Settlement is fair and reasonable and in the best interest of its estate. The Debtor believes that Securitization Trusts should accept the settlement for several reasons, including that the Securitization Trust Settlement: (1) provides for the release to each Securitization Trust the Securitization Trust's Collateral Account (subject to transfer of certain amounts to the Plan Trustee from the Collateral Account for NCSLT 2007-3, NCSLT 2007-4, NCSLT 2001-CP1 and NCSLT 2002-CP1), (2) returns to the Securitization Trusts recoveries and the rights to recovery in respect of loans that defaulted and were purchased by or on behalf of the Debtor pre-petition, (3) provides the opportunity for each Securitization Trusts to use Recoveries from pre-petition defaulted loans to pay for future defaulted loans and (4) will save a significant amount in cost, expense and delay by avoiding having the Trust Adversary Proceeding decided on the

LIBC/3667825.11

merits.  Moreover, by accepting the Securitization Trust Settlement and, thereby the "Decoder" to determine the amount of such Securitization Trust's Claim, each Trust and the Debtor's estate will avoid substantial litigation cost and delay regarding the appropriate methodology that should be used to determine the guaranty claims of the Securitization Trusts.  These costs include costs of the estate to prosecute the Trust Adversary Proceeding, since the costs of the estate's professionals including the Creditors' Committee professionals are borne by the estate.

b)      *Determination of Contingent Guaranty Claims*

Because most of the claims asserted against the Debtor are contingent obligations that are not easily valued or estimated, the Debtor and the Creditor's Committee have spent a considerable amount of time determining how to value the Debtor's Contingent Guaranty Claims.  Rather than engaging in a lengthy and costly estimation process, the Plan Proponents have elected to use the "Decoder" as the basis for estimating Guaranty Claims.  While the Debtor may not necessarily agree with the Claim amounts that result from the Decoder it is willing to use it to form the basis of a global compromise and settlement with its Creditors.  As a result, the proposed settlement for the Make and Wait Lenders, Make and Hold Lenders, Securitization Trusts, KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trusts use the "Decoder" to determine claims.  However, pursuant to the terms of the Plan, if a Creditor does not accept the settlement, the Plan Trustee has the right to assert the Base Case methodology or such other methodology as the Plan Trustee deems appropriate.  If the Debtor's Base Case were adopted, as a general matter, claims of Make and Wait Lenders, Make and Hold Lenders, Securitization Trusts, KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trusts would be lower.   The following is a description of the "Decoder" developed by the Creditors' Committee as well as the Debtor's Base Case.

(1)      The Decoder

In order to determine the claims of the Securitization Trusts, Make and Wait Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), KeyCorp Trusts and Make & Hold Lenders (collectively the "Creditors"), a claims estimation methodology (the "Decoder") was developed by the Creditors' Committee.  The Decoder was designed to take into account key aspects of the Creditors' student loan portfolios such as age, portfolio composition and actual default and recovery experience on the loans.

The Decoder uses the Commencement Date (or April 7, 2008) as the claims estimation date and adjusts for actual results through December 31, 2008.  Claims are calculated using loan origination amounts and the anticipated repayment dates.

In order to refine the predicted defaults of the Creditors' portfolios, the portfolios are divided into a matrix of seventy three (73) composition categories within two (2) origination channels – School-Based-Channel ("SBC") loans and Direct-to-Consumer ("DTC") loans.  Within each origination channel, the loans are divided into sub-groups of credit types such as Credit Worthy Co-signer ("CWC"), Credit Worthy Student ("CWS"), Credit Ready ("CR"), and

26

Pre-College student loans made to parents ("K-12"). The sub-groups are further subdivided into nine (9) credit tiers based on FICO scores.

Cumulative default rates ("CDR") are calculated for each of the 73 categories of loans within each origination channel. Vintage default reports, which show actual default experience by vintage, for each of the 73 categories of loans were analyzed and used as a basis for the CDRs calculated for each loan category. The CDRs were derived using a twelve year default timing curve, which is based upon the expected rate at which loans default over time. The default timing curve assumes that the maximum CDR is experienced by the twelfth (12) year of repayment for a student loan.

The Decoder provides for a net recovery rate on defaulted loans of 48%, which reflects both cash recoveries and rehab recoveries. These recoveries are assumed to be realized over ten (10) years commencing on the default date. Estimated annual recovery amounts for defaulted loans after the Claims Estimation Date are assumed over ten (10) years commencing on the first month in which there is an estimated default amount.

The Decoder provides for adjustments to the calculated claims. Adjustments include: contractual obligations for each lender; the cost of collections for each lender to collect recoveries on defaulted loans; and actual results through December 31, 2008. Based on the loan documentation for each lender, certain unpaid fees due to TERI ("Fees Receivable") will be used to offset the net present value of future defaults and recoveries. The following four (4) types of fees are considered: Fees due at Securitization; Basis Point Fees; Supplemental Fees and Origination Fees.

For the purposes of calculating the present value of future cash, a 5% discount rate ("Discount Rate") is used. For the purposes of calculating the annual interest income on segregated reserve balance, a 2.5% interest income rate ("Interest Income Rate") is used until the balance is depleted by defaults.

A memorandum describing the methodology of the Decoder in greater detail is attached as Exhibit B.

(2)      The Debtor's Base Case

The value of each lender's contingent claim based on the Debtor's guaranty depends in large part on the assumed default rate for student loans in the relevant portfolio and the timing of the defaults over the life of the portfolio. Given that it is impossible to know what will happen in the future, such default rates and timing curves can only be estimated based on historical information.

Historically, the Debtor has largely relied upon its database of private student loans to estimate future default rates. The Debtor's database includes records for over 2 million loans in excess of $20 billion which the Debtor has guaranteed. The database includes historical information dating back over 20 years. The database and historical experience related to default and recovery timing were the foundation for developing the "Base Case".

27

The current economic environment provides a basis to argue for modifications to the default rate and timing assumptions used in the Debtor's estimation. However, no one can accurately determine the length of the current economic downturn, its impact on defaults for a particular FICO score or type of student loan originated, or where default rates will settle once the recession is over. Using historical data to determine default rates and timing of defaults is appropriate, especially since the Debtor's data takes into account previous economic recessions.

The methodology used to calculate the Debtor's Base Case relies upon historical experience. Each lender's portfolio was segmented by anticipated year in which payment on the loan commences ("repay year"), channel (school certified or direct to consumer), FICO[11] score ranges and credit type. Cash flows based on projected default and recovery rates are spread over a timing curve beginning in the anticipated repay year. Certain adjustments are made to account for fraud or deferred loans, which have the effect of bringing a small portion of defaults earlier in the life of the loan. The net cash flow for each period is calculated by taking the difference between default and recovery cash flows. These cash flows plus the interest on reserve balances, if applicable, are discounted to calculate a Net Present Value ("NPV").

The Debtor's Base Case methodology then captures actual experience through December 31, 2008 by factoring, if applicable, the reserve balance as of December 31, 2008 and the NPV of certain adjustments for: net fees receivable, liquidated claims through December 31, 2008, variance in recoveries projected vs. recoveries received through December 31, 2008 and actual defaults vs. projected defaults through December 31, 2008 including any recovery adjustments to account for the differences between projected and actual defaults. The Debtor believes this methodology offers the best combination of projecting claims based on historical data, historical trends and capturing actual performance through the latest year. Contingent claims across all classes were calculated using the same methodology.

c)    *Most Favored Nations Provision*

The Plan contemplates the creation and establishment of a "most favored nations" provision in the event that the holder of a Make and Wait Claim, Make and Hold Claim, Securitization Trust Claim, KeyBank (other than in its capacity as a Make and Wait Lender), KeyCorp Trust or other Trust Claim elects to reject the Plan's proposed compromise and litigate the amount of its Claim (a "Litigating Creditor") and pursuant to a Final Order of the Bankruptcy Claim, such Litigating Creditor's Allowed Claim is determined to be at least 10% greater than the amount of such Litigating Creditor's Claim as determined pursuant to the Decoder.

In the event that a Litigating Creditor obtains an Order of the Bankruptcy Court allowing such Creditor's Deficiency Claim in an amount at least 10% greater than the amount of such Deficiency Claim as determined by the Decoder (and set forth on the applicable schedule of the Plan), the Plan Trustee will be obligated to re-calculate the amount the Guaranty Claims of the Make and Wait Lenders, KeyBank (other than in its capacity as a Make and Wait Lender, KeyCorp Trusts, Make and Hold Lenders (including Other Trusts) and each Securitization Trust

---

[11]    FICO is a publicly-traded corporation that created the most widely used credit score model in the United States, The FICO score is calculated statistically with information from the consumer's credit files.

using the findings of the Bankruptcy Court regarding the proper calculation of such Claims (the "Revised Calculation"). Pursuant to the terms of the Plan, the Plan Trustee may seek further or other orders of the Bankruptcy Court as the Plan Trustee desires to facilitate the proper determination of the Revised Calculation with respect to any and all claims. To the extent that there are multiple evidentiary hearings to determine the amount of an Allowed Deficiency Claim, the Revised Calculation shall be completed using the Final Order of the Bankruptcy Court that would yield the greatest claim amounts.

However, notwithstanding anything contrary contained in the Plan, no Allowed Claim shall be reduced as a result of any Revised Calculation and the Plan Trustee will not implement any Revised Calculation without prior approval of the Bankruptcy Court following notice to all Creditors and an opportunity for Creditors to be heard.[12]

The Plan Proponents believe that the Most Favored Nations provision is the most fair mechanism by which to maintain proportionality among similarly situated creditors. Moreover, any Revised Calculation remains subject to Bankruptcy Court supervision to ensure that the manner in which the Revised Calculation is being imposed is fair to the general unsecured creditors, as a whole.

### d)   *Reorganized TERI*

On and after the Effective Date, Reorganized TERI will retain all rights, title, and interest in the Reorganized TERI Assets. The Plan Proponents believe that Reorganized TERI's retention of such assets will allow for the reorganization and successful emergence of the Debtor from chapter 11. Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws that will be included in the Plan Supplement. In addition, the members of the Initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement. On and after the Effective Date, Reorganized TERI shall remain a Massachusetts not-for-profit corporation.

### e)   *Reorganized TERI Assets.*

The Reorganized TERI Assets are: (a) the Retained Cash; (b) the Restricted Charitable Funds; (c) the Restricted Grant Funds; (d) the right to receive payment of the TERI Net Recovery; (e) the Retained Contracts; (f) Reorganized TERI's right under the Collection Contract; (g) the Remaining Plan Trust Assets, if any; (h) the Residuals; and (i) all furniture, fixtures, equipment, Data, and all other assets necessary to support Reorganized TERI's business, all as determined substantially consistently with the Pro Forma Statement of Reorganized TERI assets to be included in the Plan Supplement. The Plan Supplement will contain a Pro Forma statement of Reorganized TERI Assets.

---

[12]   Further, for the avoidance of doubt, only Claims of entities holding guaranty Claims would be recalculated.

29

f)    *Retained Cash*

Reorganized TERI shall be permitted to retain $3,400,000 of Unrestricted Cash, subject to reduction as set forth in the Plan.

g)    *Restricted Charitable Funds*

Restricted Charitable Funds means Cash or other assets held by the Debtor pursuant to a charitable deed of gift, the use of which is restricted by applicable state law or other non-bankruptcy law to the furtherance of a specific purpose or purposes in accordance with the express or implied intent of the party that transferred or donated such assets to the Debtor. As described in Section II.A.4, the Debtor currently holds $14,000,000 in principal amount of Restricted Charitable Funds that its asserts can only be used for limited purposes. The restriction on these funds is more fully described below. As part of a compromise and settlement between the Creditors' Committee and the Debtor, the parties have agreed to a Restricted Charitable Gift Funds Carve-Out of $6,000,000. This Restricted Charitable Gift Funds Carve-Out will be transferred to the Plan Trustee on the Effective Date.

h)    *Restricted Grant Funds*

Restricted Grant Funds means Cash or other assets held by the Debtor pursuant to private or government grants, the use of which is restricted to specific activities by the terms of the grants. The Debtor holds such funds from time to time in an amount not more than approximately $1 million. The Plan Supplement will reflect the amount of Restricted Grant Funds held by the Debtor at the time of the filing of the Plan Supplement.

i)    *TERI Net Recovery*

Pursuant to the Plan, Reorganized TERI will enter into the Collection Contract with the Plan Trustee, pursuant to which Reorganized TERI will be entitled to collect the proceeds of certain TERI Owned Loans previously owned by the Debtor but which will be transferred to the Plan Trustee for the benefit of unsecured creditors. Reorganized TERI will be entitled to be paid a certain amount of such proceeds, calculated as follows for a period of two years beginning on the Effective Date:

(a)    For the first year of the Term, the first $1,000,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the first year of the Term, the TERI First Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds in excess of $1 million, but the TERI First Year Share will not exceed $1,000,000. For purposes of illustration only, if TERI collects $6,000,000 in net collections in the first year of the TERM, then the First Year Eligible Collections shall equal $5,000,000, and the TERI Share in the first year of the TERM shall be $1,000,000 ($6m-$1m = $5m, 20% x $5m = $1m).

(b)    For the second year of the Term, the first $1,000,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's

30

administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets.   For the Second Year of the Term, The TERI Second Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1 million but the TERI Share will not exceed $1,000,000.   For purposes of illustration only, if TERI collects $6,000,000 in net collections in the second year of the Term, then the Second Year Eligible Collections shall equal $5,000,000, and the TERI Share in the second year of the TERM shall be $1,000,000 ($6m-$1m = $5m, 20% x $5m = $1m).

(c)      If, and only if, as of the end of the Term: (a) the Collection Contract has not been terminated for cause; (b) the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share is less than $2,000,000; (c) the sum of (i) the First Year Eligible Collections plus (ii) the Second Year Eligible Collections is at least $10,000,000; and (d) the Plan Trust has received $2,000,000 of TERI Loan Net Proceeds Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets during the Term, Reorganized TERI shall be entitled to the Additional Share.  The Additional Share is the amount by which $2,000,000 exceeds the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share.

j)      *Retained Contracts*

Retained Contracts consist of any executory contracts or unexpired leases entered into by the Debtor prior to the Commencement Date that are assumed by the Debtor pursuant to section 365 of the Bankruptcy Code, or that are not rejected by the Debtor pursuant to section 365 of the Bankruptcy Code and therefore "ride through," as well as any contracts entered into by the Debtor during the pendency of this Chapter 11 Case.  Retained Contracts will include, any retirement, pension and similar plans, and will be listed in the Plan Supplement.

k)      *Collection Contract*

As noted in section (i) above, the Plan Trustee shall enter into a Collection Contract with Reorganized TERI, pursuant to which contract Reorganized TERI will be entitled to collect TERI Loan Proceeds.  The form of the Collection Contract will be set forth in the Plan Supplement, and will include certain customary and reasonable fees payable to Reorganized TERI for its collection services.

l)      *Remaining Plan Trust Assets*

Reorganized TERI shall be entitled to payment of any Plan Trust Assets remaining in the Plan Trust in the event that the Plan Trustee has distributed Plan Trust Assets to the holders of Allowed General Unsecured Claims equal to 100% of the aggregate amount of all Allowed General Unsecured Claims, plus any statutory interest payable to the holders of Allowed General Unsecured Claims necessary to pay such Claims "in full."

31

m)    *The Residuals*

TERI owns approximately 25% of the equity interest in the "National Collegiate Student Loan Trusts". These equity interests are called "Residuals." The value of the Residuals is uncertain. Pursuant to the terms of the Plan, Reorganized TERI shall retain ownership of the Residuals but following the Effective Date, the Plan Trustee and TERI shall attempt in good faith to reach an agreement regarding the proper treatment of the Residuals, in a manner that will not impose obligations upon the Plan Trustee or the beneficiaries of the Plan Trust to recognize and/or pay taxes relating to Reorganized TERI's ownership of the Residuals. The Plan provides that nothing in the Plan shall obligate the Plan Trustee, the Plan Trust or the beneficiaries of the Plan Trust to assume any obligation or liability with respect to federal or state taxes in any way attributable or arising as a result of ownership of the Residual, or payable on account of income or accretion of value earned by, allocated to or attributable to the owner(s) of the Residual.

n)    *Other Assets*

Reorganized TERI will be entitled to retain all furniture, fixtures, equipment, Data, and all other assets necessary to support the Debtor's business. Such assets shall be detailed in the Plan Supplement.

The Debtor has prepared the Reorganized TERI Financial Statements, attached as Exhibit D, in support of its assertion that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized TERI. (See Section V.C.2 of the Disclosure Statement).

## B.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of Claims in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a

32

kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

### C.    SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN

The Plan Proponents anticipate that various factors may influence the amounts of each Class of Claims. Based upon (1) a review of the Claims Register maintained by the Debtor's claims agent, (2) an estimate of guaranty claims using the Committee's Decoder, and (c) a review of the Debtor's books and records, the Plan Proponents estimate that total amounts related to Administrative and Priority Claims may range from approximately $4 to $6 million, Secured Claims may range from approximately $350 to $400 million, General Unsecured Claims may range from approximately $300 million to $375 million and Convenience Class Claims may range from approximately $25,000 to $150,000.

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.**

| Class | Type of Claim | Treatment of Claim | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Paid in full in Cash | 100% |

LIBC/3667825.11

| 2a – 2p | Secured Claims of Make and Wait Lenders | Each holder of an Allowed Secured Claim, classified in separate subclasses within Class 2 (Classes 2a through 2p) will receive a transfer of the Collateral Account funds securing such Allowed Secured Claim, net of any Make and Wait Lender Decoder Equity.<br><br>(If the holder of an Allowed Make and Wait Claim is also entitled to a Deficiency Claim, such Deficiency Claim will be treated as a General Unsecured Claim).<br><br>The Allowed Secured Claim and Deficiency Claim of any Make and Wait Lender that accepts the Plan will be based on the amounts listed on <u>Schedule A</u> to the Plan.  Any Make and Wait Lender that rejects the Plan, will litigate the Allowance and amount of its Claim in Bankruptcy Court after the Effective Date. | 100% of Allowed Secured Claim |
| 3a – 3l | Secured Claims of Securitization Trusts<br><br>(other than NCSLT Master Trust, NCSLT 2007-3, NCSLT 2007-4, NCSLT 2001-CP1, NCSLT 2002-CP1) | If the Plan is confirmed and the Securitization Trust Settlement is approved, Securitization Trust Claims classified in separate subclasses within Class 3 (Classes 3a – 3l) will receive (1) a transfer of the Securitization Trust Collateral and (2) a Securitization Trust Settlement Claim (which will be treated as a General Unsecured Claim) which represents a reduced Deficiency Claim as part of the Securitization Trust Settlement. | 100% of Allowed Secured Claim |

LIBC/3667825.11

| 3m – 3q | Secured Claims of Securitization Trusts  NCSLT Master Trust NCSLT 2007-3 NCSLT 2007-4 NCSLT 2001-CP1 NCSLT 2002-CP1 | If the Plan is confirmed and the Securitization Trust Settlement is approved, Securitization Trust Claims classified in separate subclasses within Class 3 (Classes 3m – 3q) will receive (1) a transfer of the Securitization Trust Collateral, except that NCSLT 2007-3 shall be required to remit $1,600,000 of the balance to the Plan Trustee, NCSLT 2007-4 shall be required to remit $700,000 of the balance to the Plan Trustee, NCSLT 2001-CP1 shall be required to remit $405, and NCSLT 2002-CP1 shall be required to remit $752,347 to the Plan Trustee and (2) the NCSLT Master Trust will receive a Securitization Trust Settlement Claim (which will be treated as a General Unsecured Claim), which represents a reduced Deficiency Claim as part of the Securitization Trust Settlement.  NCSLT 2007-3, NCSLT 2007-4, NCSLT 2001-CP1 and NCSLT 2002-CP1 shall have no Allowed General Unsecured Claim. | 100% of Allowed Secured Claim |
| 4a-k | Secured Claims of KeyBank (other than in its capacity as a Make and Wait Lender) and Key Corp Student Loan Trusts | Each holder of an Allowed Key Corp Trust Claim and KeyBank (other than in its capacity as Make and Wait Lender), classified in separate subclasses within Class 4 (Classes 4a through 4k) will receive their allocable portion of the Victory Fund Account as of the Commencement Date securing such Allowed Secured Claim.  (Each holder of an Allowed Key Corp Trust and KeyBank (other than in its capacity as a Make and Wait Lender) will also be entitled to a Deficiency Claim, which Deficiency Claim will be treated as a General Unsecured Claim).  The Allowed Secured Claim (i.e., allocable portion of the Victory Fund Account as of the Commencement Date) and Deficiency Claim of any KeyCorp Trust that accepts the Plan or of KeyBank (other than in its capacity as a Make and Wait Lender), if it accepts the Plan, will be based on the amounts listed on Schedule C to the Plan. Any KeyCorp Trust that rejects the Plan, or KeyBank (other than in its capacity as a Make and Wait Lender), if it rejects the Plan, will litigate the Allowance and amount of its Claim | 100% Allowed Secured Claim |

| | | in the Bankruptcy Court after the Effective Date. | |
|---|---|---|---|
| 5 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim will receive the General Unsecured Claim Distribution. The amount of the General Unsecured Claim of a Make and Hold Lender that accepts the Plan will be based on the settlement amount listed on Schedule D to the Plan.  Any Make an Hold Lender that rejects the Plan will litigate the Allowance and amount of its Claim in the Bankruptcy Court after the entry of the Confirmation Order. Includes:  (i) Make and Hold Lender's Claims, (ii) Other General Unsecured Creditors and Deficiency Claims. | 40% to 60% (estimate only) |
| 6 | Convenience Claims | Paid in full in Cash | 100% |

## D.    PURPOSE, LIMITATIONS, AND STRUCTURE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtor with adequate information to make an informed decision as to whether to accept or reject the Plan.  This Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability by any party, or be admissible in any other case or any bankruptcy or non-bankruptcy proceeding involving the Debtor or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

On _____, 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "Approval Order") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtor's Creditors to make an informed judgment whether to accept or reject the Plan.

36

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A
DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS
OF THE PLAN.

The statements contained in this Disclosure Statement generally are made as of the date
hereof, unless another time is specified, and delivery of this Disclosure Statement after that date
does not mean that the information set forth in this Disclosure Statement remains unchanged
since the date of this Disclosure Statement or the date of the materials relied upon in preparation
of this Disclosure Statement. The Plan Proponents have prepared the information contained in
this Disclosure Statement in good faith, based upon the information available to them. No audit
of the financial information contained in this Disclosure Statement has been conducted.
Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are
forward-looking and contain estimates, assumptions and projections, and there can be no
assurance that these forward-looking statements will turn out to be true.

The description of the Plan contained in this Disclosure Statement is intended as a
summary only and is qualified in its entirety by reference to the Plan itself. If any inconsistency
exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The
Plan is a legally binding arrangement and should be read in its entirety. No one should rely on a
summary of the Plan in determining whether to accept or reject the Plan. Each holder of an
Impaired Claim or entity permitted to vote to accept or reject the Plan should read, consider and
carefully analyze the terms and provisions of the Plan as well as the information contained in this
Disclosure Statement and the other documents provided herewith.

The Disclosure Statement describes:

- background information on the Debtor, its prepetition business and finances, and the
events leading to its Chapter 11 Case (Section II);

- significant developments during this case (Section III);

- the proposed Plan (Section IV);

- the procedures and requirements for confirming the Plan (Section V);

- certain federal income tax consequences of the Plan (Section VI);

- certain risk factors to consider before voting on the Plan (Section VII); and

- the Plan Proponents' recommendation that holders of Impaired Claims vote to accept
the Plan (Section VIII).

In addition, attached as Exhibits A through C to this Disclosure Statement are copies of
the following documents:

| | |
|---|---|
| Exhibit A | Plan |
| Exhibit B | Decoder |
| Exhibit C | Best Interest Test |

37

Exhibit D        Reorganized TERI Financial Statements

All of the exhibits listed should be attached to this Disclosure Statement and should have been served on you with this Disclosure Statement. In addition, there are certain documents and other materials identified in this Disclosure Statement and/or the Plan that are not attached to the Disclosure Statement or the Plan. These documents or other materials will be contained in the Plan Supplement. The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. If any of the exhibits identified above were not attached to the Disclosure Statement served on you, or if you want to obtain a copy of the Plan Supplement, once filed, you may do so by reviewing the website of the Debtor's claims agent (http://chapter11.epiqsystems.com) or by sending a written request to the Plan Proponents at the following addresses:

> Goodwin Procter LLP
> Exchange Place
> 53 State Street
> Boston, MA 02109
> (617) 570-1000
> Attorneys for the Debtor and
> Debtor in Possession
> Attn:   Daniel M. Glosband, Esq.
>        Gina Lynn Martin, Esq.

> Duane Morris LLP
> 470 Atlantic Avenue
> Boston, MA  02110
> (857) 488-4216
> Attorneys to the Creditors' Committee
> Attn:   Jeffrey D. Sternklar

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorneys listed above by mail or by phone.

## E.      VOTING ON THE PLAN

### 1.      Classes Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests that are members of a class that is (a) impaired under section 1124 of the Bankruptcy Code (an "Impaired Class") and (b) not deemed to have rejected a plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject a plan.  Classes of claims or equity interests that are unimpaired under section 1124 of the Bankruptcy Code are deemed to have accepted the plan and are not entitled to vote.  Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under a plan are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the plan.

LIBC/3667825.11

Under the Plan, for purposes of Bankruptcy Code sections 1122 (classification), 1123 (treatment of classes), 1126 (acceptance of a plan), and 1129 (confirmation) Classes 2a–2p are treated as separate Classes, Classes 3a – 3q are treated as separate Classes, Classes 4a-4k are treated as separate Classes, while Class 5 and Class 6 are a single Class. Classes 2a-2p, Class 3a-3q, Classes 4a-4k and Class 5 are each Impaired and, to the extent Claims in those Classes are Allowed, the holders of those Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan. In contrast, Classes 1 and 6 of the Plan are unimpaired. Consequently, holders of Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Court has entered the Order (A) Temporarily Allowing Claims, (B) Establishing Solicitation and Voting Procedures and (C) Approving forms of notices and ballots (the "Solicitation Procedures Order"). Pursuant to the Solicitation Procedures Order, [●], 2010 has been set as the Voting Record Date. That means any entity entitled to vote to accept or reject the Plan must have held a Claim against the Debtor or held a note issued by a Securitization Trust or KeyCorp Trust as of such date. A Ballot which may be used to vote for the acceptance or rejection of the Plan has been sent to all entities that are entitled to vote to accept or reject the Plan with this Disclosure Statement.

If you are a holder of a Claim entitled to vote or believe you have a right to vote on the Plan pursuant to the Solicitation Procedures Order and you did not receive a Ballot with this Disclosure Statement, you received a damaged Ballot or lost your Ballot, or you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Epiq Bankruptcy Solutions, LLC at (646) 282-2500.

### 2.      Voting Instructions

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. Please refer to the Solicitation Procedure Order, which is enclosed with this Disclosure Statement if you are entitled to vote, for more specific instructions on voting on the Plan.

The Debtor, with the approval of the Bankruptcy Court, has engaged Epiq Bankruptcy Solutions, LLC as the Voting Agent to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Voting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file a report on such tabulation (the "Voting Report") as soon as practicable before the Confirmation Hearing.

BALLOTS RECEIVED BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.

TO BE COUNTED, YOUR BALLOT (OR A MASTER BALLOT) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 4:30 P.M., PREVAILING EASTERN TIME, ON _____, 2010 (the "VOTING DEADLINE").

LIBC/3667825.11

EACH HOLDER OF A CLAIM MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTES. BY SIGNING AND RETURNING A BALLOT, EACH ENTITY ENTITLED TO VOTE ON THE PLAN WILL CERTIFY TO THE BANKRUPTCY COURT AND THE PLAN PROPONENTS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

By signing and returning a Ballot, each entity to vote under the Plan will be certifying to the Bankruptcy Court and the Plan Proponents that, among other things,

- the holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has cast the same vote with respect to all Claims in a single Class; and

- no other Ballots with respect to the amount of the Claims have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are thereby revoked.

### 3.    Tabulation of Votes

To ensure that a vote is counted, each entity entitled to vote pursuant to the Solicitation Procedures Order should: (a) complete a Ballot; (b) indicate the holder's decision either to accept or reject the Plan in the boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth above by the Voting Deadline.

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim.

Ballots received after the Voting Deadline may not be counted.  A Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot.  Delivery of a Ballot to the Voting Agent by facsimile, e-mail or any other electronic means will not be accepted.  No Ballot should be sent to the Debtor, the Debtor's agents (other than the Voting Agent), or the Debtor's financial or legal advisors. The Bankruptcy Code requires the Debtor to disseminate additional solicitation materials if the Debtor makes material changes to the terms of the Plan or if the Debtor waives a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Holders must vote all of their Claims within a particular Plan Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the Debtor may, in its

40

discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Plan Proponents nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Plan Proponents will file the Voting Report with the Bankruptcy Court as soon as practicable after the Voting Deadline.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions above or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged.  The Voting Report also shall indicate the Plan Proponents intentions with regard to such Irregular Ballots.

## F.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

### 1.    Confirmation Hearing Date

The Confirmation Hearing will commence on _____, 2010 at _____ prevailing Eastern Time, before the Honorable Henry J. Boroff, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Massachusetts, ___ Floor, Courtroom __, [ADDRESS].  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on all Persons who have requested notice in this Chapter 11 Case, and the Persons who have filed objections to the Plan ("Plan Objections"), without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.

### 2.    Plan Objection Deadline

The Plan Objection Deadline is _____, 2010, at _____ prevailing Eastern Time. All Plan Objections must be filed with the Bankruptcy Court and served on the Plan Proponents and certain other parties in accordance with the Approval Order on or before the Plan Objection Deadline.  Plan Objections or requests for modification of the Plan, if any must:

- be in writing;

- conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

- state the name and address of the objecting Person and the amount and nature of the Claim of such Person;

- state with particularity the basis and nature of the Plan Objection and, if practicable, a proposed modification of the Plan that would resolve such Plan Objection; and

- be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is **actually received** by the Plan Proponents on or prior to Plan Objection Deadline.

The Plan Proponents believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Plan Proponents, and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

## II.    BACKGROUND TO THIS CHAPTER 11 CASE

### A.    THE DEBTOR'S BUSINESS

Founded in 1985, The Education Resources Institute, Inc. is a nonprofit organization incorporated under Massachusetts General Laws, chapter 180, located in Boston, Massachusetts. TERI promotes access to education for students of all ages and incomes with two primary programs. Through its College Access programs, TERI assists low-income, first-generation-to-college and other underserved students in pursuing higher education. TERI is a nationally recognized leader in college access through support and promotion of research-based policies and practices. Locally it provides innovative direct service programs in Massachusetts. Through its loan guarantee programs, TERI has guaranteed more than two million private student loans.

### 1.    College Access Programs

Through a variety of programs and partnerships, TERI works primarily with Boston and Brockton low-income students and adult learners, as well as those who are first in their families to plan to attend college. TERI's delivery model includes multiple middle and high school-based programs and a variety of outreach services.

TERI's school-based programs provide college awareness activities and postsecondary planning assistance for young people from low-income backgrounds in Boston and Brockton public schools. TERI school-based Education Advisors and Coach Mentors organize and lead various activities to increase students' awareness of the importance of postsecondary education in today's economy, the types of postsecondary opportunities available, the steps involved in preparing and applying for college, and financial aid awareness. They also provide one-on-one assistance with the college application and financial aid processes.

TERI's principal College Planning Center is located at the main Boston Public Library in Copley Square, Boston. Satellite Centers are located at four Boston library branches, four

42

Greater Boston community sites and one community site in Brockton. At the College Planning Centers, Education Advisors provide free, individual advice and resources to make planning and paying for college a less intimidating process for students, families and adults.

### 2.    Student Loan Guarantees

Since 1985, TERI has guaranteed over two million loans totaling more than $20 billion. Prior to its Chapter 11 Case, TERI had never defaulted on any guaranteed student loan obligations. TERI's guarantees obligate it to purchase defaulted loans from lenders or securitization trusts. The funds used for loan purchases come from segregated reserve accounts (the Pledged Accounts or Joint Pool Account) or from its general reserves. Prior to 2001, TERI worked directly with banks to process and guarantee private education loans that were originated by the banks as lenders. After a loan application was processed by TERI and the loan was originated by a bank, TERI would receive an origination fee for its services in assisting in the origination of the loan and a loan guarantee fee. Certain of the banks required TERI to segregate a portion of the guarantee fees in an account in the event that the student loan defaulted. TERI was required to purchase the defaulted loan on account of its guarantee and applied such segregated funds to the extent available. Certain other bank lenders did not require that TERI segregate these funds. Guarantee fees for loans made by those banks that did not require segregation were deposited in the Debtor's general operating account.

In the late 1990's, TERI experienced financial difficulties and explored strategic transactions that would strengthen its financial position and enable it to continue to provide loan guarantees and college access services. After evaluating alternatives, the Board of Directors of TERI approved a series of transactions with FMC and certain affiliates of FMC.

In 2001, FMC purchased the loan processing operations of TERI and entered into a series of agreements with TERI to undertake risk management, administrative and support functions as well as origination services and future securitizations of TERI-guaranteed loans. In accordance with the agreements, FMC acted as TERI's exclusive agent in designing loan programs and processing private education loans for various bank lenders throughout the United States. FMC's costs for the origination and other services it provided were reimbursed by TERI to FMC at cost. Although TERI received a loan origination fee in connection with the loans, it was obligated to reimburse FMC for the cost of the services FMC provided relating to loan origination. At the time of rejection of the FMC Contracts, the cost of the origination services exceeds the fees received. Prior to the fall of 2007, TERI was able to cover the shortfall from post-origination revenues, especially those arising from the securitization of loans by FMC.

Generally, FMC structured and administered the securitization of the student loans into Securitization Trusts that were special purpose entities created to hold a pool of student loans. The Securitization Trusts issued bonds collateralized by the student loans. The student loans were then serviced by another entity, such as PHEAA d/b/a American Education Services or Great Lakes Higher Education Corporation. Since 2001, FMC structured and administered approximately 20 securitizations of pooled student loans, where a majority of the underlying loans were guaranteed by TERI.

In connection with the structuring and administration of the securitization transactions by FMC, to secure its guaranty obligations TERI transferred a certain percentage of the fees received in respect of TERI Guaranteed Loans to a segregated Pledged Account that is subject to a deposit and security agreement or similar agreement for the benefit of the Securitization Trust. The amounts that TERI deposits into segregated Pledged Accounts were initially calculated to exceed the estimated amounts of defaulted loans, net of recoveries.

### 3.    Employees

TERI has 63 employees; of these, 37 (30 full-time and 7 part-time) work in College Access. The College Access Committee of the Board has four members and was established in 2003 to focus specifically on and support TERI's college access work. TERI's Local College Access Programs division also has a College Access Advisory Committee, established in 1987, which has 14 members and meets three times a year. The College Access Advisory Committee members represent institutions of higher education, community-based organizations, Boston Public Schools and other organizations that support college access work.

Each member of TERI's senior management has twenty or more years' experience working at some of the largest financial institutions in the country, including Bank of America, Capital One and Nellie Mae. TERI's Board of Directors includes past presidents of large banks as well as a former chancellor and president of a prominent university.

Alan Blair, the Debtor's Director of Collections, has over eight years experience managing the collection of recoveries of defaulted student loans, including four years at FMC as Senior Vice President and 2 years at TERI. He also supervised collections of a hospital for two years.

### 4.    Charitable Gifts and Other Restricted Funds

The Debtor holds three charitable gifts. Each of the three gifts is subject to restrictions on the use of both gift corpus and income. Due to these restrictions, the Debtor believes that none of the gifts are available to satisfy creditor claims in the Debtor's Chapter 11 Case. However, the Creditors' Committee disputes this assertion. Reorganized TERI shall retain the gifts (subject to the Restricted Charitable Gift Carve-Out in compromise of this dispute) pursuant to the terms of the Plan. The three charitable gifts are:

1.    A Deed of Gift dated September 30, 1986 in favor of TERI from Massachusetts Higher Education Assistance Corporation ("MHEAC") of $1,000,000 to create a fund for state wide education counseling services (the "Counseling Gift").

2.    A Deed of Gift dated September 30, 1986 in favor of TERI from MHEAC of $1,000,000 to create a fund for a higher education information center (the "HEIC Gift," and together with the Counseling Gift, the "Small Gifts")

3.    A Deed of Gift dated September 30, 1986 in favor of TERI from MHEAC of $12,000,000 to create a fund for furthering higher education through improvements in the administration of and access to financial aid, as amended by the Further Stipulation to the Deed

44

of Gift dated October 8, 1986 and the Further Stipulation to the Deed of Gift dated December 16, 1986 (the "Financial Aid Gift," and together with the Small Gifts the "Gifts" and each individually a "Gift").

## Financial Aid Gift

On September 30, 1986, TERI and MHEAC agreed to the terms of the Financial Aid Gift by executing a Deed of Gift (the "Financial Aid Deed of Gift"). Pursuant to Section 1 of the Financial Aid Deed of Gift, TERI agreed that it "will not use or apply the [f]und for any purpose other than the furtherance of higher education." TERI also agreed in the Further Stipulation to the Deed of Gift dated October 8, 1986 (the "First Further Stipulation") that:

> "[t]he [f]und shall be used for the purpose of furthering higher education, including without limitation averting loan defaults, promoting awareness of education loan and financing opportunities, professional improvement of financial aid administrators, using technology to streamline loan processing, and assisting educational, or other public service institutions to provide educational training or other developmental programs."

Pursuant to the Further Stipulation to the Deed of Gift dated December 16, 1986 (the "Second Further Stipulation" and together with the First Further Stipulation the "Further Stipulations"), the second section of the Second Further Stipulation provides that the TERI Board will have final approval of all disbursements made from the Gift. The two stipulations are consistent in requiring that TERI comply with the use restrictions in order to use the Financial Aid Gift. Indeed, the description of the restrictions on use is identical in each of the Further Stipulations.

## Counseling Gift

On September 30, 1986, TERI and MHEAC agreed to the terms of the Counseling Gift by executing a Deed of Gift (the "Counseling Deed of Gift"). Pursuant to Section 1 of the Counseling Deed of Gift, TERI agreed that it "will not use or apply the [f]und for any purpose other than the furtherance of higher education." The Counseling Deed of Gift described the Counseling Gift in Section 2 of the Counseling Deed of Gift as:

> "[o]ne million dollars for counseling concerning financial aid and education loan programs to other metropolitan areas or sections of the state of Massachusetts to such centers as may attract corporate, philanthropic or public support on a dollar for dollar matching basis, according to guidelines adopted by the TERI board."

45

**HEIC Gift**

On September 30, 1986, TERI and MHEAC agreed to the terms of the HEIC Gift by executing a Deed of Gift (the "HEIC Deed of Gift"). Pursuant to Section 1 of the HEIC Deed of Gift, TERI agreed that it "will not use or apply the [f]und for any purpose other than the furtherance of higher education." The HEIC Deed of Gift described the HEIC Gift in Section 2 of the HEIC Deed of Gift as:

> "[o]ne million dollars for the Higher Education Information Center for counseling concerning financial aid and education loan programs in the Boston area, to match, on a dollar for dollar basis, those contributions made by colleges and universities each year."

Section 2 of the HEIC Deed of Gift also requires that the interest income from the HEIC Gift be used to support the Higher Education Information Center. Pursuant to Section 4 of the HEIC Deed of Gift, TERI shall maintain the HEIC Gift in a segregated fund on its books and TERI will maintain a fidelity bond with respect to the HEIC Gift. If the Higher Education Information Center is not in existence or does not operate in furtherance of higher education, then the HEIC Gift shall be used for "the furtherance of higher education, or those who aspire to higher education" in accordance with Section 1 of the HEIC Deed of Gift.

The Debtor has not spent the principal of any of the Gifts. The Debtor maintains the HEIC Gift and Counseling Gift in a segregated account in accordance with the terms of each Deed of Gift. Further, while the Financial Aid Gift was not segregated, a review of the Debtor's books and records reveals that the Debtor has not spent the principal of any of the Gifts.

The Debtor believes that pursuant to Massachusetts states law (which determines the Debtor's property rights pursuant to Section 541 of the Bankruptcy Code) and applicable case law, the Restricted Charitable Funds are not available to satisfy creditor claims but rather, pursuant to the terms of their conveyance, must be used for the charitable purpose for which such gift was intended.

The Creditors Committee disagrees with the conclusion reached by the Debtor regarding the Gifts. The Creditors' Committee believes that some portion of the Financial Aid Gift is available for all of the Debtor's creditors. Pursuant to the terms of the Plan, the Debtor and Creditors' Committee have agreed to resolve their dispute regarding the Financial Aid Gift by creating a carve-out. Thus, if the Plan is confirmed and becomes effective, the Debtor will receive the HEIC Gift, the Counseling Gift and the Financial Aid Gift less $6,000,000.

The HEIC Gift and the Counseling Gift will remain in segregated accounts and be used according to their restrictions solely for purposes of furthering higher education. The Financial Aid Gift will be administered in accordance with the Deed of Gift dated September 30, 1996 and Further Stipulations dated October 8, 1986 and December 16, 1986 and its uses will be restricted to purposes of furthering higher education. TERI's Board of Directors has confirmed, and Reorganized TERI's board of directors will confirm, that from and after the Effective Date, the Financial Aid Gift (less the $6,000,000 retained by the Plan Trust), will be used only as permitted by the Deed of Gift and Further Stipulations for paying the costs of, and general

46

overhead expenses reasonably attributable to, Reorganized TERI's "College Access" outreach programs. The Financial Aid Gift retained by Reorganized TERI will not be used in connection with its portfolio management or collection management services.

## B.    SUMMARY OF SIGNIFICANT PREPETITION LIABILITIES

### 1.    Guaranty Obligations

The primary source of TERI's prepetition liabilities involve TERI's activities as a guarantor of student loans. As of the Commencement Date, TERI owed guaranty obligations to: (a) Securitization Trusts; (b) Make and Wait Lenders, which own student loans that were to be sold to and securitized by FMC, but which instead have been retained by the Make and Wait Lenders due to the inability of FMC to purchase and securitize such loans; (c) KeyCorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) and (d) Make and Hold Lenders, which own student loans and which intended that the loans would be carried on their own balance sheets. The Securitization Trusts, KeyCorp Trusts, KeyBank (other than in its capacity as Make and Wait Lender) and Make and Wait Lenders are secured by Pledged Accounts. Certain of the Make and Wait Lenders have a Joint Pool Account rather than an account in their own name, in which such Make and Wait Lenders have a *pari passu* security interest in the Joint Pool Account.

TERI's obligation to purchase any student loan is contingent upon, among other things, the occurrence of a default by the borrower of such student loan. As of the Commencement Date, the principal amount of TERI Guaranteed Loans was approximately $12 billion. However, because not all of the borrowers of TERI Guaranteed Loans will default on their obligations, the actual amount of TERI's liability to student loan lenders, Securitization Trusts or KeyCorp Trusts must be estimated using, among other factors, forecasts of future default rates. In determining the appropriate estimation model, the Debtor developed the Base Case, and various "Stress Cases" (which hypothesize a greater occurrence of defaults) and the Creditor's Committee developed its Decoder. Although the Debtor believes its Base Case accurately predicts the amount of such lenders' claims it has agreed to use the Decoder as a compromise and settlement. The Debtor believes that the settlement amounts offered reflect projected default rates that are higher than default rates that will actually occur, and thus overstate the amount of the Allowed Claim owed to Creditors.

### 2.    The Debtor's Pension Plan

The Debtor maintains a defined benefit pension plan (the "Pension Plan") for its employees. The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1301 et seq. An employee begins to participate in the Pension Plan on the January 1 or July 1 coincident with or next following the first date that he has both (i) attained age 21 and (ii) completed at least one year of service (as defined in the Pension Plan). The Pension Plan provides benefits to vested participants calculated under formulae in the plan which take into account the participant's credited service, compensation over specified periods, age at benefit commencement, and form of payment. A participant becomes vested in his Pension Plan benefit upon completion of five years of service

or employment at or after normal retirement age (age 65). In certain cases, the Pension Plan provides benefits to a participant's beneficiary upon the participant's death.

TERI has adopted an amendment to the Pension Plan to "freeze" the Pension Plan, effective December 31, 2009. This means that after December 31, 2009, no additional employees will be permitted to join the Pension Plan and no Pension Plan participants will accrue additional benefits. After the Plan becomes Effective, Reorganized TERI will continue to contribute to the Pension Plan consistent with federal law to fund the benefits that accrued prior to the freeze.

Reorganized TERI will remain obligated to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA § 302; Internal Revenue Code § 412. The Pension Plan may be terminated only if the statutory requirements of either ERISA § 4041, 29 U.S.C. § 1341, or ERISA § 4042, 29 U.S.C. § 1342, are met. If the Pension Plan terminates Reorganized TERI and all members of its controlled group will be jointly and severally liable for the unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan. See 29 U.S.C. § 1362(a).

The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. PBGC has filed in the bankruptcy proceedings estimated claims for unfunded benefit liabilities, contingent on plan termination, and claims for unpaid minimum funding contributions and premiums. PBGC asserts administrative priority for certain amounts of its claims under 11 U.S.C. §§ 507(a)(2), 507(a)(5) and 507(a)(8). No determination in respect of PBGC's claims has been made in TERI's Chapter 11 Case and TERI expects that, given its decisions not to terminate the Pension Plan (and to freeze the Pension Plan instead) and to satisfy the minimum funding standards, the PBGC's claims will, ultimately, be withdrawn in TERI's Chapter 11 Case.

Nothing in this Plan of Reorganization will release or discharge any fiduciary of the Pension Plan, within the meaning of 29 U.S.C. § 1002(21), from any liability arising as a result of such fiduciary's breach of fiduciary duty under ERISA with respect to the Pension Plan.

Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor (i) is a member of the controlled group of Reorganized TERI or the Debtor for any purpose, and (ii) shall incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.

### 3.    FMC Contracts

The Debtor had significant contractual obligations with FMC. These are discussed in Section III.B.1. below.