C.    **EVENTS LEADING TO THIS CHAPTER 11 CASE**

As stated previously, FMC acted as TERI's exclusive loan processing agent. TERI received the bulk of its guarantee fees at the time of origination and received subsequent payments at the time the loans were securitized. In late 2007, the turmoil in the financial markets began and demand for bonds backed by student loans evaporated. FMC has not been able to arrange a securitization since late 2007. As a result, TERI experienced a significant decline in revenues just as the slowing economy led to an increase in the default rate of student loans. Thus, TERI's revenues declined and its obligations to purchase loans increased.

In response to the reduction in revenues, the Debtor reduced its operating budget for 2008 by 20%. Although the Debtor was able to accomplish this reduction without terminating any employees, immediately prior to the Commencement Date, it made further reductions by terminating 25 employees, representing 22% of its staff.

On March 26, 2008, Moody's Investors Service downgraded TERI's issuer rating, citing concerns about TERI's asset quality, liquidity position and adequacy of capital and reserves. As a result of the downgrade by Moody's, a bank made a demand, pursuant to its guaranty agreement with TERI, that TERI establish a segregated reserve to support TERI's guarantees to that lender. Establishment of such a reserve would have had a negative effect on TERI's cash position and liquidity, possibly to the detriment of other parties in interest. TERI believed that the filing of the Chapter 11 Case enabled it to avoid a liquidity crunch that, without the protections afforded by Chapter 11, may have resulted in TERI's demise. The Chapter 11 Case also has provided TERI with the breathing room it needs to develop a long-term business plan so that it can continue its College Access Programs and pursue other related activities to fund its College Access pursuits.

III.    **THE CHAPTER 11 CASE**

A.    **FILING AND FIRST DAY ORDERS**

On the Commencement Date, the Debtor filed its petition under chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

1.    **Certain First Day Orders**

Early in this case, the Court entered a number of orders requested by the Debtor that were designed to minimize disruption to the Debtor's business operations as a result of the chapter 11 filing. Among other things, these orders authorized the Debtor (a) to maintain its existing bank accounts, cash management systems, and use of existing checks and business forms and (b) to pay prepetition wages, payroll taxes, employee benefits and related expenses.

The Court also entered orders intended to facilitate the administration of this case. Among other things, these orders (a) authorized specific case management procedures; (b) extended the time for the Debtor to file schedules and statements of financial affairs; and (c) established procedures for compensation and reimbursement of professionals.

### 2.   Retention of Debtor's Professionals

To assist the Debtor in carrying out its duties as a debtor-in-possession and to otherwise represent the Debtor's interests in the Chapter 11 Cases, the Bankruptcy Court authorized the Debtor to retain and employ the following advisors: (a) Epiq Bankruptcy Solutions, LLC, as claims, noticing, and balloting agent to the Debtor; (b) Grant Thornton LLP, as financial advisor to the Debtor; (c) Goodwin Procter LLP, as counsel to the Debtor; and (d) Craig and Macauley PC, as special conflicts counsel to the Debtor. The Bankruptcy Court also entered an order approving certain procedures for the interim compensation and reimbursement of professionals and Creditors' Committee members in the Chapter 11 Case.

### 3.   The Creditors' Committee

On April 30, 2008, the United States Trustee appointed a five-member Creditors' Committee to represent the interests of unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code. The original members of the Creditors' Committee included the following:  (a) Bank of America, One Federal Street, 5th Floor, Boston, MA 02110; (b) U.S. Bank, 800 Boylston Street, Boston, MA 02199-8004; (c) M & T Bank, One M & T Plaza, Buffalo, NY 14203; (d) Nellie Mae, 1250 Hancock Street, Suite 205 N, Quincy, MA 02169-4331; (e) Wachovia Securities, Wachovia Capital Markets, LLC, 301 South College Street, NC0537, Charlotte, NC 28288. KeyBank, 127 Public Square, Cleveland, OH, 44114, was appointed to the Creditors' Committee in May, 2008.

In April 2009, Bank of America withdrew as a member of the Creditors' Committee.  In January 2010, Nellie Mae withdrew as a member of the Creditors' Committee.

The Creditors' Committee retained (a) Duane Morris LLP as counsel; (b) Posternak Blankstein & Lund LLP as special conflicts counsel; and (c) FTI Consulting, Inc. as financial advisors.

### 4.   Claims Bar Date

The Bankruptcy Court approved October 17, 2008 as the deadline for filing proofs of claim against the Debtor (the "Claims Bar Date"), and approved the form and manner of notice of the Claims Bar Date.

## B.   OTHER DEVELOPMENTS

### 1.   Rejection of FMC Contracts

Prior to the Commencement Date, the Debtor was party to several contracts with FMC, First Marblehead Education Resources, Inc., and TERI Marketing Services, Inc., which contracts included a Master Servicing Agreement, a Guarantee Agreement, a Database Agreement, and a Marketing Agreement (the "FMC Contracts"). The Debtor, in its business judgment, determined that performance of its obligations under such contracts was either cost prohibitive given the shutdown of the securitization markets or of no utility to the estate. Early in this Chapter 11 Case, the Debtor requested that the Bankruptcy Court approve the rejection of the FMC Contracts under section 365 of the Bankruptcy Code.

Because the Debtor's operations had been largely outsourced to FMC and its affiliates, the Debtor needed time to transition its operations away from the FMC and its affiliates to provide those services in house or through third party service providers. To facilitate this process, the Debtor and FMC entered into a Transition Services Agreement pursuant to which FMC and/or FMER would provide certain services for a limited time period to the Debtor following the rejection of the FMC Contracts, including loan origination services, multiple loan disbursement services, services in connection with collection efforts, and support services to improve the Debtor's infrastructure. The services provided by FMC and FMER pursuant to the Transition Services Agreement were to be provided at reduced costs from the costs under the FMC Contracts.

On June 23, 2008, the Bankruptcy Court approved the rejection of the FMC Contracts and the Debtor's entry into the Transition Services Agreement. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or in the Confirmation Order shall affect the terms of the Transaction Services Agreement dated May 30, 2008, as approved by the Bankruptcy Court on June 23, 2008.

### 2.    Stipulations With Certain Creditors

#### a)    *Stipulations Previously Approved*

At various times during the Chapter 11 Case, the Debtor negotiated stipulations with Bank of America, N.A., Chase, UFSB, Union Federal Savings Bank and UFSB Private Loan SPV ("UFSB SPV," and together with Bank of America, Chase, and UFSB, the "Settling Creditors"). Pursuant to each of these stipulations, the Debtor and each Settling Creditor agreed to terminate the contracts underlying the loan programs through which student loans were made by the Settling Creditor and guaranteed by the Debtor. The stipulations settled disputes over, among other things, amounts owed by the Debtor to each Settling Creditor based on assumptions about default rates.    In exchange for a waiver of Claims against the Debtor, including Claims based on the Debtor's prepetition obligations to guarantee defaulted student loans, Administrative Expense Claims based on the Settling Creditors' postpetition funding of certain loans (the "Pipeline Loans"), and claims for interest as a consequence of delays in receipt of funds due to interruptions in the Debtor's cash management systems caused by the chapter 11 filing (the "Interest Claims"), the Debtor agreed to transfer certain amounts to the Settling Creditors outside the context of a Plan. The specific terms of each stipulation are summarized as follows:

#### Chase

- The Debtor transferred to Chase all of the funds in the Chase Pledged Account, totaling approximately $40.2 million as of April 31, 2008.

- Chase waived all Claims and Administrative Expense Claims based on the Debtor's guarantee obligations, and its Interest Claim up to the aggregate amount of $20,000.

- The Debtor waived any existing or future claim to guarantee fees.

LIBC/3667825.11

- Chase and the Debtor did not waive other claims, defenses, and obligations.

- Rights and obligations that by the terms of the underlying agreement survive termination remain in force.

- Chase and the Debtor agreed to perform certain transitional activities.

**Bank of America**

- The Debtor transferred all funds in the Bank of America Pledged Account, totaling $25,556,081 as of November 30, 2008, to Bank of America except for $1,460,000 which was transferred to the Debtor's operating account free and clear of all liens, claims, and encumbrances.

- The Debtor retained all postpetition recoveries on TERI Owned Loans.

- The Debtor transferred to Bank of America all guaranty fees, totaling approximately $1,003,000, received in respect of Bank of America's Pipeline Loans, held in the Debtor's operating account.

- Bank of America waived all Claims, including certain Administrative Expense Claims, and its Interest Claim.

- The Debtor waived any existing or future claim to guaranty fees.

- The Debtor and Bank of America agreed to release each other from all claims, defenses, and obligations other than certain identified exceptions, including with respect to certain confidentiality agreements and certain ongoing deposit accounts and lease obligations.

- The Debtor agreed to provide certain transition services to Bank of America.

**UFSB and UFSB SPV**

- The Debtor transferred to UFSB and UFSB SPV (collectively, the "UFSB Entities") the full amount of funds in the UFSB Pledged Account, totaling $31,623,103, except for $1,586,204, which was transferred to the Debtor's operating account free and clear of all liens, claims, and encumbrances.

- The Debtor retained all TERI Owned Loans and all postpetition recoveries on TERI Owned Loans.

- The Debtor waived any existing or future claim to guaranty fees.

- The Debtor and UFSB Entities released each other from all claims, defenses, and obligations other than limited exceptions.

LIBC/3667825.11

- All proofs of claim filed by the UFSB Entities were expunged and the UFSB entities were precluded from filing any further proofs of claim against the Debtor.

Each of the stipulations between the Debtor and the Settling Creditors has been approved by the Bankruptcy Court.

### 3.    The Nellie Mae Adversary Proceeding

On February 4, 2010, Nellie Mae Education Foundation, Inc. ("Nellie Mae") filed an adversary complaint against the Debtor, seeking, inter alia, a declaratory judgment that certain loans in TERI's possession, in the principal amount of approximately $22.3 million, are property of Nellie Mae. Nellie Mae also asserts that the Debtor has been improperly accounting for, and therefore, misappropriating, collections on a portion of those so-called "Non-Cash Loans", which are property of Nellie Mae. Nellie Mae asserts that the total amount of cash held by TERI that in fact belongs to Nellie Mae is at least $1.0 million.

The Debtor has not had any meaningful opportunity to review each of the allegations made by Nellie Mae in its Complaint and will file an answer or other responsive pleading as required pursuant to the Federal Rules of Bankruptcy Procedure or the Bankruptcy Court, as applicable. Upon a preliminary review of the Nellie Mae Complaint, the Debtor believes that any recoveries received by the Debtor in respect of "Non-Cash Loans" prior to the Commencement Date are, at best, a pre-petition claim against the Debtor. The Debtor also believes that the Nellie Mae Complaint will largely turn on whether the defaulted loans in question were "purchased" by TERI.

The Plan provides that all student loans identified by the Debtor (if any) that are the subject of the Nellie Mae Adversary Proceeding, shall be held in escrow by Reorganized TERI after the Effective Date pending determination by the Bankruptcy Court of the Nellie Mae Adversary Proceeding, and shall be distributed in accordance with such Final Orders the Bankruptcy Court may enter in the Nellie Mae Adversary Proceeding.

Assuming that Nellie Mae were successful in its Complaint against TERI, the Debtor does not believe that the transfer of the student loans to Nellie Mae or the payment of $1 million would materially change (1) the anticipated recovery to general unsecured creditors or (2) Reorganized TERI's ability to operate. Specifically (1) none of the Nellie Mae loans were included in the "Receivables recoverable on claim payments" column of the Liquidation Analysis, in recognition of the dispute with Nellie Mae regarding the ownership of the so-called "Non-Cash Loans" and (2) any cash payments to be made to Nellie Mae would be within the $2.3 million of the "accrued expenses" column of the Liquidation Analysis. Moreover, although a complete investigation of the facts underlying Nellie Mae's Complaint has not been completed at this juncture, the Debtor anticipates that it will vigorously dispute many of the allegations contained in such Complaint.

The Plan Proponents anticipate that, following the Effective Date, the defendants to the Nellie Mae Adversary Proceeding will be both Reorganized TERI and the Plan Trustee.

LIBC/3667825.11

### 4.    Plan Proponents' Negotiations

Since late July, 2008, the Debtor and Creditors' Committee have been working towards a consensual and successful resolution of this Chapter 11 Case.  On July 24, 2008, the Bankruptcy Court approved a stipulation by and among the Debtor and Creditors' Committee that provided certain milestones for the Debtor to satisfy, including providing a claims analysis, liquidation analysis and business plan to the Creditors' Committee by certain dates.

The Debtor met each milestone and such documents became the building blocks of the Plan.  In November 2008, the Debtor and the Creditors' Committee entered into a further stipulation that provided that each party had the right to file a plan of reorganization provided that the other party consented, in writing, to such filing.  That agreement among the parties remained in place until August 5, 2009, the date on which the exclusive right to file a plan of reorganization expired.

In November 2008, the Debtor and Creditors' Committee began negotiating a term sheet regarding the principle terms of a Plan.  That term sheet formed the framework of the Plan.

## IV.    SUMMARY OF THE PLAN

**THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  IT IS NOT INTENDED TO REPLACE A CAREFUL REVIEW AND ANALYSIS OF THE PLAN, BUT ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.**

### A.    ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

### 1.    Administrative Claims

Except to the extent the holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim will be paid (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms between the holder of such claim and the Debtor, or (b) such lesser amount as the holder of an Allowed Administrative Expense Claim and the Debtor might otherwise agree; *provided, however* that expenses of operation accrued and unpaid as of the Effective Date arising in the ordinary course of the Debtor's business and payable in such ordinary course (including any and all Claims and Expenses directly or indirectly arising from or related to the Pension Plan) will be paid solely by Reorganized TERI from Reorganized TERI Assets in the ordinary course after the Effective Date.

LIBC/3667825.11

2. **Pre-Effective Date Professional Fees and Expenses**

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses prior to and including the Effective Date under section 330 or 503(b) of the Bankruptcy Code will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to any such final application must be filed on or before a date to be set by the Bankruptcy Court in the Confirmation Order. Any entity granted such an award by the Bankruptcy Court must be paid in full by the Plan Trustee, in such amounts as are Allowed, within ten (10) days after the order granting such award is a Final Order.

3. **United States Trustee Quarterly Fees and Other Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, will be paid by the Debtor on the Effective Date. Following the Effective Date, the Plan Trustee shall file all post-confirmation reports and pay all fees (solely from and to the extent of available Plan Trust Assets) payable pursuant to 28 U.S.C. §1930(a)(6) until the Chapter 11 Case is closed pursuant to a Final Order.

4. **Priority Tax Claims**

Except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise, each holder of an Allowed Priority Tax Claim, will be paid from Available Cash in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Debtor or the Plan Trustee agree. Any Allowed Priority Tax Claim paid after the Effective Date shall accrue interest at the rate calculated in accordance with 28 U.S.C. §1961 until such Allowed Priority Tax Claim is paid in full.

B. **CLASSIFICATION AND TREATMENT OF CLAIMS**

1. **Summary of Classification and Treatment of Claims**

The following table designates the Classes of Claims, other than Administrative Expense Claims and Priority Tax Claims, and specifies which of those classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

| CLASS | STATUS |
|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired/Deemed to Accept |
| Classes 2a – 2p – Secured Claims of Make and Wait Lenders | Impaired/Entitled to Vote |

55

| | |
|---|---|
| Classes 3a – 3q – Secured Claims of Securitization Trusts | Impaired/Entitled to Vote |
| Classes 4a-4k – Secured Claims of Key Corp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) | Impaired/Entitled to Vote |
| Class 5 – General Unsecured Claims | Impaired/Entitled to Vote |
| Class 6 – Convenience Claims | Unimpaired/Deemed to Accept |

2.    **Classification and Treatment of Claims and Interests**

a)    *Class 1 — Priority Non-Tax Claims*

*Classification*: Class 1 consists of Priority Non-Tax Claims against the Debtor.

*Impairment and Voting*: Class 1 is Unimpaired by the Plan. For purposes of the Plan, each holder of an Allowed Claim in Class 1 is conclusively deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions:* In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims, each holder of an Allowed Priority Non-Tax Claim against the Debtor shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. Such Claims shall be paid from Available Cash.

b)    *Classes 2a – 2p – Secured Claims of Make and Wait Lenders*

Class 2 consists of the Secured Claims of the Make and Wait Lenders. Each Allowed Secured Claim in Class 2 shall be considered to be a separate subclass within Class 2, and each such subclass shall be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in class 2 is Impaired by the Plan and is entitled to vote to accept or reject the Plan. Issues affecting Secured Claims of the Make and Wait Lenders are discussed in Section I.A.3.c. of this Disclosure Statement.

c)    *Classes 3a – 3q – Secured Claims of Securitization Trusts.*

Classes 3a-3q consist of the Secured Claims of the Securitization Trusts. Each Allowed Secured Claim in Classes 3a-3q shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Classes 3a-3q are Impaired by the Plan

and each is entitled to vote to accept or reject the Plan.  Issues affecting Secured Claims of Securitization Trusts are discussed in Section I.A.3.d. of this Disclosure Statement.

     d)     *Classes 4a – 4k Secured Claims of Key Corp Trusts.*

     Class 4 consists of the Secured Claims of KeyCorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender).  Each Allowed Secured Claim in Class 4 will be considered a separate subclass within Class 4, and each subclass will be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code, Sections 1122, 1123, 1126 and 1129.  Each subclass in Class 4 is Impaired by the Plan is entitled to vote to accept or reject the Plan.  Issues affecting Key Corp Trust Claims and the Claim of KeyBank (other than in its capacity as a Make and Wait Lender) are discussed in Section I.A.3.d. of this Disclosure Statement.

     e)     *Class 5 – General Unsecured Claims.*  Class 5 consists of all General Unsecured Claims, including the Make and Hold Claims.  Issues affecting General Unsecured Claims are discussed in Section I.A.3.g. of this Disclosure Statement.  Class 5 is Impaired by the Plan and is entitled to vote to accept or reject the Plan.

     The following make up the General Unsecured Claims in this Chapter 11 Case:

     (i)     **Make and Hold Claims**.  The Allowed amount of the Make and Hold Claim of an Accepting Make and Hold Lender will be the amount of the "Make and Hold Lender Settlement Claim" for such Make and Hold Lender as listed on <u>Schedule D</u> to the Plan.  The Allowance or disallowance of the Claim of a Make and Hold Lender that rejects the Plan, shall be determined after the Effective Date by the Bankruptcy Court pursuant to 11 U.S.C. §502.  To the extent the Court determines pursuant to 11 U.S.C. §502 that such Make and Hold Claim should be allowed, then such Allowed Make and Hold Claim shall be treated and classified as an Allowed Claim in Class 5.

     (ii)     **Make and Wait Deficiency Claims**.  Each Make and Wait Lender that accepts the Plan (i) shall be deemed to have authorized the transfer to the Plan Trustee the amount, if any, listed with respect to such Make and Wait Lender in the "Make and Wait Lender Payment Amount (If Any)" column of <u>Schedule A</u> to the Plan and (ii) shall have an Allowed Deficiency Claim in the amount, if any, listed with respect to such "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of the attached <u>Schedule A</u>.  Each Make and Wait Lender that rejects the Plan shall have the Allowed amount of its Secured Claim (if any) and Deficiency Claim (if any) determined by the Bankruptcy Court pursuant to 11 U.S.C. §502.

     (iii)     **Securitization Trust Deficiency Claims**.  Each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement will have an Allowed Claim (if any) in the amount listed in the "Securitization Trust Settlement Claim" column of <u>Schedule B</u> attached to the Plan.  Each Securitization Trust that rejects the Plan, and thereby, the Securitization Trust

LIBC/3667825.11

Settlement, shall have its Allowed Claim (if any) determined in accordance with Section 4.2 of the Plan.

    (iv)   **KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trust Deficiency Claims.** Each KeyCorp Trust that accepts the Plan and KeyBank (other than in its capacity as a Make and Wait Lender), if it accepts the Plan, and, thereby, the Key Access Program Settlement, will have an Allowed Claim in the amount listed in the "Program Decoder Settlement Claim" column of Schedule C attached to the Plan. Each KeyCorp Trust that rejects and, KeyBank (other than in its capacity as a Make and Wait Lender) if it rejects the Plan, and thereby, the Key Access Program Settlement, shall have its Deficiency Claim (if any) determined in accordance with Section 4.3 of the Plan.

    (v)   **Other General Unsecured Claims.** Unless otherwise provided in the Plan, the Allowed amount of Other General Unsecured Claims will be determined by the Bankruptcy Court in accordance with section 502 of the Bankruptcy Code.

    f)   *Class 6 – Convenience Class Claims*

    *Classification*: Class 6 consists of Convenience Class Claims.

    *Impairment and Voting*: Class 6 is Unimpaired by the Plan. Each holder of an Allowed Claim in Class 6 is deemed to have accepted the Plan.

    *Distributions*. In full and complete satisfaction, settlement and release of and in exchange for the Convenience Class Claims, each holder of an Allowed Convenience Class Claim will be paid in full from Unrestricted Cash, except to the extent such holder of an Allowed Convenience Class Claim agrees to less favorable treatment, on the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim.

## C.   PROVISIONS REGARDING VOTING AND DISTRIBUTION UNDER THE PLAN

### 1.   Voting of Claims

Each holder of an Allowed Claim as of the Record Date in Classes 2a – 2p, Classes 3a – 3q, Classes 4a-4k or Class 5 will be entitled to vote to accept or reject the Plan. For voting purposes, and consistent with the provisions of the Solicitation Procedures Order, the amount of Claim that a holder of a Claim in Classes 2a – 2p, Classes 3a – 3q and Classes 4a – 4k may vote in respect of its General Unsecured Claim in Class 5 (if any) will be the amount of the Claim (as filed or as otherwise temporarily allowed by the Bankruptcy Court for voting purposes) less the amount held in the Collateral Account. For voting purposes, and consistent with the provisions of the Solicitation Procedures Order, the amount of Make and Hold Claims in Class 5 will be

LIBC/3667825.11

deemed to be the amount stated on such Creditor's Proof of Claim or as otherwise temporarily allowed by the Bankruptcy Court for voting purposes.

### 2.    Acceptance by Impaired Class

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors will have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class or holders of Claims permitted to vote pursuant to the provisions of the Solicitation Procedures Order that have timely and properly voted to accept or reject the Plan. The Solicitation Procedures Order governs the voting by the Securitization Trusts, the Other Trusts and the Key Corp. Trusts and the Plan Proponents urge you to read such order in its entirety for a more complete understanding regarding which entities are entitled to vote and the mechanics by which a Class may be deemed to accept or reject the Plan.

### 3.    Presumed Acceptances of the Plan

Classes 1 and 6 are not Impaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan.

### 4.    Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 5.    Method of Distributions Under the Plan

a)    *Distributions Generally*

(1)    Reorganized TERI will make all distributions required by the Plan other than those to be made by the Plan Trustee.

(2)    The Plan Trustee will make all other distributions from the Plan Trust to holders of Claims in accordance with the Plan and the terms and conditions set forth in the Plan Trust Agreement.

b)    *Distributions of Cash*

Any payment of Cash made by Reorganized TERI or the Plan Trustee pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

LIBC/3667825.11

c) *Distributions Free and Clear*

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of the Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, will be free and clear of any liens, claims, and encumbrances, and no other entity will have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

d) *Timing of Performance*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

e) *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor. The holder must notify Reorganized TERI or the Plan Trustee, as applicable, in writing of a change of address, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different from the address of such holder as set forth in the Schedules. Neither Reorganized TERI nor the Plan Trustee will be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided in the Plan. Notwithstanding the foregoing, with respect to each Securitization Trust, Other Trust and KeyCorp Trust, distributions in respect of an Allowed Claim of such Trust including defaulted loans (if any), shall be made to the Trust, subject to the lien and security interest of the applicable indenture trustee for such Trust, and shall be delivered to the trustee or indenture trustee for such Trust (as appropriate) or to such other person as may be designated by the indenture trustee or trustee in writing delivered to Reorganized TERI or the Plan Trustee, as applicable, provided that loan documents, including the related student loan note in respect of a defaulted loan, shall be delivered by the entity that has possession of such loan documents, to the applicable servicer as custodian and agent for the indenture trustee or trustee, to be held under the applicable custody agreement among such servicer as custodian for the indenture trustee or trustee and the Trust.

f) *Distributions to Holders as of Record Date*

As of the close of business on the Record Date, the claims register for the Debtor will be closed and there will be no further changes made to the identity of the record holder of any Claim. Neither Reorganized TERI nor the Plan Trustee will have any obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized TERI and the Plan Trustee will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

LIBC/3667825.11

g)      *Undeliverable and Unclaimed Distributions*

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the holder notifies Reorganized TERI or the Plan Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions will, subject to the last sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by Reorganized TERI or the Plan Trustee in respect of Allowed Claims will be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check will be made in accordance with the notice provisions of the Plan to Reorganized TERI or the Plan Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued. All claims for undeliverable distributions or voided checks will be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made. After such dates, all such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will become unencumbered Cash of Reorganized TERI, or the Plan Trust, as appropriate pursuant to the Plan. The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code will not be entitled to any other or further distribution under the Plan on account of such Claim.

h)      *Setoffs*

Except with respect to an Allowed Claim that is Allowed as part of a compromise and settlement approved pursuant to a Final Order (including settlements set forth in Section 6.2 of the Plan), to the extent permitted under the Bankruptcy Code or other applicable law, Reorganized TERI, or the Plan Trustee, as applicable, may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and Causes of Action of any nature that the Debtor has against the holder of such Allowed Claim.

i)      *Application of Distributions*

Distributions to any holder of an Allowed Claim will be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any unless the application is governed by an indenture or other governing document in which case the terms of such document shall govern. No provision of the Plan or Confirmation Order shall modify any charging lien or other right of the indenture trustee, trustee or other entity in another representative capacity to reimburse itself for fees, expenses and disbursements against any distribution.

j)      *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtor or the Plan Trustee, as applicable, will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting

61

requirements. ***The Debtor and the Plan Trustee will have the right to withhold distributions to any holder of a Claim, and any such Claim shall not become an Allowed Claim, notwithstanding any other provision of the Plan, unless and until such holder of a Claim executes and delivers to the Plan Trustee an Internal Revenue Service Form W-9.*** Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### D.      MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

#### 1.      Reorganized TERI

##### a)      *Reorganized Articles of Incorporation and Reorganized By-Laws*

Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which will be included in the Plan Supplement. Prior to the closing of TERI's Chapter 11 case, any amendments to Reorganized TERI's Articles of Incorporation and Reorganized By-laws will be filed with the Bankruptcy Court.

##### b)      *Boards of Directors and Officers*

The identities of the members of the  initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement and will be in effect as of the Effective Date.

##### c)      *Reorganized TERI (Not-For-Profit)*

Reorganized TERI will, as of the Effective Date, remain a not-for-profit corporation.

##### d)      *Retention of Reorganized TERI Assets*

On and after the Effective Date, Reorganized TERI will retain its rights, title, and interests in the Reorganized TERI Assets.

#### 2.      Compromise and Settlement

The Plan is the product of months of negotiations between many interested parties, including the Debtor, the Creditors' Committee, FMDS, as Administrator to the Securitization Trusts and U.S. Bank, N.A., in its capacity as Indenture Trustee to the Securitization Trusts and KeyBank. The following is an outline of the terms of the proposed compromise and settlements for the Make and Wait Lenders, Make and Hold Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), Key Corp Trusts and Securitization Trusts.

LIBC/3667825.11

a)      *Make and Wait Lender Settlement*

(1)      Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by an Accepting Make and Wait Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Wait Lender, including the amounts, allowance, relative priority and treatment of the Secured Claim and the Deficiency Claim (if any) of such Accepting Make and Wait Lender.

(2)      **Claims of An Accepting Make and Wait Lender**.  Each Make and Wait Lender in Classes 2a – 2p that accepts the Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement  (1) will have an Allowed Secured Claim in the applicable subclass of Class 2 in the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on Schedule A attached to the Plan, and will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of Schedule A attached to the Plan.

(3)      **Release of Make and Wait Lender Equity and Make and Wait Lien Dispute Amount to Plan Trustee by Accepting Make and Wait Lender.**  Each Make and Wait Lender in Classes 2a – 2p that accepts the Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Make and Wait Lender Payment Amount (If Any)" on Schedule A attached to the Plan and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(4)      **Disbursement of Remainder of Collateral Account to Accepting Make and Wait Lender.**   On the Effective Date, the Debtor shall be deemed to release from the applicable Collateral Account, and such amount shall be remitted, to each Accepting Make and Wait Lender, in full satisfaction of such Accepting Make and Wait Lender's Allowed Secured Class 2 Claim, the applicable amount for such Accepting Make and Wait Lender in the column

63

labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on <u>Schedule A</u> attached to the Plan, plus all interest and other earnings (if any) paid and deposited into such Pledged Account as of the Effective Date.

(5)     **Retention by Accepting Make and Wait Lender of Loans Not Purchased by the Debtor**.  Each Accepting Make and Wait Lender will retain all loans that were not purchased by the Debtor as of the Effective Date.

(6)     **Bankruptcy Court Approval of Make and Wait Lender Settlement**.  For each Accepting Make and Wait Lender, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Wait Lender Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, the Plan Proponents, Reorganized TERI and all Creditors.

(7)     **Release of Claims against the Debtor and the Estate**. On the Effective Date, the Claims against the Debtor and the Estate of each Accepting Make and Wait Lender receiving the treatment provided by the Make and Wait Lender Settlement, subject to and upon implementation of the Make and Wait Lender Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(8)     **Rejection of Executory Contracts**.  On the Effective Date, all Guaranty Agreements executed in favor of the Make and Wait Lenders and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Wait Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Wait Lenders will be deemed waived.

b)     *Make and Hold Settlement*

(1)     Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by an Accepting Make and Hold Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting

Make and Hold Lender, including the amounts, allowance, relative priority and treatment of the Make and Hold Claims of such Accepting Make and Hold Lender

(2) **Claims of An Accepting Make and Hold Lender**.  An Accepting Make and Hold Lender shall have an Allowed Claim calculated as the larger of the Claim calculated by the Decoder and the Claim calculated by the Debtor's Base Case, as set forth in the column labeled "Make and Hold Lender Settlement Claim" on Schedule D attached to the Plan.  All such claims will be treated as Allowed Class 5 Claims.

(3) **Distributions to Accepting Make and Hold Lenders and Effectiveness of Make and Hold Settlement**.  All distributions to Accepting Make and Hold Lenders pursuant to the Plan will be made on account of and in consideration of the Make and Hold Lender Settlement, which, upon the Effective Date, will be binding on all Accepting Make and Hold Lenders, the Plan Proponents, and Reorganized TERI.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Hold Lender Settlement and the Bankruptcy Court's finding that such Make and Hold Lender Settlement is fair, reasonable, equitable and in the best interests of the Accepting Make and Hold Lenders, the Plan Proponents and Reorganized TERI.

(4) **Rejection of Make and Hold Guaranty Agreements**.  On the Effective Date, all Guaranty Agreements executed in favor of the Make and Hold Lenders and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Hold Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Hold Lenders will be deemed waived.

c) *Securitization Trust Settlement*

(1) Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 the acceptance of the Plan by a Securitization Trust Settlement will constitute a good faith compromise and settlement of all Claims, Causes of Action and controversies between the Debtor and each Securitization Trust receiving the treatment provided by the

65

Securitization Trust Settlement, including, without limitation, the amounts, allowance, relative priority and treatment of the Secured Claim and Deficiency Claim of each Securitization Trust and any other claim, whether a general unsecured claim, priority claim or administrative expenses claim that each such Securitization Trust, the Indenture Trustee under the Indenture for such Securitization Trust, or the administrator for such Securitization Trust (in such capacity) has asserted or might assert against the Debtor or its estate.  Notwithstanding the foregoing, nothing in the Plan shall bar any entity from seeking Allowance of an Administrative Expense Claim arising under 11 U.S.C. §503(b)(3)(D) and (4) ("Substantial Contribution Claim"), and as to any such Substantial Contribution Claim, the parties reserve all their respective rights, claims and defenses.

(2)    **Claims of An Accepting Securitization Trust**.  Each Securitization Trust in Classes 3a – 3q that accepts the Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement  (A) will have an Allowed Secured Claim in the applicable subclass of Class 3 in the amount set forth in the column labeled "Payment to Accepting Securitization Trust from Collateral Account" on Schedule B attached to the Plan, and (B) will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Securitization Trust Settlement Claim (If Any)" column of Schedule B attached to the Plan.

(3)    **Release of Securitization Trust Equity by Accepting Securitization Trust**.  Each Securitization Trust in Classes 3a – 3q that accepts the Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Securitization Trust Payment Amount" on Schedule B attached to the Plan and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(4)    **Disbursement of Remainder of Pledged Account to Accepting Securitization Trust**.  On the Effective Date, the Debtor shall be deemed to release from the applicable Pledged Account, and such amount shall be remitted, to each Securitization Trust in Classes 3a – 3q that accepts the

66

Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, in full satisfaction of the Allowed Secured Claim of such Accepting Securitization Trust, the applicable amount for such Accepting Securitization Trust in the column labeled "Payment to Accepting Securitization Trust from Pledged Account" on Schedule B attached to the Plan, plus all interest paid and deposited into such Pledged Account as of the Effective Date.

(5)     **Disbursement of Remainder of Securitization Trust Collateral to Accepting Securitization Trust**.  On the Effective Date, the Debtor shall cause to be transferred to each Accepting Securitization Trust such Securitization Trust's Securitization Trust Collateral remaining after payment by such Securitization Trust of the Securitization Trust Payment Amount.

(6)     **Securitization Trusts Release With Respect to Postpetition Defaulted Loans**.  In full and final settlement of the Trust Adversary Proceeding with respect to each Securitization Trust that accepts the Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, (A) each such Securitization Trust will have no claim to any loans purchased by or on behalf of the Debtor (or its agent) or otherwise transferred to or for the benefit of the Debtor on or after the Commencement Date or to any recoveries on such loans, including recoveries received prior to the date hereof, (B) all such defaulted postpetition loans and postpetition recoveries shall be transferred free and clear of all liens, claims, interests and encumbrances to the Plan Trust, and (C) neither the applicable Securitization Trusts nor their indenture trustees shall have any security interest in, or Claim to, such defaulted loans or recoveries obtained in respect thereof (but otherwise reserving rights under the Plan as the holder of a Claim in Class 5).  Any defaulted loan on account of which (i) the Debtor made payment, (ii) payment was made from funds in a Pledged Account, or (iii) a Securitization Trust received payment, shall be considered a defaulted loan purchased by the Debtor.

(7)     **Retention by Accepting Securitization Trust of Loans Not Purchased by the Debtor**.  Each Securitization Trust will retain all loans that were not purchased by the Debtor as of the Effective Date.  Each Securitization Trust will also retain (a) all defaulted loans that were purchased by or

67

on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust prior to the Commencement Date, (b) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to prepetition defaulted loans and (c) the proceeds from the sale by the Debtor of such prepetition defaulted loans to a Securitization Trust at any time following rehabilitation.

(8)    **Bankruptcy Court Approval of Securitization Trust Settlement**.  For each Securitization Trust that accepts the Plan, and thereby the Securitization Trust Settlement, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Securitization Trust Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, the Plan, Reorganized TERI and each Securitization Trust (including the Indenture Trustee and other secured parties under the related Indenture pursuant to which such Trust issued its notes), receiving the treatment provided by the Securitization Trust Settlement.

(9)    **Dismissal of Trust Adversary Proceeding**.  On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed with prejudice, and judgment of dismissal may enter pursuant to Fed.R.Civ.P. 54, made applicable to the Trust Adversary Proceeding pursuant to Fed.R.Bankr.P. 7054, as to (a) each Securitization Trust that accepts or is deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, (b) the administrator with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (c) the owner trustee of each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (d) U.S. Bank, National Association, in any capacity in which it was named as a defendant in the Trust Adversary Proceeding with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, and (e) the indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and accepted the Plan and Securitization Trust Settlement with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities, and not individually.

LIBC/3667825.11

(10)  **Release of Claims against the Debtor and The Estate**.
On the Effective Date, the Claims against the Debtor and
the Estate of the Securitization Trusts, the Indenture
Trustees under the Indenture for such Securitization Trusts
and the administrators for such Securitization Trust (in such
capacity) receiving the treatment provided by the
Securitization Trust Settlement, subject to and upon
implementation of the Securitization Trusts Settlement, will
be deemed satisfied and no further recovery shall be
permitted in respect of such Claims.

(11)  **Rejection of Executory Contracts**.  On the Effective Date,
all Guaranty Agreements executed in favor of the
Securitization Trusts and the related Deposit and Security
Agreements and other related documents entered into by
the Debtor prior to the Commencement Date will be
deemed rejected, and with respect to Claims asserted by
Securitization Trusts accepting the Plan or that are deemed
to accept the Plan, thereby receiving the treatment provided
by the Securitization Trust Settlement, all Debtor's claims
or rights to set off any Guaranty fees, basis point fees and
other interests in loans held by such Securitization Trusts
will be deemed waived.

(12)  **Estate's Retention of Rights With Respect to Residuals**.
Nothing herein shall be deemed a waiver or release of the
rights, if any, that the Debtor or any other party may have
to receive a portion (if any) of the Residual with respect to
any and all of the Securitization Trusts.

d)  *KeyBank National Association and KeyCorp Trusts Settlement*

(1)  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code
and Bankruptcy Rule 9019, the acceptance of the Plan by
KeyBank National Association (excluding in its capacity as
a Make and Wait Lender) and acceptance of the Plan by
each KeyCorp Trust will constitute a good faith
compromise and settlement of all Claims and controversies
between the Debtor and KeyBank National Association and
each Accepting KeyCorp Trust, including the amounts,
allowance, relative priority and treatment of the Claims of
KeyBank National Association and each Accepting
KeyCorp Trust.

(2)  Unless KeyBank National Association (excluding KeyBank
National Association in its capacity as a Make and Wait
Lender) or a KeyCorp Trust rejects the Plan, KeyBank

National Association and each KeyCorp Trust, as applicable, shall receive the following treatment on the Effective Date of the Plan or as soon thereafter as is practicable: (a) it shall be paid its allocable share in the Victory Fund as of the Commencement Date (as appears in column on <u>Schedule C</u> of the Plan labeled "Allocation of Victory Fund"), (b) it shall have an Allowed Key Access Program Deficiency Claim as set forth in the column labeled "Key Access Program Decoder Settlement Claim" on <u>Schedule C</u> of the Plan; and (c) it shall cause to be paid to the Plan Trustee free and clear of all interests, liens, claims and encumbrances, its allocable share of all recoveries or other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon not previously transferred to the Debtor.

(3)     Notwithstanding the preceding paragraph, if KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects the Plan and is thereby deemed to opt out of the Key Access Program Settlement, the following treatment shall be applied: (a) each KeyCorp Trust that rejects the Plan, and KeyBank National Association if it rejects the Plan, shall have the Allowed amount of its Claim determined by the Bankruptcy Court by Final Order, following appropriate notice and an opportunity to be heard, in accordance with the Key Access Program Election; (b) the funds in the Victory Fund as of the Commencement Date shall be paid to KeyBank National Association and held in escrow until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, the proper method for distributing such funds; and (c) the parties reserve all rights with respect to recoveries and other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon, including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

(4)     Any distributions to KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender), if it accepts the Plan, or to an Accepting KeyCorp Trust pursuant to the Plan will be made on account and in consideration of the Key Access

70

Program Settlement, which, upon the Effective Date, will
be binding on KeyBank National Association, the
Accepting KeyCorp Trusts, the Debtor, and Reorganized
TERI. Entry of the Confirmation Order will constitute the
Bankruptcy Court's approval, as of the Effective Date, of
the Key Access Program Settlement and the Bankruptcy
Court's finding that such Key Access Program Settlement
is in the best interests of KeyBank National Association,
the Accepting KeyCorp Trusts, the Debtor, and
Reorganized TERI, and is fair, equitable and reasonable.

### 3.    Plan Trust

#### a)    *General*

On or before the Effective Date, the Plan Trust Agreement, in a form reasonably
acceptable to the Plan Proponents, shall be executed, and all other necessary steps shall be taken
to establish the Plan Trust and the beneficial interests therein, which shall be for the benefit of
the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective
Date. In the event of any conflict between the terms of the Plan and the terms of the Plan Trust
Agreement, the terms of the Plan Trust Agreement shall govern. The Plan Trust Agreement may
provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only
to the extent that such powers, duties, and authorities do not affect the status of the Plan Trust as
a liquidating trust for United States federal income tax purposes, or otherwise have material
adverse effect on the recovery of holders of Allowed General Unsecured Claims. This Section
6.3 is qualified in its entirety by the terms of the Plan Trust Agreement. If there is any
inconsistency between the terms of the Plan and the terms of the Plan Trust Agreement, the
terms of the Plan Trust agreement shall control.

#### b)    *Purpose of Plan Trust*

The Plan Trust shall be established for the sole purpose of liquidating and distributing its
assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to
continue or engage in the conduct of a trade or business, except to the extent reasonably
necessary to achieve, and consistent with, the liquidating purpose of the Plan Trust.

#### c)    *Costs and Expenses of Plan Trust*

The costs and expenses of the Plan Trust, including the fees and expenses of the Plan
Trustee and its retained professionals, shall be paid out of the Plan Trust Assets, and
Reorganized TERI shall not be responsible for any fees, expenses, or costs of the Plan Trust.
The Litigation Claims Costs incurred by the Plan Trustee and the fees and expenses incurred in
connection with the prosecution and settlement of any Claims are costs and expenses of the Plan
Trust.

#### d)    *Plan Trust Assets*

As of and as soon as practicable after the Effective Date, Debtor shall assign and transfer to the Plan Trust all of its rights, title and interests in and to the Plan Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, whether such Claims are Allowed on or after the Effective Date.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, and subject to clause (c) of Section 6.2(d)(iii) of the Plan or as otherwise specifically set forth therein shall be free and clear of any liens, claims and encumbrances, and no other entity (other than Creditors receiving rights under the Plan), including the Debtor or Reorganized TERI, will have any interest, legal, beneficial, or otherwise, in the Plan Trust or the Plan Trust Assets upon their assignment and transfer to the Plan Trust (other than as provided in the Plan or in the Plan Trust Agreement).  Upon delivery of the Plan Trust Assets to the Plan Trust, Reorganized TERI will be released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims, and, except as provided in the Collection Contract, shall have no further monetary obligations to the Plan Trust or the Plan Trustee.

The Plan Proponents expect that the Plan Trust Assets will consist of (1) approximately $46 million in Cash (including $4.0 million in Cash obtained as a result of various settlements with Make and Wait Lenders set forth in the Plan), (2) $36.1 million in book value of projected recoveries of defaulted loans, and (3) $85.9 million in book value of projected recoveries of defaulted loans transferred to the Plan Trustee in the event the Securitization Trust Settlement is accepted by each Securitization Trust.  The Plan Proponents currently estimate that the value of assets transferred to the Plan Trustee (assuming the parties accept the various settlements set forth in the Plan) is approximately $168 million.  However, there can be no assurance that such value will actually be achieved.  (See Section VII. Risk Factors -- Risk that Plan Trustee Will Not Achieve the Projected Recoveries in Respect of Defaulted Loans).

e)    *Governance of Plan Trust*

The Plan Trust will be governed by the Plan Trust Agreement and administered by the Plan Trustee.

f)    *Appointment of a Plan Trustee*

Prior to the Effective Date, the Creditors' Committee shall select the Plan Trustee.  The identity of the Plan Trustee will be disclosed by the Creditors' Committee no later than the date of the hearing to consider confirmation of the Plan.  The salient terms of the Plan Trustee's employment, including the Plan Trustee's duties and compensation, shall be set forth in the Plan Trust Agreement.  The Plan Trustee will not be the Debtor, an affiliate of the Debtor or former agent of the Debtor.  The Plan Trustee, in the reasonable discretion of the Creditors' Committee, will have the qualifications and experience necessary to satisfy the responsibilities and obligations of the Plan Trustee as outlined in the Plan and the Plan Trust Agreement

g)    *The Plan Trustee Advisory Committee*

The Plan Trustee Advisory Committee shall advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust

72

Agreement. The Plan Trust Agreement shall specify the procedures for replacing any member of the Plan Trustee Advisory Committee.

h)    *Transferability of Plan Trust Interests*

The beneficial interests of the Plan Trust shall not be transferable, unless otherwise provided for in the Plan Trust Agreement. To the extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then such securities shall be exempt from the requirements of applicable non-bankruptcy law to the maximum extent permitted by 11 U.S.C. §1145.

i)    *Investment of Cash*

The Plan Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided, however,* that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities. The Plan Trustee shall be authorized to manage any transferred Collateral Accounts pending resolution of the disposition of such Collateral Account pursuant to the terms of the Plan or a Final Order.

j)    *Retention of Professionals by the Plan Trustee*

The Plan Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Plan Trustee on such terms as the Plan Trustee deems appropriate, without Bankruptcy Court approval; *provided however* that such counsel and other professionals shall be subject to the prior approval of the Plan Trustee Advisory Committee or, if such approval is not obtained, then such counsel and other professionals may be retained only upon Bankruptcy Court approval. All costs of compensation and expenses of professionals retained by the Plan Trustee are costs and expenses of the Plan Trust and shall be paid out of the Plan Trust Assets.

k)    *Compensation of the Plan Trustee*

The Plan Trustee will be entitled to reasonable compensation (which shall be negotiated by the Plan Trustee with the Creditors' Committee) in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

l)    *Cooperation of Reorganized TERI*

Reorganized TERI will provide information, including Data needed for Claim administration and asset monetization, to the Plan Trustee. Such information will include, but will not be limited to, information regarding the status and amount of General Unsecured Claims to enable the Plan Trustee to perform its duties. Reorganized TERI will cooperate with the reasonable requests of the Plan Trustee and its professionals in the administration of the Plan Trust, including, in providing Data, documentation, witness testimony and other evidence in support of the prosecution of the Litigation Claims. The Plan Trust will reasonably reimburse

LIBC/3667825.11

Reorganized TERI, pursuant to the terms of a reimbursement agreement to be negotiated, for any extraordinary costs incurred to comply with requests for cooperation made by the Plan Trustee.

m)    *Distribution of Plan Trust Assets*

The Plan Trust Assets shall be distributed in accordance with the Plan Trust Agreement without the need for further order of the Bankruptcy Court or notice to any entities.

n)    *Federal Income Tax Treatment of Plan Trust*

(1)    Plan Trust Assets Treated as Owned by Creditors

For all federal income tax purposes, all parties (including, without limitation, the Debtor, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Plan Trust Assets to the Plan Trust including any amounts or other assets subsequently transferred to the Plan Trust (but only at such time as actually transferred) for the benefit of the holders of General Unsecured Claims, whether Allowed on or after the Effective Date, as (A) a transfer of the Plan Trust Assets directly to the holders of Allowed General Unsecured Claims, followed by (B) the transfer by such Persons to the Plan Trust of such Plan Trust Assets in exchange for beneficial interests in the Plan Trust. Accordingly, the holders of Allowed General Unsecured Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Plan Trust Assets.

(2)    Tax Reporting

(a)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties shall treat the Plan Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, are the grantors and beneficiaries. In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee shall promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment.  The Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 1 of the Plan.  The Plan Trustee also shall annually send to each record holder of a beneficial interest in the Plan Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Plan Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit. Subject to

74

Section 6.3(o)(ii)(C) of the Plan, the Plan Trust's taxable income, gain, loss, deduction or credit shall be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

(b)     As soon as possible after the Effective Date, the Plan Trustee shall make a good faith valuation of the value of the Plan Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all federal income tax purposes.

(c)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Plan Trustee), the Plan Trustee shall (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (3) treat as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets shall no longer be held in the Disputed Claims Reserve) and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections). The holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, shall report, for tax purposes, consistent with the foregoing.

(d)     The Plan Trustee shall be responsible for payments, out of the Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets, including the Disputed Claims Reserve.

(e)     The Plan Trustee may request an expedited determination of taxes of the Plan Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust (including the Disputed Claims Reserve).

LIBC/3667825.11

o)    *Dissolution of Plan Trust*

The Plan Trustee and the Plan Trust shall be discharged or dissolved, as the case may be as set forth in the Plan Trust Agreement.

p)    *Transition of Servicing and Collections of Defaulted Loans*

For a period of at least 30 days following the Effective Date, the Plan Trustee and First Marblehead Education Resources, Inc. ("FMER") shall attempt in good faith to negotiate the terms of a mutually acceptable transition agreement with respect to the servicing and collection of defaulted loans subject to the Trust Adversary Proceeding or otherwise subject to any Securitization Trust Settlement. For a period of no less than 90 days following the Effective Date, FMER shall continue to perform the services it has been providing during the Chapter 11 Case with respect to servicing and collecting defaulted loans subject to the Trust Adversary Proceeding pursuant to the Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the Benefit of the Trusts, entered on June 23, 2008, and FMER shall be entitled to payment from the Plan Trustee pursuant to such order; provided, however, FMER shall have no obligation to provide such services after the 90th day following the Effective Date.

### 4.    Closing of the Chapter 11 Case

The Plan Trustee will seek authority from the Bankruptcy Court to close the Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### E.    PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

### 1.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan the Plan Trustee will not be compelled or required to distribute any Cash or other property on account of any Disputed Claim or any portion thereof, unless and until such Claim becomes an Allowed Claim, and distribution on account of such Allowed Claim is required pursuant to the terms of the Plan. In the event that a Make and Wait Lender or Make and Hold Lender purchased or sold loans guaranteed by the Debtor on the secondary market and the Debtor's records do not reflect such purchase or sale, the Plan Trustee shall be entitled to withhold distributions to such Creditors pending determination of the rightful owner of such loans.

### 2.    Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor, and following the Effective Date, only the Plan Trustee, will have the right to the exclusion of all others to make, file, and prosecute objections to Claims, and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable. Objections to Claims must, subject to the Local Rules for the United States Bankruptcy Court—District of Massachusetts, be filed with the Bankruptcy Court and served upon each affected creditor. From

and after the Confirmation Date, all objections will be litigated to a Final Order except to the extent that the Plan Trustee elects to withdraw any such objection or the Plan Trustee and the holder of the Disputed Claim elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

### 3.    Estimation

In the event that the Plan Proponents seek entry of an order estimating claims, such estimation order shall not prejudice or otherwise affect the ability of the Plan Proponents or Plan Trustee, as the case may be, to object to the allowance of any Claim on any basis and the Bankruptcy Court will retain jurisdiction with respect to all Claims, including any Claim estimated pursuant to an estimation order.

### 4.    Allowance of Disputed Claims

If, on or after the Effective Date, any Disputed Claim in a Class that is entitled to receive a distribution under the Plan becomes an Allowed Claim, the Debtor, Reorganized TERI, or the Plan Trustee, as applicable, must, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, distribute to the holder of such Allowed Claim an amount sufficient to pay to such holder of a Disputed Claim the amount that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

### 5.    Disallowance of Claims Without Further Order of the Bankruptcy Court

As of the Confirmation Date, any Disputed Claim for which a proof of Claim has not been filed, will be deemed disallowed and expunged, without further act or deed.

### 6.    No Distribution in Respect of Disallowed Claims

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed.

### F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption or Rejection of Executory Contracts and Unexpired Leases

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity prior to the Commencement Date will be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed

on schedules 8.1(A)(executory contracts) or 8.1(B) (unexpired leases), which schedules will be contained in the Plan Supplement; provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either rejected or assumed as of the Effective Date. The Debtor will provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on schedules 8.1(A) or (B) will not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

Reorganized TERI will pay from Reorganized TERI Assets all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan by the earlier to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtor and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtor's sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

The Retained Cash of the Debtor shall be reduced by an amount equal to one-half of any Allowed General Unsecured Claims minus $50,000 arising from the rejection by the Debtor of the aggregate of all executory contracts rejected by the Plan (excluding Claims arising from the Debtor's rejection of Guaranty Agreements or other program documents or Claims filed against the Debtor prior to the filing of the Plan regardless of whether the underlying contract to which the claim relates was previously rejected pursuant to an Order of the Bankruptcy Court.

### 2. Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

### 3. Inclusiveness

Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or

LIBC/3667825.11

unexpired lease, without regard to whether such agreement, instrument or other document is
listed on Schedules 8.1(A) and 8.1(B).

### 4.    Return of Guaranty Fees

As soon as practicable following the Effective Date, the Plan Trustee (or the Debtor in
cooperation with the Plan Trustee) will return any Guaranty Fees received in respect of Pipeline
Loans to holders of Make and Wait and Make and Hold Claims that accept the Secured Creditor
Settlement or Make and Hold Settlement.

| AMOUNT OF GUARANTY FEES TO BE RETURNED ||
| --- | --- |
| BANK | AMOUNT |
| PNC Bank | $959,136.00 |
| National City | $76,358.00 |
| HSBC | $30,000.00 |
| Comerica Bank | $40,541.04 |
| HSBC Bank | $30,717.63 |
| Sun Trust Bank | $28,363.91 |
| U.S. Bank | $26,619.45 |
| M&T Bank | $21,027.44 |
| Huntington Bank | $18,364.62 |
| Members 1st Federal Credit | $13,131.12 |
| KeyBank | $11,718.70 |
| Sovereign Bank | $3,627.77 |
| Penn Security Bank and Trust | $3,623.58 |
| UICI/CFLD | $3,440.44 |
| TCF Bank | $2,791.36 |
| AES (Keystone) | $1,406.11 |
| GMAC Bank | $1,379.55 |
| InsurBanc | $573.21 |
| M&T Bank (Keystone) | $151.65 |

### 5.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to
Sections 8.1 or 8.4 of the Plan must be filed with the Claims Agent on or before the Rejection
Bar Date.  All such Claims not filed within such time will be forever barred from assertion
against the Debtor, its Estate or Reorganized TERI and its property.

### 6.    Insurance Policies

All of the Debtor's insurance policies (which policies are maintained by the Debtor in the ordinary course of business and the premiums for which have been prepaid) will remain in full force and effect with regard to Reorganized TERI, and are not required to be assumed by the Debtor. Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity to the extent of available insurance, including, without limitation, the insurer under any of the Debtor's policies of insurance. Under all circumstances, Reorganized TERI, and not the Plan Trustee or the Plan Trust Assets, shall be responsible for and available to pay all premiums and other insurance related expenses and liabilities.

### 7.    Compensation and Benefit Programs

From and after the Effective Date, Reorganized TERI shall make any and all payments due (for Cure Costs, contributions, Administrative Expense Claims, Claims or otherwise) solely from Reorganized TERI Assets for any and all savings plans, retirement plans (including without limitation the Pension Plan), health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, other insurance plans and management contracts. Reorganized TERI's obligations under this section shall apply regardless whether the Debtor assumes, rejects or neither assumes nor rejects such plans and contracts as of the Effective Date.

### 8.    Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized TERI will continue to pay all retiree benefits of the Debtor (within the meaning of section 1114 of the Bankruptcy Code) and all amounts due or to become due in any way related to the Pension Plan, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor had obligated itself to provide such benefits, *provided, however*, nothing herein will alter Reorganized TERI's right to amend or modify retiree benefits in accordance with applicable law. Reorganized TERI will remain obligated (to the exclusion of the Plan Trustee or any Creditor) to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA §302; Internal Revenue Code §412. The Pension Plan may be terminated only if the statutory requirements of either ERISA §4041, 29 U.S.C. §1341, or ERISA §4042, 29 U.S.C. §1342, are met. If the Pension Plan terminates, Reorganized TERI and all members of its controlled group will be jointly and severally liable for unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan. See 29 U.S.C. §1362(a).

Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor (i) is a member of the controlled group of Reorganized TERI or the Debtor for any purpose, including as set forth in the immediately preceding sentence, and (ii) shall incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative

agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.

### G.    CONDITIONS PRECEDENT TO THE ENTRY OF THE CONFIRMATION ORDER

The following are conditions to the entry of the Confirmation Order by the Bankruptcy Court:

(a)    The Bankruptcy Court has found and determined that all of the applicable requirements of 11 U.S.C. §1129 have been satisfied, have been performed or have occurred;

(b)    The Creditors' Committee has not reasonably determined that the Debtor and the Creditors' Committee are unable or will be unable to agree upon the form and substance of any document included in the Plan Supplement;

(c)    The Confirmation Order shall be entered no later than June 15, 2010; and

(d)    The Debtor has disbursed Cash prior to the Confirmation Hearing substantially in accordance with its cash projections provided to the Creditors' Committee and Final Orders of the Bankruptcy Court, and for no other purposes.

### H.    EFFECTIVENESS OF THE PLAN

#### 1.    Conditions Precedent to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date of the Plan which shall occur on or before June 30, 2010 unless the Creditors' Committee consents to an extension beyond June 30, 2010.

(a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth in the Plan, which shall be in form and substance satisfactory to the Plan Proponents;

(b)    No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in Section 9.1 or 10.1 of the Plan are satisfied or waived;

(c)    The Available Cash transferred to the Plan Trustee on the Effective Date shall not be less than $36,000,000 (inclusive of the aggregate Cash the Debtor deposited into the KeyBank Victory Fund after the Commencement Date) and exclusive of any Ambac Trust payments to the Debtor by the Cash (or other property transferred to released) to the Debtor or Plan Trustee from any Collateral Account;

(d)    The Creditors' Committee shall have filed with the Court a "Notice Establishing the Date for the Effective Date," and

LIBC/3667825.11

(e)    All documents, instruments and agreements, in form and substance satisfactory to the Plan Proponents, provided for under or necessary to implement the Plan, including but not limited to the Plan Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties thereto.

### 2.    Waiver of Conditions

Each of the conditions precedent in section 10.1 of the Plan may be waived, in whole or in part, by the Plan Proponents. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

### 3.    Reduction in Retained Cash

If Available Cash is not at least equal to $36,000,000 (inclusive of the amounts held in the KeyBank Victory Fund), then, at the election of the Creditors' Committee, in its sole discretion, the Effective Date of the Plan may occur and the Retained Cash will be reduced by an amount equal to the difference between $36,000,000 and the Available Cash.

## I.    EFFECTS OF CONFIRMATION

### 1.    Vesting of Assets.

(a)    As of the Effective Date, the property of the Estate, including all claims and Causes of Action against third parties that arose prior to or after the Commencement Date, will vest in Reorganized TERI or the Plan Trust as provided in the Plan.

(b)    From and after the Effective Date, Reorganized TERI and the Plan Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.

(c)    Pursuant to Section 1141(c) of the Bankruptcy Code, as of the Effective Date, all assets of Reorganized TERI and the Plan Trust (including, without limitation, all funds in all Collateral Account established for the benefit of Entities who have not filed timely a proof of claim) will be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

(d)    Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall affect the terms of the Transition Services Agreement dated May 30, 2008, as approved by order of the Bankruptcy Court dated June 23, 2008, or the parties' respective rights thereunder or with respect thereto.

### 2.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtor and its respective successors and assigns, whether or not the Claim of such holder is

Impaired under the Plan and whether or not such holder has accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

### 3.      Discharge

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor and Reorganized TERI, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Confirmation Date.  Upon the Effective Date, all such Persons or Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor or Reorganized TERI.

### 4.      Releases

#### a)      *Satisfaction of Claims Against the Debtor*

*Except as otherwise provided for in section 12.4(b) and (c) of the Plan, the treatment to be provided for respective Allowed Claims against the Debtor pursuant to the Plan shall be in full satisfaction, settlement and release of such respective Claims against the Debtor.*

#### b)      *Releases by Debtor Releasors*

*Except as otherwise specifically provided in section 12.4(b) of the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the implementation of the Plan, the Released Parties, on and after the Effective Date, are released by the Debtor Releasors from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, or any Person or Entity claiming derivatively through or on behalf of the Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date other than for claims based upon gross negligence or willful misconduct; provided, however, that for the avoidance of doubt, the foregoing release does not include a release of any objection or defense that the Debtor Releasors may have with respect to Allowance of any Claim, provided, further, that nothing in this paragraph shall be deemed to be a release by any of the Debtor Releasors of any Person or Entity of any Causes of Action or of any obligations imposed on any of them pursuant to the Plan.*

#### c)      *Injunction*

LIBC/3667825.11

*As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons or Entities who, directly or indirectly, have held, hold or may hold Claims against the Debtor or, as to Claims which are derivative of the Debtor and released pursuant to Section 12.4(b), the Released Parties, are permanently enjoined from taking any of the following actions on account of any such Claims, debts, interests or liabilities, other than actions brought to enforce any rights or obligations under this Plan: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, the Plan Trustee, the Released Parties or their respective properties, (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall be deemed to (a) be a release by any of the Debtor Releasors, or any Person or Entity other than Released Parties, of any Causes of Action; (b) enjoin the prosecution by the Plan Trustee of the Causes of Action (other than to the limited extent provided for in the Plan against the Released Parties), and (c) subject to section 5.5(h) above, enjoin any Person or Entity from asserting any defense or claims as a defense in any civil action, including, without limitation, in the Trust Adversary Proceeding. Notwithstanding any language to the contrary herein or in any other document, as to any Entity (including the Released Parties), nothing herein shall impair or enjoin the Plan Trustee from seeking to enforce, or to assert rights and recover damages with respect to any breach of the terms of this Plan.*

d)      <u>Exculpation</u>

The Debtor, the Released Parties, KeyBank National Association, as Administrator and Master Servicer of the KeyCorp Trusts, The Bank of New York Mellon Trust Co., N.A., as Eligible Lender Trustee and as Indenture Trustee for certain KeyCorp Trusts, The Bank of New York (Delaware), as Owner Trustee for certain KeyCorp Trusts, Deutsche Bank Trust Company Americas, as Indenture Trustee and Owner Trustee for certain KeyCorp Trusts, FMDS, solely in its capacity as Administrator to the Securitization Trusts, U.S. Bank, National Association, solely in its capacity as Indenture Trustee, trustee and eligible lender trustee to the Securitization Trusts and Other Trusts, and in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, and as bank or agent with respect to the Collateral Accounts, and MBIA Insurance Corporation, and Ambac Assurance Corporation and their respective members and professionals (acting in such capacity) (the foregoing, excluding the Debtor, the "Plan Exculpation Parties"), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, or any act taken or omitted to be taken in connection with, in contemplation of, during or in any way related to the Chapter 11 Case (all of the foregoing being collectively referred to as the "Exculpated Acts"), except for transactions, acts or omissions (i) as a result of willful misconduct or gross negligence, (ii) with respect to

LIBC/3667825.11

transactions occurring pursuant to the "Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the benefit of the Trusts" entered by the Bankruptcy Court on June 23, 2008, (iii) occurring pursuant to the Transition Services Agreement between FMER and the Debtor approved by the Bankruptcy Court on June 23, 2008, or (iv) pursuant to any contracts between or among the Debtor and any entity entered into prior to the commencement of this Bankruptcy Case. This provision does not exculpate the foregoing Persons, including the Debtor, from performing their duties under the Plan and effectuating the Plan. Nothing in this section 12.4(i) exculpates the Debtor or Reorganized TERI from performing its obligations under any contract or agreement not rejected under the Plan pursuant to 11 U.S.C. §365 or (ii) exculpates any Person from obligations unrelated to the Exculpated Acts it may owe to any other Person under any contract.

## 5.    Release of Assets

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor, its assets and properties and the Estate.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited as set forth in Article XI of the Plan.

## J.    RETENTION OF JURISDICTION

### 1.    Jurisdiction of Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

(b)    To determine any and all pending adversary proceedings, applications and contested matters relating to the Chapter 11 Case;

(c)    To hear and determine any objection to any Claims;

(d)    To hear and determine the Causes of Action;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

LIBC/3667825.11

(g)     To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(j)     To hear and determine any actions brought against the Plan Trustee or Reorganized TERI;

(k)     To recover all assets of the Debtor, property of the Estate and assets of the Plan Trustee, wherever located;

(l)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through the closing of the Chapter 11 Case);

(m)     To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(n)     To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(o)     To enter a final decree closing the Chapter 11 Case.

## K.     MISCELLANEOUS PROVISIONS

### 1.     Post-Confirmation Date Fees and Expenses

After the Effective Date, Reorganized TERI will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the professional persons employed by Reorganized TERI in connection with the implementation and consummation of the Plan and any other matters as to which such professionals may be engaged. The fees and expenses of such professionals will be paid within ten (10) Business Days after submission of a detailed invoice therefor. If Reorganized TERI disputes the reasonableness of any such invoice, Reorganized TERI will timely pay the undisputed portion of such invoice, and Reorganized TERI or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such portion of the disputed invoice.

86

### 2.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Case, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents will terminate; *provided, however*, that immediately prior to the dissolution of the Creditors' Committee, any and all analyses or work product prepared by and/or information obtained by the Creditors' Committee or its attorneys, accountants and other agents related to the Causes of Action must be transferred to the Plan Trust and will be deemed an asset of the Plan Trust for purposes of the Plan; *provided further, however*, the Creditors' Committee will continue to exist after such date solely with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional retained by the Creditors' Committee.  On and after the Effective Date, the Plan Trustee Advisory Committee will have the same standing to participate in proceedings before the Bankruptcy Court as the Creditors' Committee had prior to the Effective Date.

### 3.    Plan Supplement

The documents comprising the Plan Supplement will be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Debtor's bankruptcy counsel or on the website of the Voting Agent (www.epiqsystems.com). All exhibits and schedules contained in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 4.    Plan Controls Disclosure Statement; Confirmation Order Controls Plan

To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan will be controlling. To the extent the Confirmation Order is inconsistent with the Plan, the provisions of the Confirmation Order will be controlling.

### 5.    Modification of the Plan.

The Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order, subject to the consent of the Creditors' Committee. After the entry of the Confirmation Order but prior to the Effective Date, the Plan Proponents may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that is deemed to have accepted the Plan will be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

LIBC/3667825.11

Prior to the Effective Date, the Creditors' Committee, in its sole and absolute discretion, shall have the right not to accept any portion of the Plan Trust Assets. Any such Plan Trust Assets that the Creditors' Committee declines to accept as Plan Trust Assets shall instead be deemed to be Reorganized TERI Assets under the Plan.

## V.    CONFIRMATION PROCEDURES

### A.    VOTING PROCEDURES AND SOLICITATION OF VOTES

The voting procedures and the procedures governing the solicitation of votes are described above in Section I, and in the Solicitation Procedures Order, which has been sent to you simultaneously with this Disclosure Statement if you are entitled to vote on the Plan.

### B.    CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing will commence on _____, 2010 at _____ prevailing Eastern Time, before the Honorable Henry J. Boroff, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Massachusetts, ___ Floor, Courtroom __, **[ADDRESS]**.

### C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan proponents will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Plan Proponents under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been approved or is subject to approval by the Bankruptcy Court.

- The Plan Proponents have disclosed the identity and affiliations of the individuals proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of Reorganized TERI and the appointment to or continuance in office of such individuals is consistent with the interest of Creditors and with public policy.

- The requirement that any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan does not apply.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Claims deemed to reject the Plan.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan. The Plan contemplates the liquidation of the Plan Trust Assets by the Plan Trustee.

- The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed during the Debtor's Chapter 11 Case for each quarter (including any fraction thereof), to the Office of the United States Trustee. Subsequent to the Effective Date, the Plan Trustee will pay such fees until the case is closed.

1.    **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's chapter 11 case was converted to a chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In a chapter 7 case, unsecured creditors of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

As described in more detail in the Liquidation Analysis, the Plan Proponents believe that the value of any distributions if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of distributions under the Plan because conversion of the Chapter 11 Case would likely result in additional costs. There could also be higher general unsecured claims, including claims of the Pension Benefit Guaranty Corporation (estimated to be at least $1.5 million) and claims by senior management for claims under such officer's employment contracts. The Plan Proponents estimate that General Unsecured Creditors will receive a distribution of approximately 40-60% of their total Allowed Claims pursuant to the terms of the Plan and approximately 15%-17% if the case were converted to Chapter 7. However, such estimation includes a number of assumptions and significant economic uncertainties so there can be no assurance that the estimates provided herein and in the Best Interest Analysis will actually be achieved.

As set forth in the Liquidation Analysis, the Plan Proponents have assumed that the contingent guaranty claims would be the same in Chapter 7 as Chapter 11. However, as set forth in this Disclosure Statement, the value of the guaranty claims using the Creditors' Committee's "Decoder" is the product of months of negotiations. There is no assurance that Chapter 7 Trustee would adopt the "Decoder" or that creditors would continue to agree to a claim based upon such Decoder. Therefore, guaranty claims in a Chapter 7 could be substantially higher.

The Plan Proponents also believe that the value of any distributions to each Class of Allowed Claims in a hypothetical Chapter 7 case would be less than the value of distributions under the Plan because the distributions in a hypothetical Chapter 7 case likely would be delayed for a substantial period of time due to litigation regarding security interests and claim amounts. There is a risk that distribution of the proceeds of a hypothetical Chapter 7 liquidation might not

90

occur for one or more years after the completion of such liquidation in order to resolve Claims and prepare for distributions. Incorporating the time value of distributions to the liquidation analysis attached as Exhibit 3, would further lower the estimated recoveries as presented.

In addition, the Plan Proponents believe that if the case were converted to a Chapter 7, the estate would lose its tax exempt status and would incur "phantom income tax" as a result of the Debtor's ownership interest in the Residuals. While the amount of such tax is uncertain, the Plan Proponents currently estimate that such phantom income tax could cause the Chapter 7 estate to incur millions of dollars of tax liability, per annum.

Finally, the Plan Proponents believe that a Chapter 7 Trustee who has no specific familiarity with the Debtor's business or Causes of Action, and no agreement with the Debtor's personnel to cooperate, may not be able to maximize the value of the estate's assets. The Plan Proponents believe that the structure of the Plan, including utilizing the expertise of the Debtor, the Creditors' Committee and their respective professionals, and allowing Reorganized TERI to collect the TERI Owned Loans, will provide additional recoveries for creditors that could not be obtained by outside trustees and professionals who are not familiar with this Chapter 11 Case.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of Reorganized TERI to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

Reorganized TERI expects to have approximately 60 employees -- 40 of whom will work almost exclusively in the "College Access" outreach programs. The remaining employees will be Reorganized TERI's senior management, collection management and accounting staff. Reorganized TERI expects to generate revenues by providing loan related services, including portfolio management and collection management services.

The Debtor has prepared Exhibit D to this Disclosure Statement, entitled Reorganized TERI Financial Statement and comprised of financial projections and pro forma balance sheets ("Projections") for the three years ended April 30, 2011, 2012, and 2013. The Projections are based upon a variety of assumptions subject to significant business, economic and competitive uncertainties, contingencies and risks, many of which are beyond the control of the Debtor. Consequently, the Projections should not be regarded as a representation or warranty by the Debtor that the Projections will be realized. Actual results may vary materially from those presented and the variations may be adverse..

The Projections indicate that Reorganized TERI will have sufficient cash to operate its business and collect the TERI Owned Loans pursuant to the Collections Contract. The Projections assume that Reorganized TERI will be able to generate revenue in addition to the revenue generated by the Collections Contract by providing various portfolio management and collection management services. However, in the event that such new business does not

LIBC/3667825.11

materialize within 12 months of the Effective Date, Reorganized TERI intends to further reduce costs by further reducing headcount and implementing additional cost-saving measures. Regardless of whether Reorganized TERI is able to generate new business, the Debtor believes that it will have sufficient cash, resources and time to implement operational changes, reduce overhead and continue to operate its business and perform under the Collections Contract. Pursuant to internal projections prepared by the Debtor (and set forth below), even in a "worst-case" scenario in which Reorganized TERI is unable to generate any revenue other than the Collections Contract and existing collection management contracts, and without use of any the funds from the Restricted Charitable Gifts or Restricted Grant Funds, Reorganized TERI will be able to reduce costs (but maintain its collection staff) and still have nearly $1,400,000 of the $3,400,000 of Retained Cash as of April 30, 2012.

## The Education Resources Institute, Inc.

Income Statement – TERI "Conservative Case" Scenario

| ($ in whole amounts) | Projected 12 Months Ended 4/30/2011 | Projected 12 Months Ended 4/30/2012 |
|---|---|---|
| **Revenue** | | |
| Collections revenue | 814,870 | 638,488 |
| Risk management revenue | - | - |
| Shared recoveries | 1,000,000 | 1,000,000 |
| Other revenue | - | - |
| **Total Revenue** | **1,814,870** | **1,638,488** |
| Expenses | | |
| Depreciation | (69,351) | (73,351) |
| Employee costs* | (2,231,733) | (883,939) |
| Professional services | (286,000) | (235,750) |
| SG&A | (793,699) | (758,735) |
| TERI other income (expense) | (52,268) | (52,406) |
| **Total Expenses** | **(3,433,021)** | **(2,004,181)** |
| **Operating Income** | (1,618,150) | (365,694) |
| Interest Income (expense) | 10,007 | 7,501 |
| **Net Increase in Assets** | **$  (1,608,143)** | **$  (358,192)** |

* May increase if Board elects to award severence

92

In addition, because the overwhelming majority of the Debtor's assets, will be transferred to the Plan Trust, the ability of the Plan Trustee to make the distributions contemplated by the Plan is independent of future earnings of Reorganized TERI. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 6 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. The Claims in Classes 2a-2p, Classes 3a - 3q, Classes 4a-4k and Class 5 are Impaired under the Plan. These voting Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### a)    *Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that

the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Plan Proponents believe that the Plan does not unfairly discriminate against any holders of Claims against the Debtor.

b) *Fair and Equitable*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class of claims, the test sets different standards depending on the type of claims in such class.

(1)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (I) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(2)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property. This second requirement is sometimes referred to as the "absolute priority rule".

The Plan Proponents believe that the Plan is fair and equitable to all Classes, and that the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Plan Proponents believe that pursuant to existing case law, the absolute priority rule is not applicable in a chapter 11 of a not for profit corporation.

94

Non-profit entities typically have no equity holders.[13] Courts have ruled that, as a result of the lack of equity holders, the absolute priority rule is not applicable to a non-profit Chapter 11 plan. The *Teamsters* Bankruptcy Court stated that "the [a]bsolute [p]riority rule does not provide that a debtor entity may not receive or retain property unless all creditors have been paid in full."[14] Rather, the Bankruptcy Court held that "the [a]bsolute [p]riority rule does not, by its terms, prohibit a debtor entity from retaining its own assets, and cannot, by its terms, apply to a situation such as this where the debtor has no equity security holders."[15] The Ninth Circuit upheld the Bankruptcy Court's ruling while explaining the rationale for its holding. The Ninth Circuit stated that the rationale for the absolute priority rule in the for profit context is that equity owners should be forced to choose between liquidating their interest in the debtor or contributing value to the debtor, because the equity owners only concern is the profitability of the corporation, making their decision one of pure economics.[16] Implied in this statement is the justification for the courts ruling that the absolute priority rule does not apply in nonprofit contexts because there is no equity holder whose sole motivation is profit. Under our facts, there is no equity holder, and the assets to be retained by the debtor are retained to facilitate the debtor's charitable mission. Profit is not the primary motivation.

Courts applying *Teamsters* and *Wabash* look at the question of whether there are equity interests in a non-profit Chapter 11 case, and will not apply the absolute priority rule if no equity interest exists. Thus, the fundamental question for courts is simply whether there is any ownership interest analogous to an equity interest being retained by the debtor in the proposed plan.[17] The absolute priority rule did not prevent plan confirmation in a non-profit hospital's bankruptcy because the debtor did not have a "favored position" over the hospital's largest unsecured creditor.[18]

## VI.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and Reorganized TERI and holders of certain Allowed Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder (the "Regulations"), and administrative and judicial interpretations thereof available on or before such date. Changes in such roles or new interpretations thereof may have retroactive effect and could significantly

---

[13]   *In re Save Our Springs (S.O.S) Alliance, Inc.*, 388 B.R. 202, 245 (W.D.Tex. 2008).

[14]   *In re General Teamsters, Warehouseman and Helpers Union, Local 890*, 225 B.R. 719, 735-736 (Bankr.N.D.Cal. 1998).

[15]   *Id. at 737.*

[16]   *Teamsters* at 874.

[17]   *In re Corcoran Hosp. Dist.*, 233 B.R.449, 458 (Bankr.E.D.Cal 1999) (holding that the absolute priority rule did not apply to a non-profit hospital district because the "residents" of the district had no ownership interest akin to that of shareholders of a corporation or partners in a partnership.).

[18]   *In re Whittaker Memorial Hosp. Ass'n, Inc.*, 149 B.R. 812, 816 (Bkrtcy.E.D.Va. 1993); *See also, Independence Village*, 52 B.R. 715, 726 (stating that where a non profit had no shareholders, no interest existed that was inferior to the unsecured creditors interest).

LIBC/3667825.11

affect the federal income tax consequences described below.  The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtor has not requested and will not request a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.

The following discussion does not address any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law or United States tax laws other than income taxation.  This discussion does not apply to holders of Allowed Claims who are not United States Persons (as described by Section 7701(a)(30) of the Code), nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtor within the meaning of the Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, holders liable for the alternative minimum tax, holders whose functional currency is not the US dollar, regulated investment companies, tax-exempt organizations, pass-through entities such as partnerships and holders through such pass-through entities and holders of Claims who are themselves in bankruptcy).  Furthermore, this discussion assumes that holders of Claims hold only Claims in a single Class.  Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

If a partnership holds a Claim, the tax treatment of a partner of such partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding Claims against the Debtor, you should consult your tax advisors.

The following assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out.  This discussion further assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS AND SCHEDULES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE**

LIBC/3667825.11

TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A.    CONSEQUENCES TO THE DEBTOR AND REORGANIZED TERI

The Debtor is a not-for-profit corporation that is exempt from federal income taxation under section 501(c)(3) of the Title 26 of the United States Code (the "Tax Code"). After the Effective Date, Reorganized TERI will remain a not-for-profit. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of the Debtor or Reorganized TERI. Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences to it or Reorganized TERI.

### B.    CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2a – 2p, 3a – 3q, 4a-4k, 5 AND 6

Pursuant to the Plan, holders of Allowed Priority Non-Tax Claims (Class 1), Secured Claims of Make and Wait Lenders (Classes 2a through 2p), Secured Claims of Certain Securitization Trusts (Classes 3a through 3q), Secured Claims of Key Corp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) (Classes 4a-4k) and Convenience Class Claims (Class 6) will receive Cash in full payment of their Allowed Claims. A holder of a Claim who receives Cash in exchange for such Claim pursuant to the Plan generally will recognize income, gain, or loss for federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.

### C.    CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASS 5

Pursuant to the Plan, holders of General Unsecured Claims (Class 5) will receive a Pro Rata share of the beneficial interests in the Plan Trust. In general, each holder of a General Unsecured Claim will recognize gain or loss equal to the difference between (a) "amount realized" which is equal to the fair market value of the undivided interest in the Plan Trust received by such holder and (b) the holder's adjusted tax basis in its Claim.

#### 1.    The Plan Trust

The Plan Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity), such that the holders of its beneficial interests are treated as owning an undivided interest in the underlying assets of the trust. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Plan Trust has been structured

with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, Reorganized TERI, the Plan Trustee and the holders of Allowed General Unsecured Claims against the Debtor) are required to treat, for federal income tax purposes, the Plan Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, are the owners and grantors. However, no ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Plan Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge the trust classification, the federal income tax consequences to the Plan Trust, the holders of Claims against the Debtor, and Reorganized TERI may vary from those discussed herein.

*Holders of Allowed General Unsecured Claims are urged to consult with their tax advisors regarding potential alternative characterizations.*

        a)      *General Tax Reporting by the Plan Trust Trustee and Beneficiaries*

For all federal income tax purposes, all parties (including, without limitation, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims against the Debtor) must treat the transfer of assets to the Plan Trust, and any amounts or other assets subsequently transferred to the Plan Trust in accordance with the terms of the Plan (but only at such time as actually transferred), as a transfer of an undivided interest in the Plan Trust Assets to the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, followed by the transfer of the entire interest in the Plan Trust Assets by the beneficiaries of the Plan Trust to the Plan Trust (absent being notified by the Plan Trustee, as discussed below, or the IRS that an alternative treatment is required). Consistent therewith, all parties must treat the Plan Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, are the owners and grantors. Thus, the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, will be treated as the direct owners of an undivided interest in the assets of the Plan Trust for all federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the Plan Trust).

Pursuant to the Plan, the Plan Trustee shall make a good faith valuation of the value of the Plan Trust Assets and shall provide such valuation to the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date. Under the Plan, such holders (and all other parties, including Reorganized TERI) are required to report the value of such assets in a manner consistent with the valuations provided by the Plan Trustee for federal income tax purposes. There can be no assurance that the IRS will agree with the valuations provided by the Plan Trustee, and a different valuation of the assets transferred to the Plan Trust could subject the holders of Allowed General Unsecured Claims against the Debtor to additional income taxes.

Subject to the treatment of the Disputed Claims Reserve (discussed in the next section), the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, will be required to report on their federal income tax return their allocable share of any taxable income, gain, loss, deduction or credit recognized or incurred by

the Plan Trust. Allocations of taxable income and gain will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The character of items of income, gain, loss and credit to any holder, and the ability of such holder to benefit from any deduction or losses, may depend on the particular situation of each holder.

The federal income tax obligations of a holder of an Allowed General Unsecured Claim against the Debtor that will result from holding an interest in the Plan Trust are not dependent upon the Plan Trust distributing any Cash or other proceeds. Therefore, any such holder may incur a federal income tax liability with respect to its allocable share of the income of the Plan Trust regardless of the fact that the Plan Trust has not made any concurrent distribution to the holder. In general, other than in respect of assets treated as held in the Disputed Claims Reserve and distributions resulting from unclaimed distributions, a distribution of Cash or property by the Plan Trust will not be taxable to the holder as such holder would already be regarded for federal income tax purposes as owning the underlying assets (and would already have realized associated income, if any).

Subject to definitive guidance that an alternative treatment of the Plan Trust is required, the Plan Trustee will file with the IRS returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Plan Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct each holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.

Pursuant to the Plan, all parties are required to treat the Plan Trust as a "grantor trust" subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee). In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment.

b)      *Tax Treatment of Disputed Claims Reserve*

Pursuant to the Plan, the Plan Trustee will hold the assets of the Plan Trust allocable to, or retained on account of, Disputed General Unsecured Claims against the Debtor, as determined from time to time, separately from other assets of the Plan Trust in the Disputed Claims Reserve.

99

Such assets shall be subject to an allocable share of all expenses and obligations of the Plan Trust. Distributions from the Disputed Claims Reserve will be made, in accordance with the Plan, as Disputed General Unsecured Claims against the Debtor are subsequently resolved.

Under section 468B(g) of the Tax Code, amounts earned in an escrow account, settlement fund or similar fund are subject to tax on a current basis, as the amounts are earned. The Plan provides that the Plan Trustee will, to the extent permitted under applicable law, make an election to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9, and report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties must report consistently with such treatment.

A disputed ownership fund is subject to a separate entity level tax, in a manner similar to either a corporation or a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.,* depending upon the nature of the assets transferred to the fund. In the present case, it is expected that the Disputed Claims Reserve will be taxable similar to a corporation. So treated, the Disputed Claims Reserve will be subject to a separate entity tax (maximum federal income tax rate, currently 35%).

In determining the taxable income of the Disputed Claims Reserve, (a) any amounts transferred by the Debtor to the reserve will be excluded from the reserve's income; (b) any sale or exchanges of property by the Disputed Claims Reserve (including recoveries on Plan assets, to the extent allocable to the Disputed Claims Reserve) will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis that the Disputed Claims Reserve has in such property; (c) any interest income or other earnings with respect to the Disputed Claims Reserve's assets will be included in the Disputed Claims Reserve's income; and (d) any administrative costs (including state and local taxes) incurred by the Disputed Claims Reserve will be deductible by the Disputed Claims Reserve.

Pursuant to the Plan, the Plan Trustee will take into account in determining the taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims against the Debtor had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), and as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims against the Debtor as and when, and to the extent, such Claims are subsequently resolved (following which time such assets shall no longer be held in the Disputed Claims Reserve).

Although not entirely certain, it appears that distributions from the Disputed Claims Reserve to holders of Allowed General Unsecured Claims against the Debtor should be taxed to such holders in the same manner as if such amounts were received directly from the Debtor. Although not expected, if upon the termination of the Disputed Claims Reserve, the reserve has any unused tax loss or credit carryforwards, the Treasury Regulations would allocate the carryforwards among all or part of the holders of the Allowed General Unsecured Claims against the Debtor.

100

### D.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding obligations (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%). Backup withholding generally applies if the holder: (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is such holder's correct number and that such holder is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, applicable Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' federal income tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.*

## VII.   RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a resolicitation of votes.  Finally, there can be no assurance that any or all of the conditions to the Effective Date of the Plan will be met (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

LIBC/3667825.11

### B.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN SECTION VI OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES" FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTOR AND FOR HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

### C.    RISK THAT CLAIMS WILL BE HIGHER THAN ESTIMATED

The projected distributions and recoveries set forth in this Disclosure Statement and the analysis attached as Exhibit C are based on the Plan Proponents' estimates of contingent claims as well as an estimate of other Allowed Claims.  The Plan Proponents project that the Claims asserted against them will be resolved in and reduced to an amount that approximates their estimates.  There can be no assurance, however, that the Plan Proponents' estimates will prove accurate.  If the estimate is low, for example, the Plan Trust Assets may not be sufficient to reach the projected 55% recovery to General Unsecured Creditors.

### D.    RISK THAT THE CLAIMS OF FMC AND ITS SUBSIDIARIES WILL NOT BE SUBSTANTIALLY REDUCED BY THE COURT

As disclosed previously, prior to the Commencement Date, TERI outsourced its front office and back office services to FMC, including loan processing, human resources and accounting.  On October 16, 2008, FMC and its subsidiaries, FMER and FMDS filed separate proofs of claim against the Debtor alleging rejection damages and other claims in excess of $87,000,000.  The Debtor believes that the Claims asserted by the FMC entities are substantially inflated and seeks damages that are not compensable under state law.  The Debtor believes that the amount of FMC's aggregate claims are no more than $14,000,000 and potentially significantly less than that amount.  The Debtor intends to file an objection to FMC's claim.  However, there can be no assurance that the Debtor will prevail in its objection.  If the FMC claims are not reduced, the recovery to holders of General Unsecured Claims will be diluted.

### E.    RISK THAT THE PLAN TRUSTEE WILL NOT ACHIEVE PROJECTED RECOVERIES IN RESPECT OF DEFAULTED LOANS

A significant portion of the value ascribed to the Plan Trust is comprised of defaulted student loans that must be collected through various collection methods and agencies.  The book value represents the present value of future recoveries of defaulted loans using a 48% net recovery rate (which is consistent with the Debtor's historical experience).  The value of these loans is subject to a variety of factors -- including the timing of recoveries, the net recovery rate and the discount rate.  However, there can be no assurance that such amount will actually be achieved.  Moreover, often it takes years to recover defaulted loans and given the life of these

LIBC/3667825.11

assets, there is the possibility that the Plan Trustee will seek to monetize the defaulted loan portfolios at a future date, thereby, in all likelihood, reducing the value received in respect of the defaulted loan portfolios.

### F.    LITIGATION RISKS

The Plan provides, among other things that the Debtor's interest in Causes of Action will be transferred to the Plan Trust to be prosecuted by the Plan Trustee for the benefit of the holders of General Unsecured Claims.  Although the Plan Proponents anticipate that the Causes of Action will, in time, be resolved in a manner that provides a net benefit to the holders of General Unsecured Claims, there can be no guarantee that the result will be favorable.

Other than the Trust Adversary Proceeding and the Make and Wait Lien Dispute, the Plan Proponents are not aware of any Significant Causes of Action that may exist or might be asserted by the Plan Trustee.

## VIII.  CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Plan Proponents urge holders of impaired Claims that are entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [time], Prevailing Eastern Time, on [Date, 2010].

LIBC/3667825.11

Dated: Boston, Massachusetts
        February 25, 2010

Respectfully submitted,

THE EDUCATION RESOURCES
INSTITUTE, INC.

By their attorneys,


Daniel M. Glosband
Daniel M. Glosband, P.C. (BBO# 195620)
Gina Lynn Martin, Esq. (BBO# 643801)
Goodwin Procter  LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1000


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS


Jeffrey D. Sternklar
Jeffrey D. Sternklar (BBO# 549561)
Duane Morris LLP
470 Atlantic Avenue
Boston, Massachusetts  02110
(857) 488-4216