# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| In re )<br><br>THE EDUCATION RESOURCES INSTITUTE, INC., )<br><br>Debtor. ) | Chapter 11<br>Case No. 08-12540(HJB) |

## MOTION FOR INTERPRETATION OF ORDER

### INTRODUCTION

1.        The Education Resources Institute, Inc., the debtor and debtor in possession in the above-captioned case ("TERI" or the "Debtor") was party to several contracts with The First Marblehead Corporation ("FMC"), First Marblehead Education Resources, Inc. ("FMER"), and First Marblehead Data Services, Inc. ("FMDS") (collectively, the "First Marblehead Entities," "First Marblehead Contracts").  The First Marblehead Contracts were rejected pursuant to the Order Granting Motion (A) Pursuant to Section 365 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 6006 and 9014 Authorizing Debtor to Reject Certain Contracts with the First Marblehead Corporation and (B) Pursuant to Section 363 of the Bankruptcy Code Authorizing the Debtor to Enter into a Transition Services Agreement entered by this Court on June 23, 2008 (the "Contracts Order").  A copy of the Contracts Order is attached as Exhibit 1. The Contracts Order provides, *inter alia,* "that this Court will retain jurisdiction to construe and enforce the terms of this Order."  (Contracts Order, final Ordered paragraph).

2.        The First Marblehead Entities assert that the Transition Services Agreement ("TSA") and the Contracts Order extend in perpetuity provisions of one of the rejected First

Marblehead Contracts. Those provisions would prohibit TERI from using its own Data[1] for any purpose unrelated to loan guarantee programs offered and guaranteed by TERI, a currently non-existent business, while leaving Reorganized TERI exposed to contingent, whole dollar post-confirmation indemnity liability. This interpretation, which is contrary to the record in this case and which neither TERI nor its Official Committee of Unsecured Creditors ("Committee") share, is unsupported by the operative documents and poses a serious threat to Reorganized TERI. Accordingly, TERI seeks to have the Court interpret the Contracts Order with respect to this issue. The TSA and the Contracts Order make clear that the disputed restrictions and obligations expired on May 31, 2010. Statements in FMC's Form 10-K filed on September 2, 2010 (discussed below) and in the October 7, 2010 Stipulation Resolving Claims of First Marblehead Education Resources, Inc., The First Marblehead Corporation, and First Marblehead Data Services, Inc. (Docket Number 1151) (the "FMC Stipulation") indicate, however, that FMC takes the position that certain restrictions on TERI's Data use remain in effect. If this issue is not resolved, Reorganized TERI may be unable to operate any business other than performing the Collections Contract or re-instituting a guarantee business and may remain exposed to contingent obligations to indemnify the First Marblehead Entities with respect to Data-related issues. This result would run counter to the plain terms of the Contract Order and TSA, as well as the clear expectations of the parties.

3.      In light of Reorganized TERI's diminished finances, it cannot delay confrontation of this issue and risk expensive post-Effective Date litigation with the First Marblehead Entities over use of its Data. Consequently, it is compelled to present this issue to the Court. Such

---

[1]  Capitalized terms not defined herein will have the meanings ascribed in the <u>Modified Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors as of August 26, 2010</u>.

litigation would pit a post-emergence non-profit with greatly diminished resources against a publicly-held company with hundreds of millions of dollars in cash at its disposal. The FMC Stipulation identifies this dispute as the "Database Dispute." This Motion presents the Database Dispute for resolution by the Court. The Debtor respectfully requests that this Court interpret the Contracts Order to preclude the First Marblehead Entities from asserting that restrictions on TERI's use of Data and TERI's obligations to indemnify the First Marblehead Entities have not expired and that the Court otherwise enforce the Contracts Order, as detailed below.

In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

4.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409. The statutory predicate for the relief sought herein is section 105(a) of title 11 of the United States Code (the "Bankruptcy Code" or the "Code"). Federal Rules of Bankruptcy Procedure ("FRBP") 9013 and 9014 apply to this Motion as does Local Bankruptcy Rule of the United States Bankruptcy Court for the District of Massachusetts ("MLBR") 9013-1. There can be no question that the Court has jurisdiction to entertain this Motion. As recently stated by the U.S. Supreme Court:

> The answer here is easy: as the Second Circuit recognized, and respondents do not dispute, the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders. See *Local Loan Co. v. Hunt*, 292 U. S. 234, 239 (1934) . What is more, when the Bankruptcy Court issued the 1986 Orders it explicitly retained jurisdiction to enforce its injunctions.

Travelers Indem. Co., et al. v. Bailey, 557 U.S. ___, 129 S.Ct. 2195, 2205, No. 08-295, slip op. at 13 (2009) (upholding the bankruptcy court's jurisdiction to enter an order clarifying an earlier order). See also In re Pearson, et al., 990 F.2d 653 (1st Cir. 1993) (holding that a court retains authority to enforce, modify, and interpret consent decrees as part of the court's

3

"inherent powers"); Harvey v. Johanns, 494 F.3d 237, 242 (1st Cir. 2007) ("We must, of course,

accord deference to the district court's interpretation of the wording of its own order.").[2]

## BACKGROUND

5.      On April 7, 2008 (the "Petition Date"), the Debtor commenced its bankruptcy

case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code.

6.      The Official Committee of Unsecured Creditors in the Chapter 11 Case (the

"Creditors' Committee") was appointed on April 30, 2008.  No trustee or examiner has been

appointed.

7.      The Debtor is operating its business and managing its property as a debtor in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On August 30, 2010, the Debtor and the Creditors' Committee filed the Modified

Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the

Official Committee of Unsecured Creditors as of August 26, 2010 ("the August 2010 Plan").  A

hearing on confirmation of the Plan was held on October 18, 2010.

9.      In approximately 2001, TERI agreed to sell to FMER (a) a redacted version (the

"Delivered Database") of TERI's loan database (the "Loan Database") and (b) virtually all of

TERI's loan-related and administrative operations.  As part of the same transaction, TERI agreed

to outsource TERI's origination, staff support, and other administrative functions exclusively to

FMC. At that time, FMC, with under 30 employees, was a modest player in the burgeoning

securitization market, aggregating loans originated by banks into specially formed trusts and

---

[2]    No less an authority than Judge Learned Hand stated that the power of judges to consider the meaning of their
own orders was "ancient and elementary" and "so common and so necessary to the reasonable exercise of their
jurisdiction," when he rejected the proposition that a bankruptcy judge's orders cannot be revisited. Central Ill.
Co. v. Irving Tr. Co. (In re Pottasch Bros Co., Inc.), 79 F.2d 613, 616 (2nd Cir. 1935).

LIBA/2124161.3

causing the trusts to issue private student loan asset-backed securities ("ABS") for sale to investors. FMC proposed that TERI be the sole guarantor of all loans bought by any trust formed by FMC. FMC approached TERI with the administrative outsourcing and exclusive guaranty proposal because it believed that TERI's guaranty and TERI's name recognition would enhance its ABS business and allow FMC to substantially increase the volume and profit margin of its ABS business. TERI, in turn, hoped that FMC's business model would benefit student borrowers by providing liquidity to the private student loan market, which would in turn increase much needed funding during a period of rapidly growing higher education costs. Accordingly, TERI sold almost all of its student loan origination and guaranty operations to FMC in 2001 and almost all of TERI's employees became FMC's employees when the sale occurred. Notwithstanding the sale to the FMC Entities of its operations and of the Delivered Database, TERI retained ownership of its Loan Database.

10.    In connection with this arrangement, TERI and FMC entered into several contracts with an initial five year term and a five year extension, to expire no later than 2011. The Master Loan Guaranty Agreement between TERI and FMC dated as of February 2, 2001, as amended, established the terms pursuant to which TERI would guaranty student loans.

11.    The Master Servicing Agreement between TERI and FMER, a subsidiary of FMC, dated as of July 1, 2001 (the "MSA"), as supplemented, covered day-to-day operations, including loan origination, risk management, customer service, collections, accounting, payroll, claims management and program administration. Under the MSA, TERI reimbursed FMER monthly at cost for its expenses, pursuant to a negotiated annual budget. Before the beginning of each new fiscal year, FMER presented TERI with estimates of FMER's costs and loan volume. After a short process of negotiation, the parties would agree on the final cost budget.

12.    The Database Sale and Supplementation Agreement dated June 20, 2001 (the

"Database Agreement") granted rights to FMER and FMC to use data gathered by TERI in

connection with its business as a loan guarantor and imposed certain restrictions and obligations

on TERI, FMER, and FMC with respect to Data for the term of the Database Agreement and for

two years after its termination.  There were no restrictions on or obligations of TERI that

extended beyond the end of that two-year, post-termination period.  The effect of the TSA on the

Database Agreement, as referenced in the TSA, is at the heart of the dispute that necessitated this

Motion.  A copy of the Database Agreement is attached hereto as Exhibit 2.

13.    The securitization market began to evaporate in September 2007, the economy

continued to deteriorate in 2008, and TERI was forced to file its chapter 11 petition in April of

2008.  The economics of TERI's business could no longer support the cost structure of the FMC

Contracts.  TERI filed the Motion of Debtor for Order (A) Pursuant to Section 365 of the

Bankruptcy Code Authorizing the Debtor to Reject Certain Contracts with the First Marblehead

Corporation and (B) Pursuant to Section 363 of the Bankruptcy Code Authorizing the Debtor to

Enter into a Transition Services Agreement (the "Contracts Motion") in June 2008.  Pursuant to

the Contracts Motion and as part of the Contracts Order, the Court authorized TERI to enter into

the TSA.  A copy of the TSA is attached as Exhibit 3.  The TSA addressed the terms of the

transition of operations and services back to TERI from FMER.

### THE TSA ISSUE

14.    The second paragraph of Section 2.1 of the TSA contains the following provision

concerning the Database Agreement:

> Notwithstanding the rejection or other termination of the Database Agreement, (i)
> FMER shall continue to possess all right, title and interest in and to the Delivered
> Database (as defined in the Database Agreement), including the right to use and
> possess the Delivered Database and the right to share the data with FMC, to

6

disclose the data to others, to copy and manipulate the data and generally to exercise ownership of the Delivered Database and all modifications and enhancements thereof and (ii) the Loan Database transferred from FMER to TERI pursuant to Section 2.1 of this Agreement shall remain subject to sections 2.01 (Grant), 2.02 (FMER Restrictions) and 2.03 (TERI Restrictions) of such Database Agreement and any and all additional terms of the Database Agreement that pursuant to section 10.01 of the Database Agreement survive termination of such agreement and remain in full force and effect.

15.     Thus, the TSA provides that, notwithstanding rejection and termination of the Database Agreement, two aspects would survive on the same terms and to the same extent as provided in the Database Agreement.[3] First, the initial part of Section 2.1 of the TSA, Section 2.1(i), confirms FMER's perpetual rights to the Delivered Database. This provision is not the subject of the current dispute. The Database Agreement defines the Delivered Database sold to FMER as "the database created pursuant to Sections 3.01 and 3.02," which includes essentially all of TERI's loan-related data: the "Loan Database," updated for the life of the Database Agreement, but redacted to exclude information identifying specific borrowers and lenders. (Database Agreement, Section 2.01, Section 3.01 and definitions of Delivered Database, Excluded Data and Loan Database.)[4] Section 2.1(i) is independently operative and is not limited as to time or scope by the "Surviving Obligations" provision of section 2.01 of the Database Agreement discussed below in paragraphs 17 and 18.[5] In this respect, the TSA does not change the terms of the Database Agreement with respect to the Delivered Database and is identical in

---

[3]   The Contracts Order provides, inter alia, that "each of the First Marblehead Entities may treat each of the First Marblehead Contracts as terminated as of May 31, 2008." (Contracts Order, third Ordered paragraph).

[4]   "Loan Database" consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including, without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria.

[5]   TERI believes that the Delivered Database retained by FMER may contain Excluded Data and the Court should direct it to purge any such Excluded Data.

LIBA/2124161.3

effect to the section of the Database Agreement that concerned the Delivered Database, which

provides as follows:

> 5.01    Delivered Database.
>
>> As to the Delivered Database, including, without limitation, the Initial
>> Loan Database, Queries and Updates actually delivered to FMER, the
>> right and ownership granted hereunder is perpetual and non-cancelable,
>> except as provided in Section 5.03 with respect to repurchase of assets
>> under the Purchase and Sale Agreement.[6]

Database Agreement, Section 5.01.

16.     The Loan Database, unlike the Delivered Database, always belonged to TERI.

FMER only maintained the Loan Database in its former role as TERI's exclusive outsource

provider.  The issue in dispute between TERI and the First Marblehead Entities arises from

Section 2.1(ii) of the TSA, concerning the Loan Database.  Section 2.1 of the TSA, which

required TERI to pay FMER to transfer the Loan Database back to TERI, provided that the

"survival" provision of the Database Agreement would survive rejection and termination of the

Database Agreement.  Specifically, Section 2.1(ii) of the TSA provides "(ii) **the Loan Database**

transferred from FMER to TERI pursuant to Section 2.1 of this **Agreement shall remain**

**subject to sections** 2.01 (Grant)[7], **2.02 (FMER Restrictions) and 2.03 (TERI Restrictions) of**

**such Database Agreement and any and all additional terms of the Database Agreement**

**that pursuant to section 10.01 of the Database Agreement survive termination of such**

---

[6]    Section 5.03 is not applicable.  It deals with TERI's right to repurchase the Delivered Database in circumstances
that never arose.

[7]    The inclusion of the "Grant" of rights in the Delivered Database to FMER is redundant in the Database
Agreement in light of Section 5.01 and is similarly redundant in the TSA in light of Section 2.1(i).

LIBA/2124161.3

**agreement and remain in full force and effect.**" (emphasis supplied).  Just as Section 2.1(i) of

the TSA made no change to the Database Agreement, neither did Section 2.1(ii).[8]

17.    Section 10.01 of the Database Agreement concerning the survival of certain

obligations provides as follows:

10.01 <u>Survival</u>.

**The Surviving Obligations shall survive termination of this Agreement for a period of two years after the termination date.**  (emphasis supplied).

18.    The Database Agreement defines the **"Surviving Obligations"** as "the obligations

of the parties **pursuant to Sections** 2.01, **2.02, 2.03, and Articles VIII, IX, and X** hereof, which

obligations shall survive termination of this Agreement." (emphasis supplied).[9]  The sections

referenced as containing surviving obligations – those obligations which continue for two years

after the termination of the Database Agreement and then expire – provide as follows:

(a)    Section 2.02 of the Database Agreement comprises the FMER

Restrictions, which essentially impose a requirement that TERI consent to any sale or

license of the Delivered Database by FMER (except to FMC or as part of a sale of

substantially all of its assets) and which require that FMER obtain confidentiality

agreements from parties to whom it is entitled to disclose the Delivered Database.

(b)    Section 2.03 of the Database Agreement comprises the TERI Restrictions,

which prohibit TERI from selling, licensing or transferring the Loan Database or its copy

---

[8]    The Database Agreement is by no means clear in its distinctions between the Delivered Database, which includes the Initial Loan Database and updates, and the Loan Database, which includes the same data and from which TERI is allowed to make derivative databases, and just how the TERI Restrictions and the FMER Restrictions apply to these permutations.  Fortunately, Section 10.01 is clear that the Surviving Obligations, whatever their scope or meaning, survive termination for two years.

[9]    Section 2.01, which provides that the grant of rights to the Delivered Database survives termination, is superfluous in light of Section 5.01 as discussed in paragraph 15 above.

LIBA/2124161.3

of the Delivered Database and which limit TERI's use of the Data to the "Retained

Uses," defined as:

> [T]he right retained by TERI to utilize the original version of the Loan
> Database (including the original copy thereof and information thereafter
> obtained, generated, recorded or otherwise received by TERI which would
> otherwise be deemed part of the Loan Database) for its own use for purposes of
> designing, underwriting, implementing, evaluating and managing education loan
> guarantee programs offered and guaranteed by TERI.

Database Agreement at 3 (emphasis supplied).

    (c)    Article VIII of the Database Agreement contains FMC's guarantees of

FMER's performance under the Database Agreement.

    (d)    Article IX of the Database Agreement contains detailed indemnity

undertakings by each of TERI and FMER for claims or losses relating to breaches of the

Database Agreement by either of them.

    (e)    Article X of the Database Agreement contains typical miscellaneous

provisions and also, importantly, contains Section 10.01 which provides that the

Surviving Obligations survive termination for a period of two years after the termination

date.

    19.    The TSA had an initial term of 60 days with two 30-day extensions.  Both parties

had the right to terminate the TSA for various reasons.  The TSA provided that during its term

FMC or FMER would provide, in exchange for compensation:  (1) loan origination services, (2)

multiple loan disbursements, (3) collection efforts, (4) default prevention, (5) post-default

collections, and (6) infrastructure to the Debtor as it transitioned away from FMC.[10]  Nowhere in

the Contract Rejection Motion or the Contracts Order is there any indication that terms of the

Database Agreement will be modified by the TSA, any discussion of the perpetual Data

restrictions or indemnity obligations posited by the First Marblehead Entities, nor any indication

that TERI agreed to restrict in perpetuity its use of the Loan Database that it owned.  The reason

for the omission is simple – TERI never agreed that the restrictions would apply indefinitely.

Indeed, TERI agreed to the application of the two year survival provision of the Database

Agreement and to FMER's ownership of the Delivered Database, just as both provisions were

stated in the original Database Agreement.  In so doing, TERI understood that its post-

confirmation use of Data might be limited to activities relating to loans that it had guaranteed or

to any new guaranty business were the market for such business to return.  However, the

limitation that TERI agreed to would be for, at most, a brief, finite period – that is, two years; the

same two year period always contemplated by the Database Agreement.  Since the Contracts

Order provided that "each of the FMC Entities may treat each of the FMC Contracts as

terminated as of May 31, 2008," the Surviving Obligations would terminate on May 31, 2010.

Neither TERI nor the Creditors' Committee, which supported the Contracts Motion (nor,

presumably, the Court or any other party), had any reason to think that the TSA gave the FMC

Entities perpetual Surviving Obligations, something that they never had under the original

Database Agreement.

---

[10]   Section 3.13 of the TSA provides that "Article II shall survive termination of this agreement" but this provision
does not affect the interpretation of Section 2.1 of Article II which incorporates into the TSA the survival
provisions of the Database Agreement.

20.    The references to the Database Agreement in the Contracts Motion are neutral on

the issue of the restriction on TERI's use of Data.[11]  However, other portions of the Contracts

Motion and the record of the June 20, 2008 hearing on the Contracts Motion clearly reflect

TERI's intentions to use the Data for purposes in addition to its historic guaranty business.  For

example, in discussing rejection of the Marketing Agreement, TERI states, without reference to

guarantees, that "[f]ollowing rejection, TERI will be able to market its own loan programs

directly to lenders and schools…",[12] an impossibility if TERI could not use its Data.  In

discussing the Master Loan Guaranty Agreement, TERI states that "TERI is diligently working

with its advisors to formulate a new business plan and business model in this challenging

economic environment, and promptly relieving itself of the burdens of the Guaranty Agreement

is in the best interests of TERI, its estate and its creditors."[13]  When asked by counsel to the

United States Trustee to discuss TERI's prospective business prospects, TERI's counsel noted

that TERI planned to exploit its Data:  "Using what's really TERI's primary source of value,

which is its intellectual property to evaluate risk and model portfolios in some way or other is,

you know, a piece of the equation; and that's really one thing TERI has that hardly anyone else

has."[14]

21.    In connection with the February 2010 Plan, TERI submitted projections of its

intended post-confirmation operations (Reorganized TERI Financial Statements, Exhibit D to the

Disclosure Statement).  Those projections were preceded by a statement of Key Assumptions

---

[11]    "The Debtor seeks to reject the Database Agreement.  Going forward, the TSA will govern the parties'
obligations with respect to the Loan Database (as defined in the Database Agreement)."  Contracts Motion, par.
15.

[12]    Contracts Motion, par. 16.

[13]    Contracts Motion, par. 14.

[14]    Transcript of hearing on: (#238) [the Contracts Motion]; June 20, 2008.  Copy attached as Exhibit 4.

LIBA/2124161.3

that included the following: "Management's long range plan includes generating revenues from further developing its existing collection management business and offering portfolio management services..."[15] Testimony at the April 28, 2010 hearing on confirmation by TERI's financial advisor, James Peko, dealt extensively with the subject of portfolio and risk management services to be offered by TERI and the use that TERI would make of its Data in providing such services.[16] This evidence led to the Court's finding at page 204 "And so [TERI] appears to be ready to take on new work, has a good reputation in this collection area, and there's no reason why the portfolio management business should not rapidly improve in a – market in which those services are needed."[17] Without the ability to use its Data, TERI could not conduct a portfolio management business.

22.     The First Marblehead Entities were present in the courtroom and spoke, through counsel, at both the hearing on the Contracts Motion and the hearing on the February 2010 Plan. They never made known to the Court or the parties, at either hearing, their view that the TSA prohibited TERI from using its Data such that TERI's representations and evidence were incorrect. They should not now or in the future be allowed to take the contrary position that they first disclosed to the Court and the parties in interest on the eve of the Confirmation Hearing.

23.     Until September of 2010, FMC's Annual Report to the Securities and Exchange Commission on Form 10-K (the "10-K") discussed data issues in a way that was consistent with the TSA and with TERI's understanding. Each of the 10-K's for the fiscal years ended June 30,

---

[15]   The identical language appears in the updated Reorganized TERI Financial Statements that are attached to the Supplemental Disclosure.

[16]   See, for example, pages 142-162 of the Transcript of the April 28, 2010 hearing, attached hereto as Exhibit 5.

[17]   Id., at p. 204.

2008 and June 30, 2009 contained two sections that addressed data.[18]  One section is captioned *If competitors acquire or develop a student loan database or advanced loan information processing systems, our business could be adversely affected* (the "Competitors Section") and explains the value of the database owned by the First Marblehead Entities.  The language of this section appears to be identical for 2008 and 2009 and only mentions TERI in a statement concerning lack of access to updates from TERI following termination of the First Marblehead Contracts.  The next section of the 10-K is captioned *If we are unable to protect the confidentiality of our proprietary database and information systems and processes, the value of our services and technology will be adversely affected* (the "Protection Section") and contains the following language for each of the three years:  "We have sought to limit TERI's rights to disclose its historical loan database in the context of the TERI Reorganization…"

24.    TERI does not dispute the accuracy of the language of the Protection Section for the years ended June 30, 2008 and 2009 (although the words "limit TERI's rights to disclose" are narrower than the limitations contained in the Retained Uses), since the TERI Restrictions survived until May 31, 2010.  However, when the identical language was repeated in the 10-K for the year ended June 30, 2010 (filed on September 2, 2010), it manifested the position of the First Marblehead Entities that some restrictions remained on TERI's use of its Data after the two-year survival period expired on May 31, 2010.  The 2010 10-K also adds language to the Competitors Section for the first time that emphasizes the intentions of the First Marblehead Entities to attempt to deprive TERI of its rights to use its Data:  "In addition, if TERI were to assert successfully that certain contractual restrictions on the use and sale of its historical loan

---

[18]    Excerpts from the FMC 10-K's for fiscal 2008, 2009 and 2010 containing the relevant sections are attached as Exhibit 6 (a), (b) and (c).

data terminated in the context of the TERI Reorganization or otherwise, the competitive

advantage of our loan database could diminish."

25.     FMC never argued this position in the context of the lengthy negotiations over the

plan of reorganization.  More than one year after the expiration of the TSA, with less than a year

left before the Surviving Obligations were to terminate, TERI negotiated with the Committee,

with FMDS and with other parties a plan of reorganization that presumed that Reorganized TERI

would create business and revenue by using the Loan Database for collection and portfolio

management services.  None of those parties suggested that TERI would be unable to use its

Data.  Moreover, despite FMC being actively involved in the negotiation and review of the

February 2010 Plan and the August 2010 Plan, it never claimed in a pleading or other writing

(not subject to Rule 408 of the Federal Rules of Evidence) that TERI did not have the right to use

its own data until the Database Dispute was identified in the FMC Stipulation.

26.     The February 2010 Plan and the August 2010 Plan contain the same broad

definition of Data, clearly encompassing the Loan Database and TERI's copy of the Delivered

Database.[19]  Data is included as one of the Reorganized TERI Assets (February 2010 Plan,

sections 1.36, 1.112; August 2010 Plan, sections 1.34, 1.104).  Pursuant to Article XII of the

February 2010 Plan and the August 2010 Plan, the Data would vest in TERI as of the Effective

Date, free and clear of any Claims, liens, encumbrances, charges and other interests, except as

provided in the Plan or the Confirmation Order."  February 2010 Plan at section 12.1(c).  The

survival of the TSA, including the brief post-confirmation survival of the Surviving Obligations,

was accomplished by section 12.1(d) of the Plans:

---

[19]   **Data** means all books and records of the Debtor, including, but not limited to, computer generated or computer maintained books and records and computer data, and electronically generated or maintained books and records or data.  Section 1.36 of February 2010 Plan and Section 1.34 of August 2010 Plan.

15

(d) Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in this Plan or in the Confirmation Order shall affect the terms of the Transition Services Agreement dated May 30, 2008, as approved by the order of the Bankruptcy Court dated June 23, 2008, or the parties' respective rights thereunder or with respect thereto.

27.     Section 12.1(d) of the Plan, in part, confirms that FMER's rights to the Delivered Database are not affected by the Plan, such that confirmation is consistent with the TSA and the perpetual grant of ownership under the Database Agreement.  However, Section 12.1(d) of the August 2010 Plan is now superfluous with respect to the continuation of the TERI Restrictions and the FMER Restrictions, since May 31, 2010 has come and gone and the Surviving Obligations have terminated.

28.     The notion that the TSA extended the TERI Restrictions indefinitely was never presented to the Court until the October 7, 2010 filing of the FMC Stipulation (in the FMC Stipulation, TERI reserved its rights to dispute the position now asserted by FMC and FMER). Nothing in the Motion or the transcript of the June 20, 2008 hearing on the Contracts Motion supports the interpretation advanced by the First Marblehead Entities.  The First Marblehead Entities' position, if correct, would mean that in June 2008 TERI forfeited, without any notice, perhaps its most valuable asset (its Loan Database) and its ability to ever conduct any business other than guaranteeing loans.  Such a transaction would clearly be outside of the ordinary course of TERI's business and would require notice and a hearing under §363(b)(1) of the Bankruptcy Code.  The Contracts Motion and the Notice of Hearing [the <u>Motion filed by Debtor The Education Resources Institute, Inc. for Order (A) Pursuant to Section 365 of the Bankruptcy Code Authorizing the Debtor to Reject Certain Contracts with the First Marblehead Corporation and (B) Pursuant to Section 363 of the Bankruptcy Authorizing the Debtor to Enter into a Transition Services Agreement</u> [Docket No. 238] and the <u>Notice of Hearing on the Contracts Motion</u> [Docket No. 242]] do not disclose a request for such a disposition of TERI's property

16

and, consequently, do not satisfy the requirements of §363. The hearing record of the Contracts

Motion contains no mention of such a request by TERI and provides no support for it. If the

intent of the TSA was to proscribe TERI's use of its Data, presumably to provide the FMC

Entities with a monopoly on use of the TERI's Data and to prevent competition by TERI, that

intent was well disguised.

29.     On the same day that it filed the Contracts Motion, the Debtor also filed the

Motion for Order Authorizing and Directing the Debtor to Honor Certain of its Guaranty

Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts (including

all property credited thereto) established for the Benefit of the Trusts (the "Trusts Motion"). On

the same day the Contracts Order was entered, the Court also entered the Order Pursuant to

Sections 105, 362, and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor

Certain of Its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain

Pledged Accounts Established for the Benefit of the Trusts (the "Trusts Order"). Throughout the

Trusts Order there are "Ordered" paragraphs that specifically provide that certain of TERI's

obligations will survive termination. In contrast, nowhere in the Contracts Order does it provide

that any obligations will survive termination of the TSA. Instead, there is only the reference in

the TSA itself to survival of certain provisions of the Database Agreement pursuant to section

10.01 thereof, i.e. for two years from termination. If an explicit provision of the TSA or the

Database Agreement was to survive forever, particularly one that caused the Debtor to forfeit a

valuable asset, that issue should have been brought explicitly to the fore. There was no clear and

explicit provision in the TSA or Contract Order nor was such a provision even proposed by the

First Marblehead Entities, presumably because they knew that any such request would be

rejected.

## ARGUMENT

30.     Since the Contracts Order was not meaningfully opposed, at least as between

TERI and the Creditors' Committee, on the one hand, and the First Marblehead Entities on the

other, it was entered on a consensual basis with no separate findings, "for the reasons set forth

more specifically in the Motion." Contracts Order, introductory paragraph.  In that regard, by

expressing and approving a voluntary agreement of the parties, the Contracts Order was

essentially the same as a consent decree.  There is abundant jurisprudential guidance for the

interpretation of consent decrees including the following comprehensive exposition by the

Second Circuit in a case dealing with the extension of an appointment made under a consent

decree:

> While consent decrees "should be construed basically as contracts"
> between the litigants, United States v. IBT, 998 F.2d 1101, 1106 (2d
> Cir.1993) (quoting United States v. ITT Continental Baking Co., 420 U.S.
> 223, 236-37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975)), "[f]ew persons
> are in a better position to understand the meaning of a consent decree than
> the district judge who oversaw and approved it," Berger v. Heckler, 771
> F.2d 1556, 1576 n. 32 (2d Cir.1985) (internal quotes omitted). Further, a
> consent decree is an order of the court and thus, by its very nature, vests
> the court with equitable discretion to enforce the obligations imposed on
> the parties. See, e.g., EEOC v. Local 580, International Association of
> Bridge, Structural & Ornamental Ironworkers, 925 F.2d 588, 593 (2d
> Cir.1991) ("[T]hough a court cannot randomly expand or contract the
> terms agreed upon in a consent decree, judicial discretion in flexing its
> supervisory and enforcement muscles is broad."); Berger v. Heckler, 771
> F.2d at 1567-68 (consent decrees are "hybrid" in the sense that, though
> construed as contracts, "they are ... enforced as orders").

United States v. Local 359 Seafood Workers, 55 F. 3d 64, 68 (2nd Cir. 1995).  See also In re

Pearson, supra, 990 F.2d at 657.

31.     In a context analogous to interpretation of the Contracts Order, the First Circuit

was called upon to interpret a stipulation approved by the Bankruptcy Court in the New Seabury

case.  In re New Seabury Company Limited Partnership, Debtor v. New Seabury Properties,

LIBA/2124161.3

LLC., 450 F.3d 24 (1st Cir. 2006). To resolve a dispute over competing plans of reorganization

presented by the debtor and an entity identified as NSP, the parties executed a stipulation (the

"Stipulation") agreeing to a plan of reorganization under which NSP would acquire substantially

all of the debtor's property while the debtor would retain the "real estate brokerage segment of

the Debtor's business." Id. at 26. A dispute arose after confirmation about whether the debtor

was entitled to the net cash generated by the brokerage business through the effective date of the

plan. Id. at 27. After two appeals to the District Court and remands back to the Bankruptcy

Court, the matter reached the First Circuit. Id. at 28-33. The First Circuit noted that stipulations

are subject to principles of contractual interpretation (Id. at 33), and made two observations that

are particularly germane to the TSA issue. First, the Court noted that the transaction occurred in

the context of "the unique posture of the bankruptcy proceedings" and could not be viewed as a

simple commercial transaction. Id. at 39. That unique posture also exists in the TERI case and

informs the TSA; TERI and its creditors, at an early stage of its reorganization case, could not

give away TERI's potentially most valuable asset without clear notice and a hearing that

addressed that issue. Second, the New Seabury Court refused to find that a significant term of

the Stipulation could be created by inference in the absence of a specific reference in the

Stipulation. The Court denied the New Seabury debtor the brokerage-generated cash that it

sought, saying:

> If retention of the cash was an item of importance to the Debtor, it is not
> unreasonable to believe that it would have sought to negotiate a reference
> thereto in the Stipulation. We see no unfairness in holding against the
> Debtor in the absence of such a reference, such absence being indicative
> that the parties formed no such agreement.

Id. Similarly, if permanently depriving TERI of its ability to use its Data was an important term

of the TSA, it should have been clearly so-stated for the TSA to have that effect.

32.    Because consent decrees and stipulations are to be construed as contracts, it

follows that normal rules of contract interpretation apply here. Where the wording of a contract

is unambiguous, the contract must be enforced according to its terms. Freelander v. G. & K.

Realty Corp., 357 Mass. 512, 516 (1970). When contracts are plain and free from ambiguity,

they must be construed in accordance with their ordinary and usual sense. See, e.g.,

Massachusetts Mun. Wholesale Elec. Co. v. City of Springfield, 49 Mass. App. Ct. 108, 111

(2000) (citing Ober v. National Cas. Co., 318 Mass. 27, 30 (1945)); Edwin R. Sage Co. v. Foley,

12 Mass. App. Ct. 20, 28 (1981); see also Save-Mor Supermarkets, Inc. v. Skelly Detective

Serv., Inc., 359 Mass. 221, 226 (1971) (a court "must ascertain the fair meaning of the language"

and apply it "to the subject matter"). Under Massachusetts law, the question of whether a

contract is ambiguous is, in the first instance, a question of law for the Court to decide. Boston

Edison Company v. Federal Energy Regulatory Commission, 856 F.2d 361, 365 (1st Cir. 1988)

(addressing an appeal by a utility from orders of the FERC interpreting long-term energy

contracts); Sergi v. Everett Savings Bank, 233 B.R. 586, 589 (1st Cir. BAP 1999) (interpreting a

confirmed plan and stipulation). The structure of the contract, in addition to its wording,

provides its meaning. Id. at 366.[20]

33.    The TSA is clear and unambiguous that the Surviving Obligations survived for a

period of two years from May 31, 2008. The terms and structure of the TSA are the first matters

to be analyzed. Boston Edison, supra, 856 F.2d at 365, 366. The recitals to the TSA identify the

First Marblehead Contracts, describe the impending rejection of the First Marblehead Contracts,

the agreement of the First Marblehead Entities to provide certain transitional services, and the

desire of the parties that the TSA govern the provision of those services. There is not a word in

---

[20]    The TSA provides that it shall be construed in accordance with and governed by Massachusetts law. TSA
Section 3.4.

the recitals about TERI forfeiting forever its rights to its Data and no reason to think that an

agreement dealing with transitional services would have that effect. Structurally, the TSA was to

deal with a *transition* and a transition is a temporal concept susceptible to being completed

within a time frame; it does not contemplate permanence or perpetuity; it does not contemplate a

permanent divestiture of rights.

34.    Article II of the TSA is entitled "Data Transfer." The first paragraph provides

that all TERI-owned data held by FMER and described in the paragraph or on Exhibit E to the

TSA will be delivered to TERI for a fee. The second paragraph of Section 2.1 of the TSA (set

forth in paragraph 14 above) confirms FMER's ownership of the Delivered Database (Section

2.1(i)) and contains TERI's agreement to the survival of the Surviving Obligations pursuant to

Section 10.1 of the Database Agreement: "(ii) the Loan Database transferred from FMER to

TERI pursuant to Section 2.1 of this Agreement shall remain subject to sections 2.01 (Grant),

2.02 (FMER Restrictions) and 2.03 (TERI Restrictions) of such Database Agreement and any

and all additional terms of the Database Agreement that pursuant to section 10.01 of the

Database Agreement survive termination of such agreement and remain in full force and effect."

There is nothing ambiguous about this provision. The Loan Database was only to be subject to

the listed restrictions for the period provided for in Section 10.01 of the Database Agreement.

The TSA and the Contracts Order unambiguously provide that the Surviving Obligations

terminated on May 31, 2010 and that there are no perpetual restrictions on TERI's rights to use

its own data.

35.    Because this language is clear, unambiguous, and susceptible of only one

meaning, there is no need to consider any extrinsic evidence to interpret these provisions. To the

extent the Court needs to look outside of the four corners of the relevant documents to determine

whether the provision is ambiguous, and it does not, that review would show that there is no

ambiguity. A court may consider necessary extrinsic evidence "for the very purpose of deciding

whether the documentary expression of the contract is ambiguous." Donoghue v. IBC USA

(Publications), Inc., 70 F. 3d 206, 215 (1st Cir. 1995) (in a dispute over whether certain contracts

required royalty payments, the court directed the parties to proffer the extrinsic evidence that

they wished to introduce to facilitate the trial court's determination of whether the contract was

ambiguous); Sergi v. Everett Savings Bank, supra, 233 B.R. at 590; Union Pacific Railroad

Company, A.L. v. Mason City & Fort Dodge Railroad Company, 222 U.S. 237, 247 (1911)

(holding that a consent decree must be considered in the context in which it was entered:

"whatever ambiguity arises from some of its parts, its extent must be determined by what

preceded it and what it was intended to execute"); Robert Industries, Inc. v. Spence, 362 Mass.

751, 753 (Mass. 1972) (applying the same principle to the determination of whether a lease is

ambiguous: "A lease is to be read in light of the circumstances of its execution, which may

enable the court to see that the words are really ambiguous.").

36.    The fact that TERI and the First Marblehead Entities disagree about the meaning

of this language does not mean that it is ambiguous: "Ambiguity is not created simply because a

controversy exists between the parties each favoring an interpretation contrary to the other's."

Sergi, 233 B.R. at 589; see also Lumbermens Mut. Cas. Co. v. Office Unlimited, Inc., 419 Mass.

462, 466 (1995) (("Contractual terms are not ambiguous, though, merely because the parties to

the contract disagree as to the meaning of the terms."). "Ambiguity exists only when the

language of a contract is susceptible of more than one *reasonable* meaning." Jefferson Ins. Co of

New York, 23 Mass. App. Ct. at 474.

LIBA/2124161.3

37.     Here the relevant extrinsic evidence points overwhelmingly to the lack of any ambiguity. As noted above and explained further below, the Contracts Motion, the record of the hearing on that Motion, the Debtor's Financial Projections, and the record of the April 28, 2010 hearing all constitute extrinsic evidence that TERI's reading is correct and that no ambiguity exists.

38.     Like the TSA, the Contracts Motion focused on the rejection of the First Marblehead Contracts and "the terms and conditions pursuant to which one or more of the FMC Entities will provide certain services to TERI for a brief period of time." Contracts Motion, Paragraph 1. All of the paragraphs in the Contracts Motion describe the TSA as encompassing services to be provided; none mention the Surviving Obligations or restrictions on TERI's use of its Data. Contracts Motion, Paragraphs 18-26. The only mention of Data is in paragraph 15, which supports rejection of the Database Agreement:

### 3. Rejection of the Database Agreement is in the Best Interests of the Debtor, its Estate and its Creditors

15.     The Database Agreement is a contract pursuant to which TERI (i) transferred certain of its information regarding loans and loan default rates to FMC in exchange for a lump sum payment and monthly installment payments and (ii) agreed to update the information and respond to certain information requests from FMC regarding the information in exchange for a monthly payment for the life of the contract. The Debtor seeks to reject the Database Agreement. **Going forward, the TSA will govern the parties' obligations with respect to the Loan Database (as defined in the Database Agreement).** The Debtor believes that the "Data Transfer" section of the TSA addresses and fairly resolves the cost implications to each of the parties in a way that matches their benefits.

This language, in the context of a "brief" transition agreement, does not support a perpetual extension of the Surviving Obligations.

LIBA/2124161.3

39.     Most telling, however, are the recurrent statements by TERI of its plans to use its Data – the Loan Database –which went uncontroverted by the First Marblehead Entities. The statement quoted in paragraph 20 above, from the hearing on the Contracts Motion, demonstrates TERI's view that it sought authority to enter into the TSA but did not thereby permanently restrict its rights to use Data. The Court entered the Contracts Order based on that understanding, and the TSA, read in light of those circumstances, cannot be ambiguous. Subsequent record events—similar positions regarding Data use by TERI in its financial projections and in Mr. Peko's testimony that were similarly unchallenged by the First Marblehead Entities—corroborate the determination. The TSA provides for a two year survival of the TERI Restrictions and that two years has now expired.

## NOTICE

40.     A copy of this Motion will be served on (i) counsel to the First Marblehead Entities, (ii) counsel to the Creditors' Committee (iii) counsel to First Marblehead Data Services, Inc., as Administrator of the National Collegiate Trusts, (iv) counsel to U.S. Bank, N.A., as Indenture Trustee of the National Collegiate Trusts, (v) the Office of the Attorney General for the Commonwealth of Massachusetts, (vi) the Office of the United States Trustee and (vii) all parties who have filed notices of appearance or request for notice in these proceedings. In light of the nature of the relief requested, the Debtor submits that no further notice is required. The FMC Stipulation makes it clear that the Motion will be opposed by FMC and obviates the need for compliance with MLBR 9013-1(b).

## RELIEF REQUESTED

WHEREFORE, the Debtor respectfully requests that the Court enter an Order granting this Motion, interpreting the Contracts Order to preclude the First Marblehead Entities from

24

asserting that the FMER Restrictions, the TERI Restrictions and the indemnity obligations remain in force, directing FMER to purge Excluded Data from the Delivered Database and granting Debtor such other and further relief as is just and proper.

Respectfully submitted,

THE EDUCATION RESOURCES INSTITUTE, INC.

By its attorneys,

/s/ Daniel M. Glosband
GOODWIN PROCTER LLP
Daniel M. Glosband (BBO# 195620)
Dahlia S. Fetouh (BBO# 651196)
Gina Lynn Martin (BBO# 643801)
Kirk L. Johnson (BBO# 669164)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
phone: (617) 570-1000
November 2, 2010                    fax: (617) 523-1231

LIBA/2124161.3