## **EXHIBIT 1**

CONTRACTS ORDER DATED JUNE 23, 2008

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) |  |
|  | ) | **Chapter 11** |
| **THE EDUCATION RESOURCES INSTITUTE, INC.,** | ) | **Case No. 08-12540 (HJB)** |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## ORDER GRANTING MOTION (A) PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, FEDERAL RULES OF BANKRUPTCY PROCEDURE 6006 AND 9014 AUTHORIZING THE DEBTOR TO REJECT CERTAIN CONTRACTS WITH THE FIRST MARBLEHEAD CORPORATION AND (B) PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO ENTER INTO A TRANSITION SERVICES AGREEMENT

Upon the motion (the "Motion") of The Education Resources Institute, Inc., the debtor and debtor in possession in the above-captioned case. (the "Debtor") for an order pursuant to section 365 of the Bankruptcy Code1 and Bankruptcy Rules 6006 and 9014 authorizing the Debtor to reject the FMC Contracts effective as of the date of the filing of the Motion, and sufficient notice having been given and due cause appearing therefor, the Court finds that, for the reasons set forth more specifically in the Motion, cause has been shown for granting the requested relief; and it is accordingly

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Debtor the FMC Contracts are rejected effective as of May 31, 2008; and it is further

ORDERED, that each of the FMC Entities may treat each of the FMC Contracts as terminated as of May 31, 2008, and it is further

---

1 Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

1

ORDERED, that the Debtor is authorized to enter into the Transition Services Agreement, as amended, between the Debtor and the FMC Entities, which Transition Services Agreement will govern the relationship of the Parties from June 1, 2008 forward, and it is further

ORDERED, that the 10 day automatic stay imposed pursuant to 6004(h) is hereby waived, and it is further

ORDERED that nothing in this Order shall limit any claims, rights or remedies of FMC, FMER, TMSI, or any of their affiliates may have against TERI or any of its affiliates, including, without limitation, all claims, rights or remedies arising from or in connection with the rejection of the FMC Contracts, all of which claims, rights and remedies are preserved, and it is further

ORDERED, that this Court will retain jurisdiction to construe and enforce the terms of this Order.

Dated: _June 23_, 2008

_United States Bankruptcy Court Judge_

LIBC/3315995.2

## **EXHIBIT 2**

DATABASE SALE AND SUPPLEMENTATION AGREEMENT

DATABASE SALE AND SUPPLEMENTATION AGREEMENT

THIS DATABASE SALE AND SUPPLEMENTATION AGREEMENT ("Agreement") is entered into by and between THE EDUCATION RESOURCES, INC. ("TERI"), a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, with its principal place of business at 330 Stuart Street, Boston, Massachusetts 02116, and FIRST MARBLEHEAD EDUCATION RESOURCES, INC. ("FMER"), a Delaware corporation having its principal place of business at 30 Little Harbor, Marblehead, Massachusetts 01945.  The First Marblehead Corporation ("FMC") joins in this Agreement for the limited purposes set forth below. This Agreement is dated as of June 20, 2001.

RECITALS

WHEREAS, FMER has entered into an Asset Purchase and Sale Agreement pursuant to which FMER is acquiring certain tangible and intangible assets of TERI; and

WHEREAS, FMER has entered into a certain Master Servicing Agreement dated as of July 1, 2001, pursuant to which FMER will deploy the assets acquired from TERI in providing comprehensive services in support of TERI's loan guarantee programs; and

WHEREAS, it is a condition of FMER's willingness to acquire assets from TERI and provide long-term services under the Master Servicing Agreement that FMER and FMC be the only third parties having rights to use Loan Database now held and to be obtained in the future by TERI.

NOW, THEREFORE, in consideration of these presents and the covenants contained herein, the parties hereto hereby agree as follows:

ARTICLE I
DEFINITIONS

Capitalized terms used in this Agreement without definition have the meanings set forth in the Purchase and Sale Agreement.  In addition, the following terms have the following meanings:

"Closing Date" has the meaning set forth in the Purchase and Sale Agreement.

"Database Note" has the meaning set forth in Section 4.01.

"Delivered Database" means the database created pursuant to Sections 3.01 and 3.02.

"Excluded Data" means (a) the name of any borrower or obligor, (b) any unique identifier with respect to any borrower or obligor such as social security number or complete mailing address, (c) the identity of any lender with respect to any loan, and (d) any data of any type provided to or held by TERI with respect to loans originated by National City Bank.

"FMC" means The First Marblehead Corporation, a Delaware corporation having a principal place of business at 30 Little Harbor, Marblehead, Massachusetts 01945.

"FMER Default" means:

      (a)    A payment default shall have occurred under the Database Note and shall not have been cured within any applicable cure period;

      (b)    FMER shall fail to make any payment required hereunder when due, other than payments due under the Database Note, and such failure shall continue for 15 days after TERI shall provide written notice and demand for cure;

      (c)    FMER shall fail to perform any other covenant or agreement under this Agreement and such failure shall continue for 30 days after TERI shall provide written notice and demand for cure;

      (d)    FMER shall become a debtor in any proceeding under the U.S. Bankruptcy Code and such proceeding shall remain undismissed for a period of sixty (60) days; or

      (e)    FMER and/or FMC shall default under the Purchase and Sale Agreement or the Note issued pursuant thereto and such Note has been accelerated, or the Master Servicing Agreement shall have been terminated for cause by TERI.

"FMER Restrictions" has the meaning set forth in Section 2.02.

"Initial Loan Database" means the data included in the Delivered Database as initially created and delivered pursuant to Section 3.01.

"Law" has the meaning set forth in Section 6.03(b).

"Loan Database" consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including, without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria.

"Master Loan Guaranty Agreement" means the Agreement of that name between TERI and FMC dated as of February 2, 2001.

"Master Servicing Agreement" means the agreement of that name among FMER, TERI and FMC dated as of July 1, 2001.

"Outsource Provider" means FMER or such other provider of data services as TERI may retain from time to time.

"Purchase and Sale Agreement" means the Asset Purchase and Sale Agreement among TERI, FMER, FMC, and TERI Marketing Services, Inc. dated as of April 6, 2001.

"Queries" means statistical queries posed to TERI by FMER with respect to certain aspects of Loan Database resident on the automated data processing systems of TERI or its Outsource Provider, the responses to which shall not include any Excluded Data.

"Retained Uses" means the right retained by TERI to utilize the original version of the Loan Database (including the original copy thereof and information thereafter obtained, generated, recorded or otherwise received by TERI which would otherwise be deemed part of the Loan Database) for its own use for purposes of designing, underwriting, implementing, evaluating and managing education loan guarantee programs offered and guaranteed by TERI.

"Securitization" or "Securitization Transaction" shall mean and refer to a transaction in which one or more Program Lenders sell TERI-guaranteed loans to a Special Purpose Entity, which entity funds the acquisition of such loans by the issuance of debt instruments or other obligations, which instruments or obligations are limited in recourse to the assets being purchased by such special purpose entity and certain other assets, such as the Pledged Account described in Section 2.04 of the Master Loan Guaranty Agreement, bond insurance and other assets supporting obligations issued by the Special Purpose Entity.

"Surviving Obligations" shall mean the obligations of the parties pursuant to Sections 2.01, 2.02, 2.03, and Articles VIII, IX,  and X hereof, which obligations shall survive termination of this Agreement.

"TERI Default" means:

(a)    TERI shall fail to deliver any Update or Query response (other than by reason of delay by FMER) that is required hereunder and such failure shall continue for more than 30 days after written notice and demand for cure.

(b)    TERI shall breach any other obligation hereunder and such failure shall continue for more than 30 days after written notice and demand for cure.

(c)    TERI shall become a debtor in any proceeding under the U.S. Bankruptcy Code and such proceeding shall remain undismissed for a period of sixty (60) days.

(d)    TERI shall default under the Purchase and Sale Agreement, or the Master Servicing Agreement shall have been terminated for cause by FMER.

"Updates" means the additional data provided to FMER pursuant to Section 3.01.

ARTICLE II
DATABASE TRANSFER AND RESTRICTIONS

2.01    Grant.

TERI hereby transfers, assigns and grants to FMER all right, title, and interest in and to the Delivered Database as a derivative of the Loan Database.  This grant includes, without limitation, the right to use and possess the Delivered Database, together with the rights to share the data with FMC, to disclose the data to others, to copy and manipulate the data, and generally to exercise ownership of the Delivered Database and all modifications and enhancements thereof, subject to the FMER Restrictions set forth in Section 2.02.  FMER and FMC hereby agree to abide by and conform to the FMER Restrictions.  TERI retains all right, title, and interest in and to the Loan Database as such, subject to the TERI Restrictions set forth in Section 2.03.

2.02    FMER Restrictions.

FMER agrees that its ownership of the Delivered Database is subject to the following restrictions (the "FMER Restrictions").  FMER will not assign, license, or disclose the Delivered Database for consideration, either in whole or in part, in the form delivered or as part of a derivative work, without TERI's consent, except that:

(a)    FMER may sell or give the Delivered Database to FMC, which itself will not assign, license or disclose the Delivered Database for consideration, either in whole or in part, in the form delivered or as part of a derivative work, without TERI's consent;

(b)    FMER may sell, transfer or license the Delivered Database in connection with a sale of substantially all the assets or business of FMER.

Nothing in this section shall in any way restrict FMER's or FMC's right to provide data from the Delivered Database or derivative works thereof to any lender, rating agency, bond insurer, investor, credit enhancement provider or other Person in connection with the planning, operation or marketing of an education loan program by FMER or FMC, including, without limitation, in connection with a Securitization Transaction, notwithstanding any consideration received by FMER or its Affiliates in connection with such transaction.  FMC and FMER agree that disclosures made under the preceding sentence shall be subject to a confidentiality agreement pursuant to which the receiving

party agrees not to use the data except in support of the education loan program in question and not to redisclose the data, except as required by law.

2.03    TERI Restrictions.  TERI agrees that during the term of this Agreement it will use the Loan Database, and/or its retained copy of the Delivered Database only for the Retained Uses.  Specifically, but not by way of limitation, TERI will not sell, license or transfer, the Loan Database or any substantial portion thereof to any person nor will it disclose the same except in furtherance of the Retained Uses.  Any such disclosure shall be subject to a confidentiality agreement pursuant to which the receiving party agrees not to use the data disclosed by TERI except in support of TERI's guaranty program and not to redisclose the data, except as required by law.  If this Agreement terminates under circumstances that do not trigger the operation of Section 5.03 below, TERI will be entitled to create by independent efforts any database that is derivative from the Loan Database; if the resulting work is identical or substantially identical to the Delivered Database, TERI may not sell such work but may disclose its contents to any Outsource Provider.  If this Agreement terminates under circumstances that trigger the operation of Section 5.03 below, the restrictions set forth in this Section 2.03 shall be of no force and effect.

2.04    Database Protection.

If the United States hereafter adopts any legal scheme for the protection of databases apart from copyright, the parties will in good faith negotiate such amendments to this Agreement as shall be necessary or advisable to allocate the rights under such scheme in the same manner as set forth herein.

ARTICLE III
CREATION AND DELIVERY OF THE DELIVERED DATABASE

3.01    Initial Loan Database and Updates.

TERI and/or its Outsource Provider will create a derivative work of the Loan Database as it exists on the Closing Date, by deleting therefrom all Excluded Data.  Such derivative work, and all modifications thereto made pursuant to this Article III, will be referred to in this Agreement as the Delivered Database and its contents as the Initial Loan Database.  TERI shall deliver the first version of the Delivered Database to FMER within ten days after the Closing Date in a mutually agreed medium and format. Thereafter, TERI, or its Outsource Provider, shall deliver Updates to FMER no less frequently than monthly, also in a medium and format then employed by TERI, or in any other mutually agreed format and medium.  Each Update shall consist of all additions or modifications, other than Excluded Data, made to the Loan Database since the last previous delivery hereunder, and shall be added to and deemed a part of the Delivered Database.

3.02    Queries.

FMER shall also have the right to tender and receive prompt responses to statistical Queries to TERI, or its Outsource Provider, from time to time; provided, however, that such Query shall not require TERI or its Outsource Provider to expend an unreasonable amount of computer time or require additional computer programming by TERI, unless FMER shall pay directly, as and when incurred, the cost of such computer time or programming payable to any third party . Responses to Queries shall be based upon a review, analysis or examination of the Loan Database, excluding Excluded Data. Responses to Queries shall be added to and be deemed a part of the Delivered Database.

ARTICLE IV<br>CONSIDERATION

4.01    Initial Delivery.

In consideration of the initial delivery of the Delivered Database, FMER shall pay to TERI the sum of Four Million Dollars ($4,000,000), plus interest at the rate of six percent (6%) per annum in 120 equal monthly installments of Forty-Four Thousand Four Hundred and Eight Dollars ($44,408), beginning thirty (30) days after the Closing Date. On the Closing Date, FMER will deliver to TERI a note substantially in the form of Exhibit A attached hereto, calling for payments of principal and interest at the time and in the amount set forth in this subsection ("Database Note").

4.02    In consideration of the right to receive Updates and Queries, FMER shall pay TERI a monthly purchase fee of $62,294, in advance, beginning thirty (30) days after the Closing Date on the same day of each month thereafter, and continuing for sixty (60) months. Thereafter, if this Agreement is renewed pursuant to Section 5.02 hereof, FMER shall pay the monthly purchase fee of Twenty Thousand, Six Hundred and Twenty-Seven Dollars ($20,627) for sixty (60) months, on the same monthly due date as the initial term.

ARTICLE V<br>TERM AND TERMINATION

5.01    Delivered Database.

As to the Delivered Database, including, without limitation, the Initial Loan Database, Queries and Updates actually delivered to FMER, the right and ownership granted hereunder is perpetual and non-cancelable, except as provided in Section 5.03 with respect to repurchase of assets under the Purchase and Sale Agreement.

5.02    Term; Future Updates and Queries.

The right to receive (and obligation to pay for) Updates and Queries under this Agreement shall continue for a term of five years, commencing on the date first set forth above. Either party may renew this Agreement for one, five-year renewal term by delivery of written notice to the other party not less than sixty (60) days prior to the

expiration date of this Agreement.  FMER may not renew this Agreement if it has defaulted under the Note issued by it pursuant to the Purchase and Sale Agreement and such note has been accelerated.

5.03   Repurchase of Delivered Database.

TERI may repurchase the Delivered Database upon the occurrence and consummation of TERI's repurchase of Purchased Assets pursuant to Section 9.2 of the Purchase and Sale Agreement.  Such repurchase shall only be effective upon payment to FMER of an amount equal to all amounts paid under Section 4.01 hereof, less a factor for amortization equal to $1/120^{th}$ of the face amount of the note delivered under Section 4.01 hereof multiplied by the number of months between the Closing Date under the Purchase and Sale Agreement and the repurchase date.  Such repurchase shall also result in the forgiveness of any other and further payments hereunder.  Upon such repurchase pursuant to Section 9.2 of the Purchase and Sale Agreement, the repayment by TERI to FMER, and the delivery of written notice of termination pursuant to this Section by TERI to FMER, this Agreement shall terminate and FMER shall return and shall cause any of its Affiliates to whom the Delivered Database or any portion thereof has been disclosed to return to TERI all copies, reproductions, modifications and derivative works related to the Delivered Database, and any and all data packs and other forms in which the Delivered Database or any portion thereof is held and/or shall certify to TERI that all such things have been destroyed.  Further, FMER and FMC immediately shall cancel or terminate any and all licenses, grants for the use of or other similar arrangements it has entered into with any other party with respect to the Delivered Database or any copies, reproductions, modifications or derivative works related thereto.  Thereafter, none of FMER, FMC or any parties with whom FMER or FMC granted licenses, or other rights of use with respect to the Delivered Database  shall have the right to use any portion of the Delivered Database and TERI's use and ownership of the Delivered Database shall in no way be restricted.

5.04   FMER Default.  FMER's right to receive future Updates and Queries may be terminated by TERI upon five (5) days' written notice upon the occurrence of an FMER Default, in which event all further obligations of TERI and FMER, other than Surviving Obligations and other than FMER's obligation to make payments under Sections 4.01 and 4.02 , shall terminate.  TERI may accelerate the obligations of FMER under Sections 4.01 and 4.02 if, but only if, the FMER Default includes a failure to make a timely payment under said sections.  In the event that FMER in fact pays all amounts due under Sections 4.01 and 4.02, whether in timely installment payments or after acceleration, FMER shall be entitled to receive Updates and Queries for the remaining term of this Agreement, but the restrictions of Section 2.03 shall no longer apply to TERI.

The obligation of FMER to make payments under Section 4.01 shall be secured by the Security Agreement issued under the Purchase and Sale Agreement, and said Security Agreement shall include as collateral all of FMER's right, title and interest in the Delivered Database.

5.05    TERI Default. FMER may, in its sole discretion, terminate this
Agreement as to future Updates and Queries upon five (5) days' written notice upon the
occurrence of a TERI default, in which event all further obligations of TERI and FMER,
other than Surviving Obligations, shall terminate.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES OF TERI

TERI represents and warrants to FMER, as of the date hereof, and, with respect to
the matters in Sections 6.03 and 6.05, as of the date of any Initial Loan Database delivery,
Update or Query, as follows:

6.01    Organization and Qualification.

TERI (i) has been duly organized and is validly existing and in good standing as a
non-profit corporation under Chapter 180 of the Massachusetts General Laws, (ii) has the
requisite power and authority and all necessary governmental approvals to own, lease and
operate its properties and to carry on its business as it is now being conducted, and (iii) is
duly qualified or licensed to do business, and is in good standing, in each jurisdiction
where the character of the properties owned, leased or operated by it or the nature of its
business makes such qualification or licensing necessary.

6.02    Authority.

TERI has all the necessary corporate power and authority to execute and deliver
this Agreement, to perform its obligations under this Agreement and to consummate the
transactions contemplated by this Agreement.  The execution and delivery of this
Agreement by TERI and the consummation by TERI of such transactions have been duly
and validly authorized by all necessary corporate action and no other corporate
proceedings on the part of TERI are necessary to authorize this Agreement or to perform
such obligations  This Agreement has been duly authorized and validly executed and
delivered by TERI and constitutes a legal, valid and binding obligation of TERI,
enforceable against TERI in accordance with its terms.

6.03    No Conflicts.

Except as set forth in Schedule 6.03 attached hereto, the execution and delivery of
this Agreement by TERI do not, and the performance of this Agreement by TERI will
not:

(a)    conflict with or violate any provision of TERI's certificate of
incorporation or bylaws;

(b)    conflict with or violate any foreign or domestic law, statute, ordinance,
rule, regulation, order, judgment or decree ("Law") applicable to TERI or by which any
of the Loan Database is or may be bound by or affected; or

FM.TERI.rph.Database Sale Agreement EXECUTION.doc                8

(c)    Result in any breach of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) under, or give any right of termination, amendment, acceleration or cancellation of, or result in the creation of any lien on any property or asset of TERI under any note, bond, mortgage, indenture, contract, agreement, commitment, lease, license, permit, franchise or other instrument or obligation (collectively, "Contracts") to which TERI is a party or by which it or its assets or properties may be bound or affected.

6.04    Required Governmental Consents and Compliance with Law.

The execution and delivery of this Agreement by TERI do not, and the performance by TERI of its obligations under this Agreement will not, require any consent, approval, authorization or permit of, or filing with or notification to, any domestic or foreign national, federal, state, provincial, or local governmental, regulatory, administrative authority, agency, commission, court, tribunal or arbitral body or self-regulated entity (each, a "Governmental Entity"), other than a notification to the Massachusetts Attorney General.

6.05    Good Title.

TERI has good right and power to convey the Delivered Database pursuant to the terms of this Agreement, free and clear of all liens, encumbrances, claims and restrictions.

ARTICLE VII
REPRESENTATIONS AND WARRANTIES OF FMER AND FMC

Each of FMER and FMC represents and warrants to TERI, as to itself, as of the date hereof, and as of the date of the Initial Loan Database delivery and the date of any Update or Query, as follows:

7.01    Organization; Authority.

(a)    Each of FMER and FMC has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its incorporation, has the requisite power and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as now being conducted, and is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary.

(b)    Each of FMER and FMC has all the necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by FMER and FMC and the consummation by

FMER and FMC of such transactions has been duly and validly authorized by all necessary corporate action and no other corporate proceedings on the part of FMER and FMC are necessary to authorize this Agreement or to perform their obligations under this Agreement. This Agreement has been duly authorized and validly executed and delivered by FMER and FMC and constitutes a legal, valid and binding obligation of FMER and FMC , enforceable against FMER and FMC in accordance with its terms.

7.02    No Conflicts.

The execution and delivery of this Agreement by FMER and FMC do not, and the performance of this Agreement by FMER and FMC will not:

(a)    conflict with or violate any provision of FMER's or FMC's certificate of incorporation or bylaws;

(b)    conflict with or violate any provision of Law applicable to FMER or FMC or by which any property or asset of FMER or FMC is or may be bound; or

(c)    result in any breach of, or constitute a default (or an event which with or without notice or lapse of time or both would become a default) under, or give to others any right of termination, amendment, acceleration, or cancellation of, or result in the creation of a lien on any property or asset of FMER or FMC under any Contract to which FMER or FMC is a party or by which it or its assets or properties is or may be bound or affected.

7.03    Filings and Consents.

The execution and delivery of this Agreement FMER and FMC do not, and the performance of this Agreement by FMER and FMC will not require any consent, approval, authorization or permit of, or filing with a notification to, any Governmental Entity.

ARTICLE VIII
FMC GUARANTEE

FMC hereby guarantees the full and timely performance by FMER of each of its obligations pursuant to this Agreement. Such Guarantee is primary and not secondary and it shall not be necessary, in order for TERI to enforce such guarantee, for TERI to institute suit or exhaust any remedies against FMER or make any claim or demand against FMER before requiring performance by FMC hereunder.

ARTICLE IX
INDEMNIFICATION

9.01    Indemnification.

(a)    TERI will indemnify, defend and hold harmless FMER and FMC from and against any and all claims, demands or suits (by any person or entity), losses, liabilities, damages (including any consequential, special, indirect, punitive or incidental damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith), to the extent the foregoing are not covered by insurance (each, an "Indemnifiable Loss"), asserted against or suffered by FMER or FMC relating to, or resulting from, or arising out of any breach by TERI of any representation, warranty or covenant (without regard to any qualifications with respect to materiality contained therein) contained in this Agreement; provided, however, that in the case of any Indemnifiable Loss arising under this Section 9.01, (x) such indemnification shall be effective only with respect to claims regarding the Initial Loan Database, written notice of which is received by TERI no later than the second anniversary of the date of this Agreement, and (y) such indemnification shall be effective only with respect to claims regarding any Update or Query, written notice of which is received by TERI no later than the second anniversary of the date of delivery of the Update or Query in question, and (z) no amounts shall be due and payable until and unless the aggregate amount of such Indemnifiable Loss is equal to $75,000 or more (when aggregated with all Indemnifiable Losses under the Purchase and Sale Agreement), at which point such indemnification shall relate to all Indemnifiable Losses; and (zz) TERI's total liability under this indemnity shall not exceed amounts received by TERI under this Agreement and the Purchase and Sale Agreement at the time of assertion of claims together with the right of FMER to set off against such Indemnifiable Loss any amounts remaining to be paid to TERI hereunder.  Notwithstanding the foregoing clause (z), TERI's obligation to indemnify hereunder shall not be subject to such minimum amount of Indemnifiable Loss with respect to any cost incurred by FMER or FMC in defense of any claim by any person that this Agreement and/or the transfer of the Delivered Database hereunder violates a contractual right of such person to designate data as confidential, which right is first exercised after the date hereof (a "Contract Claim").  In the event that a Contract Claim is asserted against FMER or FMC, TERI shall elect one of two optional courses of action, as follows:

    (i)    In the event that termination of its contract with the claimant would moot any claims against FMC and FMER, TERI may elect to cause such termination, or

    (ii)    TERI may elect to indemnify FMER for costs of defending such claim, in which event TERI's liability for costs of defense shall be limited to the lesser of 50% of such costs, or $100,000.  The foregoing limitation shall not apply to any loss or cost relating to any judgement actually entered against FMER or FMC, which loss or cost shall be subject to the general minimum amount of $75,000 set forth above.  The availability of defense costs under this provision shall not restrict FMER's general rights under this

indemnity should losses as a result of a Contract Claim exceed such minimum amount.

(b)    FMER will indemnify, defend and hold harmless TERI from and against any and all Indemnifiable Losses asserted against or suffered by TERI relating to, resulting from, or arising out of any breach by FMER of any representation, warranty or covenant contained in this Agreement; provided, however, that (X) such indemnification shall remain in effect only with respect to claims, written notice of which is received by FMER no later than the second anniversary of the date of termination of this Agreement, (Y) no amounts shall be due and payable until and unless the aggregate amount of such Indemnifiable Losses (aggregated with Indemnifiable Losses under the Purchase and Sale Agreement) is equal to $75,000 or more, at which point such indemnification shall relate to all Indemnifiable Losses, and FMER's total liability under this provision shall not exceed the total amount paid by FMER under this Agreement.

(c)    Any person entitled to receive indemnification under this Agreement (an "Indemnitee") having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs, and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss hereunder.  The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss and (ii) to take into account any net tax benefit recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

(d)    The expiration, termination or extinguishment of any covenant shall not affect the parties' obligations under this Section 9.01 if the Indemnitee provided the person to provide indemnification under this Agreement (the "Indemnifying Party") with proper notice of the claim or event for which indemnification is sought, prior to such expiration, termination or extinguishment.

9.02    Defense of Claims.

(a)    If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any person who is not a party to this Agreement (a "Third Party Claim") with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than ten (10) days after the Indemnitee's receipt of notice of such Third Party Claim. Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee.  The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

(b)    If within ten (10) days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim, the Indemnitee receives written notice from the Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.02(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof.  Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder.  If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder, the Indemnifying Party may accept and agree to such offer, and shall give written notice to the Indemnitee to that effect.

(c)    Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a "Direct Claim") will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than ten (10) days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) days within which to respond to such Direct Claim.  If the Indemnifying Party does not respond within such thirty (30) day period, the Indemnifying Party will be deemed to have accepted such claim.  If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

(d)    If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of Bank of America, NA or its successor), will promptly be repaid by the Indemnitee to the Indemnifying Party.  Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party is then in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said indemnity payment is hereby made expressly subordinated and

subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision hereof, each such Indemnitee and Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights. Nothing in this Section 9.02(d) shall be construed to require any party hereto to obtain or maintain any insurance coverage. The rights contained herein shall not be duplicative of any reductions effected pursuant to Section 9.01(c) hereof.

(e)    A failure to give timely notice as provided in this Section 9.02 will not affect the rights or obligations of any party hereunder except if, and only to the extent that, as a result of such failure, the party which was entitled to receive such notice was actually prejudiced as a result of such failure.

ARTICLE X
MISCELLANEOUS

10.01    Survival.

The Surviving Obligations shall survive termination of this Agreement for a period of two years after the termination date.

10.02    Counterparts.

This Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

10.03    Governing Law .

This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the law of the Commonwealth of Massachusetts without regard to conflict of law principles.

10.04    Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH SUCH PARTY MAKES THIS

WAIVER VOLUNTARILY, AND (IV) EACH SUCH PARTY HAS BEEN INDUCED
TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE
MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

    10.05   Electronic Records and Signatures.  The parties intend that reasonably
reliable electronic records and signatures shall be binding upon the parties in accordance
with the provisions of the Federal Electronic Signatures in Global and National
Commerce Act.  The parties agree that records and signatures transmitted by facsimile
when bearing the routing information and imprints ordinarily provided by such
technology, shall constitute binding records and signatures upon the parties.  Either party
may, in any facsimile, expressly rebut the binding effect of such communication, but such
exclusion from this section shall only apply to that particular facsimile transmission.  The
parties further agree that a notice under Section 10.06 may be given by e-mail and shall
constitute a writing.  The parties further agree that e-mail, voice mail or other recording
of voices shall not constitute an electronic signature for purposes of the parties'
transactions under this Agreement.  Finally, other forms of electronic record and
signature may be adopted by the parties by subsequent agreement from time to time.

    10.06   Notices.  All notices given by any party to the other under this Agreement
shall be in writing and shall be delivered:

    (a)   Personally, by electronic record, as herein defined, by overnight courier,
prepaid, or by depositing the same in the United States mail, certified, return receipt
requested, with postage prepaid, addressed to the party at the address set forth below.
Any party may change the address to which notices are to be sent by notice of such
change to the other party given as provided herein.  Such notices shall be effective on the
date received.  Notice shall be given as follows:

    If to FMER:

Ralph James
The First Marblehead Corporation
30 Little Harbor
Marblehead, MA  01945
Phone: (800) 895-4283
Fax: (781) 639-4583
E-Mail: rjames@gateloan.com

With a copy to:
Richard P. Hackett, Esq.
Pierce Atwood
One Monument Square
Portland, Me 04101
Phone: 207-791-1280
Fax:  207-791-1350
E-Mail:  rhackett@pierceatwood.com;  dchampoux@pierceatwood.com

If to TERI:

President and Chief Executive Officer
The Education Resources Institute
330 Stuart Street
Boston, MA 02116
Phone: 617-426-0681
Fax: 617-422-8880
E-Mail: parker@teri.org

With a copy to:
Richard A. Wiley, Esq.
Hill & Barlow, A Professional Corporation
One International Place
Boston, MA 02110-2600
Phone: 617 428-3000
Fax: 617 428-3500
E-Mail: rwiley@hillbarlow.com

10.07   [Intentionally Omitted.]

10.08   Severability.

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability or the other provisions of this Agreement.  If any provision of this Agreement, or the application of that provision to any person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted for that provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of the invalid or unenforceable provision and (b) the remainder of this Agreement and the application of the provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of the provision, or the application of that provision, in any other jurisdiction.

10.09   Interpretation.

The Table of Contents and headings in this Agreement are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions of this Agreement.  Where a reference in this Agreement is made to a Section, exhibit or schedule, that reference shall be to a Section of or exhibit or schedule to this Agreement unless otherwise indicated.  Neither party shall be deemed the drafter of this Agreement or any of the exhibits hereto, which Agreement and exhibits are the product of detailed, arms' length negotiations between the parties and their respective counsel.

10.10    Assignability.

Except as provided in Section 2.02(b), this Agreement may not be assigned by either party without the express written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment in violation of this provision shall be ineffective and void. The foregoing restriction shall not apply to a merger, consolidation or other transfer by operation of law, nor to any change in the equity ownership or control of either party.

10.11    Preservation of Data Separation; Firewall.

FMER is also receiving from TERI certain Servicing Information, as defined in the Master Servicing Agreement. FMER receives such data and information solely as agent under said agreement and not for any other purpose. FMER agrees to keep Servicing Information separate and apart from the Delivered Database and not to commingle the same. FMER shall establish written policies and procedures to prevent the disclosure of Servicing Information to FMC or any other person, except where explicitly allowed under a written consulting agreement between TERI and such person, and to prevent the commingling of Servicing Information with the Delivered Database. A copy of such policies and procedures  shall be delivered to TERI as soon as practical after the date hereof.  FMC agrees to abide by such policies and procedures. Such policies shall prohibit any person utilizing Delivered Database from directly accessing computer systems of the Outsource Provider in a way that would allow the association of any particular individual with the deidentified information in the Delivered Database.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers as of the date above first written.

WITNESS:

FIRST MARBLEHEAD EDUCATION
RESOURCES, INC.

By:
Name: Ralph M. James
Title: President

THE EDUCATION RESOURCES
INSTITUTE, INC.

By:
Name: Thomas D. Parker
Title: President & CEO

FM.TERI.rph.Database Sale Agreement EXECUTION1.doc                17

THE FIRST MARBLEHEAD CORPORATION

By: _____
Name: Ralph M. James
Title: Senior VP and COO

## **EXHIBIT 3**

REDACTED TRANSITION SERVICES AGREEMENT

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement is dated as of May 30, 2008 (the "Agreement") between The Education Resources Institute, Inc., a Massachusetts non-profit corporation ("TERI"), The First Marblehead Corporation, a Delaware corporation ("FMC") and First Marblehead Education Resources, Inc. ("FMER"; together with FMC, the "FMC Entities").

WHEREAS, TERI and FMC, FMER and/or TERI Marketing Services, Inc. ("TMSI") are parties to several agreements, including (i) the Master Loan Guaranty Agreement dated as of February 2, 2001 (the "Guaranty Agreement"); (ii) the Master Servicing Agreement dated as of July 1, 2002 (the "MSA"); (iii) the Database Sale and Supplementation Agreement dated as of June 20, 2001 (the "Database Agreement"); (iv) the Marketing Services Agreement dated as of July 1, 2001 (the "Marketing Agreement" and together with the Guaranty Agreement, MSA, and Database Agreement, the "FMC Agreements");

WHEREAS, on April 7, 2008 (the "Petition Date"), TERI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court");

WHEREAS, TERI has informed FMC that it seeks to reject, pursuant to Section 365 of the Bankruptcy Code, the FMC Agreements and that TERI will request that the effective date of such rejection will be May 31, 2008, 11:59 p.m. (Eastern Time) and that this Agreement become effective as of June 1, 2008, 12:01 a.m. (Eastern Time) (the "Effective Date");

WHEREAS, upon the terms and subject to the conditions set forth herein, each of the parties hereto has agreed to provide or cause to be provided (in such capacity, the "Provider") to the other party (in such capacity, the "Recipient") certain transitional services on the terms set forth in this Agreement and the appendices hereto ("Appendices" and each an "Appendix");

WHEREAS, the parties seek for this Agreement to govern the provision of certain Services (defined below) for the term of this Agreement beginning on the Effective Date and agree that the parties shall cooperate with one another to have the Motion seeking rejection of the FMC Agreements and approval of this Agreement approved by the Bankruptcy Court as soon as practicable;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## SERVICES PROVIDED

1.1    Services. Upon the terms and subject to the conditions set forth in this Agreement (including the Appendices hereto), Provider will provide or cause to be provided each of the services (collectively, the "Services") described in the Appendices hereto (each of which Appendix sets forth, among other things: (i) a description of the Services to be rendered, the provider of such Services and the recipient of such Services; (ii) the period during which such

Services will be provided (the "Time Period"); (iii) the cost or charges for providing such Services and the arrangements for payment thereof; (iv) the procedures necessary to cancel such Services; and (v) the person to whom notices and communications regarding such Services should be given).

 1.2 Level of Services. Provider shall generally provide the Services in substantially the same manner and of the same quality and standards as it generally performs comparable services consistent with past practices but shall not be obligated in connection with its performance of the Services to:  (i) hire any additional employees, consultants or independent contractors; (ii) maintain the employment of any specific current employees, consultants or independent contractors; (iii) maintain any specific level of staffing; or (iv) purchase, lease, or license any additional equipment, software, facility or other asset or property. The Services shall be further subject to the terms and conditions of any agreements between Provider and any third party, as well as any terms and conditions set forth in the Appendices.

 1.3 Reimbursement for Services. In full compensation for the Services, Recipient shall pay Provider the charges and costs for providing  Services (determined in accordance with the applicable Appendix) within fifteen (15) days after receipt of Provider's monthly invoice therefor unless payment is required more often or in advance pursuant to any such Appendix. The Recipient shall not be required to pay for any meetings with management, other assistance or consultation provided by any employees or consultants of the Provider during the terms of this Agreement unless the applicable Appendix specifically identifies and/or charges for the costs of such services. All payments will be made in U.S. dollars. Each invoice shall set forth in reasonable detail the calculation of the charges and costs upon which the amount to be reimbursed is based, broken down by the Services rendered during the period to which such invoice relates.

 1.4 Conditions Precedent. Notwithstanding anything herein to the contrary, the effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

 (a) TERI shall have paid to FMER all amounts due under the MSA through May 31, 2008 on or before June 23, 2008;

 (b) TERI will have obtained from the Bankruptcy Court no later than three (3) business days following the hearing date set by the Bankruptcy Court, and in no event later than June 30, 2008, a final order in a form and substance reasonably acceptable to FMC (i) acknowledging the first priority security interests of the Trusts (defined below) in the pledged accounts (including all assets and funds in such accounts) established for such Trusts pursuant to the various guaranty agreements and deposit and security agreements by TERI in favor of such Trusts, and (ii) authorizing and directing TERI to honor its obligations under such guaranty agreements and deposit and security agreements to purchase defaulted loans using cash collateral in the pledged accounts established for the benefit of the following securitization trusts (collectively, the "Trusts"): The National Collegiate Trust-2001-CP1; The National Collegiate Student Loan Trust 2001 AR 1, 2, 3; The National Collegiate Trust 2002-CP1; The National Collegiate Student Loan Trust 2003-1; The National Collegiate Student Loan Trust 2004-1; The National Collegiate Student Loan Trust 2004-2; The National Collegiate Student Loan Trust 2005-1; The National Collegiate Student Loan Trust 2005-2; The National Collegiate Student Loan

LIBC/3315992.1

Trust 2005-3; The National Collegiate Student Loan Trust 2006-1; The National Collegiate Student Loan Trust 2006-2; The National Collegiate Student Loan Trust 2006-3; The National Collegiate Student Loan Trust 2006-4; The National Collegiate Student Loan Trust 2007-1; The National Collegiate Student Loan Trust 2007-2; The National Collegiate Student Loan Trust 2007-3; and The National Collegiate Student Loan Trust 2007-4;

(c)  The Bankruptcy Court shall have entered a final order in form and substance reasonably acceptable to FMC approving this Agreement, by June 30, 2008.

    1.5    Term.  Subject to the terms hereof, this Agreement shall become effective as of the Effective Date and shall terminate on July 31, 2008 (or such later date specified in any Appendix), provided, however, that TERI shall have the right to extend this Agreement (a) for one additional 30 day period provided that it gives written notice of such election to extend in accordance with the provisions of Section 3.1 hereof no later than July 15, 2008 and (b) for a second 30 day period subject to the consent of FMC (not to be unreasonably withheld) provided that TERI gives written notice of such election to extend in accordance with the provisions of Section 3.1 hereof no later than August 12, 2008.  Notwithstanding the foregoing or any contrary language in this Agreement or any Appendix, TERI may, upon ten (10) business days notice to FMC, cancel and terminate any specific Service or all of the Services specified in any Appendix hereto with no effect on any other Service or Appendix.  FMC may, upon three (3) business days notice to TERI, terminate this Agreement or any Specific Service in the event of breach by TERI of Section 1.3 of this Agreement if such breach is not cured within three (3) business of receipt of such notice.  TERI shall not be excused from paying any monies due to or earned by Provider prior to the effective date of termination.

ARTICLE II

DATA TRANSFER

    2.1  The FMC Entities agree, at TERI's sole cost determined according to Appendix D, and subject to the conditions set forth herein, to provide TERI with the data comprising the Loan Database (as defined in the Database Agreement) to the extent such data is or has been received by TERI solely in connection with its business as a loan guarantor and is stored, maintained or held by FMER and is data owned by TERI and a copy of the data identified on Appendix E hereto, certain of which data may be included in, and shall constitute a part of, the Loan Database.  FMER will provide such data as soon as practicable but in any event on or before July 31, 2008.  FMC and/or FMER will deliver the data in machine readable form where appropriate, otherwise in printed form.  TERI shall be responsible for any and all data transformation and transport within the TERI infrastructure to make the data usable for TERI's purposes.  TERI shall not be entitled to any software, application or other system owned or developed by or licensed by the FMC Entities-, or any proprietary information of FMC.

Notwithstanding the rejection or other termination of the Database Agreement, (i) FMER shall continue to possess all right, title and interest in and to the Delivered Database (as defined in the Database Agreement), including the right to use and possess the Delivered Database and the right to share the data with FMC, to disclose the data to others, to copy and manipulate the data and generally to exercise ownership of the Delivered Database and all modifications and

3

enhancements thereof and (ii) the Loan Database transferred from FMER to TERI pursuant to Section 2.1 of this Agreement shall remain subject to sections 2.01 (Grant), 2.02 (FMER Restrictions) and 2.03 (TERI Restrictions) of such Database Agreement and any and all additional terms of the Database Agreement that pursuant to section 10.01 of the Database Agreement survive termination of such agreement and remain in full force and effect.

Subject to section 3.11, TERI hereby acknowledges and agrees that the FMC Entities have paid all amounts due under the Database Agreement as of the date hereof and that no fees shall be due after the date hereof for any Updates or Queries (each as defined in the Database Agreement), and TERI is no longer obligated to furnish any.

2.2  To the extent not prohibited by applicable law, regulation, rule or contract-, and notwithstanding the definition of Excluded Data under the Database Agreement, TERI hereby grants to FMC and FMER-a non-exclusive, fully paid and perpetual right and license to use the following data solely for "fraud prevention purposes" data in the case management systems, the last 13 months of the "ALE" data and data in the internal fraud table from the Capstone system (the "Fraud Data"). TERI will use reasonable efforts to (a) cooperate with any requests by FMER to third parties for consent to the use of the Fraud Data and (b) to otherwise facilitate the use of the Fraud Data by FMER.

## ARTICLE III

## MISCELLANEOUS

3.1.    Notices and Communications.  All notices and communications provided for herein shall be deemed to have been duly given if delivered to the persons noted in the applicable Appendix or by notification via electronic mail or overnight delivery, to Willis J. Hulings, President and Chief Executive Officer (hulings@teri.org) and Amy W. Bizar, General Counsel (bizar@teri.org) of TERI, Park Square Building, 31 St. James Avenue, 4th Floor, Boston, MA 02116 and Jack L. Kopinsky, President, Chief Executive Officer and Chief Operating Officer (jkopnisky@firstmarblehead.com) and Peter B. Tarr, Chairman and General Counsel (ptarr@firstmarblehead.com) of FMC, Prudential Tower, 800 Boylston Street, 34th Floor, Boston, MA 02199.

3.2.    Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including any trustee appointed in TERI's chapter 11 or in any chapter 7 proceeding; provided that neither TERI nor FMC may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other; and provided further that no permitted transfer or assignment will relieve the transferring or assigning party of its obligations under this Agreement.

3.3.    No Third Party Rights.  Nothing contained in this Agreement is intended to confer any rights or benefits on any Person other than the parties hereto.

4

3.4.  <u>Governing Law and Jurisdiction</u>. This Agreement shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without giving effect to the conflicts of law rules of such state.

3.5.  <u>Force Majeure</u>. Neither party shall be liable to the other party for its failure or delay in performing its obligations hereunder (other than its obligation to pay money) due to any contingency beyond such party's control including, without limitation, acts of God, fires, floods, wars, acts of war, sabotage, terrorism, accidents, labor disputes (whether or not such disputes are within the power of the party to settle), shortages, governmental laws, ordinances, rules or regulations (whether valid or invalid), inability to obtain power, materials, equipment or transportation and any other similar contingency (each a "<u>Force Majeure Event</u>").

3.6.  <u>Headings</u>. The descriptive headings used in this Agreement are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify, or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement.

3.7.  <u>Indemnity</u>. TERI and FMC respectively will indemnify, defend and hold each other harmless from and against any and all claims, demands or suits (by any person or entity), losses, liabilities, damages (but excluding any consequential, special, indirect, punitive or incidental damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance (each, an "Indemnifiable Loss"), asserted against (a) TERI or (b) FMER and/or FMC by an unrelated third party relating to, resulting from or arising out of any breach by TERI or FMER and/or FMC, respectively, of this Agreement; provided, however, that the indemnity provided to TERI by FMC shall not exceed in scope the indemnity provided under the MSA.

3.8.  <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the parties under this Agreement.

3.9.  <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon one and the same instrument.

3.10.  <u>Amendments; No Waivers</u>.

(a) Any provision of this Agreement may be amended or waived (including any term set forth in any Appendix hereto) if, and only if, such amendment or waiver is in

LIBC/3315992.1

writing and signed, in the case of an amendment, by TERI and FMC, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

3.11    Reservation of Rights.  Notwithstanding anything herein to the contrary, nothing herein shall limit or otherwise affect any claims, rights or remedies of FMC, FMER, TMSI, or any of their affiliates that such entities may have against TERI or any of its affiliates, including without limitation all claims, rights or remedies arising from or in connection with the rejection of the FMC Contracts, all of which claims, rights and remedies are preserved.  TERI reserves any claims, rights or remedies that it may have against the FMC entities, including without limitation, its rights in respect of the balance of the Database Note, as defined in the Database Agreement, of approximately $3,168,000.

3.12    Non-Solicitation.  During the term of this Agreement and for a period of six (6) months thereafter, neither party shall hire or solicit the employment of a then-actively employed employee of the other who has participated in the provision of services hereunder (an "Engaged Party").  This prohibition shall not apply if such employment results from a general circulation advertisement.  If either party hires an Engaged Party in violation of the foregoing restriction, such party shall pay to the other party as liquidated damages an amount equal to three hundred and fifty (350) times the party's standard hourly billing rate (or hourly wage rate) for the Engaged Party, which amount is intended to compensate the party for its loss, including all costs and expenses that may be incurred by the party in replacing such employee.  Each party agrees and acknowledges that the restrictions and amounts of damages set forth in this Section are reasonable and necessary in order to protect the party's legitimate business interests.

3.13    Survival.  Article II shall survive termination of this agreement.

6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**THE EDUCATION RESOURCES INSTITUTE, INC.**

By: s/William G. Davidson, Jr.
Name:  William G. Davidson, Jr.
Title:  Senior Vice President and CFO


**THE FIRST MARBLEHEAD CORPORATION**


By: s/Kenneth Klipper
Name: Kenneth Klipper
Title: Senior Vice President


**FIRST MARBLEHEAD EDUCATION RESOURCES, INC.**


By: s/Kenneth Klipper
Name: Kenneth Klipper
Title:  Senior Vice President

1

Appendix A

PIPELINE LOANS

DESCRIPTION:     Any and all services related to the collection, evaluation, administration, approval or denial, processing and funding of student loans pursuant to which an application was received pursuant to any existing loan program on or before the later of (i) the termination of this Agreement pursuant to Section 1.5 and (ii) the date that is 60 days after all lenders suspend or terminate loan programs with TERI ("Pipeline Loans"). To the extent that any such services are provided after the termination of this Agreement, TERI will pay for those services on the same terms as if the Agreement remained in effect.

PROVIDER:     FMER

TIME PERIOD:     The earlier of (i) the termination of this Agreement pursuant to Section 1.5 and (ii) the date that is 60 days after all lenders suspend or terminate loan programs with TERI.

COST:     FMER will charge TERI a fee equal to the amount of the Origination Fee that the lender is obligated to pay TERI pursuant to its existing agreement with TERI.

CONTACT:     Anne P. Bowen

2

## Appendix B

## MULTIPLE DISBURSEMENTS

DESCRIPTION:      A portion of certain student loans are disbursed in multiple segments.
FMER tracks and ensures that multiple disbursements are made to the
proper borrower or educational institution at the proper time.

PROVIDER:         FMER

TIME PERIOD:      FMER has agreed to provide this service with respect to (i) any loan
which had its first disbursement prior to May 31, 2008 and (ii) any loan
for which an application is received on or after May 31, 2008 and for
which FMC has received the fee described in Appendix A to this
Agreement.  Such disbursements may extend beyond the termination of
the Agreement.

COST:             No Cost

CONTACT:          Anne P. Bowen

LIBC/3315992.1

Appendix C

COLLECTION ACTIVITIES

FMER will perform certain activities with respect to collection of TERI-guaranteed loans as set forth in this Appendix C. TERI-guaranteed loans that have been purchased by the Trusts prior to default are referred to herein as the "Securitized Loans". All other TERI-guaranteed loans are referred to herein as the "Non-Securitized Loans." As a condition precedent to FMER's obligations under this Appendix C, TERI agrees that it will continue to remit payments owed to collection agencies (i) for post-default services, which amounts the collection agencies generally net out of recoveries being remitted to TERI; (ii) for loan rehabilitation services, which amounts TERI withholds from the purchase proceeds for such loans (i.e. amounts paid by the Trusts to TERI for the purchase of rehabilitated loans) and remits directly to the collection agencies; and (iii) for default prevention services with respect to Non-Securitized Loans to the extent such services are being managed by FMER pursuant to this Appendix C.

| | |
|---|---|
| DESCRIPTION: | Claims Processing and Review |
| | FMER will continue to review the claims packages to ensure that a "Guaranty Event" has occurred, that the applicable lender has complied with all of its obligations with regard to the servicing and origination of the loan. |
| PROVIDER: | FMER |
| TIME PERIOD: | June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.5 hereof. |
| COST: | ██████████████████████ Same charge for Securitized Loans, but payable only by the offsets described in the Debtors Motion for Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing Debtor Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in certain Pledged Accounts Established for the Benefit of the Trusts ("Motion to Pay Trust Claims") |
| CONTACT: | Anne P. Bowen |

4

DESCRIPTION:        Default Prevention

Refers to collection activities designed to prevent a loan from defaulting.

PROVIDER:        FMER

TIME PERIOD:        June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.5
hereof.

COST:        ██████████████████████ Same charge for Securitized
Loans, but payable only by the Offsets described in the Motion to Pay
Trust Claims.

CONTACT:        Anne P. Bowen

DESCRIPTION:        Post-Default Collections

Costs of oversight and administration of the efforts to collect on defaulted
loans.

PROVIDER:        FMER

TIME PERIOD:        June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.4
hereof.

COST:        ████████████████████████████████

████████████████████████████████

CONTACT:        Anne P. Bowen

LIBC/3315992.1

<u>Appendix D</u>

INFRASTRUCTURE

The Information Technology services provided under this Appendix D shall be provided by
FMC and/or FMER in a reasonable manner consistent with past service level agreements.
Neither FMC nor FMER makes any further representation or warranty with regard to the services
to be provided hereunder and specifically disclaims any implied warranty of fitness for a
particular purpose.

"Acceptance" of FMC and/or FMER deliverables hereunder shall occur no later than the
fifth business day following the date such deliverables are provided. In the event TERI notifies
FMC or FMER of any deficiencies within five (5) business days of the date such deliverables are
provided, FMC and/or FMER shall attempt to resolve such deficiencies, subject to the terms and
conditions of the Agreement and Appendix D. In no event shall FMC and/or FMER have any
obligation to TERI after the later of (i) "acceptance" of any deliverable hereunder and (ii) the
expiration or termination of this Agreement.

Applications shall be maintained for TERI in a "Run Only" mode. Operating capacity
shall be provided at the same level provided immediately prior to the effective date of this
Agreement. Except as requested by TERI and agreed to in writing by FMC, neither FMC nor
FMER shall be required to develop source code and system changes will be made only as
necessary to fix malfunctioning or nonfunctioning systems or system components. FMC may in
its sole discretion accept or reject any request for source code development or system
enhancements. All services to be provided hereunder, including any agreed-upon projects
requiring source code development or system enhancements, will be performed in accordance
with the policies, procedures and processes of FMC and/or FMER.

TERI acknowledges and agrees that it shall be solely responsible for the provision of
services from third parties following the term of this Agreement, including without limitation the
identification of appropriate vendors, negotiation of agreements with such third parties and all
related costs, including costs of purchase and transfer or delivery by FMC or FMER. Except as
may otherwise be provided in this Appendix D, neither FMC nor FMER shall have any
obligation or liability to TERI with respect to the provision of services from third parties by
TERI, including without limitation with respect to software and equipment licensing, web
hosting and domain name registration, networks, "Right to Use" agreements, outsourcing, ASP
relationships, or timesharing. Neither FMC nor FMER shall be held responsible for any delays
in transition service delivery caused by TERI or any third party providers to TERI, FMC or
FMER.

Nothing in this Agreement or Appendix D shall require FMC or FMER to maintain
permanent internal or external network connectivity on behalf of TERI, and TERI acknowledges
that FMC and FMER intend to terminate any such connectivity following the termination of this
Agreement (or upon termination of the Services listed in this Appendix D, if earlier). At all
times during the term of this Agreement, TERI and each of its employees, consultants and agents
shall (i) comply with all state, federal and local acts, statutes, rules, regulations and published

6

guidelines concerning the security, confidentiality, handling, disclosure, use and protection of consumer or customer information and (ii) adhere to FMC's policies and standards regarding information technology and security, including acceptable email and internet use and the Information Security Policy of FMC.

DESCRIPTION:       IT Support

TERI shall acquire and deploy all hardware and operating infrastructure related to operating its environment and shall not acquire any assets from FMC and/or FMER, including but not limited to desktops/laptops, WAN/LAN, switches, network services, PBX and phones, hand-held devices (including PDA devices and mobile phones), physical network, firewalls and security appliances, operating systems or office support software. Following the term of this Agreement (or upon termination of the Services listed in this Appendix D, if earlier), TERI shall return, or have returned, to FMER all equipment as to which FMC and/or FMER has an ownership or leasehold interest, including without limitation all desktops/laptops, phones, hand-held devices (including PDA devices and mobile phones), network equipment and computer peripherals.

During the term of this Agreement and subject to the terms of this Appendix D, FMC shall provide:

Continued availability of current internal and external network connectivity, including external access to the existing applications hosted for TERI back-office business processes, administrative and college access business processes

Continued availability of the following websites:

www.teri.org - S&M website hosted by FMER

www.tericollegeplanning.org - S&M website hosted by FMER

www.coachprogram.org - S&M website hosted by FMER

www.thinkcollegeearly.com - S&M website hosted by FMER

www.bhep.org - S&M website hosted by FMER

www.pathwaystocollege.net - College Access website hosted by web.com

http://teri.webexone.com/login.asp?loc=&link= - Intranet hosted by Webex

http://www.williamsprinting.com/admin/login.asp  - Fulfillment Website

7

1 wiki website at Brockton hosted by icdsoft.com

Continued availability of current Window's domain, services and server applications supporting user authentication, printing, file storage, intranet, email, backups and electronic fax

Continued availability of existing user workstations (and/or laptops) with their legally licensed software, to the extent previously installed and supported by FMC and/or FMER

Continued availability of existing internal and external (in bound and out bound) phone and fax service including toll free services

Continued availability of existing computer peripherals including network and local printers, directly attached scanners, and connectivity for printing/scanning for leased reprographic business hubs

Continued availability of current wireless service and associated wireless telephone and PDA devices – including replication with email and scheduling to Messaging server

Continued availability of current logical and physical security for the foregoing

PROVIDER:        FMC

TIME PERIOD:     June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:         Richard Ross

DESCRIPTION:     Business Applications

Continued availability, including maintenance of existing interfaces for, HR and Payroll transactions

Hosting of, and/or continued availability, including maintenance of existing interfaces for, Finance and Accounting software for transactions, reporting and budgeting

8

Continued availability, including maintenance of existing interfaces for, data and provision of files and systems in support of TERI's risk management function

Continued availability, including maintenance of existing interfaces for, college-related contact management data for the TERI sales force.

PROVIDER:         FMC

TIME PERIOD:      June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:          Richard Ross

DESCRIPTION:      Business Processes

Delivery by FMER and/or FMC to TERI in machine readable format or otherwise in printed form of:

- all file-server based TERI end-user electronic files
- all SharePoint based TERI end-user electronic files
- all MS Exchange Data (emails, contacts, calendars) of TERI employees, to the extent permitted by law.

FMC and FMER agree to the logical deletion by FMC and FMER of the foregoing TERI end-user electronic files and MS Exchange Data, to the extent permitted by law. TERI acknowledges and agrees that it shall have no right to request, and FMC or FMER shall have no further obligation to deliver, any such data following logical deletion by FMC and/or FMER.

FMER and/or FMC shall cooperate in good faith with TERI regarding the independent provision by TERI of:

- Voice and data service provided by Verizon
- Web hosting and domain name registration in situations in which FMC and/or FMER have agreements for websites that were procured for TERI's benefit including delivery in machine readable format of static web pages and client side scripts.
- Agreements for HRMS and Payroll services, including delivery in machine readable format or otherwise in printed form of all related current and historic TERI data

9

- Agreements for Finance and Accounting software, including delivery in machine readable format or otherwise in printed form of all related current and historic TERI data, accompanied by relevant file format descriptors, data dictionary and relevant end-user documentation necessary to consume the files, in each case to the extent such materials exist as of the date hereof and FMC and/or FMER has the right to transfer such materials.

FMC and FMER agree to the logical deletion by FMC and FMER of the foregoing current and historic TERI data, to the extent permitted by law. TERI acknowledges and agrees that it shall have no right to request, and FMC or FMER shall have no further obligation to deliver, any such data following logical deletion by FMC and/or FMER.

FMER and/or FMC shall cooperate in good faith with TERI regarding the independent provision by TERI of:

- Agreements for salesforce.com software, including delivery in machine readable format or otherwise in printed form of all related current and historic college-related contact management data, accompanied by relevant file format descriptors, data dictionary and relevant end-user documentation necessary to consume the files, in each case to the extent such materials exist as of the date hereof and FMC and/or FMER has the right to transfer such materials.

PROVIDER:       FMC

TIME PERIOD:    June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:        Richard Ross

COST:           The following shall apply to all services provided under this Appendix D:

███████████████████████████████

---

1 The monthly rate will be adjusted to reflect any termination of services or of the Agreement during a month."

LIBC/3315992.1



Neither FMC nor FMER shall engage any third parties with respect to services to be provided hereunder without (i) providing TERI with a written statement describing the nature and scope of such engagement, together with a cost estimate, and (ii) TERI's prior written approval. TERI shall provide any approval or disapproval of such engagement as soon as practicable and in no event later than the second business day following delivery by FMC and/or FMER of such written statement. TERI shall reimburse FMC and/or FMER for the costs of any third-party engagement approved by TERI, unless the parties otherwise agree in writing.

FMC and/or FMER shall provide services set forth in Section 2.1 of the Agreement on a time and materials basis.

FMC and/or FMER will provide enhancement services as requested by TERI and agreed to by FMC on a time and materials basis.

11

Appendix E

Two years of data derived from AES's MR-50 and MR-53 reports, as well as comparable data from loan servicers other than AES to which TERI is entitled under its guaranty agreements with lenders

A copy of data housed in the ALE

A copy of data housed in the RMS

A copy of data housed in the Orig APP FMER systems

A final update to the Guaranty Access Database

A copy of the data and results of the validation study

LIBC/3315992.1