# **EXHIBIT 4**

JUNE 20, 2008 HEARING TRANSCRIPT

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - BOSTON

```
===============================
IN THE MATTER OF:                  .  Case #08-12540
                                   .
THE EDUCATION RESOURCES            .  Boston, Massachusetts
    INSTITUTE, INC.                .  June 20, 2008
                     Debtor.       .  2:11:47 p.m. O'clock
===============================
```

## TRANSCRIPT OF HEARING ON:
**(#238)  DEBTOR'S MOTION FOR ORDER (A) PURSUANT TO §365 OF THE
BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO REJECT CERTAIN
CONTRACTS WITH THE FIRST MARBLEHEAD CORPORATION, AND (B),
PURSUANT TO §363 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR
TO ENTER INTO A TRANSITION SERVICES AGREEMENT;
(#239)  DEBTOR'S MOTION FOR ORDER PURSUANT TO §§1056, 362, AND 363 OF
THE BANKRUPTCY CODE AUTHORIZING DEBTOR TO HONOR CERTAIN OF ITS
GUARANTY OBLIGATIONS AND PURCHASE DEFAULTED LOANS USING CASH
IN CERTAIN PLEDGED ACCOUNTS ESTABLISHED FOR THE BENEFIT OF THE
TRUSTS;  (#342) JOINDER OF U.S. BANK TO RELIEF REQUESTED.
BEFORE THE HONORABLE HENRY J. BOROFF, J.U.S.B.C.**

APPEARANCES:

For the Debtor:                    DANIEL M. GLOSBAND, ESQ.
                                   GINA L. MARTIN, ESQ.
                                   Goodwin Procter, LLP
                                   53 State Street   Exchange Place
                                   Boston, MA   02109
                                          --------continued---------->

Electronic Sound Recording Operator:    Mary L. Artesani

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net**

Page 2 Cover
#08-12540
6-20-2008

**APPEARANCES - Continued**

| | |
|---|---|
| For First Marblehead Corp. and First: Marblehead Data Services, Inc., Trust Administrator: | DENNIS L. JENKINS, ESQ. Wilmer Cutler Pickering Hale & Dorr 60 State Street Boston, MA  02109 |
| For U.S. Bank, N.A.: Indenture Trustee for Student Loan Trusts: | RICHARD C. PEDONE, ESQ. Nixon Peabody, LLP 100 Summer Street Boston, MA  02110 |
| For the U.S. Trustee: | ERIC K. BRADFORD, AUST Office of the U.S. Trustee 10 Causeway Street,  11th Fl. Boston, MA  02222 |
| Conflicts Counsel to the Official Committee of Unsecured Creditors: | DAVID J. REIER, ESQ. Posternak, Blankstein & Lund, LLP 800 Boylston Street Boston, MA  02199 |
| For the Creditors' Committee: | JEFFREY D. STERNKLAR, ESQ. Duane Morris 470 Atlantic Avenue   Suite 500 Boston, MA  02210 |

Electronic Sound Recording Operator:  Mary L. Artesani

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
Exhibits 4-6    Page 4 of 82
Document    Page 3 of 46

Page 2

1  (At 2:11:47 p.m.)

2          CLERK:  Calling the case of The Educational

3  Resources Institute.

4          MR. GLOSBAND:  Daniel Glosband for the debtor, along

5  with Gina Martin.

6          MR. PEDONE:   Richard Pedone for U.S. Bank as

7  Indenture Trustee.

8          MR. BRADFORD:   Eric Bradford for the U.S. Trustee.

9          MR. STERNKLAR:   Good morning, Your Honor.  Jeffrey

10  Sternklar for the Creditors' Committee.

11          MR. REIER:   David Reier also appearing as Special

12  Conflicts Counsel for the Creditors' Committee.

13          MR. JENKINS:  Your Honor, Dennis Jenkins for First

14  Marblehead.

15          MR. GLOSBAND:   Good afternoon.   We have two

16  motions before the Court this afternoon.  The first is with

17  respect to the rejection of our contracts with First

18  Marblehead Corporation; the second is with respect to using

19  funds in pledged accounts of the various securitization trusts

20  to pay defaulted claims when those claims are presented by

21  those trusts.

22          And I'd like to just explain the relationship of the

23  motions and then some general context, if that's all right.

24          As we indicated in our prior appearances, TERI,

25  which is the acronym for The Educational Resources Institute,

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Document   Page 4 of 46

**Page 3**

1  Inc., was very closely allied since 2001 with First Marblehead

2  Corporation.  These contracts embody that alliance where First

3  Marblehead Corporation in 2001 essentially purchased the

4  debtor's back room operations, and through these agreements

5  implemented that activity as the debtors' agent.

6         Because of the credit market crisis and its impact

7  on securitizations and the sales of bonds secured by pools of

8  student loans, activities came to a very precipitous halt in

9  September of 2007.  At that time that that halt occurred,

10  under the contracts and the way they were structured, First

11  Marblehead's costs to TERI were based upon the huge volume

12  level of lending activity that had been ongoing in the prior

13  years, but there was no more lending activity.  And so part of

14  TERI's revenues disappeared when the securitization market

15  dried up, but worse than that was the ongoing costs at the

16  levels that they were at.

17         And so as our primary goal in this case -- at least

18  our initial goal in this case, we undertook to find a way to

19  reduce those costs because without that production we would

20  have basically bled to death.

21         And so the first motion that's in front of you this

22  afternoon reflects what I think is a very successful result of

23  that exercise.  If the motion is allowed, and I'll go into it

24  in more detail, we basically dropped TERI's costs from what

25  they would have been for June of something over seven million

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 03/03/09   Page 6 of 82   03/03/09 10:01:36   Desc Main
Document   Page 5 of 46

**Page 4**

 1  dollars, and I'll -- if I may approach and hand up a little

 2  chart.

 3              THE COURT:   Thank you.   Everyone else has this?

 4              MR. GLOSBAND:   I'm distributing it.   This chart is

 5  taken from materials that were presented to the Creditors'

 6  Committee in the context of discussing these motions with them

 7  initially.

 8              This is really just to give you a sense of the order

 9  of magnitude.   Costs for the ten months ended on the date that

10  we filed the bankruptcy case for 134 million dollars, or over

11  -- you know, ten million dollars a month, 13 million dollars a

12  month.   For June, but for this agreement, there would have

13  been $7,700,000.   In fact, there is going to be $545,000.   So

14  it's hard to over-emphasize how dramatic the results of this

15  agreement are.

16              The context for this, as focused by Mr. Bradford's

17  objection, is what does this really mean?   Well, it basically

18  means that we've gotten TERI's operating costs down to a level

19  where it's got time to figure out what its exit strategy is

20  going to be, and I know Mr. Bradford asked us to tell us, tell

21  you that today.   We can't tell you that today.

22              There are several different options we're

23  considering.   They involve various permutations of business

24  model and use of remaining capital, but I felt we couldn't

25  spend time thinking about those until we stanched the bleeding

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
                    Exhibits 4-6    Page 7 of 82
                    Document    Page 6 of 46

Page 5

1 to the point where we could operate at essentially a break-

2 even while we thought about those.  So that's where we are.

3        THE COURT:    I thought the essence of the United

4 States Trustee's concern to be two things:  The first one that

5 you mentioned.  The second one that concerned, that in the

6 process of getting rid of all the costs, that TERI was also

7 getting rid of all of its income, and that that seemed to put

8 TERI into a posture where its recovery might become

9 impossible.

10        MR. GLOSBAND:  I think there are two answers to

11 that.  The first is that whether or not we got rid of the

12 costs, we had essentially gotten rid of most of the income

13 because of market conditions, and so these activities don't

14 really affect income much at all.  The part of the income that

15 theoretically would have been implicated would have been the

16 fees that TERI earned on guaranteeing loans.

17        Because of the bankruptcy, TERI's not really in a

18 position to guarantee loans.  We're going through some

19 exercises which we will be visiting you with next week and

20 that were embodied to some extent in the Citizens Bank

21 pleadings that were filed and heard last week, to eliminate

22 any issue as to whether there's any post-petition guaranty of

23 liability.

24        So we're not in a position, I don't think, to

25 undertake that kind of liability.  It wouldn't be prudent.  If

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 8 of 82
Document   Page 7 of 46

Page 6

1  we had the capital to do it, we may or may not have the

2  capital to do it.  That's tomorrow's analysis now that we've

3  got the costs down.

4          But there are ongoing revenues from recoveries on

5  loans that TERI owns that it purchased from its general

6  reserve accounts in the past.

7          THE COURT:  These are the default -- defaulted

8  loans?

9          MR. GLOSBAND:  That's correct, but those --

10          THE COURT:  The ones that they were forced to take

11 responsibility for.

12          MR. GLOSBAND:  Yes, but those -- those recoveries

13 average just over $400,000 a week, so it's not insignificant.

14 In addition, TERI has interest income on its own funds that

15 seems to vary on the cash flows, and I didn't think to bring

16 with me a -- the traditional cash flow that we've given to the

17 Committee; but it's in the -- you know, $100,000 range or so,

18 on an average week.

19          And then because of the transition arrangements we

20 are starting to make with lenders as we reject their contracts

21 we'll also be recouping funds for doing collection-related

22 activities for those lenders.  So it's a significantly smaller

23 business than it was, and it's not intended to be the

24 permanent business.    If that's all we're able to do after we

25 have time to think about it, you know, maybe it's not going to

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 4-6   Page 9 of 82
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Document   Page 8 of 46

Page 7

1  be a stand-alone reorganization; that's not clear yet.  But

2  the thing that is clear, we've cut the costs down, and we can

3  manage those costs with existing revenues or pretty close, you

4  know, to that, and we've got time to think about it.

5        I don't want to telegraph exit strategies because I

6  don't know what they're going to be.  We've talked to some

7  lenders about essentially a new guarantee model that's

8  collateral-based.  It would be structured in a way that we

9  would not incur significant additional costs to do that, so

10  that's a possibility.  Increasing this collection activity is

11  a possibility.  Using what's really TERI's primary source of

12  value, which is its intellectual property to evaluate risk and

13  model portfolios in some way or other is, you know, a piece of

14  the equation; and that's really one thing TERI has that hardly

15  anybody else has.

16        So we've got some pieces to work with, and hopefully

17  we've got some time to work with them because we have gotten

18  rid of our costs.  So that's the essence of it.  It's not a

19  direct answer, but I don't have a direct answer.

20        So that's the context, if you will, for this motion.

21  To just go through the pieces of it, there were several

22  agreements, beginning with the master services agreement under

23  which all of these costs were incurred and passed through and

24  it described what was done for TERI by First Marblehead.

25  There then was a marketing-related agreement.  There was a

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Exhibit 04403/09  Page 10 of 82/03/09 10:01:36   Desc Main
Document      Page 9 of 46

**Page 8**

1  data-related agreement, and there was a master form of

2  guaranty agreement that then plugged into the various

3  guaranties about the securitization trusts.

4      All of those will be rejected, and to deal with the

5  impact on TERI's operations, since it was all essentially

6  contracted to First Marblehead, we're also entering into a

7  transition services agreement which we've attached to the

8  pleadings, and it basically provides for those services that

9  we need First Marblehead to continue for us until we're able

10  to undertake them on our own.  And so the term of that

11  agreement is sixty days extendable by us unilaterally for

12  another thirty, and extendable thirty more to a total of 120,

13  with the consent of First Marblehead, not to be unreasonably

14  withheld.

15      And it's the costs under that agreement that are

16  reflected in the $545,000-a-month number that we provided in

17  the pleadings.  That number is not the entire cost, to be

18  honest, because there's a bit of a collection charge on top of

19  that that's a per-item basis in the contract, but it's not

20  significant.

21      So what has to happen on a transitional basis is

22  that we need to finish processing loans that were, as we've

23  described it, in the pipeline -- loans or applications that

24  were received before we could shut that process off or before

25  the lenders would shut that process of.  All of the pipelines

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
Exhibits 4-6    Page 11 of 82
Document    Page 10 of 46

**Page 9**

1    either have been shut or will be shut on date certain, but the

2    loans going through have to be completed and funded, and

3    there's paperwork and mechanics and accounting and the like

4    that First Marblehead will continue to do for us on a very

5    limited cost basis.  Essentially it will accept the

6    origination fee that we got in respect of those loans, so it's

7    a neutral cost.  We just pay them what we would have received,

8    and they do the work.

9            There's another category of loan that involves

10   multiple disbursements where a loan would be funded, for

11   example, by semester, or by year if there's more than one

12   year.  So there were loans that were made previously that have

13   subsequent disbursements coming due.  First Marblehead will do

14   the processing for those disbursements so that that money goes

15   out to the borrowers, and there will be no specific cost for

16   that.  That's just something they're going to do as part of

17   this agreement.

18           The next area has to do with collection activities,

19   and there are two categories of collection activity, what is

20   sort of divided to pre-default and post-default.

21           Pre-default involves activities aimed at trying to

22   enhance loan payments before they actually get to the point of

23   being in default, which means they're 180 days past due.  That

24   is essentially an out-of-pocket cost for someone, and it had

25   been an out-of-pocket cost for TERI, if you will, at a run

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
Exhibits 4-6    Page 12 of 82
Document    Page 11 of 46

**Page 10**

1    rate of I'm told two to three million dollars a month.

2    We agree with First Marblehead that that activity,

3    if they choose to do it in respect of loans that are owned by

4    the securitization trusts, will be paid for by First

5    Marblehead, and that's really the bulk of that expense.

6    Because of the age of those loans, those are the bulk of the

7    loans that were hitting the points where they would need to be

8    tended to minimize defaults.

9    First Marblehead has reserved the right to recover

10    back that money from what would be our residual interest in

11    the trusts someday.  The way that works is if, at the end of

12    the trust's maturation, there's money left over -- and there

13    should be, the way they're designed -- TERI, I believe, is

14    entitled to 80 per cent of that.  First Marblehead is entitled

15    to -- TERI is entitled to 20 per cent; First Marblehead is

16    entitled to 80 per cent.  So 20 per cent of these pre-default

17    costs would be charged to TERI's someday, not an immediate

18    cash item, and something we thought not terribly

19    controversial.

20    Post-default collections, loans that are already in

21    default, most of that cost, except for an administrative

22    charge, is paid for out of the recovery on the loan, so with

23    respect to those there is a -- there's a small administrative

24    cost that TERI ordinarily would receive, but if First

25    Marblehead is doing the work TERI is going to let that money

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Exhibit 4/06/09 Page 12 of 04/03/09 10:01:36   Desc Main
Document   Page 12 of 46

**Page 11**

1  go to First Marblehead -- so again, pretty much cost-neutral

2  to TERI.

3       I feel like I'm missing a piece here.  Excuse me a

4  second.

5       Oh, yeah, the last item is that there's a fairly

6  intricate set of steps under the servicing guidelines that

7  govern how all of these loans are serviced by a third-party

8  servicing agency that have to be completed for a loan to be a

9  claim that could be submitted for payment by TERI or by one of

10 these reserved funds; and so we've agreed on essentially a

11 per-loan charge to be paid to First Marblehead for being sure

12 that all of those steps have been completed and that it's a

13 real default, that we get the right paperwork, all that sort

14 of stuff.

15      We've not disclosed the costs because they also are

16 going to relate to what our pricing will be with our counter-

17 parties going forward.  We have disclosed them to the

18 Committee's professional so that they could see that the gross

19 arithmetic that we did was correct, but we don't want to

20 disclose the unit costs.

21      So all in all, in large part by pushing away the

22 collection costs related to the trust and by reducing to a

23 really negligible level the transitional costs, we've gone

24 from, you know, something in the seven-to nine million dollar

25 range with First Marblehead per month to I think something

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Exhibit A-3 09    Page 4 of 92 03/09 10:01:36    Desc Main
Document    Page 13 of 46

**Page 12**

1   slightly over $500,000 per month.

2        The one additional piece that people have asked me

3   about is, "Well, what are *your* costs going to be to replace

4   First Marblehead?"   The answer is there will be less than a

5   million dollars, in the hundreds of thousands of dollars of

6   capital expenses to replace some of the equipment necessary,

7   all of which is in process and subject to purchase orders and

8   the like; and there will be a small incremental employee cost

9   as we had a couple of people in a couple of areas to take up

10  what are these transitional services.   But at the current

11  level of activity, it's insignificant; and as I say, we've

12  presented cash flows to the Committee, and I had promised Mr.

13  Bradford that I would meet with him to go over those cash

14  flows after the hearing.

15        But all of that leads to pretty much break even, a

16  little profit going forward while we figure out our exit

17  strategy.

18        So to conclude, I mean, this is really the watershed

19  event at this point in the case.   We've gotten to where I

20  hoped we would get.   We've gotten there by agreement so that

21  this new rate structure is effective June 1.   So we really

22  only incurred significant expenses for part of April and May,

23  and have gotten out of it as of June 1.   So from the

24  perspective of this being a good exercise of business

25  judgment, I mean, it's, to my mind, in the slam-dunk category

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 15 of 82
Document   Page 14 of 46

**Page 13**

1   in terms of its benefit to the estate.  It's the same thing

2   because if we hadn't been able to untangle this, we'd be

3   running at the seven million dollar a month rate and eroding

4   our capital base.

5          So with all of that in mind, I would ask the Court

6   to approve the motion.  But I want to add one point, and that

7   is it was a condition to this agreement that we also present

8   and have approved the second motion that's on for today, so

9   approval of this motion is only effective assuming we get past

10  Item #2.  But that's my presentation.  Thank you.

11         MR. STERNKLAR:   Good afternoon, Your Honor.

12  Jeffrey Sternklar for the Creditors' Committee.

13         The Committee largely agrees with and supports the

14  debtor's efforts to restructure the First Marblehead contract

15  and its arrangement for the reasons that Mr. Glosband

16  outlined:  Reduction of costs that let alone of that magnitude

17  can only be a good thing.  It is a necessary but, as Your

18  Honor noted, not sufficient step to having an exit strategy.

19         There is no operating income of any consequence that

20  we have been able to discern post-petition, Your Honor.  While

21  Mr. Glosband made reference to the fact that the debtor may be

22  break-even, perhaps, depending upon what time frame you look

23  at on a cash flow basis, it's break even or close on a P&L

24  basis, our projection is it's losing substantial amounts of

25  money in the post-petition period.

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Document     Page 15 of 46

Page 14

1        So that there -- the issues that Your Honor alluded

2   to are our issues:  The erosion has been significant.  This

3   will slow the erosion but certainly won't cure it, and we hope

4   to engage with the debtor relatively quickly to get to those

5   exit strategies as quickly as we can so that we can avoid any

6   more significant erosion.

7        Mr. Glosband did mention that the so-called trust

8   motion is a condition; and unfortunately, that is far more

9   problematic for the Committee.  Mr. Reier will, I think,

10  present the Committee's argument with respect to that motion,

11  but just to frame the Committee's concern, Your Honor, is this

12  motion essentially blesses liens that the Committee does not

13  feel should be blessed, let alone at this time.   We've asked

14  for time.  We've negotiated an order, but for one issue which

15  we haven't resolved.  I think we've resolved things, but that

16  one issue is a major one.

17       Perhaps the best way to think of this, Your Honor,

18  is that there's sort of two buckets of assets that the

19  Committee is concerned about.  One is the actual pledged

20  accounts.  Those are accounts, bank accounts that -- in which

21  the trusts assert a security interest to secure their

22  contingent claims and also to secured the debtor's obligation

23  under its guaranty agreements to repurchase the notes when

24  they go into default under certain conditions.

25       The analysis as of the petition date of the trust

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
Exhibits 4-6    Page 17 of 82
Document    Page 16 of 46

Page 15

1   liens and security interests and those accounts probably won't

2   be a major exercise.  There's the seventeen trusts we -- it's

3   a UCC analysis essentially -- and we would be prepared as part

4   of an overall agreement that we've tried to reach to limit a

5   very short period of time to make that determination -- fish

6   or cut bait -- on that issue.

7           The second issue, Your Honor -- the second bucket

8   concerns funds that the trusts contend they have a lien on

9   that should be added to the pledged accounts, and that is an

10  entirely different story.  Those funds, as the Committee

11  understands it, largely are two basic sources of funds.  One

12  are the recoveries on defaulted loans sold by the trusts back

13  to the debtor.  So even though the trusts would have been paid

14  for those loans out of the pledge account, their assertion is

15  they have a pre-petition security interest on the recoveries

16  that the debtor may recover on account of those loans to put

17  back in the pledge account.  So while the principal balance

18  comes down, nevertheless the pledge account is replenished.

19          That raises serious questions that requires

20  considerable eval -- or review under, among other things,

21  Section 552 of the Bankruptcy Code, Section 362 of the

22  Bankruptcy Code, Section 549 of the Bankruptcy Code.

23          The second sort of area of concern are what the

24  debtor refers to as rehabilitative loans.  These are loans as

25  to which a borrower has missed some payments, but with effort

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 4-6   Page 18 of 82
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Document   Page 17 of 46

Page 16

1 through the debtor's subcontractors those loans had been made

2 current within certain guidelines.  And those monies --

3 there's money that changes hands when those loans are returned

4 back to a "performing," quote-unquote, state.

5          Those funds the trusts would content they have a

6 pre-petition security interest on, to also be added to the

7 pledged accounts, and those raise similar concerns.

8          We've asked for time to review that longer than just

9 pre-petition UCC analysis on the bank accounts, and with one

10 exception I think we're in agreement, but it's a critical

11 exception.  Apparently post-petition, we learned this morning,

12 some funds have gone into those pledge accounts.  We don't

13 know precisely how much.  We don't know the source of them.

14 And as to those, we need a significant amount of time,

15 comparable to the latter category and not the former category,

16 to evaluate whether we had a problem with that or not.

17          We would object to allowance of this motion, Your

18 Honor, the trust motion to the extent its, I would submit,

19 artificial linkage to the First Marblehead motion means that

20 this has to get done before the Committee has had a chance to

21 look at these issues; and when you get to that motion, Mr.

22 Reier will address the Court on behalf of the Committee.

23 Thank you, Your Honor.

24          THE COURT:   Thank you.

25          MR. JENKINS:   Your Honor, Dennis Jenkins for First

1   Marblehead.

2        If you would, Your Honor, I'd like to just give

3   first a little introduction to First Marblehead because I

4   don't think we've had the opportunity to kind of explain from

5   our standpoint our role here, and then speak briefly to the

6   motion that Mr. Glosband spoke about -- the motion to reject.

7        First -- I -- First Marblehead is a corporation

8   based here in Massachusetts that together with its affiliates

9   is a key and important contributor to the country's education

10   finance system.  It's in the business of providing outsourcing

11   services for private education lending in the U.S., and the

12   First Marblehead entities help meet the growing demand for

13   private education loans by offering national and regional

14   financial institutions and educational institutions as well as

15   education loan marketers services to design and implement

16   student loan programs.

17        So it's been described today in the motions that

18   First Marblehead has been a key supplier of services to TERI

19   in this area pursuant to a number of contracts which have been

20   outlined to Your Honor.  The services include risk management,

21   administrative support functions such as collections and

22   default prevention services, and I should also mention that

23   First Marblehead is also the largest non-contingent unsecured

24   creditor in this case.

25        In May TERI approached First Marblehead about its

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
Exhibits 4-6    Page 20 of 82
Document    Page 19 of 46

Page 18

1   desire to terminate many of the agreements and these services

2   provided by First Marblehead to the debtor.   First Marblehead

3   recognized that it was -- would be in the best interest of

4   TERI's estate and the many student borrowers affected by TERI

5   to provide a carefully planned transition of services back to

6   TERI or another service provider if it chose, so First

7   Marblehead worked with TERI to create the TSA, which First

8   Marblehead believes will give TERI the ability to work through

9   this transition period.

10          I would also note that there's a dichotomy here that

11  you may ask why are these two motions linked.   One dichotomy

12  that has not been explained here today is that there -- the

13  services provided by First Marblehead include services both to

14  non-securitized loans and to securitized loans.   The contracts

15  for those services are being rejected, so there are a group of

16  securitized loans with billions of dollars of student loans at

17  stake, and non-securitized loans.   As soon as these agreements

18  are rejected there is no way, unless there is a transition

19  services agreement or another agreement, to deal with the

20  servicing of those many loans.

21          So the transition services agreement, which we've

22  spoken about, was largely negotiated to take care of all these

23  non-securitized and securitized portions, but in order to fund

24  a way to deal with the many securitized loans out there, we

25  needed a way to release funds from secured collateral pools to

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 21 of 82
Document   Page 20 of 46

**Page 19**

1  help fund that.

2          First of all, it has, as Mr. Glosband said, stepped

3  up to the plate and agreed to provide certain services that

4  may be paid, if at all, at the back end when these trusts have

5  any residuals.  But because of those two types of transactions

6  we need a way to release those secured funds to help pay for

7  that, so the two motions are linked.

8          I will respond to the motion to pay out of those

9  trust accounts in a moment, but I do think you can boil down

10  the one remaining issue on that motion to one of time:  How

11  long does the Committee need to look at post-petition

12  transactions into pledged accounts, and that's the time period

13  that I think is open.  I'm going to let Mr. Glosband speak to

14  that and reserve --

15          THE COURT:  And have you --

16          MR. JENKINS:  -- to respond to that.

17          THE COURT:  Have you discussed with the Committee,

18  counsel for the Committee, how long it thinks it needs?

19          MR. JENKINS:  We have been -- have been discussing

20  that as we were coming in, as we were walking in, and I just

21  -- that issue has not been resolved.

22          THE COURT:  But if you could agree as to that

23  point --

24          MR. JENKINS:  I think --

25          THE COURT:  -- then that makes the second motion

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Exhibit 4406/09 Page 22 of 82 03/09 10:01:36   Desc Main
Document   Page 21 of 46

**Page 20**

1  viable, which promotes the viability of the first motion.

2          MR. JENKINS:  I believe -- that's my understanding

3  that we're down to that one -- one remaining issue.  So I'll

4  reserve to respond after he's presented that motion, Your

5  Honor.  Thank you.

6          THE COURT:   All right.

7          MR. BRADFORD:   Good afternoon, Your Honor.  Eric

8  Bradford for the U.S. Trustee.

9          Earlier today I filed a motion for authorization to

10  file a late objection, both to the First Marblehead rejection

11  motion and --

12          THE COURT:   That's granted.

13          MR. BRADFORD:   Thank you very much.  As I've set

14  forth in the objection and as Mr. Glosband observed in his

15  closing remarks as to the FMC motion, the debtor bears the

16  burden of demonstrating that these two motions are in the best

17  interest of the estate; and I don't know that it's possible to

18  consider one without the other.  I think we're all in

19  agreement with that.

20          Certainly the U.S. Trustee does not object to the

21  reduction of the debtor's costs post-petition, but as the

22  Court accurately summarized our objection, the issue comes as

23  to the reduction in the debtor's income, occasioned by the

24  segregation motion and the guarantee motion; and certainly,

25  the debtor, since it's posted, according to its April monthly

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
                    Exhibits 4-6    Page 23 of 82
                    Document    Page 22 of 46

**Page 21**

1  operating report, an accrual loss of $6,500,000, rightfully I

2  think the creditors and certainly the U.S. Trustee are

3  concerned with how all this is going to play out.

4          I have not yet reviewed the debtor's monthly

5  operating report for May.  That's going to be filed, I

6  understand, sometime later today.

7          The bottom line as to these two motions is that I

8  believe that since the guaranty motion is treating the secured

9  collections on account of loans subject to the security

10  interests as cash collateral, it's reasonable and consistent

11  with the local rule and Section 363 to have projections of

12  what the debtor reasonably anticipates over the next thirteen

13  to eighteen weeks it's going to realize and expend in the way

14  of cash.  And I think that those types of projections are

15  necessary and certainly reconciliations of them periodically

16  are necessary as well, so that we could test the debtor's

17  projections and what it thinks it's going to do.

18          The remarks regarding the possible exit strategies

19  that the debtor is considering I think are certainly

20  important, particularly where the debtor is the net consumer

21  of cash and is unprofitable post-petition.

22          The U.S. Trustee is vitally concerned with potential

23  for administrative insolvency in any case.  We're not saying

24  that that's imminent here, but we do have other motions where

25  the debtor is proposing to continue issuing its guarantees on

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Exhibit A-B   Filed 09/03/09   Entered 09/03/09 10:01:36   Desc Main
Document   Page 23 of 46

**Page 22**

1 post-petition pipeline loans.  The issue of whether those

2 particular guarantees constitute administrative expenses of

3 the estate -- and there have been two sides fleshed out, both

4 for the Committee and for the debtor on that issue in the

5 various pleadings that have been filed.

6        I don't know.  I don't know if it's going to be a

7 priority expense of the estate.  If the debtor is on the line

8 for those -- those guarantees and they're paid in full dollars

9 post-petition, then they're issues.

10       So I think in considering both of the motions that

11 you have before you today:  213 -- I'm sorry  -- 239 and 238

12 -- it's difficult to approve certainly one without the other,

13 and without additional information regarding the debtor's

14 projected post-petition financial performance, I'm not so sure

15 that the debtor -- I'm confident that the debtor hasn't

16 demonstrated or met its burden under 363.

17       THE COURT:   Thank you.

18       MR. GLOSBAND:   Just to close the presentation on

19 the motion to reject the First Marblehead contracts, there

20 were two minor changes to the transition services agreement:

21 One just to clarify language, the other to reflect a small

22 change in the cost relationships based on the next motion and

23 the fact that we're going to be segregating funds instead of

24 turning them over.  And so I would just like to hand the Court

25 the revised transition services agreement and the revised

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Document     Page 24 of 46

**Page 23**

1  order from the one we filed, which only says, "As amended to

2  reflect the revision to the TSA." And I know you can hold

3  these aside until we get to that motion.

4        THE COURT:   How long would it take the debtor to

5  give Mr. Bradford the information that he's looking for?

6        MR. GLOSBAND:   In other words cash flows?

7        MR. BRADFORD:   Projections.

8        THE COURT:   Some projections over the next ninety

9  days.

10        MR. GLOSBAND:   It depends how late he wants to stay

11  today. I -- I could -- I have a four o'clock conference call

12  after which I'd be happy to meet with Mr. Bradford, if you'd

13  like. I have those. I meant to bring them with me. We ran

14  out the door and left them on the printer.

15        THE COURT:   All right. If I --

16        MR. GLOSBAND:   Those would not be publicly

17  available, though. Those would be in confidence. And if we

18  were to file them with the Court, we would ask them to be, you

19  know, kept -- keep them in confidence.

20        THE COURT:   Well, I'm not quite sure it's necessary

21  to file them with the Court. Would you be prepared to share

22  them with the Creditors' Committee?

23        MR. GLOSBAND:   We *have* shared them with the

24  Creditors' Committee.

25        THE COURT:   Have you. All right. Well, let's go

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Exhibits 4-6    Page 26 of 82
                            Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
                            Document    Page 25 of 46

**Page 24**

1  on -- go on to the second matter and see how that rolls out.

2          MR. GLOSBAND:  Okay.  It might be useful in the

3  context of this motion to hand up in advance the black-lined

4  order that shows how far we've gone.

5      (Pause)

6          MR. GLOSBAND:  In addressing the first motion, Mr.

7  Sternklar generally described this motion, so I won't repeat

8  all of that.  The -- the idea of this motion is that money

9  that is, we believe, collateral for the various trusts to

10  secure TERI's obligation to them to purchase defaulted loans

11  would be used for just that purpose.  So in that regard I

12  don't think this implicates the local rule with respect to the

13  debtor's use of cash collateral.  In fact, we're just turning

14  it back to the secured party who has a security interest in

15  it.

16          The issues that the Committee has raised basically

17  deal with their need to have more time to fully evaluate

18  whether or not the security interest of the trusts in their

19  collateral are good.  As Mr. Sternklar indicated, there are

20  basically two categories of collateral pledged accounts, and

21  as to each of those pledged accounts there exists deposit and

22  security agreements which are also designed to be and say that

23  they are control agreements for UCC perfection purposes, so I

24  don't think it should take them very long to review those and

25  decide if they think they're effective.

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Exhibit 0408/09    Page 27 of 82 03/09 10:01:36    Desc Main
Document    Page 26 of 46

Page 25

1              And with respect to that issue, the issue of the

2    perfection of security interest in the pledged accounts, we've

3    agreed, and it's reflected in the black-lined order -- and

4    First Marblehead as well has agreed -- that the Committee will

5    have fourteen days to raise any issues with respect to those

6    security interests.

7              The other categories of collateral -- and I really

8    only think there's one other, but I'll try to explain why I

9    think that -- are admittedly more complicated.  The general

10   category is what is defined in the documents as Recoveries,

11   with a capital "R."  And Recoveries are essentially any

12   amounts realized by TERI on account of a loan it bought from

13   one of these trusts out of the trusts' collateral.  And while

14   Mr. Sternklar sort of intimates that that's a -- it's double

15   counting, it's essentially as if, as additional collateral to

16   a lender, someone gave them a security interest in accounts

17   receivable, that, you know, was just additional collateral --

18   assuming they had an interest in the real estate, they also

19   have a security interest in accounts receivable.  These

20   Recoveries are really receivables on these loans.

21             So the issue is do they have a good security

22   interest in receivables?  How does that work from a 552

23   perspective?  And I don't mean to, you know, pre-judge or

24   belittle the issue.  It's an issue.  And in respect of that

25   issue, the Committee has asked for, and First Marblehead and

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 28 of 82
Document   Page 27 of 46

**Page 26**

1  the debtor have agreed to sixty days to decide whether to

2  lodge any objection or otherwise raise the issue.

3          The third item that Mr. Sternklar referred to -- and

4  again, I don't think we need to resolve that today -- but it's

5  something called rehabilitations; and it's different in the

6  sense that TERI has a right, if a loan is made current by four

7  consecutive payments, a one-time right to put that loan back

8  to the trust, the trust to pay for that loan; and the tricky

9  part again is the payment proceeds are additional collateral

10  under the existing document, so there's a -- the same issue

11  essentially as there would be with recoveries, and that's also

12  a sixty-day issue.

13          And the only part then that isn't the subject matter

14  of an agreement is that in the ordinary course, as collections

15  and the like were processed post-petition, some of the money

16  under the governing documentation went into pledged accounts.

17  And so the question is, to challenge that money, is it a

18  fourteen-day issue or a sixty-day issue?

19          My practical suggestion to the Committee was, "Well,

20  if you think you have an issue, file something within fourteen

21  days, and, you know, we'll deal with it whenever." They said,

22  "No, we'd rather just have the sixty-day time limit." I'm

23  frankly indifferent. It's really an issue between First

24  Marblehead, the trusts represented by Mr. Pedone, and -- and

25  the Committee. But that's really I think the only issue

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 29 of 82
Document   Page 28 of 46

**Page 27**

1  that's outstanding at the moment.

2       I want to basically thank everyone because we worked

3  pretty much around the clock last (unclear - "Tuesday?") to

4  get to the point where that's the only issue, but that *is* the

5  only issue, and I don't have a way to resolve it other than my

6  own practical petition is that the order enters as it is.  If

7  they think they have an issue there, they can act on it in

8  fourteen days, and it will play itself out over time.

9       THE COURT:   Thank you.

10      MR. REIER:   Good afternoon, Your Honor.  I've been

11  retained as Special Conflicts Counsel to the Committee, and in

12  connection with that role one of our primary tasks has been to

13  conduct what we call a UCC audit of all of the outstanding

14  transactions with all of the creditors, and we have begun that

15  project.  We'd initially begun with lenders other than the

16  trusts that were the subject of motions that have already been

17  filed and are pending before the Court; and when the trusts'

18  motion got put on for rapid hearing, and appreciating the

19  important of that motion, we began to review these issues in

20  connection with the trusts.

21      And in the process of the review, one of the things

22  that we learned very quickly is that there is no one paradigm

23  document.  The -- the governing documents for the non-trust

24  lenders are different amongst each other in many important

25  respects, and the documentation involving the trusts are

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
                          Document      Page 29 of 46

**Page 28**

1  different from the lenders.  We haven't reviewed enough of the

2  documents of the Trustee to know how much and to what extent

3  they differ among each other.

4          So -- so that's the project that we've undertaken,

5  and one of the areas that the -- that we feel reasonably

6  satisfied about is that as far as the -- whether or not the

7  trusts or any party has a perfected security interest in a

8  pledged account is primarily governed by a single document,

9  and which is known generally as a control agreement.  In this

10 case they call these deposit and -- they call these deposit

11 and security agreements -- that provide -- that we believe

12 contain the language, from the ones we've seen, that probably

13 satisfy the requirements of the Uniform Commercial Code.

14         And so we believe that within a period of fourteen

15 days we can certainly review those documents for all seventeen

16 trusts, and if we have a problem with the documentation there

17 will still be enough time to resolve it within the fourteen

18 days, or file -- or file something with the Court.  And that

19 is why the Committee agreed that we would hold ourselves to a

20 fourteen-day period with respect to the pledged accounts.

21         And as Mr. Sternklar explained, and I think Mr.

22 Glosband agreed, that with respect to the other collateral,

23 it's much more complicated.  As far as we're concerned, there

24 are multiple issues, both under the Uniform Commercial Code in

25 the manner in which the other collateral is described in the

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
Document    Page 30 of 46

Page 29

1  financing statements, the manner in which the collateral is

2  described in the governing documentation, and the manner in

3  which the collateral -- the alleged collateral is transferred

4  among different accounts, and the source -- and the different

5  sources from which the collateral arises, although they are

6  principally of two sources:  One is the collections on

7  defaulted loans that TERI has repurchased from a -- from a

8  lender or from the trust; and funds in TERI's account

9  resulting from the sale back to the trusts or a lender of a

10  rehabilitated loan.   Those issues also involve the

11  application of Section 552 of the Code.

12          So one of the things that we learned in the course

13  of all of our discussions in an attempt to reach some

14  resolution that will preserve the rights of the Committee to

15  devote sixty days to that latter category, which we think is

16  much more complicated, is that we really learned this for the

17  first time this morning in our discussions; and perhaps the

18  date, the information was available before, but we were

19  certainly not aware of that.  I was certainly not aware of

20  that -- is that prior to today's hearing the debtor was

21  already engaging in certain transactions in the ordinary

22  course of business in which it is seeking to bless through

23  this order.

24          And so to the extent that funds that fall into this

25  second more complicated category have been transferred into

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 32 of 82
Document   Page 31 of 46

**Page 30**

1  the pledged accounts, the effect of the order absent the

2  Committee's review would be to exempt that from challenge by

3  the Committee and give it the same status that those funds

4  would have had if they were already in the pledged accounts as

5  of the petition date.

6          We don't know -- we don't have the information about

7  those funds.  We don't know where they came from.  We don't

8  know what the amount is.  We don't know what trusts they went

9  into.  So that's all the information we're going to have to

10  gather, but alternately the legal questions about the status

11  of those funds is going to rest in part on the analysis of

12  that second category that we need sixty days for.

13          So for us to be in the position to challenge the

14  pledged accounts in fourteen days because they may be tainted

15  by these post-petition transfers that are questionable really

16  puts the Committee in a position of having to commence actions

17  solely to preserve its rights while it continues its review;

18  and realistically, I don't think we can know -- I don't think

19  we can form, both factually and legally, a very -- a strong

20  enough case and a specific enough case to challenge those

21  transfers in the fourteen days.  The route -- just a much,

22  much more complicated category.

23          Quite frankly, if they -- if the debtor and -- for

24  First Marblehead or the trusts believe that the transfers were

25  authorized, were appropriate, that they have an interest in

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 33 of 82
Document   Page 32 of 46

Page 31

1  it, I don't see why they -- what would be the problem how they

2  would really be harmed by giving the Committee the sixty days

3  that it's seeking.  And that's -- that's the only outstanding

4  substantive issue with the order.

5        I did have -- although people are describing us as

6  having just one issue with the order, there was one other

7  smaller one which is, I believe in the nature of a

8  clarification, and I did discuss that with Mr. Glosband

9  previously, but I do want to clarify.

10        In the -- on page 6 of the black-lined order, the

11  very top paragraph deals with the rehabilitated loans, and it

12  deals both with the funds derived from the sale of the

13  rehabilitated loans back to the trust.  That part is okay, and

14  that's what is certainly agreeable to, but it also speaks in

15  terms of the recoveries from such loan.

16        My understanding is, and I'd be very happy if just

17  on the record the parties would clarify that it is agreed that

18  pending the sixty-day review period of the Committee under all

19  -- in all circumstances, recoveries from rehabilitated loans

20  will not be transferred into the pledged account.  So either

21  that should be -- either the reference to "and all Recoveries

22  from such loans" should be stricken from the order, or else

23  the parties can simply clarify that, that the general

24  provision in the order that says that

25        "All Recoveries from and after the date hereof, on

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 34 of 82
Document   Page 33 of 46

**Page 32**

1              account of any loans, are going to go into the

2              segregated account pending the Committee's sixty-day

3              review,"

4    includes those, then obvi -- then that's certainly fine with

5    the Committee.

6              THE COURT:   Thank you.

7              MR. JENKINS:   Thank you, Your Honor.   Quickly, as

8    has been mentioned, the only issue really is one of timing,

9    but I think it's helpful to understand that the only two

10   things that go into these collateral accounts and what've

11   termed as Recoveries and proceeds from repurchased

12   rehabilitated loans -- and what we are specifically focused on

13   is monies -- those either Recoveries or purchases from --

14   through the guaranty repurchases of rehabilitated loans that

15   have gone into these accounts post-petition, my understanding

16   is that these two things occur once a month -- either proceeds

17   from Recoveries come in once a month, or proceeds from the

18   repurchase of rehabilitated loans come into these accounts

19   once a month -- my understanding is that they could have that

20   information within forty-eight hours as to what's come in

21   post-petition.

22             THE COURT:   What do they do?   They accumulate it in

23   the operating account and then transfer it?

24             MR. JENKINS:   Is that correct?   Yes.

25             THE COURT:   All right.

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 35 of 82
Document   Page 34 of 46

**Page 33**

1          MR. JENKINS:  So the number of transactions post-

2   petition is very limited.

3          In terms of the documents, the documents -- there

4   are seventeen trusts here.  They almost have identi -- they're

5   similar-based documents, almost identical among them.  The

6   differences that were spoken of between the others are not

7   there.  And so the --

8          THE COURT:  So -- what -- so what in the end do you

9   want?  An opportunity to finish an abbreviated settlement

10  conversation in the hallway?  Or for me simply to decide?

11         MR. PEDONE:   Your Honor, I believe five minutes in

12  the hallway makes sense.  .  Richard Pedone on behalf of U.S.

13  Bank, the Indenture Trustee.

14         THE COURT:   Okay.  So does the United States

15  Trustee want to be heard first?

16         MR. BRADFORD:   Let me -- I just had one more to add

17  to this, and perhaps I could frame what goes on in the hallway

18  as well.

19         I thought I heard Mr. Glosband say that the guaranty

20  motion, the second motion of the two you're looking at today,

21  doesn't implicate cash collateral.  That's not what the motion

22  itself says.  As I pointed out at page 10, or on page 3 of my

23  objection, at page 10 the guaranty motion talks about

24  363(c)(2) and cash collateral.  The *pro forma* order that was

25  attached to the motion discussed cash collateral.

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 36 of 82
Document   Page 35 of 46

Page 34

1       I've had four minutes to look at the black-line.  I

2  don't see any further reference to cash collateral, but I

3  question if everyone is being so careful about these funds, at

4  least in their characterization in the four corners of the

5  motion and how they're being accounted for, will we not be

6  running the risk of adequate protection issues under 361 and

7  363 as we do down the line?  I would like some clarification

8  on that.

9       As counsel for FMC pointed out and as Mr. Glosband

10  pointed out, there are two different types of buckets here

11  into which these collections and Recoveries go, one subject

12  allegedly to the liens of the banks and the trusts, the others

13  not.  The debtor, as I understand it in the ordinary course of

14  its business post-petition, is free to consume, as cash, those

15  funds not attributable to collections generated from the

16  secured accounts.

17       I would like -- is the debtor's accounting

18  information system sufficiently robust that it can distinguish

19  between these two different types of collections?  As I

20  understand it, the debtor collects these monies.  They get

21  them from FMC, they go into the operating accounts, *then*

22  they're going to be segregated.

23       The money's been accumulating in the operating

24  account or maybe at the FMC level post-petition because

25  there's been no order authorized that I know of, authorizing

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 37 of 82
Document   Page 36 of 46

**Page 35**

1 | any funds to go back to the secured lenders into their pledged

2 | accounts on account of Recoveries on collections and so forth.

3 | So those are my concerned.

4 |         THE COURT:   I thought there was such an order.

5 |         MR. BRADFORD:   No.   There's none -- there was a

6 | cash management order, but there has been, to my knowledge --

7 | that's why the guaranty motion is in front of you.   The debtor

8 | is saying, "Please, may we go forward and continue with our

9 | pre-petition practice and recycle the cash accordingly?"

10 |         Now in the monthly operating reports that we review

11 | as carefully as we can every month, there's no distinction in

12 | terms of sources.   Maybe there doesn't really need to be, but

13 | collections on account of one group of collections, the other,

14 | you know -- I can't vouch for any of it in terms of how

15 | they're recording it and how they segregate it on their books.

16 | They're booking it somehow, and I -- clarification on those

17 | issues is important.   Again, the debtor's motion is that it's

18 | in the best interest of the estate, not just the constituency

19 | of the estate, FMC in this corporation, in this case.

20 |         I've cited to you the case out of the Second

21 | Circuit, that being the *Lionel* case.   There you had a single

22 | vocal group of constituents within a case wanting certain

23 | things done, but the test is for the case as a whole, for the

24 | estate as a whole, forget FMC all by itself for a minute.   For

25 | the estate as a whole, including the Committee, is this motion

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 38 of 82
Document   Page 37 of 46

**Page 36**

1  coupled with the FMC motion in the best interest of the

2  estate?   That's the burden the debtor has to meet.

3      THE COURT:   And that -- and it is to that question

4  that you're looking for the projections.

5      MR. BRADFORD:   Yes.   And also maybe some assurance

6  on the issue of cash collateral.   I mean, I don't want to be

7  in the situation of any of the trusts perhaps saying, "To the

8  extent that we had a post-petition interest in cash that's

9  coming out of our alleged collateral that's been diminished,

10 what are you going to do for me?   There's a 361 administrative

11 claim for adequate protection, thank you very much."

12      Well, that's not going to be on the debtor's books.

13 That's going to be asserted somehow.   So those are the issues

14 that I have.

15      MR. GLOSBAND:   Before everyone migrates to the

16 hallway, let me just answer the couple of questions that I

17 can.   It was our intention and understanding that all

18 recoveries, regardless of whether they pertained to a

19 rehabilitative loan in waiting or otherwise going to these

20 segregated accounts under this order, so that's -- to answer

21 Mr. Reier's question.

22      With respect to cash collateral, one of the

23 exceptions to the restrictions on use is if the secured party

24 whose collateral is -- consents to the use we propose to make

25 of it, they consent.   We're giving it back to them; they're --

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 39 of 82
Document   Page 38 of 46

Page 37

1  you know -- it adds to this really, so I don't think it's an

2  issue of our somehow improperly using their cash collateral.

3  It consented to that use, so there's not an adequate

4  protection issue because of that.

5          THE COURT:   So you think they're estopped from

6  complaining.

7          MR. GLOSBAND:   And so are they.   I mean, --

8          THE COURT:   Well, I'm saying they're estopped from

9  complaining.

10          MR. GLOSBAND:   They are estopped, yes.

11          THE COURT:   Okay.

12          MR. GLOSBAND:   Yes.   Finally, we keep perfect track

13  of where all of the Recovery money comes from and who it

14  belongs to from the perspective of, but for this interruption,

15  transferring it monthly to whomever it belongs to.   So, I

16  mean, I'm happy to satisfy him on that, but I don't believe

17  there's any issue, there's never been an issue with any of the

18  trusts over time.

19          THE COURT:   Well, there are a couple of different

20  options here.   Number one, you could return to the hallway and

21  see if you could satisfy both Mr. Reier and Mr. Bradford.   The

22  other alternative -- do we have an omnibus hearing date Monday

23  or Tuesday?

24          MR. GLOSBAND:   We have a hearing on Monday in

25  Worcester, Your Honor, in the afternoon.   I had hoped to

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 40 of 82
Document   Page 39 of 46

**Page 38**

1  spend five minutes discussing that at the end of this hearing.

2          THE COURT:   To try to avoid it.  To try -- to try

3  to avoid the hearing?  Is that -- ?

4          MR. GLOSBAND:  Perhaps.

5          THE COURT:   Well, anyway, to the extent that you

6  didn't, then that's an opportunity to give you a little more

7  time with less strain.  But that's up to you.  See what you

8  can do in the hallway, and I'll call the case again in about

9  -- well, I'll call the case again when you say you're done.

10         MR. GLOSBAND:  Thank you very much, Your Honor.

11         THE COURT:   All right?  Thank you.

12      (Multiple speakers and microphones being bumped)

13         SPEAKER:   (unclear) for the moment?

14         THE COURT:   Oh, sure.

15         MR. PEDONE:   Your Honor?

16         THE COURT:   Yes.

17         MR. PEDONE:   If I may just state that I'm not

18  necessarily in agreement with the issues on my client, the

19  Indenture Trustee, being estopped until we actually get to the

20  point where we have an order -- cash collateral --

21         THE COURT:   It seems to me then that you're a

22  necessary participant in the conversation in the hallway.

23         MR. PEDONE:   Yes.

24         THE COURT:   Yes.

25         MR. PEDONE:   Thank you.

**#08-12540**                                          **6-20-2008**

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
                          Document     Page 40 of 46

Exhibits 4-6   Page 41 of 82

**Page 39**

1      THE COURT:   All right.   We'll take a -- just a

2   ten-minute recess:

3                [This case recessed at 3:09:53 p.m.]

4                * * * * * * * * * * *

5                [This case resumed at 3:39:07 p.m.]

6        THE COURT:   Please be seated.

7        MR. GLOSBAND:   Thank you for your patience, Your

8   Honor.   The parties have come to terms on the order, and I'll

9   just tell you what those are, and ask politely if I may be

10  excused --

11       THE COURT:   Does this include Mr. Pedone's concern?

12       MR. GLOSBAND:   Yes.

13       THE COURT:   All right.

14       MR. GLOSBAND:   After I do that, I'd ask to be

15  excused to run.   I have an unavoidable four o'clock call with

16  a whole bunch of people.

17           So the essence of the agreement is that with respect

18  to the post-petition Recoveries or funds that have been put

19  into pledged accounts there will be a forty-five day objection

20  period.   And there's another provision that applied to the

21  language dealing with rehabilitated loans that basically said

22  if any transfers in respect of those loans had been approved

23  by some other order of the Court then they wouldn't be

24  challenged.   Well, that provision will also be added to this

25  objection.   So we're prepared to submit a revised order later

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Document   Page 41 of 46

**Page 40**

1  today or first thing Monday morning.

2          THE COURT:   Revised orders, both?

3          MR. GLOSBAND:   Beg your pardon?

4          THE COURT:   Both orders?

5          MR. GLOSBAND:   Well, the --

6          THE COURT:   The order for each of the motions.

7          MR. GLOSBAND:   The sale order is final as is.

8          THE COURT:   All right.

9          MR. GLOSBAND:   But I understand if you'd like to

10  reserve entry until this one is submitted.

11          THE COURT:   Right.

12          MR. GLOSBAND:   And then we'll submit the final

13  version of this one later today or first thing Monday morning.

14          THE COURT:   All right.

15          MR. GLOSBAND:   If I may just -- one other comment.

16          THE COURT:   Sure.

17          MR. GLOSBAND:   On Mr. Bradford's issue, he's agreed

18  that he'll assent to the entry of these orders so long as I

19  deliver to him the cash flow projections that he's asked for

20  and they show nothing egregious, and if they do he'll have a

21  right to ask the Court to reconsider the order.

22          THE COURT:   Sure.

23          MR. GLOSBAND:   And we've made logistical

24  arrangements to accommodate that.

25          And then we were going to mention briefly the two

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 43 of 82
Document   Page 42 of 46

Page 41

1 matters that were schedules for Monday.  I can do that if

2 you'd like, or I can escape and let Ms. Martin do it,

3 whichever you -- why don't I just do it?  I'm standing here.

4          THE COURT:   Well, why -- why don't you go and I'll

5 talk to Ms. Martin.

6          MR. GLOSBAND:  All right.  She's -- I guarantee you

7 she's more interesting and attractive than I am.  I very much

8 appreciate this, Your Honor.  I just have -- I have no way to

9 contact these people other than being on the phone call

10 (unclear), so I thank you.

11          THE COURT:  See ya!  Ms. Martin.

12          MR. GLOSBAND:  Have a nice weekend, Your Honor.

13          THE COURT:   You, too.

14          MS. MARTIN:   Your Honor, we had that omnibus

15 hearing scheduled for -- we *have* an omnibus hearing scheduled

16 for Monday.  There's two motions scheduled for that.  There is

17 the motion to segregate guarantee fees, and there is the

18 motion to approve the stipulation with Chase.

19          I know that you received these motions at a status

20 conference somewhat in a vacuum, but what we were trying to do

21 is we are working with the Committee with respect to the Chase

22 motion, and we've given them some information.  We need to

23 give them some more.  They want to do some more financial

24 analysis, and so we didn't want to just have a motion to

25 continue the Chase stipulation generally.  We don't think we

Case 08-12540   Doc 1171-2   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Case 08-12540   Doc 795   Filed 04/03/09   Entered 04/03/09 10:01:36   Desc Main
Exhibits 4-6   Page 44 of 82
Document   Page 43 of 46

Page 42

1  want to continue its pursuit, and we want to try and keep it

2  on track.

3          THE COURT:   Are you looking for another date for

4  that motion?

5          MS. MARTIN:   Right.  So what we were hoping was

6  that it could be scheduled -- we have a July 8th omnibus

7  hearing, and if there is no agreement on the parties, we'll

8  eventually need to have an evidentiary hearing on that.  But

9  for now I think, you know --

10         THE COURT:   Well, I --

11         MS. MARTIN:   -- the real request is the July date.

12         THE COURT:   I don't have time for that on July --

13  at least I don't think I have time for that July 8th.  So

14  what's July 8th?  A non-evidentiary hearing, and then we'll

15  see where we go?

16         MS. MARTIN:   Exactly.

17         THE COURT:   Okay.  Well, what time is your -- what

18  time are your hearings on the 8th?

19         MS. MARTIN:   I think it's ten, but I'm not sure.

20         ATTORNEY:   Ten o'clock, I think.  I don't know for

21  sure.  Ten o'clock, I believe.

22         THE COURT:   All right, say ten o'clock.  So that's

23  one of the motions.

24         MS. MARTIN:   That's one of the motions.

25         THE COURT:   Okay.

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Exhibit 04/08/09 Page 45 of 03/09 10:01:36    Desc Main
Document    Page 44 of 46

**Page 43**

1           MS. MARTIN:    The other motion is the motion to

2    segregate guaranty fees.    That motion we -- we have an

3    agreement with the Committee about how we are going to

4    structure that motion.    It will require us to file amended

5    motion, and I just -- again, I think that given that we need

6    to amend the motion, have the Committee review it, make sure

7    that it's acceptable, I don't think it's -- I don't think it

8    will be -- give the lenders enough time for the July 8th

9    hearing.

10           THE COURT:    Why don't you just withdraw it without

11   prejudice, and then you can re-institute it at your leisure.

12           Mr. Pedone, I know you want to say something, and I

13   lost track of that.    I apologize.

14           MR. PEDONE:    That's okay, Your Honor.    Your Honor,

15   there was a comment with regard to the U.S. Bank as Indenture

16   Trustee being estopped or waiving some rights.    We're in

17   formal agreement with the order as submitted, but we're not

18   agreeing that we are estopped or waiving any rights, other

19   than being bound by the terms of the order.

20           THE COURT:    Okay, then.

21           MR. REIER:    Your Honor, one last thing.    On the

22   Chase motion, the objection deadline was today at 4:30.    I

23   wonder if the Court would reschedule -- reset the objection

24   deadline for that motion as well.

25           THE COURT:    Until when?

Case 08-12540    Doc 1171-2    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Case 08-12540    Doc 795    Filed 04/03/09    Entered 04/03/09 10:01:36    Desc Main
                    Exhibits 4-6    Page 46 of 82
                    Document    Page 45 of 46

Page 44

1       MR. REIER:   Well, I would suggest  --

2       ATTORNEY:  July 7th.

3       MR. REIER:   -- July 7th at 4:30.

4       MS. MARTIN:   That's fair, Your Honor.

5       THE COURT:   July 7 at 4:30.

6       MR. REIER:   Thank you.

7       THE COURT:   Are we done?  Okay.

8       MS. MARTIN:   Your Honor, just one --

9       THE COURT:   Yes.

10      MS. MARTIN:   -- on scheduling -- so the Monday

11 hearing we'll --

12      THE COURT:   You don't have to come to Worcester

13 now.

14      MS. MARTIN:   Okay.  Thank you.

15      ATTORNEYS:  Thank you, Your Honor.

16      THE COURT:   Thank you.

17      MR. BRADFORD:  Thank you, Judge.

18 (End at 3:45:33 p.m.)

19              * * * * * * * * *

20

21

22

23

24

25

1          I certify that the foregoing is a true and accurate

2   transcript from the digitally sound recorded record of the

3   proceedings.

_Gloria C. Irwin_                    3/31/09
                                          Date

GLORIA C. IRWIN
Certified Transcriber NJ AOC200
        Federal  CERT #122
GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
609-927-0299   1-800-471-0299
        FAX  609-927-9768
e-mail  irwingloria@comcast.net

# **EXHIBIT 5**

EXCERPT FROM APRIL 28, 2010 HEARING TRANSCRIPT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - SPRINGFIELD

========================================

IN THE MATTER OF:      .  Case #08-12540

.

THE EDUCATION RESOURCES   .  Springfield, Massachusetts
   INSTITUTE, INC.          .  **April 28, 2010**
              Debtor.  .  2:15:35 p.m. O'clock

========================================

**P.M. Session**
**Volume II**

### TRANSCRIPT OF TELECONFERENCE HEARING ON:
### (#1011) HEARING ON CONFIRMATION OF FOURTH AMENDED
### JOINT PLAN OF REORGANIZATION;
### (#1045) DEBTOR'S MOTION FOR ORDER APPROVING REJECTION OF CERTAIN
### EXECUTORY CONTRACTS;
### (#1046) DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO REJECT
### AND TERMINATE EXECUTORY CONTRACTS;
### (#1066) JOINT MOTION FOR ORDER AUTHORIZING DEBTOR, RBS CITIZENS,
### N.A., AND THE CREDITORS' COMMITTEE TO ENTER INTO STIPULATION FOR
### THE SETTLEMENT OF GUARANTY CLAIMS RELATING TO THE TERMINATION
### OF CERTAIN LOAN GUARANTEES
### BEFORE THE HONORABLE HENRY J. BOROFF, J.U.S.B.C.

**APPEARANCES**:  (See next Page)

Electronic Sound Recording Operator:   Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

### GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ 08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

**JAMES PEKO - Cross/Sternklar**                    Page 142

1  it's a lot lower, they may leave.  And the very first thing

2  said this morning was that these executives are critical to

3  the feasibility of this enterprise.  The -- the IRS regs say

4  it has to be reasonable, their by-laws --

5          THE COURT:   See -- see, I don't --

6          MR. MARTIN:   -- say it has to be reasonable.

7          THE COURT:   -- I don't -- I don't believe that.   I

8  think the only person I've met that is indispensable is me.

9          MR. MARTIN:   We would concur with that, Your Honor.

10         THE COURT:   Your objection is sustained.

11         MS. FETOUH:   Thank you, Your Honor.

12 BY MR. MARTIN:

13     Q.  Let me go back to Exhibit 2 and get you -- point you

14 back to the projections.

15     A.  Sure.

16     Q.  Now just to go to the line number for portfolio

17 management services of 1.1 million, 2.8 million, and 4.9

18 million, did the debtor supply you with those numbers?

19     A.  They were put together in conjunction with the

20 debtor and Grant Thornton.

21     Q.  (Pause) You testified earlier that the assumption of

22 around fees per engagement was $250,000 per engagement in the

23 portfolio management space.

24     A.  Generally.

25     Q.  And did that number come from the debtor?  Did that

**JAMES PEKO - Cross/Sternklar**                    **Page 143**

1  number come from you?

2      A.  That number was based on a sampling of the

3  marketplace that provided similar services that we anticipate

4  providing, as well as the fact that we actually had an

5  engagement with a client for that level.

6      Q.  You testified earlier that TERI would have earned

7  $250,000 had that customer succeeded in its bid for a pool of

8  student loans, is that correct?

9      A.  That's correct.

10     Q.  Okay.  But the customer did not succeed in that, is

11 that correct?

12     A.  That's correct.

13     Q.  How much was TERI actually paid for that engagement?

14     A.  I believe they were paid $25,000 up front.  I

15 believe that there was a second scheduled payment, but I'm

16 not aware if that second payment, the milestone for that was

17 reached or not.

18     Q.  In effect, was that a contingency arrangement?

19     A.  Yes.

20     Q.  When you referred to $250,000 fees before, were

21 those also structured as contingency arrangements, or flat

22 fees under any circumstance?

23     A.  I'm not sure I can answer the question "under any

24 circumstance."

25     Q.  Were they also -- were those fees also structured

**JAMES PEKO - Cross/Sternklar**                    Page 144

1  similarly and that there would be a smaller up-front payment

2  and a larger payment upon the occurrence of certain

3  conditions?

4      A.  I'm not a hundred per cent certain on exactly how

5  those fees were structured.

6      Q.  Well, your survey that you based your assumptions on

7  state -- is based on achieving $250,000 per engagement on

8  these -- on -- on the portfolio management side.

9      A.  The survey wasn't based on anything.  The -- The

10 results of the survey are what they are.

11     Q.  You indicated that TERI has a number of prospective

12 clients it's talking to, or has talked to about engagement

13 for portfolio management services, is that -- my -- my

14 recollection of your testimony correct?

15     A.  Yes.

16     Q.  Have you personally talked to any of those clients?

17     A.  I have not.

18     Q.  So TERI has informed you of those discussions and

19 that's the only basis of your knowledge, is that correct?

20     A.  That's correct.

21     Q.  Do you know whether there have been face-to-face

22 meetings between TERI and those clients?

23     A.  My understanding is that there has.

24     Q.  Do you know who was in those face-to-face meetings

25 on behalf of TERI?

**JAMES PEKO - Cross/Sternklar**                                    Page 145

1      A.  I'm not a hundred per cent certain.

2      Q.  Do you know whether Mr. Davidson was in those

3  meetings?

4      A.  I'm not certain.

5      Q.  Do you know whether principally only Mr. Hulings was

6  in those meetings?

7      A.  I'm not sure.

8      Q.  Do you know over what time period those discussions

9  were taking place?

10     A.  No.

11     Q.  Do you know when the last such discussion occurred?

12     A.  I believe it's been in the last few months.

13     Q.  What's the most recent date on which you know of

14  such a conversation occurred?

15     A.  I don't know a specific date.

16     Q.  About as closely as you can approximate?

17     A.  I'm not sure.

18     Q.  Have any of those clients exchanged a term sheet or

19  other indication of interest with TERI to retain them for

20  services?

21     A.  I'm not certain.

22     Q.  Have you seen any such documents?

23     A.  Except for the client that had actually signed --

24  that had actually engaged TERI, no.

25     Q.  Did you ask for any such documents in preparing and

**JAMES PEKO - Cross/Sternklar**                    Page 146

 1  analyzing your projections for the disclosure statement?

 2       A.  No.

 3       Q.  Have you seen any Request For Proposal that any

 4  potential clients of TERI have sent to TERI, or that TERI has

 5  obtained, or services that would be included in portfolio

 6  management services?

 7       A.  I don't recall what services were actually included

 8  in proposals, but I have seen proposals.

 9       Q.  Have you seen any proposals for risk management

10  services?

11       A.  Can you define risk management, please?

12       Q.  Let me rephrase the question.  Have you seen any

13  proposals for risk analysis services?

14       A.  Yes.

15       Q.  From how many potential clients?

16       A.  One.

17       Q.  When was that RFP issued?

18       A.  I believe it was -- was not in the form of an

19  official RFP, but I believe that proposal went out in

20  September of 2009.

21       Q.  So is that -- is that job or work still available to

22  TERI, or has it been taken by someone else, if you know?

23       A.  That's the engagement that they executed on.

24       Q.  Oh.  So this is the same engagement we talked about.

25  And what was the fee on that engagement again?

**JAMES PEKO - Cross/Sternklar**                     Page 147

1      A.  The potential fee was $250,000.

2      Q.  What was the actual fee received by TERI?

3      A.  $25,000.

4      Q.  Have there been any RFPs or expressions of interest

5  to hire TERI in writing, including e-mails, for transaction

6  support services that you're aware of?

7      A.  I'm not sure.

8      Q.  How about for portfolio monitoring services?

9      A.  I'm not sure.

10     Q.  How about for risk consultant services?

11     A.  I'm not sure.

12     Q.  Who are TERI's competitors in -- in the portfolio

13 management market?

14     A.  I'd say their main competitor is First Marblehead.

15     Q.  How about Sallie Mae?

16     A.  Yes.

17     Q.  Nelnet? (Phonetic? -- or NELMEF?)

18     A.  I -- I'm not aware exactly the services that Nelnet

19 provides.

20     Q.  But that First Marblehead is the only competitor

21 you're aware of?

22     A.  Sallie Mae would be one.

23     Q.  Sallie Mae.  In general, do you think that the

24 market for services in this area is growing or shrinking?

25     A.  In which area?

**JAMES PEKO - Cross/Sternklar**                    Page 148

1      Q.   In portfolio management.

2      A.   I believe there are market opportunities because of

3    the market disruptions over the past 24 to 36 months has

4    created an opportunity for new entrants to come into the

5    market.  You don't only have the traditional student lenders

6    in this marketplace any longer.  There are other financial

7    institutions like investment managers that are now moving

8    into the market and trying to pick up assets at a discount.

9    Those -- those poten -- those players basically don't have

10   the expertise that's needed to monitor portfolios.  So that

11   creates a market opportunity.

12     Q.   Can we turn to Exhibit 3 for a moment, the so-called

13   conservative case scenario, or worst-case scenario?

14     A.   Sure.

15     Q.   Now what I'd like to do is actually to compare this

16   to Exhibit 2, if we can do that --

17     A.   Okay.

18     Q.   -- at the same time a little bit.  One thing, and

19   I'll confess that I didn't understand this earlier today, is

20   that the revenue lines in the conservative case scenario do

21   not include the grant income lines from the regular income

22   statement, is that correct?

23     A.   That's correct.

24     Q.   Okay.  And if I understood you earlier, the worst-

25   case statement is supposed to be for just the collections

1  business of TERI?

2      A.  Yes.

3      Q.  Okay.  So you took out the income that's the grant

4  income that's related and usable really only in College

5  Access business.

6      A.  Yes.

7      Q.  Okay.  On the expense side, did you take out the

8  expenses that are attributable to the College Access

9  business, such as employee costs?

10      A.  Most of the expenses were taken out except for

11  allocations.

12      Q.  Let me ask a more specific question.  In the worst-

13  case scenario there's a line for employee costs, do you see

14  that?

15      A.  Yes.

16      Q.  Okay.  So in -- in the 12 months ending in 2012,

17  that drops to $880,000 and change.  In that $880,000, does

18  that include the employment cost for people who would be

19  employed at that point in the College Access program?

20      A.  No.

21      Q.  Okay.  And for SGNA are you saying then that there's

22  a -- there's an allocation?

23      A.  There's actually an allocation on certain employee

24  costs.  So, for instance, general counsel, because a small

25  portion of general counsel's time would be spent on College

**JAMES PEKO - Cross/Sternklar**                               Page 150

1  Access activities, a small portion of that cost would be

2  allocated to College Access.

3      Q.  So one way to think about this is that Exhibit 2 is

4  sort of a -- is a income statement for the whole business,

5  you know, taking into account your assumptions about

6  portfolio  management, but Exhibit 3 is just one business

7  line, it's just a collections business line, without

8  portfolio management and without the College Access income or

9  expenses.

10     A.  That's not exactly correct because it -- it's not a

11  sub.  TERI doesn't report its activities in such a way; but

12  generally speaking, it's a fair representation.

13     Q.  So --

14     A.  There -- there are probably costs in here that,

15  again, would be allocated out.  So this is a true

16  conservative scenario.

17     Q.  Now you indicated that -- so -- so you could also do

18  something like this that would be just the non -- just the

19  non-profit mission part, just the College Access part with

20  income and revenue and expenses.  The revenue would just be

21  the grants essentially.

22     A.  Yes.

23     Q.  And if I -- do I understand your testimony correctly

24  that it is your view that if we had such a income statement

25  that it would show that the grants exceed all the expenses

**JAMES PEKO - Cross/Sternklar**          Page 151

1   associated with performing those grants and doing College

2   Access stuff, including the overhead?

3       A.   I -- I believe I said it's generally break-even.  It

4   actually, you know, loses a small amount of money.

5       Q.   But we don't have those numbers here.

6       A.   I think that's correct.

7       Q.   Okay.  And there are some expenses here that you

8   said would actually be -- that -- that show up here that

9   would actually still have to be paid over there on that off-

10  balance sheet, or, you know, off the financial's income

11  statement that we're now talking about.

12      A.   Well, the business is fungible.  It's not run

13  separately.  But to your -- to answer the question, there are

14  some expenses that are included in these line items that, in

15  fact, would be College Access expenses.  So to your point, if

16  you're suggesting that expenses are duplicated, yes, they

17  are.

18      Q.   So let's consider this now.  I'm just going to your,

19  your model, which said that this is only -- this -- it said

20  in the disclosure statement that it's -- shows that this can

21  operate, you know, operate its business and perform under the

22  collections contract, and I didn't understand that to mean

23  only the collections line of business.  But let's just focus

24  on this as the collections line of business.  These

25  projections just show the first two years through April 30th

**JAMES PEKO - Cross/Sternklar**                    Page 152

1  of 2012, right?

2       A.  That's correct.

3       Q.  Okay.  And in both those first two years, a million

4  dollars of the income in each year is from the shared

5  recoveries under the collection contract with the plan trust.

6       A.  That's correct.

7       Q.  And those, because there's no collection contract,

8  wouldn't necessarily be there the third year after that.

9       A.  That's correct.

10      Q.  Okay.  And if that million dollars isn't there, then

11 there's an extra million dollar loss to TERI in that third

12 year.

13      A.  Well, not exactly, because this isolates the

14 collections contract; and, in effect, in the third year,

15 TERI, depending on how the collections business worked out,

16 could decide to be in that business, or step away from that

17 business, in which case that revenue would go away, but so

18 would the cost structure associated with it.

19      Q.  Let me rephrase the question.  This is a worst-case

20 scenario based on what happens essentially if there's no

21 portfolio management revenue and excluding the charitable

22 line of business, is that correct?

23      A.  This is a worst-case scenario isolating the

24 collections business.

25      Q.  Okay.  And in that scenario in year three, the first

**JAMES PEKO - Cross/Sternklar**                    Page 153

1  year not shown here, if we just project these numbers out,

2  the loss would be -- there -- there would be a -- there's a

3  loss of revenue because the plan trust contract goes away of

4  a million dollars of revenue on these projections.

5      A.   It would be a loss of revenue, and if the plan trust

6  contract goes away, as the conservative cases provided, this

7  considers the plan trust revenues, there would be no need to

8  keep the infrastructure in place; and, therefore, the only

9  cost that would have been incurred in year three would be any

10 cost to wind that down, which would be minimal.

11     Q.   Although it could include severance, according to

12 your projections.

13     A.   It -- it's possible that there could be some

14 severance costs to it, yes.

15     Q.   So if Mr. Hulings or Mr. Davidson insisted on a new

16 severance package because they'd been stiffed on their prior

17 severance package, that severance cost would have to be paid.

18     A.   If there were contractual severance, that

19 contractual severance would need to be paid.  Under the

20 current circumstances, I don't believe the company is

21 obligated to pay any of the employees severance.

22     Q.   So what you're saying essentially is that, and I --

23 I did understand this to be the case, that if -- if this

24 worst-case scenario works out, which is no portfolio

25 management services, and nothing further develops in

**JAMES PEKO - Cross/Sternklar**                    **Page 154**

1  collections, the plan is essentially to shut down -- shut

2  TERI back down to that other case which is just College

3  Access after two years, and your view is that that's cash-

4  flow positive.

5       A.  My view is what is cash-flow positive?

6       Q.  The College Access business after that point.

7       A.  Actually, I said that College Access business was

8  break even to a slight loss.

9       Q.  Okay.  And the revenue for that business -- let me

10 take a step back.  We don't actually have any written

11 projections here for that stand-alone -- thinking about that

12 as a stand-alone business.

13      A.  That's correct.

14      Q.  Do you -- have you ever prepared any such

15 projections?

16      A.  We did look at the College Access business and the

17 operating activities of that business.

18      Q.  Have you looked at a -- I thought you said a moment

19 ago that the debtor was integrated and they didn't break

20 these out.

21      A.  They don't break them out.

22      Q.  But Grant Thornton has a set -- has another chart

23 like this or similar to this that breaks out College Access?

24      A.  Similar.

25      Q.  And it shows it's roughly break-even or a slight

**JAMES PEKO - Cross/Sternklar**                    **Page 155**

1  loss.

2       A.  Yes.

3       Q.  Okay.  And the revenue line there, if I understand

4  your testimony, is a single revenue line of grant income, is

5  that correct?

6       A.  It's grant income, yes.

7       Q.  TERI's grants I don't think are discussed in the

8  disclosure statement.  Are they government grants, or grants

9  from private charities?

10      A.  I'm not certain exactly the type of grants they are.

11      Q.  You testified earlier that the grant income -- that

12  TERI has obviously gotten grant income over time.

13      A.  Yes.

14      Q.  Did I understand you correctly earlier that the

15  grant income shown in Exhibit 2 of roughly two million

16  dollars a year is for grants that TERI has already been

17  granted?

18      A.  Yes.

19      Q.  When do those grants end?

20      A.  I don't know when each specific grants -- that --

21  that number is accumulated by a number of grants, depending

22  on what the grants supports.

23      Q.  Okay.

24      A.  Some of them are short term.  Some of the are long

25  term.

**JAMES PEKO - Cross/Sternklar**                    Page 156

1    Q.  What's the shortest term grant in that?

2    A.  I'm not certain.

3    Q.  But you're certain that all of them end after April

4    30th, 2013.

5    A.  I don't know when they end.

6    Q.  And you don't know whether they're government or

7    private charitable grants.

8    A.  I'm not certain.

9    Q.  Do you have a view, sir, as to whether the

10   government, whether state or federal's ability to give grants

11   is increasing or decreasing in the current physical

12   environment?

13   A.  You're referring to new grants, or are you referring

14   to --

15   Q.  I'm referring to --

16   A.  -- the ability to pay existing grants?

17   Q.  I'm referring to new grants.

18   A.  I -- I don't know.  That's not my area of expertise.

19   I don't know what the government is doing.

20   Q.  Are you aware that many charitable foundations have

21   suffered a significant loss of assets and revenue because of

22   the downturn in the stock market?

23   A.  Yes.

24   Q.  And would you expect that to decrease their ability

25   to give out new grants?

**JAMES PEKO - Cross/Sternklar**                    Page 157

1    A.  I would expect that it would cause them to re-

2  prioritize where they would spend that potential money.

3    Q.  Do you have any reason to believe that the grants

4  for which TERI would apply would be higher priority than

5  other one that would cut in that circumstance?

6    A.  I don't know.

7    (Pause)

8        MR. MARTIN:  Just bear with me a moment, Your

9  Honor.  I'm trying to flip through these and --

10 BY MR. MARTIN:

11   Q.  Does TERI have a document that it calls its business

12 plan?

13   A.  There have been a number of sets of projections at

14 various times that TERI has put together.  I believe some of

15 those may have a cover sheet that says, "Business Plan."

16 Some of those may not.

17   Q.  Have you seen any that include lists of potential

18 clients?

19   A.  Specific clients, or categories of clients?

20   Q.  Specific named clients that the business would

21 target to obtain business from.

22   A.  I have not.

23   Q.  So are the documents that you've seen, are they

24 principally spreadsheets?

25   A.  Yes.

**JAMES PEKO - Cross/Sternklar**                    **Page 158**

1      (Pause)

2          MR. MARTIN:  Apologies, again, Your Honor.  I've

3   asked some of these so I'm trying to --

4   BY MR. MARTIN:

5      Q.  I want to go back to the issue of TERI's

6   competitors.  You mentioned two:  First Marblehead and Sallie

7   Mae.  Are they larger or smaller companies than TERI -- re --

8   excuse me, than reorganized TERI?

9      A.  They're larger.

10     Q.  How much larger?

11     A.  I would say significantly larger.

12     Q.  What do you think TERI's competitive advantages

13  would be as against First Marblehead or Sallie Mae in

14  competing for business?

15     A.  Because of the smaller size of TERI, they would

16  actually be in a position to provide potentially a greater

17  level of customer service and interaction, and clients

18  wouldn't just be a number.  They've demonstrated during the

19  pendency of the case that they've been able -- been able to

20  attract new clients on the collection side when, in fact,

21  competing against First Marblehead and Sallie Mae.

22     Q.  How many new clients have they attracted during the

23  case?

24     A.  I don't know exactly the number.

25     Q.  Is it more than ten?

**JAMES PEKO - Cross/Sternklar**                    Page 159

1      A.  It probably is around ten, but I'm not sure.

2      Q.  What's the total annual revenue from the collections

3  efforts of TERI with those clients?

4      A.  I'm not certain.

5      Q.  Is it included in the projections?

6      A.  Yes.

7      Q.  And the projections show collections for the 12

8  months ended 2011 at two million dollars a year.  Do you have

9  any sense of the breakdown of how much of that is existing

10  business and how much is future business?

11      A.  I believe about half is existing.

12      Q.  About a million dollars is existing, but a million

13  would be future.

14      A.  Yes.

15      Q.  So the projections show that in the next year the

16  collections revenue would double.

17      A.  That's correct.

18      Q.  Projections also show that the portfolio management

19  revenue would go from 25,000 to 1.1 million.

20      A.  I think the projections show it will go from 1.1

21  million to 2.8.

22      Q.  Currently, in the last year, what's been the

23  portfolio management revenue?

24      A.  About 25,000.

25      Q.  Would you say that TERI believes that the size and

**JAMES PEKO - Cross/Sternklar**                    Page 160

1   quality of its database of student loan collections is one of

2   its competitive advantages?

3        A.   I would say that TERI believes that its depth and --

4   and knowledge in the student loan market provides at a

5   competitive advantage.

6        Q.   What does that mean -- Let's try to take a concrete

7   example here.  Let's go -- let's go back to that hedge fund,

8   or whoever it was, that paid TERI $25,000 to analyze some

9   other loan portfolio that it was going to try to purchase.

10  So there's another loan portfolio -- Let me see if I

11  understand this correctly.  The idea is -- Was the idea that

12  a hedge fund was going to produce another loan portfolio of

13  loans that's not currently owned or serviced by TERI?

14       A.   They were actually going to purchase a loan

15  portfolio that is not serviced by TERI.

16       Q.   So TERI had -- At the time -- TERI was hired for

17  this job, but it didn't actually have data on that loan

18  portfolio, it had its own data on -- its own -- TERI had its

19  own data on its own portfolios that it had serviced.

20       A.   No, that's actually incorrect.  I believe that the

21  potential purchaser had access to loan-level data on that

22  portfolio.

23       Q.   Okay.  So what -- Does this -- Did that job fall in

24  what's called transaction services as -- as it's been

25  described?

**JAMES PEKO - Cross/Sternklar**                     Page 161

1       A.  You can call it transaction services.  You can call

2   it risk management.  I -- I goes you can call it --

3       Q.  So --

4       A.  -- transaction services.

5       Q.  -- when their -- when TERI's -- You'd mentioned that

6   TERI has a deep understanding of the market and loan

7   collections.  That's based on their history of collecting the

8   loans that they worked on that they had -- that they owned

9   and that they otherwise supervised, is that correct?

10      A.  That's correct.

11      Q.  So when the hedge fund or someone else trying to buy

12  a loan portfolio hires them and has a pool of loan-level

13  data, what does TERI do with that for those kind of services?

14  Do they compare it to their own data, you know, similar year;

15  cohorts of loans; and how do they perform; where people went

16  to college; that kind of thing, do they compare it to their

17  own data?  Is --

18          MS. FETOUH:   Objection, Your Honor.  We've gone

19  fairly far afield of the issues in dispute here and certainly

20  into a level of detail that I think is unnecessary for the

21  Court's determination.

22          THE COURT:   Overruled.  But I do think that you

23  ought to bring this —

24          MR. MARTIN:   I'm not going very far with this, Your

25  Honor.

**JAMES PEKO - Cross/Sternklar**                    Page 162

1          THE COURT:    -- to a -- to a point.

2          MR. MARTIN:   I'll -- I'll get there.   I've had --

3    I'm having a hard time phrasing the question.   So let me see

4    if I can try one more time at the question.

5    BY MR. MARTIN:

6       Q.  Hedge fund comes to TERI with loan-level data for

7    something they want to buy.   Does TERI compare that loan-

8    level data to its own loan-level data to help project the

9    recoveries on the loans that are going to be purchased?

10      A.  I don't know exactly how TERI completed that

11   particular analysis.

12      Q.  Okay.   That -- that ends that line of questioning so

13   --   (Pause)  Let me ask one last question, or set of

14   questions on the worst-case scenario, if we go back to

15   Exhibit 3, and I apologize, this is a little out of order,

16   but this is another item that came up today.

17          In any of the expense lines in the worst-case

18   scenario, do any of those include ongoing costs to support

19   the pension fund and keep it from not going into termination?

20      A.  I don't recall exactly.   The pension costs are

21   included in the employee cost line item.   I can tell you it

22   amounts to approximately -- it's between a hundred and

23   $200,000 a year from year one to year three.

24      Q.  Do you know whether that's included in the $883,000

25   in year two that's shown here?

## EXHIBIT 6(a)

EXCERPT FROM FIRST MARBLEHEAD CORPORATION'S 2008 FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

---

# Form 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended: June 30, 2008**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                     to

**Commission file number: 001-31825**

---

# THE FIRST MARBLEHEAD CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3295311** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **The Prudential Tower** **800 Boylston Street, 34th Floor** **Boston, Massachusetts** (Address of principal executive offices) | **02199-8157** (Zip Code) |

Registrant's telephone number, including area code: **(617) 638-2000**

---

Securities registered pursuant to Section 12(b) of the Act:

| **Common Stock, $.01 par value** | **New York Stock Exchange** |
|---|---|
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act

Table of Contents

marketing efforts, or if they are otherwise not successful in these efforts, then we may experience a reduction in the volume of loans that we process and securitize, and our business will be adversely affected. Certain of our clients have terminated their marketing coordination agreements with us, and additional clients that have not terminated their agreements have suspended their marketing of TERI-guaranteed loan programs as a result of the TERI Reorganization or instructed TERI to stop accepting applications for TERI-guaranteed loans.

In addition, if the loans were marketed by our clients in a manner that is unfair or deceptive, or if the marketing, origination or servicing violated any applicable law, state unfair and deceptive practices acts could impose liability on a securitization trust holding the loan or create defenses to the enforceability of the loan. In response to recent legislative initiatives, lenders may increasingly focus on the direct to consumer marketing channel, increasing competition within the channel for private student loans. Investigations by the New York Attorney General, the Attorneys General of other states, the United States Congress or others could have a negative impact on the ability of our clients, and Union Federal, to market student loans. The Higher Education Opportunity Act of 2008 creates significant additional restrictions on the marketing of private student loans.

***We have expanded rapidly in recent years, and we are now streamlining our operations; if we fail to manage effectively our cost reductions, our business could be disrupted and financial results could be adversely affected.***

From our inception to June 30, 2008, our assets grew to $1.2 billion. In February 2008, we reduced headcount by 120 employees. In May 2008, we announced that we had reduced headcount by approximately 500 employees. Our cost reduction measures will place a strain on our management, systems and resources at a critical point in our business and industry. We must develop alternatives to the loan guaranty and origination services that TERI has historically provided to our clients, and we must refine our business development capabilities, our systems and processes and our access to financing sources. We must retain, train, supervise and manage our remaining employees during this period of change in our business.

We currently co-source some borrower services and telesales functions in an effort to reduce costs, take advantage of technologies and effectively manage the seasonality associated with student loan volume. We rely on our vendors to provide high levels of service and support. Our reliance on these external vendors subjects us to risks associated with inadequate or untimely service and could result in fewer loans than we would experience if we performed the service functions in-house.

We cannot assure you that we will be able to:

- expand our systems effectively;

- allocate our human resources optimally;

- identify, hire and retain qualified employees or vendors; or

- incorporate effectively the components of any business that we may acquire in our effort to achieve growth.

We are dependent upon the retention of certain key employees and the loss of any such employees could adversely affect our business. If we are unable to manage our cost reductions, or if we lose key employees as a result, our operations and our financial results could be adversely affected.

***If competitors acquire or develop a student loan database or advanced loan information processing systems, our business could be adversely affected.***

We own a proprietary database of historical information on private student loan performance that we use to help us establish the pricing provisions of new loan programs on behalf of lenders, determine the terms of securitization transactions and establish the fair value of the structural advisory fees and residuals that we recognize as revenue. We also have developed a proprietary loan information

38

Table of Contents

processing system to enhance our application processing and loan origination capabilities. Our student loan database and loan information processing system provide us with a competitive advantage in offering our services. Third parties could create or acquire databases and systems such as ours. For example, as lenders and other organizations in the student loan market originate or service loans, they compile over time information for their own student loan performance database. If a third party creates or acquires a student loan database or develops a loan information processing system, our competitive positioning, ability to attract new clients and business could be adversely affected. As a result of the termination of our agreements with TERI in the context of the TERI Reorganization, we have lost access to continuing updates to the database of TERI-guaranteed loan performance data with regard to TERI-guaranteed loans that are neither held by securitization trusts facilitated by us nor Union Federal.

***If we are unable to protect the confidentiality of our proprietary database and information systems and processes, the value of our services and technology will be adversely affected.***

We rely on trade secret laws and restrictions on disclosure to protect our proprietary database and information systems and processes. We have sought to limit TERI's rights to disclose its historical loan database in the context of the TERI Reorganization, and we have entered into confidentiality agreements with third parties and with some of our employees to maintain the confidentiality of our trade secrets and proprietary information. These methods may neither effectively prevent disclosure of our confidential information nor provide meaningful protection for our confidential information if there is unauthorized use or disclosure.

We own no material patents and have filed no patent applications with respect to our proprietary database or loan information processing systems. Accordingly, our technology is not covered by patents that would preclude or inhibit competitors from entering our market. Monitoring unauthorized use of the systems and processes that we have developed is difficult, and we cannot be certain that the steps that we have taken will prevent unauthorized use of our technology. Furthermore, others may independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our proprietary information. If we are unable to protect the confidentiality of our proprietary information and know-how, the value of our technology and services will be adversely affected.

***The loan origination process is becoming increasingly dependent upon technological advancement, and we could lose clients and market share if we are not able to keep pace with rapid changes in technology.***

Our ability to handle an increasing volume of transactions is based in large part on the systems and processes we have implemented and developed. The loan origination process is becoming increasingly dependent upon technological advancement such as the ability to process loans over the Internet, accept electronic signatures and provide process updates instantly. Our future success depends in part on our ability to develop and implement technology solutions that anticipate and keep pace with these and other continuing changes in technology, industry standards and client preferences. We may not be successful in anticipating or responding to these developments on a timely basis. If competitors introduce products, services, systems and processes that are better than ours or that gain greater market acceptance, those that we offer or use may become obsolete or noncompetitive. Any one of these circumstances could have a material adverse effect on our ability to obtain and retain key clients.

We may be required to expend significant funds to develop or acquire new technologies. If we cannot offer new technologies as quickly as our competitors, we could lose clients and market share. We also could lose market share if our competitors develop more cost effective technologies than those we offer or develop.

39

## **EXHIBIT 6(b)**

EXCERPT FROM FIRST MARBLEHEAD CORPORATION'S 2009 FORM 10-K

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

# Form 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended: June 30, 2009**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                    to

**Commission file number: 001-31825**

---

# THE FIRST MARBLEHEAD CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3295311** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **The Prudential Tower** **800 Boylston Street, 34th Floor** **Boston, Massachusetts** (Address of principal executive offices) | **02199-8157** (Zip Code) |

Registrant's telephone number, including area code: **(617) 638-2000**

---

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $.01 par value** (Title of each class) | **New York Stock Exchange** (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

---

Table of Contents

We cannot assure you that we will be able to:

- expand our systems effectively;

- successfully develop new products or services;

- allocate our human resources optimally;

- identify, hire and retain qualified employees or vendors; or

- incorporate effectively the components of any business that we may acquire in our effort to achieve growth.

We are dependent upon the retention of certain key employees and the loss of any such employees could adversely affect our business. If we are unable to manage our cost reductions, or if we lose key employees as a result, our operations and our financial results could be adversely affected.

***If competitors acquire or develop a private education loan database or advanced loan information processing systems, our business could be adversely affected.***

We own a proprietary database of historical information on private education loan performance that we use to help us establish the pricing provisions of new products on behalf of lenders, determine the terms of securitization transactions and establish the fair value of the structural advisory fees, asset servicing fees and residuals that we recognize as revenue. We also have developed, and continue to develop as of September 2, 2009, a proprietary loan information processing system to enhance our application processing and loan origination capabilities. Our private education loan database and loan information processing system provide us with a competitive advantage in offering our services. Third parties could create or acquire databases and systems such as ours. For example, as lenders and other organizations in the private education loan market originate or service loans, they compile over time information for their own private education loan performance database. Our competitors and potential competitors may have originated or serviced a greater volume of private education loans than us over the past two fiscal years, which may have provided them with comparatively greater borrower or loan data or insights, particularly during the most recent economic cycle. If a third-party creates or acquires a private education loan database or develops a loan information processing system, our competitive positioning, ability to attract new clients and business could be adversely affected. As a result of the termination of our agreements with TERI in the context of the TERI Reorganization, we have lost access to continuing updates to the database of TERI-guaranteed loan performance data with regard to TERI-guaranteed loans that are neither held by securitization trusts facilitated by us nor Union Federal.

***If we are unable to protect the confidentiality of our proprietary database and information systems and processes, the value of our services and technology will be adversely affected.***

We rely on trade secret laws and restrictions on disclosure to protect our proprietary database and information systems and processes. We have sought to limit TERI's rights to disclose its historical loan database in the context of the TERI Reorganization, and we have entered into confidentiality agreements with third parties and with some of our employees to maintain the confidentiality of our trade secrets and proprietary information. These methods may neither effectively prevent disclosure of our confidential information nor provide meaningful protection for our confidential information if there is unauthorized use or disclosure.

We own no material patents. Accordingly, our technology, including our loan information processing systems, is not covered by patents that would preclude or inhibit competitors from entering our market. Monitoring unauthorized use of the systems and processes that we have developed is difficult, and we cannot be certain that the steps that we have taken will prevent unauthorized use of our technology. Furthermore, others may independently develop substantially equivalent proprietary

28

Table of Contents

information and techniques or otherwise gain access to our proprietary information. If we are unable to protect the confidentiality of our proprietary information and know-how, the value of our technology and services will be adversely affected.

***The loan origination process is becoming increasingly dependent upon technological advancement, and we could lose clients and market share if we are not able to keep pace with rapid changes in technology.***

Our future success depends in part on our ability to process loan applications in an automated, error-free manner. The volume of loan originations that we are able to process is based in large part on the systems and processes we have implemented and developed. The loan origination process is becoming increasingly dependent upon technological advancement such as the ability to process loans over the Internet, accept electronic signatures and provide initial decisions instantly. Our future success also depends in part on our ability to develop and implement technology solutions that anticipate and keep pace with continuing changes in technology, industry standards and client preferences. We may not be successful in anticipating or responding to these developments on a timely basis. In addition, we expect to reduce our investment in technology during fiscal 2010 compared to past fiscal years. If competitors introduce products, services, systems and processes that are better than ours or that gain greater market acceptance, those that we offer or use may become obsolete or noncompetitive. In addition, if we fail to execute our clients' origination requirements or properly administer the clients' credit agreement templates or required disclosures, we could be subject to breach of contract claims and related damages. Any one of these circumstances could have a material adverse effect on our business reputation and ability to obtain and retain clients.

We may be required to expend significant funds to develop or acquire new technologies. If we cannot offer new technologies as quickly as our competitors, we could lose clients and market share. We also could lose market share if our competitors develop more cost effective technologies than those we offer or develop.

***Our business could be adversely affected if PHEAA fails to provide adequate or timely services or if our relationship with PHEAA terminates.***

As of June 30, 2009, PHEAA serviced a substantial majority of loans held by the securitization trusts that we administer. This arrangement allows us to avoid the overhead investment in servicing operations but requires us to rely on PHEAA to adequately service the trusts' education loans, including collecting payments, responding to borrower inquiries and communicating with borrowers whose loans have become delinquent. We periodically review the costs associated with establishing servicing operations to service loans. Our reliance on an external service provider for loan servicing subjects us to risks associated with inadequate or untimely services, including notice of developments in prepayments, delinquencies and defaults. A substantial increase in these rates could adversely affect our ability to access profitably the securitization markets for our clients' loans and the value of our additional structural advisory fees, asset servicing fees and residuals receivables. In addition, if PHEAA were to fail to comply with TERI's servicing guidelines in servicing securitized TERI-guaranteed private education loans, TERI would not be obligated to make guaranty payments on such loans, in which case PHEAA would be obligated to cure the noncompliance or purchase the loans. Such an event could have a negative impact on the value of our residuals, asset servicing fees and additional structural advisory fee receivables. If our relationship with PHEAA terminates, we would either need to expand or develop a relationship with another loan servicer, which could be time consuming and costly. In such event, our business could be adversely affected.

***An interruption in or breach of our information systems may result in lost business.***

We rely heavily upon communications and information systems to conduct our business. Our systems and operations are potentially vulnerable to damage or interruption from network failure, hardware failure, software failure, power or telecommunications failures, computer viruses and worms,

29

## **EXHIBIT 6(c)**

EXCERPT FROM FIRST MARBLEHEAD CORPORATION'S 2010 FORM 10-K

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

## Form 10-K

(Mark One)

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended June 30, 2010

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from            to

Commission file number: 001-31825

# THE FIRST MARBLEHEAD CORPORATION
### (Exact name of registrant as specified in its charter)

| Delaware | 04-3295311 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

The Prudential Tower
800 Boylston Street, 34th Floor
Boston, Massachusetts
(Address of principal executive offices)

02199-8157
(Zip Code)

Registrant's telephone number, including area code: **(800) 895-4283**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or

Table of Contents

reliance on external vendors subjects us to risks associated with inadequate or untimely service and could result in fewer loans than we would experience if we performed the service functions in-house.

We cannot assure you that we will be able to:

- expand our systems effectively;

- successfully develop new products or services;

- allocate our human resources optimally;

- identify, hire and retain qualified employees or vendors; or

- incorporate effectively the components of any business that we may acquire in our effort to achieve growth.

We are dependent upon the retention and motivation of certain key employees and the loss of any such employees could adversely affect our business. In addition, our future performance will also depend upon our ability to attract skilled, new employees. If we are unable to manage our cost reductions, or if we lose key employees or are unable to attract new employees, our operations and our financial results could be adversely affected.

*If competitors acquire or develop a private education loan database or advanced loan information processing systems, our business could be adversely affected.*

We own a database of historical information on private education loan performance that we use to help us enhance our proprietary origination risk score model, determine the terms of portfolio funding transactions and establish the changes in fair value of the additional structural advisory fees, asset servicing fees and residual receivables that we recognize as revenue. We also have developed a proprietary loan information processing system to enhance our application processing and loan origination capabilities. We believe that our private education loan database and loan information processing system provide us with a competitive advantage in offering our services. Third parties could create or acquire databases and systems such as ours, and TERI possesses certain historical information related to TERI-guaranteed loans. As lenders and other organizations in the private education loan market originate or service loans, they compile over time information for their own private education loan performance database. Our competitors and potential competitors may have originated or serviced a greater volume of private education loans than we have over the past two fiscal years, which may have provided them with comparatively greater borrower or loan data, particularly during the most recent economic cycle. If a third party creates or acquires a private education loan database or develops a loan information processing system, our competitive positioning, ability to attract new clients and business could be adversely affected. In addition, if TERI were to assert successfully that certain contractual restrictions on the use and sale of its historical loan data terminated in the context of the TERI Reorganization or otherwise, the competitive advantage of our loan database could diminish. As a result of the termination of our agreements with TERI in the context of the TERI Reorganization, we have lost access to continuing updates to the database of TERI-guaranteed loan performance data with regard to TERI-guaranteed loans that are neither held by securitization trusts facilitated by us nor Union Federal.

*If we are unable to protect the confidentiality of our historical loan database and proprietary information systems and processes, the value of our services and technology will be adversely affected.*

We rely on trade secret laws and restrictions on disclosure to protect our historical loan database and proprietary information systems and processes. We have sought to limit TERI's rights to disclose its historical loan database in the context of the TERI Reorganization, and we have entered into confidentiality agreements with third parties and with some of our employees to maintain the confidentiality of our trade secrets and proprietary information. These methods may neither effectively

24

Table of Contents

prevent use or disclosure of our confidential or proprietary information nor provide meaningful protection for our confidential or proprietary information if there is unauthorized use or disclosure.

We own no material patents. Accordingly, our technology, including our loan information processing systems, is not covered by patents that would preclude or inhibit competitors from entering our market. Monitoring unauthorized use of the systems and processes that we have developed is difficult, and we cannot be certain that the steps that we have taken will prevent unauthorized use of our technology. Furthermore, others may independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our proprietary information. If we are unable to protect the confidentiality of our proprietary information and know-how, the value of our technology and services will be adversely affected.

***The loan origination process is becoming increasingly dependent upon technological advancement, and we could lose clients and market share if we are not able to keep pace with rapid changes in technology.***

Our future success depends, in part, on our ability to process loan applications in an automated, error-free manner. The volume of loan originations that we are able to process is based, in large part, on the systems and processes we have implemented and developed. The loan origination process is becoming increasingly dependent upon technological advancement such as the ability to process loans over the Internet, accept electronic signatures and provide initial decisions instantly. Our future success also depends, in part, on our ability to develop and implement technology solutions that anticipate and keep pace with continuing changes in technology, industry standards and client preferences. We may not be successful in anticipating or responding to these developments on a timely basis. If competitors introduce products, services, systems and processes that are better than ours or that gain greater market acceptance, those that we offer or use may become obsolete or noncompetitive. In addition, if we fail to execute our clients' origination requirements or properly administer our clients' credit agreement templates or required disclosures, we could be subject to breach of contract claims and related damages. Any one of these circumstances could have a material adverse effect on our business reputation and ability to obtain and retain clients.

We may be required to expend significant funds to develop or acquire new technologies. If we cannot offer new technologies as quickly as our competitors, we could lose clients and market share. We also could lose market share if our competitors develop more cost effective technologies than those we offer or develop.

***Our business could be adversely affected if PHEAA fails to provide adequate or timely services or if our relationship with PHEAA terminates.***

As of June 30, 2010, PHEAA serviced a substantial majority of private education loans held by the securitization trusts that we administer and served as the sole loan servicer for loan programs based on our Monogram product offering. Our arrangements with PHEAA allow us to avoid the overhead investment in servicing operations, but require us to rely on PHEAA to adequately service the private education loans, including collecting payments, responding to borrower inquiries and communicating with borrowers whose loans have become delinquent. We periodically review the costs associated with establishing servicing operations to service loans. During the second quarter of fiscal 2010, we announced that we had entered into negotiations for the acquisition of a loan servicer. We were subsequently unable to agree to terms, and, as of the third quarter of fiscal 2010, negotiations with respect to the contemplated acquisition had terminated. We continue to believe, however, that ownership of a loan servicer could complement our overall strategy and reduce our reliance on an external service provider for loan servicing, which subjects us to risks associated with inadequate or untimely services, including notice of developments in prepayments, delinquencies and defaults, and usage rates for various borrower benefits or temporarily modified payment plans. A substantial increase in these rates could adversely affect our ability to access profitably the securitization markets for our

25