**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____

|                                              |   |                        |
|----------------------------------------------|---|------------------------|
| In re                                        | ) |                        |
|                                              | ) | **Chapter 11**         |
| **THE EDUCATION RESOURCES INSTITUTE, INC.,** | ) | **Case No. 08-12540 (HJB)** |
|                                              | ) |                        |
| **Debtor.**                                  | ) |                        |

_____

## OBJECTION TO MOTION FOR INTERPRETATION OF ORDER

The First Marblehead Corporation ("FMC"), First Marblehead Education Resources, Inc. ("FMER"), and First Marblehead Data Services, Inc. ("FMDS"; together with FMC and FMER, the "FMC Entities"), by and through their undersigned counsel, hereby object to the Motion for Interpretation of Order filed by The Education Resources Institute, Inc. ("TERI" or the "Debtor") on November 2, 2010 [Docket No. 1171] (the "Motion").[1]  In further support of this objection, the FMC Entities state as follows:

## I.    PRELIMINARY STATEMENT.

1.        Shortly after the commencement of this chapter 11 case on April 7, 2008 (the "Petition Date"), TERI filed the Contracts Motion [Docket #238] seeking authority to reject certain contracts with the FMC Entities and to enter into a postpetition transition services agreement.  On or about June 23, 2008, this Court entered the Contracts Order [Docket #364], granting the Contracts Motion.  The relief granted by the Contracts Order was critical to the success of TERI's entire reorganization for at least two reasons.  First, TERI needed to reduce quickly the monthly fees it paid to FMER.  The rejection of the FMC Contracts (as defined in the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.  The relief requested by TERI in the Motion is hereinafter referred to collectively as "TERI's Action."

Contracts Motion) saved TERI between $7 and $9 million dollars per month, achieving the "watershed event" to that point in the case.[2]

2.        Second, in connection with such rejection, the Court authorized Debtor to enter into a new postpetition contract—the Transition Services Agreement dated as of May 30, 2008 among TERI, FMC, and FMER (as amended and together with any terms of the Database Agreement (defined below) referenced therein, the "TSA").[3]  At the beginning of its chapter 11 proceeding, TERI had a major problem:  because TERI had outsourced a number of functions to FMER, TERI could not operate on a stand-alone basis if it rejected those agreements.  Unless the FMC Entities agreed to provide continuing services, an orderly reorganization of TERI would have been impossible.  Pursuant to the TSA, FMER and FMC agreed to provide certain transition services at enormously reduced cost for a period of up to four months.[4]  According to TERI, "it's hard to over-emphasize how dramatic the results of this agreement are."[5]

3.        As part of the TSA, TERI also requested, and pursuant to Section 2.1 of the TSA the FMC Entities agreed to provide to TERI, certain data that TERI itself did not otherwise possess (the "TSA Transferred Data").[6]  The transfer of the TSA Transferred Data, however, was subject to specific restrictions set forth in Section 2.1 of the TSA, to which TERI agreed in the context of negotiations over the scope and cost of transition services to be provided by the FMC

---

[2] See Transcript on Hearing on: (#238) Debtor's Motion for Order (A) Pursuant to §365 of the Bankruptcy Code Authorizing TERI to Reject Certain Contracts with the First Marblehead Corporation, and (B), Pursuant to §363 of the Bankruptcy Code Authorizing TERI to enter into a Transition Services Agreement; (#239) Debtor's Motion for Order Pursuant to §§1056, 362, and 363 of the Bankruptcy Code Authorizing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the Benefit of the Trusts; (#342) Joinder of U.S. Bank to Relief Requested before the Honorable Henry J. Boroff, J.U.S.B.C., 11:24-25, 12:18-19, June 20, 2008 ("June 20 Hr'g. Tr.").

[3] All references herein to the TSA are provided as a summary and are qualified in their entirety by the actual terms of the TSA.

[4] The initial term of the TSA was scheduled to expire on July 31, 2008.  On July 9, 2008, TERI elected to extend the term of the TSA for an additional 30-day period, to August 31, 2008.  On August 8, 2008, TERI requested, and the FMC Entities agreed, to extend the term of the TSA for an additional 30-day period, to September 29, 2008.

[5] June 20 Hr'g. Tr. 4:15-15.

[6] For purposes of this Objection, "TSA Transferred Data" means the data comprising the Loan Database (as defined in the Database Agreement) to the extent that such data has been received by TERI solely in connection with its business as a loan guarantor and is stored, maintained or held by FMER and is data owned by TERI as delivered to TERI under section 2.1 of the TSA.

- 2 -

Entities.  These restrictions, which survive and remain in full force and effect in perpetuity, allow

TERI to use the transferred data, but only for the purposes that TERI could use the data prior to

the rejection of the Database Agreement.[7]  In essence, in order to induce the FMC Entities to

provide vital transition services (at reduced cost) and the TSA Transferred Data that TERI did

not otherwise possess, TERI agreed that the existing restrictions in the Database Agreement were

maintained in perpetuity, notwithstanding the rejection (or even termination) of the Database

Agreement.

4.      Now, only after the FMC Entities have unequivocally performed every one of

their obligations under the TSA, and after the confirmation and effective date of its plan of

reorganization, TERI, as reorganized, requests that this Court issue an advisory opinion

interpreting Section 2.1 of the TSA and enter a declaratory judgment and/or grant injunctive

relief that effectively permits TERI to use the TSA Transferred Data without regard to the

express restrictions in the TSA.  **In short, TERI's Motion presents a single question for which**

**it seeks an advisory opinion:  Can reorganized TERI now keep and use the TSA**

**Transferred Data without regard to the negotiated restrictions set forth in the TSA?**

5.      This question, however, is not one over which this Court has post-confirmation

jurisdiction.  To be clear, the resolution of TERI's Action will have no effect on TERI's

creditors, its estate, or on the feasibility of TERI's plan of reorganization.  It presents nothing

more than abstract or hypothetical legal issues for determination by this Court.  TERI can

continue to use the TSA Transferred Data under the TSA for any purpose it could use it prior to

the Petition Date and for additional purposes of fulfilling its collection management contract as

part of its plan of reorganization.  TERI's plan of reorganization has been confirmed and is

---

[7] The restrictions under the Database Agreement, which are incorporated into the TSA, prohibit TERI from, among
other things, selling, licensing or transferring the TSA Transferred Data and limit TERI's use to purposes of
designing, underwriting, implementing, evaluating and managing education loan guarantee programs offered and
guaranteed by TERI.

US1DOCS 7765840v9

effective; TERI must now move forward just like any other corporation.  Consequently, TERI's

Action is simply not a matter "arising under" or "related to" TERI's chapter 11 case, and this

Court does not have subject matter jurisdiction pursuant to 28 U.S.C. §1334.  Moreover, TERI's

Action presents no justiciable case or controversy to this Court.

6.          Even if this Court does have jurisdiction, for the reasons articulated herein, the

relief requested by reorganized TERI runs counter to the plain language and context of the TSA.

7.          This objection addresses first in section III whether TERI should have filed

this matter as an adversary proceeding and the extent to which the FMC Entities are entitled to

the procedural protections of Part VII of the Federal Rules of Bankruptcy Procedures (the

"Bankruptcy Rules").  Then, in sections IV and V below, the FMC Entities address subject

matter jurisdiction and the constitutional requirements of a "case or controversy."  Because this

Court has no subject matter jurisdiction and there is no "case or controversy," this Court does not

have jurisdiction to consider TERI's Action.  If this Court, however, finds that it does have

jurisdiction to consider TERI's Action, which it should not for the reasons set forth in section IV

and V, section VI addresses the plain language of the TSA as well as the history regarding the

negotiation of the TSA, all of which supports the clear language of the TSA.  Finally, section VII

contains the answers to each of the specific allegations in the Motion and states affirmative

defenses, as required by MLBR 9013-1(i).

## II.    PROCEDURAL BACKGROUND.

8.          Almost seven years before the Petition Date, FMC, FMER, and TERI entered

into that certain Database Sale and Supplementation Agreement dated as of June 20, 2001 (the

"Database Agreement").

9.          Shortly after the Petition Date, on or about June 5, 2008, TERI filed the

Contracts Motion.  On June 23, 2008, this Court entered the Contracts Order.

10.      Following more than 14 months of extensive negotiations, on or about October 7, 2010, the Official Committee of Unsecured Creditors (the "Committee"), TERI, and the FMC Entities entered into the Stipulation Resolving Claims of First Marblehead Education Resources, Inc., The First Marblehead Corporation, and First Marblehead Data Services, Inc. (the "Stipulation").  The Stipulation resolves all claims and disputes among the FMC Entities, TERI and TERI's estate, other than certain claims regarding the rights, title and interest of the FMC Entities to certain data and intellectual property, and corresponding restrictions and obligations of TERI and its successors and assigns, referred to and defined more precisely in the Stipulation as the "Database Dispute."  In addition, in order to avoid any feasibility implications under and facilitate the implementation of the *Modified Fourth Amended Joint Plan of Reorganization as of August 26, 2010* [Docket No. 1139] (the "Plan"), and after negotiation, each of FMC and FMER agreed to waive the restrictions set forth in Section 2.03 of the Database Agreement, to the extent applicable, to permit the reorganized Debtor to use the Loan Database (as defined in the Database Agreement) and/or the Debtor's retained copy of the Delivered Database (as defined in the Database Agreement) to perform its collections and claims management obligations under the Plan.

11.      The confirmation hearing for the Plan was held on October 18, 2010.

12.      On October 18, 2010, this Court entered the *Order Authorizing Debtor, Creditors' Committee, First Marblehead Education Resources, Inc., The First Marblehead Corporation and First Marblehead Data Services, Inc., to Enter into Stipulation Resolving Claims of First Marblehead Education Resources, Inc., The First Marblehead Corporation and First Marblehead Data Services, Inc.* [Docket No. 1162], approving the Stipulation.

13.      On October 29, 2010, following a confirmation hearing, this Court entered an order confirming the Plan [See Docket No. 1170].

- 5 -

14.    On November 2, 2010, TERI filed the Motion, and on November 5, 2010, this Court scheduled a hearing to consider TERI's Motion on November 15, 2010, one day prior to the deadline under MLBR 9013-1(e) for filing objections to TERI's Motion.

15.    On November 10, 2010, the FMC Entities filed the *Request for Emergency Determination and Motion for Extension of Time and Scheduling Order* [Docket No. 1175], requesting that this court extend the deadline for filing objections to the Motion and re-scheduling or continuing the hearing to consider the Motion.  On November 12, 2010, this Court granted such motion in part, continuing the hearing to November 29, 2010 and extending the deadline for objections to November 22, 2010.

16.    The effective date of the Plan was November 19, 2010.

## III.    TERI'S ACTION CAN ONLY BE MAINTAINED, IF AT ALL, AS AN ADVERSARY PROCEEDING.

17.    Although TERI has styled its Motion as a motion to interpret this Court's June 23, 2008 Contracts Order, it is in fact (as TERI acknowledges in the body of its pleading) a request to determine the Database Dispute by interpreting the TSA—a postpetition contract—and the restrictions contained therein on TERI's right to use the TSA Transferred Data.  (See Motion ¶3.)

18.    The Motion is not a request to interpret the meaning of the Contracts Order.[8]

---

[8] The Contracts Order contains a mere seven "Ordered" paragraphs that read as follows:

ORDERED, that the Motion is granted; and it is further

ORDERED, that TERI the FMC Contracts are rejected effective as of May 31, 2008; and it is further

ORDERED, that each of the FMC Entities may treat each of the FMC Contracts as terminated as of May 31, 2008, and it is further

ORDERED, that TERI is authorized to enter into the Transition Services Agreement, as amended, between TERI and the FMC Entities, which Transition Services Agreement will govern the relationship of the Parties from June 1, 2008 forward, and it is further

- 6 -

Instead, it is a request for an advisory opinion as to the interpretation of the TSA and a request

for a declaratory judgment and injunctive relief. The final paragraph of the Motion makes this

clear: "[T]he Debtor respectfully requests that the Court enter an Order granting this Motion,

interpreting the Contracts Order to preclude First Marblehead Entities from asserting that the

FMER Restrictions, the TERI Restrictions and the indemnity obligations remain in force, and

directing FMER to purge Excluded Data from the Delivered Database . . . ."

19.       By filing the Motion pursuant to Rules 9013 and 9014 of the Bankruptcy

Rules, TERI has commenced a contested matter. See Fed. R. Bankr. P. 9014. Assuming that

this Court has jurisdiction to hear this matter, an assumption which the FMC Entities do not

concede and dispute below, because Debtor seeks to obtain injunctive or equitable relief and/or

to obtain a declaratory judgment, this matter must, pursuant to Bankruptcy Rule 7001, proceed as

an adversary proceeding. See Fed. R. Bankr. P. 7001(7) & (9).

20.       Moreover, as demonstrated by the complex factual and legal issues raised in

the Motion, this clearly is not a simple matter that should be resolved without the benefit of the

due process protections provided by Part VII of the Bankruptcy Rules. See In the Matter of

Transamerican Natural Gas Corp., 978 F.2d 1409, 1416 (5th Cir. 1993) (noting that contested

matters are subject to "less elaborate procedures" than adversary proceedings). Because the

Motion seeks a determination with respect to the TSA Transferred Data and the TSA, as a matter

---

ORDERED, that the 10 day automatic stay imposed pursuant to 6004(h) is
hereby waived, and it is further

ORDERED that nothing in this Order shall limit any claims, rights or remedies
of FMC, FMER, [TERI Marketing Services, Inc.], or any of their affiliates may
have against TERI or any of its affiliates, including, without limitation, all
claims, rights or remedies arising from or in connection with the rejection of the
FMC Contracts, all of which claims, rights and remedies are preserved, and it is
further

ORDERED, that this Court will retain jurisdiction to construe and enforce the
terms of this Order.

- 7 -

of fundamental fairness, if this matter proceeds in this Court the FMC Entities are entitled to all

the procedural due process protections provided by an adversary proceeding.  Because TERI

brought these issues before the Court as a contested matter, the FMC Entities have been unfairly

forced to include in this objection answers and defenses more appropriately addressed in an

answer to a complaint, as well as other issues that should more appropriately be considered in the

context of motions to dismiss and/or summary judgment.  In the context of an adversary

proceeding, the FMC Entities would have considerably more time and procedural protections in

considering and filing such pleadings.  In addition, it is unclear at the time of responding to the

Motion the extent to which the FMC Entities will be entitled to discovery before this Court

enters an order on substantive legal issues raised in the Motion.[9]

21.        Consequently, in the event that this Court finds that it has jurisdiction to

consider this matter—an issue addressed more fully below—the FMC Entities hereby request

that this matter be dismissed without prejudice to TERI's rights to file the matter as an adversary

proceeding governed by Part VII of the Bankruptcy Rules.

## IV.    THIS COURT HAS NO SUBJECT-MATTER JURISDICTION OVER THIS MATTER.

22.        This Court should find that it does not have subject matter jurisdiction over

TERI's Action.  It is well-established that the bankruptcy court's post-confirmation jurisdiction

over matters involving debtor or its successors is strictly circumscribed.  Congress vested

bankruptcy courts with jurisdiction to protect a financially troubled debtor and its bankruptcy

estate while it restructures its liabilities under the Bankruptcy Code.  But once the debtor has

achieved that goal through confirmation of a plan of reorganization, the bankruptcy court's job is

---

[9] TERI has raised a number of factual issues in its Motion regarding, among other things, the intent of TERI and its counsel in negotiating and drafting the TSA.  If this Court determines that it has jurisdiction to hear this matter, which the FMC Entities dispute below, this Court should schedule an evidentiary hearing and establish a discovery schedule that will permit the FMC Entities to conduct adequate discovery and respond to such issues.

- 8 -

essentially done.  Once the reorganized debtor emerges from bankruptcy with a new capital

structure, the bankruptcy court retains jurisdiction, if at all, principally to ensure that the former

debtor and its creditors honor the terms of the plan of reorganization.

23.        Accordingly, "bankruptcy jurisdiction is extremely limited after a plan is

confirmed."  Falise v. The Am. Tobacco Co., 241 B.R. 48, 58 (E.D.N.Y. 1999).  "Once the

bankruptcy court confirms a plan of reorganization, the debtor may go about its business without

further supervision or approval.  The firm also is without the protection of the bankruptcy court.

It may not come running to the bankruptcy judge every time something unpleasant happens."

Craig's Stores of Tex., Inc., 266 F.3d 388, 390 (5th Cir. 2001) (internal quotation omitted).  Put

differently, bankruptcy courts "may not keep the [debtor] in 'perpetual tutelage' … by assuming

jurisdiction over controversies between the reorganized corporation and third parties."  Falise,

241 B.R. at 57 (internal quotation omitted)).

24.        The relief TERI seeks in the Motion—an interpretation of postpetition

contract with a third party after the confirmation and effective date of the Plan—flies in the face

of this basic principle.

25.        TERI makes only one scant reference in the Motion to the jurisdiction of the

Court over this matter pursuant to 28 U.S.C. §1334.  But none of the possible grounds for

jurisdiction under Section 1334 is present here.  Section 1334 grants the district courts

jurisdiction over four types of matters that it may refer to the bankruptcy courts under 28 U.S.C.

§ 157:  "(1) cases under title 11, (2) proceeding[s] arising under title 11, (3) proceedings arising

in a case under title 11, and (4) proceedings related to a case under title 11."  In re Resorts Int'l,

372 F.3d 154, 162 (3d Cir. 2004) (internal quotation omitted); 28 U.S.C. § 1334(a)-(b).  None of

them includes the relief requested by TERI in its Motion.  This matter is not a "case[] under title

11," which "refers merely to the bankruptcy petition itself."  In re Marcus Hook Development

Park, Inc., 943 F.2d 261, 264 (3d Cir. 1991) (quoting Matter of Wood, 825 F.2d 90, 92 (5th Cir. 1987)).

26.        Nor does this matter "arise under" the Bankruptcy Code.  "Arising under" jurisdiction is limited to proceedings where "the Bankruptcy Code creates the cause of action or provides the substantive right invoked," Stoe v. Flaherty, 436 F.3d 209, 217 (3d Cir. 2006), such as "an action by the trustee to avoid a preference."  In re Guild & Gallery Plus, Inc. v. Torkelsen, 72 F.3d 1171, (3d Cir. 1996) (quoting Matter of Wood, 825 F.2d 90, 97 (5th Cir. 1987)).

27.        Likewise, TERI's action does not "aris[e] in a case under title 11."  "Arising in" jurisdiction is limited to proceedings that "by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case," such as "allowance and disallowance of claims, orders in respect to obtaining credit, determining the dischargeability of debts, discharges, confirmation of plans, [and] orders permitting the assumption or rejection of contracts." Stoe, 436 F.3d at 218.  In other words, "[p]roceedings 'arise in' bankruptcy if they have no existence outside of the bankruptcy court." U.S. Trustee v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1997).  TERI's action to interpret the TSA, a contract governed by state law, is plainly a proceeding that could exist outside of bankruptcy.

28.        Finally, there is no "related to" jurisdiction over this action, because resolution of the Motion will not affect any bankruptcy estate or any integral aspect of TERI's confirmed Plan.  See In re Boston Regional Medical Center, 410 F.3d. 100, 105 (1st Cir. 2005) (stating that related to jurisdiction requires "some effect on the bankruptcy estate . . . or an impact upon the handling and administration of the bankrupt estate" (internal quotation omitted)).  There is no bankruptcy estate that could be affected in this matter, because TERI's bankruptcy estate ceased to exist upon confirmation and the effectiveness of the Plan.  Pursuant to the Plan, on the effective date of the Plan, the property of the estate vests in the reorganized

US1DOCS 7765840v9

TERI or is transferred to the liquidating trust under the Plan.  See 11 U.S.C. §§ 1123(a)(5)(B),

1141(b).

29.        "[A]bsent a source of jurisdiction other than §1334, neither the district court

nor the bankruptcy court may determine a dispute which is unrelated to a bankruptcy case."  In re

Melissa A. Deceder, 351 B.R. 261, 265 (Bankr. D. Mass. 2006).  The First Circuit Court of

Appeals has defined "related to" proceedings as follows:

> Related proceedings do not arise under the Bankruptcy Act; they
> must, however, "potentially have some effect *on the bankruptcy
> estate*, such as altering debtor's rights, liabilities, options, or
> freedom of action, or otherwise have an impact upon the handling
> and administration *of the bankrupt estate*."  In re Smith, 866 F.2d
> 576, 580 (3d Cir. 1989); 28 U.S.C. § 157(c).  "The usual
> articulation of the test for determining whether a civil proceeding
> is related to bankruptcy is whether the outcome of that proceeding
> could conceivably have any effect *on the estate being administered
> in bankruptcy*."  Pacor v. Higgins, 743 F.2d 984, 994 (3d Cir.
> 1984) (citations omitted).

In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991), overruled on other grounds by

Connecticut Nat'l Bank v. Germain, 503 U.S. 249 (1992)(emphasis added).  Although Section

1334 does not distinguish between pre- and post-confirmation jurisdiction, "courts sometimes

have found a need to curtail the reach of related to jurisdiction in the post-confirmation context. .

. . Courts that have limited the scope of post-confirmation jurisdiction have based their holdings

on the conclusion that, once confirmation has occurred, fewer proceedings are actually related to

the underlying bankruptcy case."  In re Boston Regional Medical Center, Inc., 410 F.3d at 106.

"The rationale behind this line of decisions starts with the premise that a reorganized debtor is

emancipated by the confirmation of a reorganization plan.  It emerges from bankruptcy and

enters the marketplace in its reincarnated form.  From that point forward, it is just like any other

corporation; 'it must protect its interests in the way provided by the applicable non-bankruptcy

law,' without any special swaddling."  Id. (Citation omitted).

US1DOCS 7765840v9

30.        In In re Safety Medical Supply Int'l, Inc., a case very similar to this, the

Bankruptcy Court for the District of Massachusetts held that the Court's jurisdiction did not

extend post-confirmation to claims arising from third party breaches of postpetition, pre-

confirmation contracts where resolution of the proceedings could not benefit unsecured creditors

of the reorganized debtor.  See In re Safety Medical Supply Int'l, Inc., 334 B.R. 13, 18 (Bankr.

D. Mass. 2006).  The Court reasoned that jurisdiction no longer existed at that point because the

dispute among the parties was governed by state law and would have no effect on the

administration of the bankruptcy estate.  See id. at 17; see also, e.g., Craig's Stores of Tex., Inc.,

266 F.3d 388, 391 (5th Cir. 2001) (rejecting argument that bankruptcy court had jurisdiction over

post-confirmation contract dispute between debtor and creditor, which did not bear on the

interpretation or execution of the plan, merely because the dispute "will affect [the debtor's]

distribution to creditors under the plan").

31.        In a Chapter 7 context, this Court similarly held in In re Melissa A. Deceder,

that it lacked jurisdiction over a 93A claim where the claim for relief arose post-petition (and

therefore was not property of the estate) and where recovery of damages on account of the claim

would not be available for distribution under the Bankruptcy Code.  See In re Melissa S.

Deceder, 351 B.R. 261, 266 (Bankr. D. Mass. 2006).  This Court reasoned that the fact that

damages would not be available for distribution under the Bankruptcy Code "[weighed] heavily

against a finding that the claim is 'related to' the debtor's bankruptcy case."  Id.

32.        Here, as in Safety Medical Supply and Deceder, this Court has no jurisdiction

over TERI's Action because (i) TERI's Action involves the evaluation of the TSA, a postpetition

contract, (ii) the legal issues involved in TERI's Action are governed by state law, and (iii) the

resolution of TERI's Action will have no effect on TERI's bankruptcy estate or the Plan and will

not otherwise benefit or affect TERI's creditors.

33.     This last point weighs heavily against a finding that TERI's Action is related to TERI's bankruptcy case. Id. This Court confirmed the Plan on October 29, 2010, and the Plan became effective on November 19, 2010. Pursuant to the Plan, TERI has now emerged as a reorganized non-profit corporation and retains only a limited number of assets from the former bankruptcy estate. It must now move forward just like any other corporation.

34.     All other assets of TERI are transferred to creditors and a liquidating trust for the benefit of creditors under the Plan. The Stipulation ensures that TERI may use any and all of the TSA Transferred Data to perform its obligations to the liquidating trust under the Plan, so there is no way that any resolution of TERI's Action could affect the implementation or interpretation of the Plan or the administration of the assets under the Plan for the benefit of creditors.

35.     Moreover, in the context of approving the Stipulation and confirming the Plan, TERI already confirmed that resolution of TERI's Action was not essential to the Plan or the feasibility of its future business. This Court addressed this issue directly before the confirmation hearing for the Plan. At the hearing to consider the Stipulation, counsel for TERI explained that the settlement set forth in the Stipulation had been in negotiation for "over a year," and, in response to direct questioning by this Court, that the resolution of the Database Dispute was not critical to the feasibility of the Plan.[10] The relevant portions of the hearing transcript read as follows:

> THE COURT: To what extent is resolution in TERI's favor of the data base dispute critical to its ongoing operations? In other words, is it a feasibility issue that I need to take into account?

---

[10] See Transcript of Telephonic Hearing on: (#1011) Evidentiary Confirmation Hearing on Debtor's Fourth Amended Joint Plan of Reorganization; (#1144) Fourth and Final Application of Craig and Macauley for Compensation and Expenses as Special Counsel to TERI; (#1151) Joint Motion for Approval and Authorization of Stipulation Resolving Claims of First Marblehead Corp. and First Marblehead Data Services, Inc. before the Honorable Henry J. Boroff, J.U.S.B.C., 5:21-22, October 18, 2010 ("Oct. 18 Hr'g. Tr.").

US1DOCS 7765840v9

MR. GLOSBAND:  I was actually planning to address that in the context of the plan presentation.  While it makes a significant difference to TERI's upside prospects, on a worst-case basis TERI remains feasible, and we have numbers supporting that conclusion in Mr. Peko's affidavit that we filed at the end of last week.

THE COURT:  So the worst-case basis scenario which is described in Mr. Peko's affidavit will not get any worse if TERI is not successful in resolving the data base dispute in its favor.

MR. GLOSBAND:  That's correct.  It, in fact, assumes that we don't resolve it in our favor and nonetheless we believe very well not lavishly successful is feasible from an operating perspective.

THE COURT:  Okay.  Thank you.[11]

36.       In sum, the resolution of TERI's Action is simply not related to TERI's bankruptcy case.  Consequently, this Court does not have subject matter jurisdiction over this matter pursuant to 11 U.S.C. §1334.

## V.   TERI'S ACTION RAISES NO CASE OR CONTROVERSY OVER WHICH THIS COURT CAN EXERCISE JURISDICTION.

37.       As an additional threshold jurisdictional matter, this Court must first determine whether TERI's Action raises or otherwise presents a justiciable controversy that is ripe for adjudication.  See Pustell v. Lynn Public Schools, 18 F.3d 50, 52 (1st Cir. 1994).  As more fully explained below, TERI's Action presents no case or controversy that is ripe for adjudication by this Court and must be dismissed.

38.       TERI's Action involves nothing more than a difference of opinion between the FMC Entities and TERI regarding the meaning of section 2.1 of the TSA.  But such differences of opinion do not constitute an actual "case or controversy."  The resolution of TERI's Action will have no effect on TERI's creditors, its estate or on the feasibility of TERI's Plan.  Moreover, TERI cannot demonstrate that it has suffered or will immediately suffer any specific harm if the issues raised in its Motion are not resolved by this Court.  There is no

---

[11]  Oct. 18 Hr'g. Tr. 8:19-25 & 9:1-12.

US1DOCS 7765840v9

evidence that a resolution of TERI's Action will have any effect on TERI's current business, and

there is no evidence that TERI has any realistic probability of developing a business at any time

in the near future that will be affected by a resolution of TERI's Action.

39.        Federal court jurisdiction is limited to "cases" and "controversies" by Article

III of the United States Constitution.  See U.S. Const., Art. III, §2, cl. 1.  "The First Circuit has

stated that in order '[f]or [the court] to assume jurisdiction, there must be an actual, ongoing

controversy between the parties.' . . . Moreover, '[s]ome indication that the controversy has a

concrete impact on the parties is also necessary before a case is ripe for adjudication."  See In re

Space Building Corp., 206 B.R. 269, 271-72 (D. Mass. 1996) (quoting Pustell, 18 F.3d at 52).

"In other words, federal courts are prohibited from rendering advisory opinions, that is, opinions

which give advice about particular actions, when no party is before the court who has suffered or

imminently faces specific injury."  See In re Melendez, 235 B.R. 173, 188 (Bankr. D. Mass.

1999) (citation omitted).  "Bankruptcy Courts, now deemed units of the district courts, 28 U.S.C.

§ 151, have jurisdiction referred to them by the district courts.  Therefore bankruptcy courts,

although not established pursuant to Article III, are governed by the same case or controversy

restriction that limits the jurisdiction of Article III Courts."  In re NSCO, Inc., 427 B.R. 165, 176

(Bankr. D. Mass. 2010) (citation omitted).

40.        The court in In re NSCO, Inc. explained that the "case or controversy"

requirement applies to all federal actions, including actions for declaratory judgment, and that

"[d]etermining the presence of a case or controversy can be complicated when the requested

relief is in the form of a declaratory judgment action."  Id.  "The difference between an abstract

question and a 'case or controversy' is one of degree, of course, and is not discernible by any

precise test. . . . The basic inquiry is whether the conflicting contentions of the parties . . . present

a real, substantial controversy between parties having adverse legal interests, a dispute definite

and concrete, and not hypothetical or abstract." Id.

41.      The ripeness doctrine is closely related to this issue. See id. at 177. With

respect to this ripeness doctrine, the District Court for the District of Massachusetts recently

explained:

> The Supreme Court enunciated the criteria that make a case ripe
> for adjudication in Abbott Laboratories v. Gardner, 387 U.S. 136,
> 18 L. Ed. 2d 681, 87 S. Ct. 1507 (1967). The Court there stated
> that "the problem is best seen in a twofold aspect, requiring us to
> evaluate both the fitness of the issues for judicial decision and the
> hardship to the parties of withholding court consideration." Id. at
> 149. For an issue to be appropriate for judicial review, it should be
> "purely legal" and "final." Id. Additionally, the impact of the
> challenged action must be "sufficiently direct and immediate." Id.
> at 152.

In re Space Building Corp., 206 B.R. 269, 272 (D. Mass. 1996).

42.      In In re Vitalsigns Homecare, Inc., the bankruptcy court held that the "case or

controversy" requirement prevented it from entering a "comfort order" as to whether the

automatic stay applied to the termination of the debtor's Medicare Provider Number and from

entering an order enjoining the termination of the Medicare Provider Number by the United

States Department of Health and Human Services ("HHS") or the Center for Medicare and

Medicaid Services. See In re Vitalsigns Homecare, Inc., 428 B.R. 14, 16-17 (Bankr. D. Mass.

2010). HHS sought a comfort order that the automatic stay had not prevented automatic

termination of the Medical Provider Number pursuant to otherwise applicable federal

regulations, and the trustee and a secured lender of debtor requested an order confirming the

automatic stay applied and an order enjoining termination so that they could arrange a sale of the

number. Id. at 16. The court reasoned there was "no case or controversy and the dispute [was]

not ripe for adjudication" because (i) there was no potential buyer for the Medicare Provider

Number and (ii) if HHS was correct that the agreement pursuant to which the provider number

was issued automatically had already terminated pursuant to federal regulations, then the number

did not exist. Id. at 17. The court concluded that it simply did not have jurisdiction to advise

the parties how to proceed. See id.

43.     In In re Space Building Corp. the United States District Court for the District

of Massachusetts held that the court did not have jurisdiction to consider an appeal where the

appeal was actually a request by a debtor to clarify whether a bankruptcy court's order

dismissing debtor's bankruptcy case altered the effect of the debtor's previously confirmed plan

of reorganization and confirmation order. In re Space Building Corp., 206 B.R. at 272, 275. The

court reasoned that there was no "case or controversy" because no other party in interest

contested the issues raised by the debtor. Id. at 272  In addition, the court found that the dispute

was not ripe for adjudication because the question presented "[was] not purely legal" and

because the consequence of withholding court consideration would not affect either the debtor or

any of its creditors. Id.

44.     Here, TERI's Action presents no case or controversy for adjudication by this

Court because, prior to the filing of this matter, all that the parties had done with respect to their

relative rights defined by the "Database Dispute" was to define them and carve them out of the

releases granted under the Stipulation. The Stipulation reflects only that the parties have

determined that they do not see eye to eye about the proper interpretation of the TSA (or the

extent of the restrictions therein applicable to the TSA Transferred Data) and that they have

reserved their rights under the Stipulation.[12] TERI has provided no evidence of how a resolution

of TERI's Action will have any real world effect on TERI or its business. Instead, TERI can

only point to hypothetical harm. According to TERI, "[i]f this issue is not resolved Reorganized

---

[12] The FMC Entities have also reflected this fact in certain public filings, but such filings merely reflect statements
that the parties do not see eye to eye.

TERI *may be* unable to operate any business other than performing the Collections Contract or

re-instituting a guarantee business and *may remain* exposed to contingent obligations to

indemnify the First Marblehead Entities with respect to Data-related issues." (Motion ¶2

(emphasis added).) TERI, however, does not identify any actual business or indemnity

obligation that is being affected by this issue. This, without more, does not constitute an Article

III "case or controversy." See In re Space Building Corp., 206 B.R. at 271-272. Under these

circumstances, it is clear that TERI's Action is primarily a request for an advisory opinion as to

the meaning of the TSA, which is precisely the type of "comfort order" that the court in

Vitalsigns Homecare held it could not give. See In re Vitalsigns Homecare, Inc., 428 B.R. at 17.

45.    Even if TERI's Action presents an actual case or controversy, which it does

not, this matter would not be ripe for adjudication because (i) the dispute is entirely hypothetical,

(ii) the impact that any decision would have is unclear, and (iii) TERI will suffer no hardship if

this Court withholds judgment. See In re Space Building Corp., 206 B.R. at 272. TERI has not

produced any agreement, term sheet, or even an expression of interest with respect to its

postpetition assets or business that would indicate that the failure to resolve TERI's Action now

will have any effect on TERI or its business or its prospects at any time in the near future. Thus,

a decision with respect to TERI's Action will have no sufficiently direct or immediate impact on

TERI, as required by the standards elucidated in Abbot Laboratories. See Abbot Laboratories,

387 U.S. at 148-49, partially superseded by statute, Clean Air Amendments of 1970, Pub.L. No.

91-604, 84 Stat. 1676, overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

As more fully explained below, the resolution of TERI's Action will have no effect on TERI's

creditors or its bankruptcy estate. Although TERI, a reorganized non-profit corporation, clearly

would like to use the TSA Transferred Data to create new, for-profit business lines, it has

produced no evidence that such business lines are feasible or are anything more than wishful

thinking.  TERI received the TSA Transferred Data more than 2 years ago, and only now has

commenced this contested matter.  Debtor has not articulated any harm that it has suffered over

the past two years.  It is difficult to imagine under these circumstances how TERI will now suffer

any harm at all if this Court withholds its judgment on this issue.

## VI.    THE PLAIN LANGUAGE OF THE TSA PROVIDES THAT THE TSA TRANSFERRED DATA REMAINS SUBJECT TO THE RESTRICTIONS SET FORTH IN THE TSA.

### A.    The Clear and Unambiguous Language of the TSA Provides that the Restrictions in the TSA Survive Indefinitely.

46.       Under Massachusetts law, a contract is "construed to give it effect as a

rational business instrument and in a manner which will carry out the intent of the parties."

Shane v. Winter Hill Federal Savings and Loan Association, 492 N.E.2d 92, 94 (Mass. 1986).

"The words themselves remain the most important evidence of intention."  Id. at 95 (internal

quotation omitted).  If the words "are plain and free from ambiguity, they must be construed in

accordance with their ordinary and usual sense."  World Species List-Natural Features Registry

Institute v. Reading, 913 N.E.2d 925, 930 (Mass.App.Ct. 2009).

47.       The FMC Entities agree with TERI that the TSA is clear and unambiguous.

(See Motion ¶32.)  When read in its ordinary and usual sense, as required by applicable law, the

language of the TSA inevitably leads to only one reasonable or rational conclusion:  the

restrictions in Section 2.1 of the TSA survive termination of the TSA and continue to apply to

the TSA Transferred Data indefinitely.

48.       TERI's Action is focused primarily on the meaning of one clause of Section

2.1 of the TSA:

> "Notwithstanding the rejection or other termination of the
> Database Agreement . . . (ii) the Loan Database transferred from
> FMER to TERI pursuant to Section 2.1 of this Agreement shall
> remain subject to sections 2.01 (Grant), 2.02 (FMER Restrictions)

- 19 -

> and 2.03 (TERI Restrictions) of such Database Agreement and any
> and all additional terms of the Database Agreement that pursuant
> to section 10.01 of the Database Agreement survive termination of
> such agreement and remain in full force and effect.  (TSA, §2.01)

49.    The plain and unambiguous terms of this provision provide that the TSA

Transferred Data (i.e. the Loan Database transferred from FMER to TERI pursuant to Section

2.1 of the TSA) "remains subject to" the following:  (i) section 2.01 (Grant) of the Database

Agreement; (ii) section 2.02 (FMER Restrictions) of the Database Agreement; (iii) section 2.03

(TERI Restrictions) of the Database Agreement; and (iv) "all additional terms of the Database

Agreement that pursuant to section 10.01 of the Database Agreement survive termination of such

agreement and remain in full force and effect."

50.    Section 3.13 of the TSA provides:  "Article II shall survive termination of this

Agreement."  Section 2.1 is included in Article II of the TSA.

51.    In addition, The Contracts Order, pursuant to which the Database Agreement

was rejected and TERI was authorized to enter into the TSA, provides that the TSA "will govern

the relationship of the Parties from June 1, 2008 forward."  (Contracts Order p.2.)

52.    Under the law of the Commonwealth of Massachusetts, which governs the

TSA, the language of the TSA must be examined "by itself, independent of extrinsic evidence

concerning the drafting history or the intention of the parties."  See Bank v. Thermo Elemental

Inc., 888 N.E.2d 897, 907 (Mass. 2008).  When viewed in this manner, clearly, the TSA

language provides that "notwithstanding the rejection or other termination of the Database

Agreement" the TSA Transferred Data is subject to the restrictions listed in section 2.1 of the

TSA, without temporal limits or expiration dates.  Moreover, Section 3.13 plainly provides that

they survive termination of the TSA.  It is difficult to imagine how this language could be

clearer.  See BayBank Middlesex v. 1200 Beacon Properties, Inc., 760 F. Supp. 957, 963 (D.

Mass. 1991) ("Where the wording of a contract is unambiguous, the contract must be enforced according to its terms.")

**B.** **The History of the TSA and the Database Agreement Supports the FMC Entities' Plain Interpretation of the TSA.**

53.      It is precisely because the TSA is so unambiguous, however, that TERI is compelled to refer to extrinsic evidence concerning the drafting history or the intention of the parties in hope that this Court will ignore the TSA's plain language.  But, even if this Court is willing to look beyond the plain language of the TSA, it may do so only for the purpose of clarifying, not contradicting or changing its terms.  See Boston Edison Co. v. Federal Energy Regulatory Commission, 856 F.2d 361, 365 (1st Cir. 1988) ("only when the written agreement, as applied to the subject matter, is in some material respect uncertain or equivocal in meaning that all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms" (internal quotation omitted)).  Fortunately, a review of the history of the Database Agreement and TSA firmly supports the clear interpretation of the TSA outlined above.

54.      The history of the Database Agreement and TSA is not complicated.  In 2001, TERI entered into a related set of agreements with certain of the FMC Entities in connection with the sale by TERI to the FMC Entities of substantially all of TERI's student loan origination and guaranty operations (Motion ¶ 9).  Among those agreements was the Database Agreement. As described by TERI in its Contracts Motion:

> "The Database Agreement is a contract pursuant to which Debtor (i) transferred certain of its information regarding loans and loan default rates to FMC in exchange for a lump sum payment and monthly installment payments and (ii) agreed to update the information and respond to certain information requests from FMC regarding the information in exchange for a monthly payment for the life of the contract."  (Contracts Motion ¶ 15.)

- 21 -

55.      The source of the data transferred, and to be transferred, by TERI was the

Loan Database, which was defined as:

> "Loan Database" consists of any and all data now or hereafter
> obtained, generated, recorded, or otherwise received by TERI in
> connection with its business as a loan guarantor, including, without
> limitation, borrower data such as credit scores and other credit
> information, loan payment histories and statistics, default and
> recovery data, data regarding schools attended by borrowers and
> students whose education was financed with TERI-guaranteed
> loans, and underwriting criteria.  (Database Agreement, Art. I.)

56.      Under the Database Agreement, TERI agreed to create a derivative work of

the Loan Database, by excluding unique identifiers (e.g., name, address, social security number)

for any student loan borrower and to deliver that initial de-identified data, as well as monthly

updates consisting of all additions or modifications to the Loan Database, to FMER.  The initial

de-identified data, together with the monthly de-identified updates, constitute the "Delivered

Database."  (Database Agreement, §3.01.)

57.      Pursuant to the Database Agreement, TERI transferred, assigned and granted

to FMER "all right, title, and interest in and to the Delivered Database as a derivative of the Loan

Database."  (Database Agreement, §2.01.)  The grant to FMER included "the right to use and

possess the Delivered Database, together with the rights to share the data with FMC, to disclose

the data to others, to copy and manipulate the data, and *generally to exercise ownership of the

Delivered Database and all modifications and enhancements thereof*, subject to the FMER

Restrictions set forth in Section 2.02."  Id. (emphasis added).  TERI retained "all right, title and

interest in and to the Loan Database as such, subject to the TERI Restrictions set forth in

Section 2.03."  Id.

- 22 -

58.    The "TERI Restrictions" set forth in Section 2.03 of the Database Agreement

strictly limited TERI's use of the Loan Database (and any retained copy of the Delivered

Database) to the "Retained Uses":

> "Retained Uses" means the right retained by TERI to utilize the
> original version of the Loan Database (including the original copy
> thereof and information thereafter obtained, generated, recorded or
> otherwise received by TERI which would otherwise be deemed
> part of the Loan Database) for its *own use* for purposes of
> designing, underwriting, implementing, evaluating and managing
> education loan guarantee programs *offered and guaranteed by
> TERI*.  (Database Agreement, Art. I)(emphasis added).

They also prohibited TERI from selling, licensing or transferring the Loan Database (and any

retained copy of the Delivered Database).  (Database Agreement §2.03.)

59.    Over the succeeding years, the FMC Entities developed a suite of services

relating to private education loans and, as the FMC Entities successfully delivered their services

and broadened their client base, their facilitated loan volume grew.  The increased loan volume

provided TERI with an opportunity for significant revenues in the form of guarantee fees, as well

as a significant new source of loan data following the sale of the Delivered Database in 2001.

60.    On the Petition Date, TERI filed this Chapter 11 proceeding in this Court.

Within weeks of the Petition Date, TERI concluded that it was in its best interest to terminate all

of its contracts with FMC and its affiliates including (i) the Master Servicing Agreement, dated

as of July 1, 2001 (the "MSA"), under which FMER performed certain back office services for

TERI, and (ii) the Database Agreement.  As a result of the rejections, TERI's fees to FMER

decreased from "many millions of dollars a month to a few hundred thousand dollars a month."[13]

TERI stressed to this Court on multiple occasions the vital importance of these savings as well as

---

[13]  Transcript of Teleconference Hearing on: (#1011) Hearing on Confirmation of Fourth Amended Joint Plan of
Reorganization: (#1045) Debtor's Motion for Order Approving Rejection of Certain Executory Contracts; (#1046)
Debtor's Motion for Order Authorizing Debtor to Reject and Terminate Executory Contracts; (#1066) Joint Motion
for Order Authorizing Debtor, RBS Citizens, N.A., and the Creditors' Committee to Enter into Stipulation for the
Settlement of Guaranty Claims Relating to the Termination of Certain Loan Guarantees before the Honorable Henry
J. Boroff, J.U.S.B.C., Vol. I, 25:11-12, April 28, 2010 ("April 28 Hr'g Tr.").

US1DOCS 7765840v9

the transition services discussed below.  (See, e.g., April 28 Hr'g Tr. Vol. I, 25:11-12; June 20

Hr'g Tr. pp. 3-9.)

61.       Although TERI needed to reject the FMC Contracts, it could not immediately

operate on a stand-alone basis.  In order to build the infrastructure needed to operate on a stand-

alone basis,  TERI needed the FMC Entities to provide transition services for a short period

following the rejection of the contracts.

62.       TERI had another problem.  The simple fact is that TERI did not possess its

own copy of the Loan Database, at least in the several years leading up to its bankruptcy.  It

needed FMER to reconstruct the Loan Database.

63.       As described by TERI in the Contracts Motion, the FMC Entities eventually

agreed "after intensive negotiations and meetings.…to provide Debtor with essential services, at

reduced costs, while Debtor transitions its operations away from the FMC Entities."  (Contracts

Motion ¶ 8.)  The FMER Entities also agreed to provide TERI with the TSA Transferred Data

subject to the terms in the TSA.  TERI's counsel subsequently described the agreement by the

FMC Entities to provide these transition services as "the watershed event at this point in the

case"  (June 20 Hr'g Tr. 12:18-19) and stated "it's hard to over-emphasize how dramatic the

results of this agreement are."  (June 20 Hr'g Tr. 4:14-15.)

64.       Pursuant to the TSA, FMER confirmed its rights in the Delivered Database

notwithstanding the rejection or other termination of the Database Agreement.  In addition, FMC

and FMER secured an agreement by TERI to allow, as permitted by applicable law, the FMC

Entities to continue to use certain fully identified data (i.e., data that included the unique

identifiers) for use by the FMC Entities in connection with fraud prevention purposes.[14]

---

[14] TERI later informed the FMC Entities that it would not permit the continued use of such data for fraud prevention.

65.     Finally, in consideration for vital transition services (at reduced cost) and the

TSA Transferred Data that TERI did not otherwise possess, TERI agreed to limit its rights to

disclose and use the TSA Transferred Data.  TERI requested and, pursuant to Section 2.1 of the

TSA, the FMC Entities agreed, "at TERI's sole cost . . . and *subject to the conditions set forth*

*herein*, to provide TERI with the data comprising the Loan Database (as defined in the Database

Agreement) to the extent that such data has been received by TERI solely in connection with its

business as a loan guarantor and is stored, maintained or held by FMER and is data owned by

Debtor . . . ." (emphasis added).  The conditions of the transfer of the TSA Transferred Data

from the FMER Entities to TERI were quite explicit:

> "Notwithstanding the rejection or other termination of the
> Database Agreement . . . the Loan Database transferred from
> FMER to TERI pursuant to Section 2.1 of this Agreement shall
> remain subject to Sections 2.01 (Grant), 2.02 (FMER Restrictions)
> and 2.03 (Debtor Restrictions) of such Database Agreement and
> any and all *additional* terms of the Database Agreement that
> pursuant to Section 10.01 of the Database Agreement survive
> termination of such agreement and remain in full force and effect."
> TSA ¶ 2.1 (emphasis added).

66.     TERI agreed that, from May 31, 2008 forward, "the relationship of the parties

should be governed by the TSA."  (Contracts Motion ¶ 8.)  And, as to the Loan Database, TERI

stated that "[g]oing forward, the TSA will govern the parties obligations with respect to the Loan

Database (as defined in the Database Agreement)."  (Contracts Motion ¶15.)  The Database

Agreement was rejected in its entirety.

67.     Section 2.03 (TERI Restrictions) of the Database Agreement, preserved by

and incorporated in section 2.1 of the TSA, strictly limits TERI's use of the TSA Transferred

Data to the Retained Uses.  And the Section 2.03 (TERI Restrictions) of the Database Agreement

are expressly listed in Section 2.1 of the TSA.  These restrictions are independent of and are not

limited or qualified by the "any and all additional terms" restriction in the second paragraph of

section 2.1 of the Database Agreement, to the extent those "additional terms" are treated

differently, if at all, under the TSA.

68.        Nowhere in the TSA, which per TERI's description is to govern the parties'

relationship going forward, or in any of TERI's pleadings filed in connection with the Contract

Motion, is there any mention that the limitations imposed on TERI's use of the TSA Transferred

Data would expire two years after the rejection of the Database Agreement.  To the contrary,

section 3.13 of the TSA expressly provides:  "3.13 <u>Survival</u>.  Article II shall survive the

termination of this Agreement."  Section 2.1 of the TSA, which governs the conditions of the

transfer of the TSA Transferred Data, including the section 2.03 (TERI Restrictions), is an

essential part of Article II of the TSA.  The inclusion of the survival provision of section 3.13

made this point unequivocally clear.  In fact, the only reasonable interpretation of section 3.13 is

that it was included to establish that the restrictions in Article II of the TSA on the TSA

Transferred Data survive in perpetuity, even after the termination of the TSA.

69.        Obviously, section 3.13 of the TSA would not have been necessary and would

not be part of the TSA if section 2.1 was intended to terminate.  Nevertheless, Section 3.13 was

included, and it may not be construed to carry either no meaning or a meaning contrary to its

plain terms.  The only possible reason for its inclusion is to make absolutely clear that the TERI

Restrictions and FMER Restrictions survive termination of the TSA in perpetuity,

notwithstanding the rejection or termination of the Database Agreement.

70.        In this respect, the TSA contrasts sharply with section 10.01 of the Database

Agreement, which provides for the survival of restrictions for two years after termination of the

Database Agreement.  (<u>See</u> Database Agreement §10.01.)  Had the parties intended to apply a

two-year termination provision to the restrictions in the TSA, the Database Agreement proves

that they certainly knew how to do so.  But, the TSA clearly provides for a perpetual survival period.

71.        In sum, Debtor needed the FMC Entities to perform transition services so that Debtor could quickly reduce its overhead and move toward a reorganization.  In addition, Debtor required the TSA Transferred Data to reconstruct its own Loan Database, which it had never preserved.  The FMC Entities were willing to accommodate those requests so long as, *inter alia*: (i) the FMC Entities' rights to the Delivered Database were confirmed, subject to the limits that had applied under the Database Agreement; and (ii) TERI's future use of the TSA Transferred Data, data that the FMC Entities had generated through years of effort, was limited by the TERI Restrictions and other restrictions in section 2.1 of the TSA, which were the same restrictions that had prevailed for the previous 8 years.

72.        And that, as a matter of contract, is exactly what the TSA does.  There was no agreement that these respective limitations on data use would expire other than as provided in the TSA.  And the TSA expressly provides that they survive the termination of the TSA.  There was certainly no agreement that the restrictions would lapse, as if there was no TSA in effect.

73.        TERI has operated under Section 2.01 (TERI Restrictions) since 2001.  The TSA, in general, and the transfer of the TSA Transferred Data, in particular, were strictly conditioned upon TERI continuing to abide by these restrictions, independent of the Database Agreement, its rejection and any consequences of that rejection.

**C.        TERI's Interpretation of the TSA Ignores Its Plain Language and Is Patently Unreasonable.**

74.        The interpretation of the TSA advanced by TERI ignores the plain language of the TSA, the history of the Database Agreement and the TSA and is patently unreasonable. TERI continually ignores the fact that section 2.1 of the TSA does not say that rejection should

- 27 -

be deemed termination and that section 2.03 of the Database Agreement survives only to the

extent it would otherwise survive under section 10.01 of the Database Agreement after such

deemed termination.  In fact, section 2.1 of the TSA says directly the contrary.  Sections 2.01,

2.02 and 2.03 of the Database Agreement are not identified in the TSA by any reference to

section 10.01.  They are stand-alone provisions that survive without regard to section 10.01 of

the Database Agreement.  Only the category of "all additional terms" is identified in the TSA by

reference to section 10.01.  Moreover, even with respect to those "additional terms," section 2.1

of the TSA does not impose the two-year survival provision from section 10.01 of the Database

Agreement.  It simply uses that section to identify "additional terms" to which the TSA

Transferred Data may be subject.

75.        Similarly, TERI's argument that there is nothing in the Contracts Order or the

TSA that addresses the survival obligations under the TSA is simply wrong.  Paragraph 29 of

TERI's Motion reads:  "There was no clear and explicit provision in the TSA or the Contracts

Order nor was such a provision even proposed by the First Marblehead Entities, presumably

because they knew that such request would be rejected."  (Motion ¶29.)  But section 3.13 of the

TSA, which TERI filed with the Court, expressly states:  "<u>Survival</u>.  Article II [which contains

section 2.1] shall survive the termination of this agreement."  (Stipulation, §3.13.)

76.        In an attempt to prop up its unreasonable interpretation, which is clearly

contrary to the plain language of the TSA, TERI cites to its own pleadings and hearing

transcripts as evidence of its "intent."  These citations in the Motion, however, do not support its

interpretation of the TSA, and are in most cases either disingenuous or irrelevant.

77.        TERI argues that during the course of its chapter 11 proceedings it made a few

references to its future business plans that evidenced its intent to use the TSA Transferred Data

without restriction imposed by the TSA "for purposes in addition to its historic guaranty

business." (Motion ¶20.) Even if such intent were relevant, which it is not because the language

of the TSA is clear and unambiguous, the references in the Motion do not support the intent

TERI proposes. In particular, TERI cites statements in the Contracts Motion and at the hearing

to approve the Contracts Motion as evidence of TERI's intentions. (Motion ¶20.) None of the

statements referenced by TERI in its Motion, however, are at all explicit that its future business

plan required TERI to have access to the TSA Transferred Data without the restrictions in the

TSA. In fact, other statements made at the hearing to approve the Contracts Motion indicate that

TERI had no idea what its future business would be. At the hearing to approve the Contracts

Motion, counsel for TERI stated, "I do not want to telegraph exit strategies because I don't know

what they're going to be." (June 20 Hr'g Tr. 7:5-6.) There is simply no evidence that TERI

"intended" to use the TSA Transferred Data other than subject to the restrictions in the TSA.

Even if such intent existed, TERI never explained such intent to the FMC Entities or this Court.

The evidence actually indicates that when Debtor negotiated and executed the TSA, it simply

had not formulated any future business plan and that the TSA means what it says.

78.     TERI also argues in its Motion that the FMC Entities should have alerted

TERI to the plain language of the TSA restricting TERI's use of the TSA Transferred Data "in

the context of the lengthy negotiations over the plan of reorganization" or at some point prior to

confirmation of such plan. (See Motion at ¶25.) This argument is particularly strange in light of

Debtor's assertion that the language of the TSA is plain and unambiguous. (See Motion ¶33.)

There is no need for a contract counter party to alert the other contract party to the plain language

of an agreement. Executing the agreement serves just that purpose. Even at the confirmation

hearing on TERI's February 2010 Plan in April 2010, TERI made no mention that TERI needed

the TSA Transferred Data to be free from the TSA restrictions. The FMC Entities cannot be

expected to be clairvoyant.

79.      The interpretation of the TSA proposed by TERI simply strains credulity.

TERI's interpretation suggests that at the time it signed the TSA TERI intended to build a new

business by using a database without the restrictions to which it had been subject during the last

eight years of operations, and that TERI wholly misread the express terms of the TSA to reflect

that intent.  Moreover, it suggests that the FMC Entities knew about this intent, although it was

never expressed, but nevertheless agreed to deliver the TSA Transferred Data to TERI, so that

TERI could build new businesses to compete with the FMC Entities.  This interpretation is

contradicted by the plain language of the TSA and is patently unreasonable.

80.      TERI also argues that this Court should adopt its interpretation of the TSA

because TERI never intended to give up rights to use its data in whatever manner it chose.  (See

Motion ¶33).  Debtor's position is premised on the faulty assumption that, absent section 2.1 of

the TSA, upon the rejection of the Database Agreement, it could use the Loan Database for any

purpose, free of all restrictions.  This ignores two important points.  First, TERI did not have the

TSA Transferred Data prior to the execution of the TSA and obtained it only under the

conditions of the TSA.  Second, even in the absence of the TSA, the restrictions on TERI's use

of data pursuant to the Database Agreement would still continue until at least June 2013, as a

consequence of the FMC Entities' licensee rights to intellectual property under 11 U.S.C.

§365(n).  Thus, TERI's argument that it "forfeited" its most valuable asset and its ability to ever

conduct any business other than guarantying loans is disingenuous at best.  TERI was not

conveying property under the TSA (See Motion ¶28.); it was taking property subject to the same

restrictions on use that it always had.

81.      The fact that TERI now believes that its long-term business plan does not

work without the unauthorized use of the TSA Transferred Data is something that it should have

disclosed to the Court and the other parties.  As noted above, TERI's counsel assured this Court

at the hearing to consider the Stipulation that the resolution of TERI's Action would not affect

the feasibility of the Plan. The FMC Entities have no particular insight into TERI's business

plan or what it needs to succeed.

82.    TERI is also wholly disingenuous about its knowledge of the FMC Entities'

interpretation of the TSA. The facts contradict TERI's suggestion that it did not know about this

issue until recently. TERI knew of the FMC Entities' interpretation of the TSA and that they

believed the TSA restrictions survived in perpetuity as early as July 2009, when the parties

commenced negotiations that eventually resulted in the Stipulation. In addition, both the

February 2010 Plan and the August 2010 Plan expressly preserve the provisions of the TSA.

Section 12.1(d) of each plan states:

> Notwithstanding anything in the Plan or the Confirmation Order to
> the contrary, nothing in this Plan or in the Confirmation order shall
> affect the terms of the Transition Services Agreement dated
> May 30, 2008, as approved by the order of the Bankruptcy Court
> dated June 23, 2008, or the parties' respective rights thereunder or
> with respect thereto.

This provision was included in both plans as a result of extensive negotiations that commenced

long before TERI filed the February 2010 Plan.

83.    In addition, when moving this Court for approval of the Stipulation, TERI

stated that TERI, the Committee and the FMC Entities had been discussing a possible settlement

"for over a year" and that the negotiations "were lengthy and fulsome and, at times, highly

contentious." (See *Joint Motion for Order Authorizing and Approving Stipulation Resolving

Claims of First Marblehead Education Resources Inc. The First Marblehead Corporation and

First Marblehead Data Services, Inc.* [Docket No. 1151] at ¶16.) The single reason the

negotiations were so lengthy and contentious was that the parties could not resolve the claims

referred to in the Stipulation as the "Database Dispute." So, when TERI states in paragraph 25

- 31 -

of the Motion that FMC never claimed in a pleading or writing "(not subject to Rule 408 of the

Federal Rules of Evidence)" that TERI "did not have the right to use its own data until the

Database Dispute was identified in the FMC Stipulation," it is saved from outright falsehood

only by its tacit acknowledgment that it knew about the issue for more than a year because of

Rule 408 settlement discussions.  (See Motion ¶25.)

84.    For all of the reasons stated above, to the extent that this Court determines that it

has jurisdiction over TERI's Action, it should find that TERI's use of the TSA Transferred Data

remains subject to the restrictions set forth in Section 2.1 of the TSA, including but not limited to

the "2.03 (TERI Restrictions)."  To the extent this Court determines there is any basis to look

outside the four corners of the TSA in connection with TERI's Action, the FMC Entities request

an evidentiary hearing after the parties have had the opportunity to conduct appropriate

discovery in accordance the Bankruptcy Rules.

## VII.    ANSWER PURSUANT TO MLBR 9013-1(i).

85.    Pursuant to MLBR 9013-1(h), the FMC Entities hereby answer each of the

specific allegations in the Motion and state affirmative defenses.

86.    Paragraph 1 of the Motion contains conclusions of law and/or legal arguments

to which no response is required.  The FMC Entities admit that the FMC Entities are parties to

several agreements with the Debtor, which agreements speak for themselves.  As to the order

referenced in paragraph 1 of the Motion, the FMC Entities state that such order speaks for itself.

The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the

actual terms and conditions of such agreements or order. To the extent paragraph 1 of the Motion

contains any other allegations to which a response is required, the FMC Entities deny those

allegations.

- 32 -

87.        No response is required to the allegations set forth in paragraph 2 of the

Motion, which merely seek to characterize this action and/or contain conclusions of law and/or

legal arguments.  As to the TSA, Contracts Order, FMC Stipulation, and Form 10-K referenced

in paragraph 2, the FMC Entities state that the TSA, Contracts Order, FMC Stipulation, and

Form 10-K speak for themselves.  The FMC Entities deny all allegations that are inconsistent

with, misstate or mischaracterize the actual terms and conditions of the TSA, Contracts Order,

FMC Stipulation, or Form 10-K.  To the extent paragraph 2 of the Motion contains any

allegations to which a response is required, the FMC Entities deny those allegations.

88.        No response is required to the allegations set forth in paragraph 3 of the

Motion, which merely seek to characterize this action and/or contain conclusions of law and/or

legal arguments.  To the extent paragraph 3 of the Motion contains any allegations to which a

response is required, the FMC Entities deny those allegations.

89.        Paragraph 4 of the Motion contains conclusions of law and/or legal arguments

to which no response is required.  The FMC Entities deny the allegations in the first two

sentences of paragraph 4 of the Motion that this Court has jurisdiction over this matter pursuant

to 28 U.S.C. §1334 and that this is a core proceeding with respect to FMC Entities.  The FMC

Entities do not consent to the entry of final orders or judgment by this Court or any bankruptcy

court or bankruptcy judge.  To the extent paragraph 4 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

The FMC Entities admit the allegations in paragraph 5 of the Motion.

90.        Paragraph 6 of the Motion contains conclusions of law and/or legal arguments

to which no response is required.  The FMC Entities admit the allegations in the first and second

sentences of paragraph 6 of the Motion, but note that a plan trustee has been appointed under

Debtor's confirmed plan of reorganization.  To the extent paragraph 6 of the Motion contains any

other allegations to which a response is required, the FMC Entities deny those allegations.

91.     Paragraph 7 of the Motion contains conclusions of law and/or legal arguments

to which no response is required.  The FMC Entities admit that prior to the effective date of

Debtor's confirmed plan of reorganization, the Debtor operated its business and managed its

property as a debtor in possession under 11 U.S.C. § 1107(a) and 1108.  To the extent paragraph

7 of the Motion contains any other allegations to which a response is required, the FMC Entities

deny those allegations.

92.     The FMC Entities admit the allegations in paragraph 8 of the Motion.

93.     Paragraph 9 of the Motion contains conclusions of law and/or legal arguments

to which no response is required.  The allegations in paragraph 9 of the Motion seek to

characterize terms and conditions of unspecified agreements.  The FMC Entities admit that they

are parties to various agreements, which agreements speak for themselves.  The FMC Entities

deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and

conditions of such agreements.  To the extent paragraph 9 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

94.     Paragraph 10 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  The FMC Entities admit that FMC entered into

certain contracts with the Debtor, which contracts speak for themselves.  The FMC Entities deny

all allegations that are inconsistent with, misstate or mischaracterize the actual terms and

conditions of such agreements.  To the extent paragraph 10 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

95.     Paragraph 11 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  The FMC Entities admit that FMER is a subsidiary

of FMC and that FMER entered into a Master Servicing Agreement with the Debtor, which

agreement speaks for itself.  The FMC Entities deny all allegations that are inconsistent with,

misstate or mischaracterize the actual terms and conditions of such agreement.  To the extent

paragraph 11 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

96.      Paragraph 12 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to all references in paragraph 12 to the Database

Sale and Supplement Agreement, the FMC Entities state that such agreement speaks for itself.

The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the

actual terms and conditions of such agreement.  No response is required to the allegations in the

third sentence of paragraph 12 of the Motion, which merely seek to characterize this action.  The

FMC Entities admit that a document entitled Database Sale and Supplementation Agreement is

attached as Exhibit 2 to the Motion.  To the extent paragraph 12 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

97.      Paragraph 13 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  The FMC Entities admit that the Debtor filed its

chapter 11 petition in April of 2008.  The first two sentences of paragraph 13 of the Motion set

forth vague and conclusory allegations and, therefore, the FMC Entities lack knowledge or

information sufficient to form a belief as to the truth of those allegations.  As to the third, fourth,

and fifth sentences of paragraph 13, the FMC Entities admit that a certain Transition Services

Agreement has been executed in accordance with authority granted under the Contracts Order,

which agreement speaks for itself.  The FMC Entities also admit that the Contracts Motion was

filed on or about June 2008, and that the terms and conditions of such motion speak for

themselves.  The FMC Entities deny all allegations that are inconsistent with, misstate or

mischaracterize the actual terms and conditions of such agreement or motion.  To the extent

paragraph 13 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

98.    As to the Database Agreement referenced in paragraph 14, the FMC Entities

state that such agreement speaks for itself.  The FMC Entities deny all allegations that are

inconsistent with, misstate or mischaracterize the actual terms and conditions of such agreement.

To the extent paragraph 14 of the Motion contains any other allegations to which a response is

required, the FMC Entities deny those allegations.

99.    Paragraph 15 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to references to the TSA and the Database

Agreement in paragraph 15, the FMC Entities state that such agreements speak for themselves.

The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the

actual terms and conditions of such agreements.  No response is required to the third sentence of

paragraph 15 of the Motion, which merely seeks to characterize this action.  To the extent

paragraph 15 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

100.    Paragraph 16 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to references to the TSA and the Database

Agreement in paragraph 16, the FMC Entities state that such agreements speak for themselves.

The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the

actual terms and conditions of such agreements.  No response is required to the second sentence

of paragraph 16 of the Motion, which merely seeks to characterize this action.  To the extent

paragraph 16 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

US1DOCS 7765840v9

101.      As to paragraph 17 of the Motion, the FMC Entities state that the Database

Agreement referenced in paragraph 17 is an agreement that speaks for itself.  The FMC Entities

deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and

conditions of such agreement.  To the extent paragraph 17 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

102.      Paragraph 18 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to references to the Database Agreement in

paragraph 18, the FMC Entities state that such agreement speaks for itself.  The FMC Entities

deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and

conditions of such agreement.  To the extent paragraph 18 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

103.      Paragraph 19 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the TSA, the Database Agreement, the

Contract Rejection Motion, and the Contracts Order referenced in paragraph 19, the FMC

Entities state that the TSA, the Database Agreement, the Contract Rejection Motion, and the

Contracts Order speak for themselves.  The FMC Entities deny all allegations that are

inconsistent with, misstate or mischaracterize the actual terms and conditions of such

agreements, order or motion.  Sentences five and eight of paragraph 19 of the Motion set forth

vague and conclusory allegations and, therefore, the FMC Entities lack knowledge or

information sufficient to form a belief as to the truth of those allegations.  To the extent

paragraph 19 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

104.      Paragraph 20 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the Database Agreement, the Contracts

US1DOCS 7765840v9

Motion, the transcript, and the Master Loan Guaranty Agreement referenced in paragraph 20, the

FMC Entities state that the Contracts Motion, the transcript, and the Master Loan Guaranty

Agreement speak for themselves.  The FMC Entities deny all allegations that are inconsistent

with, misstate or mischaracterize the actual terms and conditions of the Contracts Motion, the

transcript, or the Master Loan Guaranty Agreement .  To the extent paragraph 20 of the Motion

contains any other allegations to which a response is required, the FMC Entities deny those

allegations.

105.      Paragraph 21 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the Disclosure Statement, including the

assumption and projections attached thereto, and the transcript referenced in paragraph 21, the

FMC Entities state that such documents and transcript speak for themselves.  The FMC Entities

deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and

conditions of the Disclosure Statement, including the assumption and projections attached

thereto, or the terms of the transcript.  The last sentence of paragraph 21 of the Motion sets forth

vague and conclusory allegations and, therefore, the FMC Entities lack knowledge or

information sufficient to form a belief as to the truth of those allegations.  To the extent

paragraph 21 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

106.      Paragraph 22 of the Motion also contains conclusions of law and/or legal

arguments to which no response is required.  The FMC Entities admit that counsel for the FMC

Entities was present at hearings held by the Bankruptcy Court on June 20, 2008 and April 28,

2010.  Any statements on the record by such counsel at such hearings speak for themselves.  To

the extent paragraph 22 of the Motion contains any other allegations to which a response is

required, the FMC Entities deny those allegations.

US1DOCS 7765840v9

107.    As to the 10-K's referenced in paragraph 23 of the Motion, the FMC Entities

state that such 10-K's speak for themselves.  The FMC Entities deny all allegations that are

inconsistent with, misstate or mischaracterize the actual terms and conditions of such 10-K's.

The first sentence of paragraph 23 of the Motion sets forth vague and conclusory allegations and,

therefore, the FMC Entities lack knowledge or information sufficient to form a belief as to the

truth of those allegations. To the extent paragraph 23 of the Motion contains any other

allegations to which a response is required, the FMC Entities deny those allegations.

108.    As to the 10-K's referenced in paragraph 24 of the Motion, the FMC Entities

state that such 10-K's speak for themselves.  The FMC Entities deny all allegations that are

inconsistent with, misstate or mischaracterize the actual terms and conditions of such 10-K's.  To

the extent paragraph 24 of the Motion contains any other allegations to which a response is

required, the FMC Entities deny those allegations.

109.    Paragraph 25 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  To the extent paragraph 25 of the Motion contains

any other allegations to which a response is required, the FMC Entities deny those allegations.

110.    Paragraph 26 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the February 2010 Plan and the August 2010

Plan referenced in paragraph 26, the FMC Entities state that such plans speak for themselves.

The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the

actual terms and conditions of plans.  To the extent paragraph 26 of the Motion contains any

other allegations to which a response is required, the FMC Entities deny those allegations.

111.    Paragraph 27 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the Plan referenced in paragraph 27, the FMC

Entities state that such Plan speaks for itself.  The FMC Entities deny all allegations that are

US1DOCS 7765840v9

inconsistent with, misstate or mischaracterize the actual terms and conditions of such Plan. To

the extent paragraph 27 of the Motion contains any other allegations to which a response is

required, the FMC Entities deny those allegations.

112.        Paragraph 28 of the Motion contains conclusions of law and/or legal

arguments to which no response is required. As to the Motion, transcript, hearing record,

Contracts Motion and Notice of Hearing referenced in paragraph 28, the FMC Entities state that

such Motion, transcript, hearing record, Contracts Motion and Notice of Hearing speak for

themselves. The FMC Entities deny all allegations that are inconsistent with, misstate or

mischaracterize the actual terms and conditions of such Motion, transcript, hearing record,

Contracts Motion or Notice of Hearing. The last sentence of paragraph 28 of the Motion sets

forth vague and conclusory allegations and, therefore, the FMC Entities lack knowledge or

information sufficient to form a belief as to the truth of those allegations. To the extent

paragraph 28 of the Motion contains any other allegations to which a response is required, the

FMC Entities deny those allegations.

113.        Paragraph 29 of the Motion contains conclusions of law and/or legal

arguments to which no response is required. As to the Contracts Motion, Trusts Motion,

Contracts Order, Trusts Order, TSA, and Database Agreement referenced in paragraph 29, the

FMC Entities state that such Contracts Motion, Trusts Motion, Contracts Order, Trusts Order,

TSA, and Database Agreement speak for themselves. The FMC Entities deny all allegations that

are inconsistent with, misstate or mischaracterize the actual terms and conditions of such

Contracts Motion, Trusts Motion, Contracts Order, Trusts Order, TSA, or Database Agreement.

To the extent paragraph 29 of the Motion contains any other allegations to which a response is

required, the FMC Entities deny those allegations.

- 40 -

114.       Paragraph 30 of the Motion contains conclusions of law and/or legal arguments to which no response is required.  As to the Contracts Order referenced in paragraph 30, the FMC Entities state that such Contracts Order speaks for itself.  The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and conditions of the Contracts Order.  To the extent paragraph 30 of the Motion contains any other allegations to which a response is required, the FMC Entities deny those allegations.

115.       Paragraph 31 of the Motion contains conclusions of law and/or legal arguments to which no response is required.  As to the TSA referenced in paragraph 31, the FMC Entities state that such TSA speaks for itself.  The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and conditions of the TSA.  To the extent paragraph 31 of the Motion contains any other allegations to which a response is required, the FMC Entities deny those allegations.

116.       Paragraph 32 of the Motion contains conclusions of law and/or legal arguments to which no response is required.  To the extent paragraph 32 of the Motion contains any other allegations to which a response is required, the FMC Entities deny those allegations.

117.       Paragraph 33 of the Motion contains conclusions of law and/or legal arguments to which no response is required.  As to the TSA referenced in paragraph 33, the FMC Entities state that such TSA speaks for itself.  The FMC Entities deny all allegations that are inconsistent with, misstate or mischaracterize the actual terms and conditions of the TSA.  To the extent paragraph 33 of the Motion contains any other allegations to which a response is required, the FMC Entities deny those allegations.

118.       Paragraph 34 of the Motion contains conclusions of law and/or legal arguments to which no response is required.  As to the TSA, Contracts Order, and Database Agreement referenced in paragraph 34, the FMC Entities state that such TSA, Contracts Order,

US1DOCS 7765840v9

and Database Agreement speak for themselves.  The FMC Entities deny all allegations that are

inconsistent with, misstate or mischaracterize the actual terms and conditions of the TSA,

Contracts Order, or Database Agreement.  To the extent paragraph 34 of the Motion contains any

other allegations to which a response is required, the FMC Entities deny those allegations.

119.    Paragraph 35 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  To the extent paragraph 35 of the Motion contains

any other allegations to which a response is required, the FMC Entities deny those allegations.

120.    Paragraph 36 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  To the extent paragraph 36 of the Motion contains

any other allegations to which a response is required, the FMC Entities deny those allegations.

121.    Paragraph 37 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the Contracts Motion, the hearing records and

the Debtor's Financial Projections referenced in paragraph 37, the FMC Entities state that such

hearing records and the Debtor's Financial Projections speak for themselves.  The FMC Entities

deny all allegations that are inconsistent with, misstate or mischaracterize the hearing records or

the actual terms and conditions of the Debtor's Financial Projections.  To the extent paragraph 37

of the Motion contains any other allegations to which a response is required, the FMC Entities

deny those allegations.

122.    Paragraph 38 of the Motion contains conclusions of law and/or legal

arguments to which no response is required.  As to the TSA and the Contracts Motion referenced

in paragraph 38, the FMC Entities state that the TSA and the Contracts Motion speak for

themselves.  The FMC Entities deny all allegations that are inconsistent with, misstate or

mischaracterize the actual terms and conditions of the TSA or the Contracts Motion.  To the

US1DOCS 7765840v9

extent paragraph 38 of the Motion contains any other allegations to which a response is required,
the FMC Entities deny those allegations.

123.      Paragraph 39 of the Motion contains conclusions of law and/or legal
arguments to which no response is required.  As to the statements, testimony, TSA and the
Contracts Order referenced in paragraph 39, the FMC Entities state that such statements,
testimony, TSA and the Contracts Order speak for themselves.  The FMC Entities deny all
allegations that are inconsistent with, misstate or mischaracterize such statements or testimony or
the actual terms and conditions of the TSA or the Contracts Order.  To the extent paragraph 39 of
the Motion contains any other allegations to which a response is required, the FMC Entities deny
those allegations.

124.      Paragraph 40 of the Motion contains conclusions of law and/or legal
arguments to which no response is required.  Paragraph 40 of the Motion also contains a
description of service of the Motion to which no response is required.

125.      The final paragraph of the Motion contains prayers for relief to which no
response is required.

## GENERAL DEFENSES

To the extent not explicitly admitted, the allegations of the Motion are denied.

## AFFIRMATIVE DEFENSES

## FIRST DEFENSE

The FMC Entities do not seek affirmative relief against the Debtor; therefore, the Court
lacks jurisdiction, and the Motion should be dismissed.  The FMC Entities do not consent to the
entry of final orders of judgment by the bankruptcy court with respect to the Motion.

### SECOND DEFENSE

The Court lacks jurisdiction over the subject matter of this action.

### THIRD DEFENSE

The Motion should be dismissed because Debtor failed to properly commence an

adversary proceeding as required by Fed. R. Bankr. P. 7001.

### FOURTH DEFENSE

The Motion should be dismissed due to insufficient process.

### FIFTH DEFENSE

The FMC Entities own all right, title and interest to their data and intellectual property.

### SIXTH DEFENSE

The FMC Entities retain rights to intellectual property and data pursuant to 11 U.S.C.

§365.

### SEVENTH DEFENSE

The Debtor is subject to the terms and conditions of the TSA.

### EIGHTH DEFENSE

The Motion fails for various reasons to state a cause of action upon which relief can be

granted against any of the FMC Entities.

### NINTH DEFENSE

The Debtor's claims are barred in whole or in party by the doctrines of waiver, laches,

estoppel and/or clean unhands.

### TENTH DEFENSE

The relief in the Motion is subject to rights of recoupment and setoff.

### ELEVENTH DEFENSE

The Court should abstain from hearing this matter pursuant to 28 U.S.C. §1334(c).

US1DOCS 7765840v9

**TWELFTH DEFENSE**

The FMC Entities hereby give notice that they intend to rely upon such other defenses as may become available or appear during discovery in this case, and hereby reserves the right to amend this response to assert any such defense.

**REQEST FOR JURY TRIAL**

The FMC Entities hereby request trial by jury.

**VIII.    CONCLUSION.**

For the reasons set forth herein, this Court should dismiss TERI's Action and otherwise deny the Motion.

Dated:    November 22, 2010

WILMER CUTLER PICKERING HALE AND DORR LLP


  /s/Dennis L. Jenkins
Dennis L. Jenkins (BBO #637065)
John D. Sigel (BBO #461910)
60 State Street
Boston, MA  02109
Tel:  (617) 526-6000
Fax:  (617) 526-5000
dennis.jenkins@wilmerhale.com
john.sigel@wilmerhale.com

US1DOCS 7765840v9