## **EXHIBIT A**

Reply

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| **In re** | ) | |
| | ) | **Chapter 11** |
| **THE EDUCATION RESOURCES INSTITUTE, INC.,** | ) | **Case No. 08-12540(HJB)** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

## REPLY TO OBJECTION TO MOTION FOR INTERPRETATION OF ORDER

### INTRODUCTION

The Education Resources Institute, Inc., the Reorganized Debtor in the above-captioned case (the "Debtor" or "TERI") respectfully responds to the Objection to Motion for Interpretation of Order (the "Objection") of First Marblehead Corporation, First Marblehead Education Resources, Inc. and First Marblehead Data Services, Inc. (collectively, "FMC"). TERI, in its Motion for Interpretation of Order ("Motion") , and FMC, in its Objection, recite a substantial amount of history colored by their divergent perspectives. However, the only facts that the Court need consider to resolve the Motion and the Objection are the following components of the record of this chapter 11 case:

1.    Motion of Debtor for Order (A) Pursuant to Section 365 of the Bankruptcy Code Authorizing the Debtor to Reject Certain Contracts with the First Marblehead Corporation and (B) Pursuant to Section 363 of the Bankruptcy Code Authorizing the Debtor to Enter into a Transition Services Agreement (the "Contracts Motion");[1]

---

[1] The Contracts Motion was not attached to the Motion.  A copy is attached hereto as Exhibit 1.

2.    Order Granting Motion (A) Pursuant to Section 365 of the Bankruptcy Code,

Federal Rules of Bankruptcy Procedure 6006 and 9014 Authorizing Debtor to Reject Certain

Contracts with the First Marblehead Corporation and (B) Pursuant to Section 363 of the

Bankruptcy Code Authorizing the Debtor to Enter into a Transition Services Agreement entered

by this Court on June 23, 2008 (the "Contracts Order");

3.    The TSA and the Database Agreement;[2]

4.    The record of the hearings on the Contracts Motion, the relevant part of the record

of the April 28, 2010 confirmation hearing (both attached to the Motion) and the Reorganized

TERI Financial Statements attached to the Disclosure Statement for the February 2010 Plan and

the Financial Projections attached to the Disclosure Statement for the August 2010 Plan;[3] and

5.    The October 7, 2010 Stipulation Resolving Claims of First Marblehead Education

Resources, Inc., The First Marblehead Corporation, and First Marblehead Data Services, Inc.

(Docket Number 1151) (the "FMC Stipulation").

The Objection characterizes the Motion as various things that it is not: a request for an

advisory opinion, a request for a declaratory judgment and a request for injunctive relief.  All of

this distills, in the words of the FMC Entities to "a single question for which it [TERI] seeks an

advisory opinion:  Can reorganized TERI now keep and use the TSA Transferred Data without

regard to the negotiated restrictions set forth in the TSA?"  (Objection, par. 4)  Having erected

these straw men, FMC attacks them with the following arguments:

**Objection Section III:**    **TERI's Action Can Only Be Maintained, If At All, As
An Adversary Proceeding;**

---

[2] As defined in the Motion.

[3] Attached hereto as Exhibits 2 and 3, respectively.  Exhibit 3 reflects the corrected financial projections filed with
the Supplemental Affidavit of James A. Peko [Docket No. 1157].

**Objection Section IV:**    **This Court Has No Subject Matter Jurisdiction Over This Matter;**

**Objection Section V:**    **TERI's Action Raises No Case Or Controversy Over Which This Court Can Exercise Jurisdiction;**

**Objection Section VI:**    **The Plain Language Of The TSA Provides That The TSA Transferred Data Remains Subject To The Restrictions Set Forth In The TSA**

This Reply will address each of the four arguments in turn.  The arguments each face a fatal obstacle and they each ignore their particular nemesis.  The arguments are colored by a rather odd locution concerning the Data: "As part of the TSA, TERI also requested, and pursuant to Section 2.1 of the TSA the FMC Entities agreed to provide to TERI, **certain data that TERI itself did not otherwise possess** (the "TSA Transferred Data")." (Objection, par. 3; also used in pars. 62 and 65) (emphasis added).  This phraseology can only be intended to obscure the fact that the Data was always owned by TERI while maintained by FMC as TERI's outsource provider.  By the TSA, FMC was merely returning TERI's asset – the Loan Database – to TERI, albeit subject to existing but temporary use restrictions.  FMC was not, as the Objection implies, conveying new property subject to new use restrictions.  The language of the Contracts Order and the TSA, informed by the record context, do not support FMC's position that TERI gave away nearly all of its rights to use its own Data by an obscure phrase in an agreement dealing with the transition of business operations.

TERI asks only that the Court disclose what it intended the Contracts Order to mean in authorizing TERI to enter into the TSA and whether it understood and intended, as asserted by FMC, that TERI's use of its own Data would be permanently limited to "education loan guarantee programs offered and guaranteed by TERI."  Once the Court interprets the Contracts Order, TERI asks that the Court enforce it as it deems appropriate.

LIBC/3937735.1

I. **THE MOTION FOR INTERPRETATION, NOT AN ADVERSARY PROCEEDING, IS THE APPROPRIATE PROCEDURE FOR RESOLVING THIS MATTER.**

FMC challenges the procedural posture in which the Database Dispute was presented in an attempt to avoid having the Contracts Order interpreted by the Court which conducted the Chapter 11 Case and which entered the Contracts Order in the context of that case..[4]  That challenge fails in the face of controlling United States Supreme Court precedent that upholds the process through which the Debtor has presented the Database Dispute to this Court.  FMC tries to redefine the relief that the Debtor is seeking in an attempt to invoke Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  FMC claims that the Debtor seeks a "declaratory judgment and injunctive relief" in an attempt to aggrandize the "complexity" of the Database Dispute.  Despite FMC's repeated assertions that the Debtor is seeking declaratory and injunctive relief, it is not.  Resolution of the Database Dispute is properly before the court as a contested matter pursuant to Rules 9013 and 9014 of the Bankruptcy Rules.  As recently as last year, the United States Supreme Court explicitly endorsed the process adopted by the Debtor for the interpretation of an earlier court order.  See Travelers Indem. Co. v. Bailey, 129 S.Ct. 2195 (2009).  Moreover, a simple review of the provisions of Rule 7001 makes it clear that the relief requested does not fall within its purview.

A. **The United States Supreme Court has Upheld Motions Precisely of this Nature.**

The Motion for Interpretation is the correct process in matters such as this where a party seeks a court's interpretation of its own order.  The United States Supreme Court in Travelers Indem. Co. v. Bailey, 129 S.Ct. 2195 (2009) ("Travelers"), explicitly upheld a bankruptcy

---

[4]    Capitalized terms not defined herein will have the meanings ascribed in the Modified Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors as of August 26, 2010.

court's jurisdiction to enter an order clarifying an earlier order. *See* Motion at 3. Tellingly, at no

stage in that case did the parties or the relevant courts require the institution of an adversary

proceeding.   See In re Johns-Manville Corp., 2004 WL 1876046 (Bankr. S.D.N.Y. Aug. 17,

2004) (bankruptcy court decision); In re Johns-Manville Corp., 340 B.R. 49 (S.D.N.Y. 2006)

(district court decision); In re Johns-Manville Corp., 517 F.3d 52 (2d Cir. 2008) (circuit court

decision). Perhaps even more tellingly, in its Objection FMC fails to mention, let alone attempt

to refute, this case and the controlling nature of its authority despite its inclusion in the Motion.

FMC did not because it cannot. The dispute in Travelers originated as a motion to clarify a prior

order and not an adversary proceeding, and the same process should apply here.

### B.     The Relief Requested Does Not Meet the Requirements of an Adversary Proceeding.

FMC claims that the Debtor seeks "injunctive or equitable relief and/or to obtain a

declaratory judgment," therefore requiring this matter to proceed as an adversary proceeding.

Objection at 7. The Motion for Interpretation, however, seeks neither an injunction nor

declaratory relief. The injunction remedy is an equitable remedy designed to protect rights from

irreparable injury by prohibiting or requiring certain acts by parties. Weinberger v. Romero-

Barcelo, 456 U.S. 305, 102 S.Ct. 1798 (1982) ("the Court has repeatedly held that the basis for

injunctive relief in the federal courts has always been irreparable injury and the inadequacy of

legal remedies"). An injunction, by definition, is an order directed at a party that seeks to either

restrain actions that have not been taken or to require certain actions by such party. U.S. v.

Quintana-Aguayo, 235 F.3d 682, 686 (1st Cir. 2000) ("An injunction is an order directed at *a

party*, enforceable by contempt, designed to protect relief sought in the action.") (emphasis in

original).

5

Here, the Motion does not seek to restrain any party from taking any action nor does it seek to require any party to take any action. Moreover, an injunction must be directed at a party. Here, the Motion seeks to have the Court inform the parties as to the meaning of its prior Contracts Order and then enforce the Contracts Order as appropriate. Because the Motion is not directed at any party and does not seek to coerce or prevent any action on the part of another party, the Motion cannot be a request for injunction.

Nor is the Motion a request for declaratory judgment pursuant to Bankruptcy Rule 7001(9) since no declaratory relief is sought. But even if the Motion could be seen as a request for declaratory judgment, Bankruptcy Rule 7001(9) requires that a request for declaratory judgment be brought via adversary proceeding *only* for the types of relief covered in subsections (1)-(8) of Bankruptcy Rule 7001. Fed. R. Bankr. P. 7001(9) ("The following are adversary proceedings . . . (9) a proceeding to obtain a declaratory judgment *relating to any of the foregoing*") (emphasis added). If the declaratory relief sought is outside the relief specified in Bankruptcy Rule 7001, an adversary proceeding is unnecessary. 10 COLLIER ON BANKRUPTCY ¶ 7001.10 (Alan N. Resnick & Henry J. Sommers eds. 15th ed.) (citing In re Keeler, 257 B.R. 442 (Bankr. D. Md. 2001). Thus, to the extent the Motion could be read as a request for declaratory judgment concerning the interpretation of the Contracts Order, that relief is not related to any provision of Rule 7001.

With the single exception of a Fifth Circuit case that stands for the limited and unremarkable proposition that contested matters are subject to fewer procedures than adversary proceedings, FMC does not cite any case in support of its assertion that the Motion needs to be brought as an adversary proceeding. Objection at 7. The reason for the lack of authority is simple – none exists. To the contrary, there is ample authority in support of the principle that an

6

adversary proceeding is not required for a Court to interpret its own order.  See In re Bostic

Const., Inc., 435 B.R. 46, 51 (Bankr. M.D.N.C. 2010); In re Thickstun Bros. Equipment Co.,

Inc., 344 B.R. 515 (B.A.P. 6th Cir. 2006).[5]

FMC's protestations that Motion procedure deprives it of due process are hollow.  The

Motion seeks a ruling based only on record facts.  FMC was sufficiently aware of the nature and

details of the Database Dispute to articulate its position in twelve carefully worded lines of the

FMC Stipulation.  FMC Stipulation, sixth recital.  FMC listened to the presentation of the FMC

Stipulation for approval on October 18, 2010, heard the several references to the Database

Dispute at the Confirmation Hearing that followed and then offered its own observations.

October 18, 2010 Transcript, *passim*.

## II.   THIS COURT UNEQUIVOCALLY HAS SUBJECT MATTER JURISDICTION OVER THIS MATTER

### A.   The United States Supreme Court and each Lower Court in the Travelers Matter Rejected All of FMC's Jurisdictional Arguments

In attempting to persuade this Court that it has no jurisdiction to interpret and enforce its

own Contracts Order, FMC totally ignores the jurisdictional ruling in Travelers that was quoted

in the Motion:

> The answer here is easy: as the Second Circuit recognized, and respondents do not
> dispute, the Bankruptcy Court plainly had jurisdiction to interpret and enforce its
> own prior orders. See *Local Loan Co. v. Hunt*, 292 U. S. 234, 239 (1934) . What
> is more, when the Bankruptcy Court issued the 1986 Orders it explicitly retained
> jurisdiction to enforce its injunctions.

---

[5]   Even if this Court were to decide that an adversary proceeding was procedurally proper, many courts have
excused compliance with Rule 7001 where "there was sufficient information set forth in the pleading to inform
the opponent of the issues it had to address."  See In re Aegean Fare, Inc. Aegean Fare, Inc. v. Commonwealth
of Massachusetts, Department of Revenue, 33 B.R. 745 (Bankr. D. Mass. 1983); see also In re Hyde, 334 D.
Mass 506, 507 (Bankr. D. Mass 2005).  Here, the Motion clearly defines the dispute at issue and the legal basis
pursuant to which the Court can resolve the dispute.  Converting the Motion into a complaint would do nothing
in respect of facts alleged and legal arguments asserted -- it would only serve to delay the ultimate resolution of
the Database Dispute.

Travelers, at 2205.

Just as the Bankruptcy Court in the Johns Manville Corporation chapter 11 case retained

jurisdiction to enforce its 1986 orders (Travelers at 2199, 2205), this Court retained jurisdiction

in the Contracts Order:  "ORDERED, that this Court will retain jurisdiction to construe and

enforce the terms of this Order."  Contracts Order, final paragraph.

The FMC Objection presents a treatise on the scope of jurisdiction under 28 U.S.C.

§1334, with an overlay of limits on post-confirmation jurisdiction.  Objection, pp. 8-14.  Not

once in nearly eight pages does FMC mention the Court's jurisdiction to interpret and enforce its

orders.  The objectors in Travelers attempted the same gambit in the Bankruptcy, District, Circuit

and Supreme Courts and failed all four times.  The following quotations are compelling:

Supreme Court and Second Circuit:  Prior to its ruling on jurisdiction quoted above, the

Supreme Court noted "In presenting the case to the Second Circuit the objectors argued that the

Direct Actions [subject to the 1986 injunction] fall outside the scope of the 1986 Orders and that

the Clarifying Order erroneously expands those orders to bar actions beyond the Bankruptcy

Court's subject-matter jurisdiction and statutory authority."  "In its opinion explaining the

judgment under review here, the Second Circuit recognized that "[i]t is undisputed that the

bankruptcy court had continuing jurisdiction to interpret and enforce its own 1986 orders," and

that "there is no doubt that the bankruptcy court had jurisdiction to clarify its prior orders." 517

F. 3d, at 60–61."  Travelers at 2202.

District Court:  The District Court confronted and rejected similar objections based on

general limitations on the scope of jurisdiction:  "As an initial clarification, the Objecting

Claimants incorrectly argue that there can be no "related to" jurisdiction for the 2004 Clarifying

Order, because post-confirmation, there was no longer a Manville bankruptcy estate for the

8

dispute to "relate to." (Objecting Claimants Brief at 15-16, citing Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir.1984).)  However, neither the Bankruptcy Court nor the appellees invoke "related to" jurisdiction as a basis for the Clarifying Order.  Instead, the Bankruptcy Court held that it was "enforcing its own Orders and thus its jurisdiction is derivative of the original jurisdiction" of the previous 1986 Orders."  In re Johns-Manville Corporation, 340 B.R. 49, 58-59 (S.D.N.Y. 2006).

Bankruptcy Court:  The Bankruptcy Court was the first to dispatch the same arguments: "The objectors' repeated invocation of cases such as In re Federal-Mogul Global, Inc., 300 F.3d 368, 379-384 (3d Cir.2002), cert. denied sub nom. DaimlerChrysler Corp. v. Official Comm. of Asbestos Claimants, 537 U.S. 1148, 123 S.Ct. 884, 154 L.Ed.2d 851 (2003), and Celotex Corp. v. Edwards, 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), for the proposition that 'bankruptcy courts have no jurisdiction over proceedings that have no effect on the debtor,' id., are beside the point and without merit. In this proceeding, the Court is enforcing its own Orders and thus its jurisdiction is derivative of the original jurisdiction."  In re Johns-Manville Corporation, 2004 WL 1876046 at *28 (Bankr. S.D.N.Y. Aug. 17, 2005).

There is no dispute that this Court had jurisdiction to enter the Contracts Order.  In interpreting and enforcing its own prior order, the Court's jurisdiction is derivative of its original jurisdiction to enter the Order.  The Supreme Court has endorsed jurisdiction in a context similar to this case but even more attenuated in time.  Travelers sought interpretation and enforcement of the 1986 orders in 2002.  (Travelers at 2196-2197).  TERI seeks interpretation and enforcement of a 2008 order in 2010, while its chapter 11 case is still open.

**B.     The Authorities Cited By FMC Do Not Support Its Conclusion**

Most of the cases cited by FMC deal with issues of subject matter jurisdiction that do not involve a court's interpretation and enforcement of its own order and every one of them pre-dates the Supreme Court's 2009 Travelers decision. The only case cited by FMC that deals with a court's interpretation of its orders holds that the court had subject matter jurisdiction for that purpose. In re Marcus Hook Development Park, Inc., 943 F.2d 261, 264 (3d Cir. 1991). In Marcus Hook, appellant sought review of an order of the district court affirming the entry of a final decree closing a chapter 11 case. The bankruptcy court had issued two competing orders in the chapter 11 case, one allowing a sale of property free from liens and the other order re-imposing a lien after the sale. The purchaser of the property, armed with an order declaring the property to be free and clear of liens, objected to entry of the final decree to seek resolution of a conflict with a later order that imposed a county lien on the property. The Third Circuit ruled that the proceeding was sufficiently "related to" the bankruptcy that the bankruptcy court had subject matter jurisdiction under 28 U.S.C. §1134(b). Id. at 265, 268. The Third Circuit remanded the case to the bankruptcy court for further proceedings to resolve the conflicting orders. Faced with conflicting orders, "the Purchaser logically went to the source of the problem, the bankruptcy court, and requested appropriate relief." Id. at 263.

## III.    THE DATABASE DISPUTE IS AN ACTUAL CASE OR CONTROVERSY UNDER ARTICLE III.

Despite being unable to resolve the Database Dispute after months of negotiations, FMC now attempts to downplay this dispute to no more than a "difference of opinion" that does not give rise to a case or controversy under Article III. Objection at 14-15. This characterization is wholly belied by the facts. FMC's repeated suggestions that there is "no evidence that a resolution of TERI's Action will have any effect on TERI's current business" or that "TERI has any realistic probability of developing a business at any time in the near future" ignores the

record before this Court, which includes, among other things, specific references to TERI's expected use of its Data and its prospective business prospects. It also includes direct references to the negative effect that the uncertainty of the bankruptcy proceedings have had on TERI's ability to market its portfolio management business. Applying these facts to the very cases cited by FMC, it is clear that a justiciable and ripe case or controversy exists.

A.    **The Record Evidence Makes Clear that there is an Actual Controversy Ripe for Review.**

FMC repeatedly claims that the harm articulated by TERI is "hypothetical" and that TERI has not produced evidence that its projected portfolio management business is "feasible or [is] anything more than wishful thinking." Objection at 18-19. To the contrary, the record before the Court on confirmation makes clear that TERI has real business prospects that are being hampered by the uncertainty of these proceedings:

- In the Supplemental Affidavit of James A. Peko submitted in connection with the April 28, 2010 confirmation hearing, Mr. Peko explained that TERI had actual business prospects for its portfolio management business: "[T]he Debtor has already had one large asset management fund (with over $30 billion in assets under management) engage TERI to assist in the evaluation of a private student loan portfolio as a potential investment. TERI is also in conversations with other prospective clients of student loan-related services.[6]

- In response to questions about TERI's projected portfolio management business, James Peko testified at the April 28, 2010 Confirmation Hearing that TERI had signed on a new client for transaction services and was in communication with other clients for "TERI to use its . . . [v]ast and deep knowledge of private

---

[6]    Mr. Peko's affidavit is attached hereto as Exhibit 4.

11

student loans and capitalize on the market opportunity." Peko Testimony at 115.[7]

- Mr. Peko proceeded to testify, however, that "[f]rankly, what's hampered them a bit is the fact that they're in bankruptcy. There's been interest to sign TERI up to these services, but a number of potential clients wanted more certainty to see what TERI looks like out of bankruptcy." *Id.*

- In response to the Court's question, Mr. Peko testified further about the negative impact the uncertainty of bankruptcy had on TERI's communications with prospective clients: "Like . . . the response that we received on the portfolio management, there have been conversations with a number of clients relative to collections whether they were unsure on whether or not they wanted to hire TERI. TERI was able to hire a number of client's during the pendency of the case, but there were also clients who were shy to hire TERI to do their collections." Id. at 117. When asked why the clients were shy to hire TERI, Mr. Peko explained that it was because of the "uncertainty of the outcome of the bankruptcy." Id. at 117-18.

- In addition, during the course of the October 18, 2010 confirmation hearing, counsel for TERI addressed the Database Dispute and its effect on the success of TERI's portfolio management business: "[The financial projections] assume that they generate revenues from a portfolio management business; and in part that's

---

[7]    Mr. Peko's testimony from the April 28, 2010 confirmation hearing is attached hereto as Exhibit 5.

impacted by the market and their ability, and in part it may be impacted by the

data base issue that we're going to bring before the Court subsequently."[8]

In addition, there can be no question that FMC intends to prevent TERI from using its Data

– its Objection to the Motion for Interpretation alone makes that clear.  But even beyond the

position articulated in its Objection, FMC has stated publicly in its 10-K filed for the year ended

June 30, 2010, that it intends to deprive TERI of its rights to use its Data:  "In addition, if TERI

were to assert successfully that certain contractual restrictions on the use and sale of its historical

loan data terminated in the context of the TERI Reorganization or otherwise, the competitive

advantage of our loan database would diminish."  *See* FMC 10-K for fiscal 2010, attached as

Exhibit 6(c) to the Motion for Interpretation.

The contrast between FMC's characterization of the Database Dispute in the Objection as a

"difference of opinion" and the description in the FMC Stipulation is stunning.  The following

two recitals define the Database Dispute in terms that unquestionably describe an actual case or

controversy ripe for determination:

> WHEREAS, FMER and FMC allege (a) that, notwithstanding the rejection
> of the Database Agreement pursuant to the Rejection Order, they retain certain
> intellectual property and other rights and TERI has been and remains subject to
> certain obligations and restrictions relating to the Loan Database (as defined in the
> Database Agreement) and the Delivered Database (as defined in the Database
> Agreement) and, without limiting the foregoing, that all restrictions set forth in
> Section 2.03 of the Database Agreement continue to apply to the use of the Loan
> Database and the Delivered Database by TERI and its successors and assigns, (b)
> that the restrictions set forth in Section 2.1 of the TSA have applied since May 30,
> 2008 and will apply permanently to the Loan Database transferred from FMER to
> TERI pursuant to Section 2.1 of the TSA and (c) that, notwithstanding the
> rejection of the Database Agreement pursuant to the Rejection Order, certain
> terms and provisions of the Database Agreement are integrated with, and deemed
> part of, the TSA; and

---

[8]    Excerpts from the October 18, 2010 hearing are attached hereto as Exhibit 6.

WHEREAS, TERI disputes such allegations (the "Database Dispute") and TERI, the Debtor Releasors, FMC or FMER may assert Claims, counterclaims, defenses, rights or obligations under the TSA or the Rejection Order with respect to the Database Dispute.

FMC Stipulation at 2-3.

## B.    Application of these Facts to the Law Makes Clear that a Case or Controversy Exists Over which this Court has Jurisdiction.

What FMC seems to be proposing here is that the parties play a game of chicken – FMC will lie in wait for the moment when TERI uses its Data in a manner that FMC deems restricted but TERI believes to be appropriate, only for FMC to then launch litigation. There is no need for such gamesmanship when the controversy exists today. Applying the facts described above to the very cases cited by FMC supports the existence of an actual controversy ripe for review here. For example, in Pustell v. Lynn Public Schools, cited on pages 14 and 15 of FMC's Objection, the court found an actual controversy ripe for review where there was uncertainty over the application of a local school committee requirement. 18 F.3d 50, 52 (1st Cir. 1994) (concerning challenge by parents who were homeschooling their children to a requirement that home schools allow visits by school officials). The court held that "[r]egardless of the imminence of an enforcement action, the [parents] suffer the harm of substantial uncertainty if we put off resolving their constitutional claims. We believe they are entitled to know whether they may continue to school their child at home without risking sanctions." Id. Similarly, TERI suffers harm every day that it has uncertainty over its use of its Data and is entitled to know whether it may use its Data under the Contracts Order without risking further harm. FMC's reliance on cases such as In re Space Building Corp. is misplaced because in that case no party contested the issues raised by the debtor. 206 B.R. 269, 272 (D. Mass. 1996). Here, FMC has gone on the record clearly contesting the position taken by TERI.

14

Moreover, it is clear that FMC need not actually threaten litigation to render a case justiciable. See, e.g., Pustell, 18 F.3d at 52-53 (citing cases). Further, TERI need not prove actual harm with the specificity sought by FMC. The case law is clear that TERI need only show that there is "some indication" that the controversy will have a concrete impact in order to conclude that the case is ripe for adjudication. Id. "[A] litigant does not have to await the consummation of a threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." In re NSCO, Inc., 427 B.R. 165, 177 (Bankr. D. Mass. 2010) (citing State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685, 692-93 (1st Cir. 1994)).

It is precisely in circumstances such as this in which one party has created substantial uncertainty by asserting a position directly contrary to another party that courts have found controversies ripe for adjudication. For example, in In re Kings Falls Power Corp., 185 B.R. 431 (Bankr. N.D.N.Y 1995), a dispute arose over whether a subordination agreement in a lease applied to the lessor's rights after default by debtor on the lease where the lease had not been assumed and the debtor had not defaulted. Despite the fact that the debtor had taken no action, the court found that an actual controversy existed within the meaning of the cases or controversies requirement because the lessor had expressly denied the debtor's interpretation of the contract. Id. at 437 (holding that resolution will help "clarify and settle the legal relations of the parties" and "terminate uncertainty"). Similarly, FMC has expressly denied TERI's interpretation of the Contracts Order and the TSA giving rise to this controversy. Courts have found cases to be ripe for adjudication where they seek to determine the meaning of a contract and the "uncertainty resulting from such a situation creates a sufficiently substantial financial risk, or will force parties to modify their behavior significantly." Nebraska Public Power District v. MidAmerican Energy Co., 234 F.3d 1032, 1040 (8th Cir. 2000) (holding that the "insecurity

15

caused by [the parties] contending interpretations of the [contract] works a definite, tangible and significant future harm, and indeed even works a present harm on their ability to plan and to conduct business operations . . . Delayed judicial resolution would only increase the parties' uncertainty.").

Similarly, leaving TERI and FMC to operate their businesses with conflicting interpretations of TERI's permitted use of its Data creates a direct and present harm on TERI's ability to plan and conduct business operations that will only increase by any delay in resolving this Motion. In light of this substantial uncertainty, its effect on TERI's communications with prospective clients, and the undisputed conflict between TERI and FMC concerning the interpretation of the Contracts Order and TSA, a ripe controversy exists for this Court to resolve.

## IV.  THE CONTRACTS ORDER AND THE TSA DO NOT PERMANENTLY RESTRICT TERI'S USE OF ITS OWN DATA

### A.        The Contracts Order and the TSA Must be Informed by their Context

FMC notes, perhaps ironically, that it agrees with TERI that the TSA is clear and unambiguous. Objection par. 47. It then accuses TERI of improperly referring "to extrinsic evidence concerning the drafting history or the intention of the parties in the hope that this Court will look beyond the plain language of the TSA." Objection at par. 53. Beginning at paragraph 30 of the Motion, TERI discussed the interpretation of the Contracts Order, including the TSA, and the relevant authorities at length and will not repeat itself here.

TERI will, however, plead not guilty to FMC's accusation concerning reliance on extrinsic evidence; it agrees that extrinsic evidence of drafting history or intent is not appropriate if the Contracts Order and the TSA are not ambiguous. TERI did refer, however, to the context in which the Contracts Order was entered and the TSA was signed. This Court must consider the context, the "unique posture of the bankruptcy proceedings" in the parlance of the First Circuit in

16

the New Seabury case discussed in par. 31 of the Motion, 450 F.3d at 39; "what preceded it and

what it was intended to execute" according to the Supreme Court in the Union Pacific case

discussed in par. 35 of the Motion.

FMC evidently had the idea that it could squelch future competition from TERI by

burying obscure verbiage in the TSA that it would later argue permanently and unambiguously

deprives TERI of the right to use Data that TERI always owned. As noted in the Motion, the

alleged conversion of the Data restriction from one that lasted two years after termination of the

Database Agreement to one that never ended was nowhere visible in the record of this case,

either in the Contracts Motion, the hearing on that motion, the Contracts Order or the several

occasions when TERI expressed its plans to use its Data to develop a portfolio management

business. That context, particularly the record surrounding the Contracts Motion some two

months into a large, complicated chapter 11 case, confirms TERI's reading of the TSA not

FMC's. The need to consider the context to discern meaning and the relevant authorities are

discussed in paragraph 35 of the Motion.

TERI doubts that, in considering the Contracts Motion, the Court focused on the now-

contentious TSA language and the "gotcha" effect that FMC asserts it mandates. Instead, TERI

believes and certainly hopes that the Court (like TERI) cannot have conceived that the Contracts

Order and the TSA had the surreptitious effect of permanently restricting and devaluing TERI's

Data for the benefit of FMC. If the Court's and TERI's understanding of the Contracts Order,

including the TSA, comport, the restrictions on TERI's use of its Data expired on May 31, 2010.

17

Respectfully submitted,

THE EDUCATION RESOURCES INSTITUTE, INC.

By its attorneys,


/s/ Daniel M. Glosband

Daniel M. Glosband (BBO No. 195620)
Dahlia Fetouh (BBO No. 651196)
Kirk D. Johnson (BBO No. 669164)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
E-mail:dglosband@goodwinprocter.com
dfetouh@goodwinprocter.com
kjohnson@goodwinprocter.com


Date:  November 24, 2010

18

## EXHIBIT 1

Contracts Motion

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

)
In re                                                          )
                                                               )    **Chapter 11**
THE EDUCATION RESOURCES INSTITUTE, INC.,  )    **Case No. 08-12540 (HJB)**
                                                               )
                    **Debtor.**                          )
_____)

**MOTION OF DEBTOR FOR ORDER (A) PURSUANT TO SECTION 365
OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO
REJECT CERTAIN CONTRACTS WITH THE FIRST MARBLEHEAD
CORPORATION AND (B) PURSUANT TO SECTION 363 OF THE
BANKRUPTCY AUTHORIZING THE DEBTOR TO ENTER INTO A
TRANSITION SERVICES AGREEMENT**

The Education Resources Institute Inc., the debtor and debtor in possession in the above-

captioned case (the "Debtor" or "TERI") respectfully submits this motion (the "Motion") for

order pursuant to sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code") authorizing (A) the Debtor to reject certain contracts with The First Marblehead

Corporation ("FMC"), First Marblehead Education Resources, Inc. ("FMER"), and/or TERI

Marketing Services, Inc. ("TMSI" and together with FMC and FMER, referred to herein

collectively as "FMC Entities"), effective as of May 31, 2008 and (B) the Debtor to enter into a

Transition Services Agreement with FMC.  Subject to the reservation of rights set forth in

paragraph 8 below, the FMC Entities will not object to this Motion.  In support of this Motion,

the Debtor respectfully states as follows:

### SUMMARY OF RELIEF REQUESTED

1.       The Debtor is party to several contracts with one or more of the FMC Entities,

including (i) the Master Servicing Agreement, dated as of July 1, 2001 (the "MSA"), (ii) the

1

Master Loan Guaranty Agreement dated as of February 2, 2001 (the "Guaranty Agreement"),

(iii) Database and Sale and Supplemental Agreement dated as of June 20, 2001 (the "Database

Agreement") and (iv) the Marketing Services Agreement, dated as of July 1, 2001 (the

"Marketing Agreement") and, together with the MSA, Guaranty Agreement, Database

Agreement and Marketing Agreement (the "FMC Contracts"). The Debtor has determined, in

the exercise of its business judgment, that it is not in the best interests of the Debtor, its estate, or

its creditors to continue to operate under the terms of the FMC Contracts. By this motion, the

Debtor seeks to reject the FMC Contracts pursuant to section 365 of the Bankruptcy Code, and to

have the effective date of the rejection be set as of May 31, 2008. The Debtor also seeks

authority to enter into a Transition Services Agreement pursuant to section 363 of the

Bankruptcy Code, substantially in the form of the attached Exhibit A (the "TSA"), which will

govern the terms and conditions pursuant to which one or more of the FMC Entities will provide

certain services to TERI for a brief period of time. In support of this Motion, the Debtor expects

to file an Affidavit at least 5 days prior to the hearing which outlines the benefit of entering into

the TSA with FMC.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicate for the relief requested in this

Motion is section 363 and 365 of the Bankruptcy Code. Rules 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") apply to this Motion.

## BACKGROUND

3.      On April 7, 2008 (the "Petition Date"), the Debtor commenced its bankruptcy

2

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the
"Chapter 11 Case").

4.       The official committee of unsecured creditors (the "Creditors' Committee") was
appointed on April 30, 2008.  No trustee, examiner has been appointed in this Chapter 11 Case.

5.       The Debtor is operating its business and managing its property as debtor in
possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       Founded in 1985, TERI is a nonprofit organization incorporated under
Massachusetts General Laws, chapter 180, located in Boston, Massachusetts.  TERI provides
education opportunities for all through its college access and loan guarantee activities.  TERI is a
national leader in promoting strategies for improving college access.  The Debtor manages
college access programs that target low-income individuals and those who are the first
generation in their families to attend college.  These programs are designed to raise student and
adult aspirations to include college and other post-secondary education and to provide guidance
and information directly to students and their families on planning and paying for college.  TERI
is also the managing director of the Pathways to College Network, an alliance of over 30
nonprofit organizations and funders committed to advancing college access and success for
underserved students.

7.       TERI's loan guarantee programs help students close the gap between education
costs and their other resources such as financial aid, federal student loans, savings and family
support. TERI is the oldest and largest guarantor of private (non-government) student loans with
more than $18 billion in outstanding guarantees. TERI brings together lenders, schools, students
and families to make available low-cost, high quality financing for postsecondary education.

3

## RELIEF REQUESTED

8.      By this Motion, the Debtor seeks authority under sections 363 and 365 of the

Bankruptcy Code and Bankruptcy Rules 6004 and 6006 to reject the FMC Contracts effective as

of May 31, 2008 and to enter into the TSA with FMC.  The Debtor has reviewed the terms of

each of the FMC Contracts and has determined that the burdens of these contracts, including the

significant costs to which the Debtor is subjected thereunder, greatly outweigh the benefits to the

Debtor under the contracts.  Under the current cost structure, the "burn rate" of the FMC

contracts is approximately $8-16 million per month.  Given the substantially reduced loan

volume that now exists, with little proportional reduction in monthly costs, it has quickly become

apparent that the Debtor cannot continue to operate under the FMC Contracts.  After intensive

negotiations and meetings, FMC and TERI have agreed on arrangements for one or more of the

FMC Entities to provide TERI with essential services, at reduced costs, while TERI transitions

its operations away from the FMC Entities to provide those services in house or through third

party service providers.  TERI and FMC have agreed that the rejection of the FMC Contracts

should be effective as of May 31, 2008 and from such date forward, the relationship of the

parties should be governed by the TSA.  The FMC Entities' limited assent to this Motion is not a

consent to rejection of the FMC Contracts or a novation, amendment or other modification of the

FMC Contracts.  Nothing in this Motion or the TSA will limit or otherwise affect the claims,

rights or remedies of FMC, FMER, TMSI, or any of their affiliates arising from or in connection

with the rejection of the FMC Contracts, all of which claims, rights and remedies are preserved.

A.  *The Basis for the Rejection of the FMC Contracts*

9.      Section 365(a) of the Bankruptcy Code provides that the Debtor, subject to the

Court's approval, may assume or reject any prepetition executory contract.  11 U.S.C. §365(a).

The Debtor may make this decision at any time prior to the confirmation of a reorganization plan, unless the Court orders otherwise upon the request of the nondebtor contracting party. 11 U.S.C. §365(d)(2). This flexibility allows a debtor the opportunity to determine which contracts are beneficial to the estate and should be assumed, and, correspondingly, which contracts are burdensome to the estate and should be rejected. See In re FBI Distrib. Corp., 330 F.3d 36, 42 (1st Cir. 2003), quoting Pub. Serv. Co. of N.H. v. N.H. Elec. Cooperative, Inc. (In re Pub. Serv. Co. of N.H.), 884 F.2d 11, 15-16 (1st Cir.1989) (The Code "afford[s] breathing space to decide which contracts they wish to assume [or reject]"). The decision to assume or reject a contract is not one to be taken lightly as it "is vital to the basic purpose to [sic] a chapter 11 reorganization because [it] can release the debtor's estate from burdensome obligations that can impede a successful reorganization." See FBI Distrib. Corp., 330 F.3d at 42, quoting NLRB v. Bildisco v. Bildisco, 465 US 513, 528 (1984). Thus, allowing a debtor to shed burdensome contracts furthers a primary purpose of the Code: giving debtors "a fresh start." Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.), 360 F.3d 291, 296 (1st Cir. 2004) quoting In re Corp., 340 F.3d 15, 25 (1st Cir. 2003).

10.    The debtor's decision to assume or reject an executory contract is subject to approval by the Bankruptcy Court. The standard by which a Bankruptcy Court traditionally considers such a request is the "business judgment" standard. See Bildisco & Bildisco, 465 U.S. at 523 (noting that the "traditional standard" applied to a debtor's request to assume or reject an ordinary executory contract is the business judgment standard). When rejecting a contract, in order to satisfy this standard, the debtor must show that rejection is in the best interests of its estate and need not prove that the contract in question is actually burdensome to its estate. See In re A.J. Lane & Co., 107 B.R. 435, 439, 440 (Bankr. D. Mass. 1989). In examining a debtor's

decision to reject the executory contracts pursuant to section 365 of the Bankruptcy Code, the Bankruptcy Court should defer to the debtor's decision "that rejection of a contract would be advantageous unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." Butler v. Resident Care Innovation Corp., 241 B.R. 37, 47 (Bankr. D.R.I. 1999), citing In re Sundial Asphalt Co., Inc., 174 B.R. 72, 83-84 (E.D.N.Y. 1992). As demonstrated below, the rejection of the FMC Contracts, which are extremely costly to the Debtor, is in the best interests of the Debtor and its estate and crucial to the Debtor's ability to reorganize as a viable going concern.

### 1. Rejection of the Master Servicing Agreement is in the Best Interests of the Debtor, its Estate, and its Creditors

11. There can be little doubt that the rejection of the MSA is in the best interests of the Debtor, its estate and its creditors. As described to this Court in previous motions, many of the "back office" operations of the Debtor are managed by FMER under the MSA. This management costs the Debtor millions of dollars per month (pre-petition the monthly costs were in excess of $10 million). While the FMER costs to TERI were substantial, they were manageable until the securitization markets froze in September 2007 in light of the failure of the housing market and the general economic downturn. The cash flow that TERI received on securitization of students loans stopped at that time, and the FMER costs then exceeded revenues; payment of those costs contributed to the erosion of TERI's capital that ultimately led to the filing of the Chapter 11 Case.

12. Since the Petition Date most of the services provided by FMC and/or FMER have been reduced but, even at reduced levels, the costs of the services exceed TERI's current revenues. Since the Petition Date, as lenders have suspended or reduced their TERI-related loan originations, its revenues have fallen further but the cost reductions have not offset the pre-

6

petition and post-petition revenue reductions. Although the Debtor has sufficient cash on hand to continue its current operations on a post-petition basis, it has become clear that rejecting the FMC Contracts and entering into the TSA are in the best interests of estate.

### 2. Rejection of the Guaranty Agreement is in the Best Interests of the Debtor, its Estate, and its Creditors

13. The Guaranty Agreement is an integral component of the contractually-related suite of FMC Contracts. It is a contract between FMC and TERI pursuant to which TERI (a) guaranteed or agreed to guaranty FMC-facilitated private student loans underwritten by certain lenders that were parties to note purchase agreements with FMC, (b) agreed that TERI would issue a new guaranty to the owners of to which TERI-guaranteed loans were transferred in securitization transactions and (c) obligated TERI to take various actions to facilitate securitization transactions. Under the Guaranty Agreement, TERI receives fees for guaranteeing these loans at certain points during the life of the loan, including at the time of the securitization.

14. As noted above, the securitization market shut-down in the fall of 2007 and has not yet revived. In light of the filing of the Chapter 11 Case, TERI cannot timely honor its obligations under the Guaranty Agreement nor would it be prudent to seek to do so, as FMC cannot currently securitize the underlying loans. TERI is diligently working with its advisors to formulate a new business plan and business model in this challenging economic environment, and promptly relieving itself of the burdens of the Guaranty Agreement is in the best interests of TERI, its estate and its creditors.

### 3. Rejection of the Database Agreement is in the Best Interests of the Debtor, its Estate and its Creditors

15. The Database Agreement is a contract pursuant to which TERI (i) transferred certain of its information regarding loans and loan default rates to FMC in exchange for a lump

7

sum payment and monthly installment payments and (ii) agreed to update the information and

respond to certain information requests from FMC regarding the information in exchange for a

monthly payment for the life of the contract. The Debtor seeks to reject the Database

Agreement. Going forward, the TSA will govern the parties' obligations with respect to the

Loan Database (as defined in the Database Agreement). The Debtor believes that the "Data

Transfer" section of the TSA addresses and fairly resolves the cost implications to each of the

parties in a way that matches their benefits.

### 4. Rejection of the Marketing Agreement is in the Best Interests of the Debtor, its Estate and its Creditors

16.     The Marketing Agreement is between TERI and FMER, as assignee of TMSI, a

wholly owned subsidiary of FMER, pursuant to which FMER provides certain marketing-related

services for TERI-guaranteed loan programs. This includes the development of marketing

strategies, plans, and materials. TERI reimburses FMER for the actual costs of these services in

accordance with an agreed-to budget between TERI and FMER . As it continues to formulate its

business plan, in light of the new economic realities facing the student loan market, TERI has

determined that it is no longer cost-efficient to continue the Marketing Agreement with FMER.

Following rejection, TERI will be able to market its own loan programs directly to lenders and

schools on a more cost-efficient basis than it has been able to do with TMSI under the Marketing

Agreement. TERI believes that it is vital to its post-petition business development that

relationships with schools and lenders continue to be cultivated and managed directly by TERI

employees. For these reasons, the Debtor has determined, in the exercise of its business

judgment to reject the Marketing Agreement with FMER.

8

*B. The Effective Date of the FMC Contracts Should Be May 31, 2008*

17.    After extensive negotiations among FMC and TERI, the parties have agreed to the terms for the continued provision of certain services by FMC and/or FMER following the rejection of the FMC Contracts as of May 31, 2008.  As a court of equity, under section 365 of the Bankruptcy Code, a Bankruptcy Court can enter an order approving rejections of contracts (other than contract for the lease of non-residential real property) effective as of a date that is earlier than the date of the Order approving such rejection, if the "balance of the equities preponderates in favor of such remediation."  In re Thinking Machines Corp., 67 F.3d 1021, 1028 (1st Cir. 1995).  Such relief lies within the discretion of the Bankruptcy Court and, if granted, must be consistent with the principles of section 365.  See id.  There should be little doubt that the equities favor a retroactive rejection of the FMC Contracts.  In addition, (a) FMC has assented to the retroactive effective date of the rejection, subject to approval of the TSA, and (b) the cost savings during the period from the effective date until the date of entry of an order approving the Motion will greatly enhance TERI's prospect for reorganization.

*C. The Transition Services Agreement*

18.    The Debtor and FMC have agreed to the principal terms of the TSA pursuant to which FMC and/or FMER will provide certain services to TERI following the rejection of the FMC Contracts.  A redacted copy of the TSA is attached as Exhibit A.  As the TSA contains certain proprietary pricing information, we believe it is critical to the Debtor's operations that such pricing information remain confidential.

9

19.      The TSA provides that it will have a term of approximately 60 days (June 1, 2008 through July 31, 2008), although TERI will have the right to further extend the TSA (1) for one additional 30 day period if it provides FMC with notice of such election to extend no later than July 15, 2008 and (2) for a second 30 day period subject to the consent of FMC (which consent will not be unreasonably withheld) if TERI provides FMC with notice of such election to further extend no later than August 12, 2008.  TERI will have the right, upon 10 business days' notice to FMC, to cancel and terminate any specific service (or all services) without effect on any other service to be provided by the applicable FMC Entity to TERI pursuant to the TSA.  FMC may, upon three (3) business days notice to TERI, terminate the TSA in the event of breach of payment obligations by TERI if such breach is not cured within three (3) business days of TERI's receipt of such notice.

20.      The TSA provides, *inter alia,* that FMC and/or FMER shall provide the following services to TERI:

10

(A)     **Loan Origination Services:**  FMER will continue to collect, evaluate,

administer, approve or deny and fund any approved loan applications until the earlier of (i) the

termination of the TSA and (ii) 60 days from the date all lenders suspend or terminate loan

programs with TERI.  FMER shall charge TERI a fee equal to the amount of the origination fee

that TERI is entitled to receive under the pertinent loan program for providing these services.

Because FMER is charging TERI the same amount TERI will receive from the lender, this

service is essentially cash flow neutral to TERI.  However, it provides an essential function (one

that TERI could not presently provide without significant costs) and ensures that no student

borrowers are disrupted or severely inconvenienced as a result of TERI's chapter 11 filing.

(B)     **Multiple Loan Disbursements:**  A portion of certain student loans is disbursed in

multiple segments (e.g., at the start of each semester or at the start of each school year).

Tracking and ensuring that multiple disbursements are made is critical to the student borrowers

of such loans.  TERI does not currently have the capability to track the multiple disbursements

and make the disbursements from its own accounts.  FMER has agreed to provide this service

with respect to (i) any loan which had its first disbursement prior to May 31, 2008 and (ii) any

loan with an application received after May 31, 2008 for which FMER receives the fee described

in the previous paragraph of this Motion.  FMER will provide such services to TERI at no cost.

(C)     **Collection Efforts:**  Pursuant to the terms of the MSA, FMER has served as

TERI's primary contact with all collection agencies engaged by TERI to pursue collections of

student loans that have either missed a payment or for which TERI has purchased the loan

pursuant to the applicable Guaranty Agreement.

1.     **Claims Processing and Review:**  As part of the services provided, when a

Guaranty Event occurs, thereby triggering TERI's obligation to purchase a defaulted student

LIBC/3312886.4

loan, FMER reviews the claims package to verify that a Guaranty Event has occurred, that there are no available defenses and that the applicable lender has complied with all of its obligations with regard to the servicing and origination of the loan. After that review, TERI would, prior to the Petition Date, purchase the loan and then seek to collect on the loan through various collection strategies. FMER has agreed to provide claims review services on a per claim basis. While TERI is not purchasing defaulted loans from its general funds during the Chapter 11 case, this service is nonetheless necessary to validate defaults to enable recovery actions. FMER has agreed to provide its claims review services for claims arising with respect to loans securitized in an FMC-sponsored securitization ("Securitized Loans") at no out of pocket cost but subject to certain offsets described in the Motion to Pay Trust Claims.

    2. **Default Prevention:** Default prevention, as its moniker suggests, is designed to prevent a loan from defaulting. Typically, after a student borrower misses one to two payments, the collection effort is transferred to a collection agency so that the agency can try to induce the borrower to begin paying on its loan again. Under the existing agreement, TERI reimbursed FMER for costs of administration regarding the default prevention work plus the cost charged by the Collection Agency if it was able to "cure" the default. Pursuant to the TSA, TERI has agreed to pay FMER a fixed dollar amount per cure for administering this function for loans other than Securitized Loans and TERI will continue to pay the costs charged by third party collection agents. This represents a substantial savings to TERI because it will only be required to pay FMER the costs associated with those loans that actually begin repayment in contrast to the existing relationship which has TERI paying all default prevention costs regardless of whether such efforts were successful. FMER has agreed to provide TERI its default prevention management services with respect to the Securitized Loans at no cost to

12

TERI, subject to certain offsets set forth in the Motion to Pay Trust Claims set forth in paragraph 23 hereof.

                3.       **Post-Default Collections:**  Once a Guaranty Event has occurred, and TERI becomes obligated to purchase the loan, the defaulted loan is purchased and various collection strategies are used to collect the defaulted loan, including litigation with borrowers, bankruptcy of borrowers and probate of borrowers' estates.  There are costs associated with oversight and administration of the efforts to collect the defaulted loans.  Although the majority of the costs are incurred as fees owed by TERI directly to the collection agencies, FMER employs a collections staff who are devoted to oversight and administration of claims.  Pursuant to the TSA, TERI has agreed to pay FMER a fixed percentage of the gross amount of the dollars recovered with respect to loans that are not Securitized Loans.  This arrangement allows TERI to pay only for services to the extent they are successful on a unit cost basis in contrast to the existing arrangement pursuant to which TERI pays for all costs associated with FMER collections (e.g., salary, benefits, space, etc.).  Subject to paragraph 23 below, FMER has agreed to provide TERI its post-default oversight and administration services with respect to the Securitized Loans at no cost to TERI, provided that TERI remit to FMER the same percentage of recoveries that it would otherwise have retained with respect to those loans.

      (D)     **Infrastructure:**  FMC has agreed to provide TERI with certain support to enable TERI to improve its infrastructure.  Examples of the services to be provided by FMC include, but are not limited to:  (1) continued availability of current internal and external network connectivity, (2) continued availability of current Window's domain, services and server applications supporting user authentication, printing, file storage, intranet, email, backups and electronic fax, (3) continued availability of existing user workstations (and/or laptops),  (4)

LIBC/3312886.4

continued availability, including maintenance of existing interfaces for, finance and accounting software for transactions, reporting and budgeting, (5) continued availability, including maintenance of existing interfaces for, Human Resources and payroll transactions, (6) agreements for Human Resources and payroll services, finance and accounting software, sales contract management software, and (7) delivery in machine readable format of all file-server based TERI end-user electronic files and all SharePoint based TERI end-user electronic files.

21.     For each of the services described above, FMC will provide services which will allow TERI to independently complete selected activities and smoothly transition activities from the FMC Entities to TERI. These services will include meetings with TERI management, assisting in moving accounts, and data and other items to TERI owned systems in addition to general assistance during the transition. Unless specifically priced within the TSA, TERI will not be charged for these additional services.

22.     Moreover, it is important to note that simultaneously with the filing of this Motion, the Debtor has filed a Motion for Order Pursuant to Sections 105, 362, and 363 of the Bankruptcy Code authorizing Debtor to honor certain of the guaranty obligations and purchase defaulted loans using cash in certain Pledged Accounts established for the benefit of the trusts (the "Motion to Pay Trust Claims"). Approval of the Motion to Pay Trust Claims is a condition precedent to the TSA becoming effective.

23.     As more fully described in the Motion to Pay Trust Claims, FMC has agreed to bear all of TERI's out-of-pocket costs (i.e. costs other than those amounts payable by TERI to the collection agencies for post-default collection activities and for collection activities on loans that are rehabilitated, each of which categories is "cost-neutral" to TERI) of collection efforts associated with the Securitized Loans subject to a right of reimbursement from the residual

14

interest in the trust.  Currently, the trusts represent the lion's share of collection costs.

24.     The Debtor believes that it is in the best interest of its estate and creditors that it be permitted to enter into the TSA with FMC.  The TSA will provide the Debtor with essential functions at substantially reduced costs.

25.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale or disposition of a debtor's assets, many courts have construed this section, to require that the decision be based upon the sound business judgment of the debtor. See In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) ("Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession may use, sell or lease property other than in ordinary course when a sound business purpose justifies such action"); In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

26.     The Debtor believes that the TSA is a vital building block for TERI to be able to emerge from Chapter 11.  Moreover, given the substantially reduced costs agreed to between TERI and FMC, it alleviates concerns voiced by the Creditors' Committee that the Debtor's relationship with FMC had become prohibitively expensive.  For all of these reasons we urge the Court to approve the rejection of the FMC Contracts and authorize the Debtor to enter into the TSA.

15

## Waiver of Rule 6004(h)

27.     The Debtor seeks an Order immediately approving the relief sought in this Motion and, therefore, requests that the 10 day stay of order imposed pursuant to 6004(h) be waived.

## Notice

28.     The Debtor has served notice of this Motion on (a) the Office of the Attorney General for the State of Massachusetts, (b) the Office of the United States Trustee for the District of Massachusetts, (c) proposed counsel for the Creditors' Committee (d) FMC and (e) each of the Creditors listed on the Debtor's Top 20 Unsecured Creditors List.  In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

16

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as Exhibit B authorizing the Debtor to reject the FMC Contracts as of May 31, 2008, authorizing the Debtor to enter into the Transition Services Agreement, substantially in the form of the attached Exhibit A and granting the Debtor such other and further relief as is just and proper.

Respectfully submitted,

THE EDUCATION RESOURCES INSTITUTE, INC.

By its attorneys,


s/Gina Lynn Martin
Daniel M. Glosband (BBO No. 195620)
Gina Lynn Martin (BBO No. 643801)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231

E-mail:dglosband@goodwinprocter.com
        gmartin@goodwinprocter.com

*Attorneys for the Debtor and Debtor in Possession*

June 5, 2008

# EXHIBIT A

## REDACTED TRANSITION SERVICES AGREEMENT

TRANSITION SERVICES AGREEMENT

This Transition Services Agreement is dated as of May 30, 2008 (the "Agreement") between The Education Resources Institute, Inc., a Massachusetts non-profit corporation ("TERI"), The First Marblehead Corporation, a Delaware corporation ("FMC") and First Marblehead Education Resources, Inc. ("FMER"; together with FMC, the "FMC Entities").

WHEREAS, TERI and FMC, FMER and/or TERI Marketing Services, Inc. ("TMSI") are parties to several agreements, including (i) the Master Loan Guaranty Agreement dated as of February 2, 2001 (the "Guaranty Agreement"); (ii) the Master Servicing Agreement dated as of July 1, 2002 (the "MSA"); (iii) the Database Sale and Supplementation Agreement dated as of June 20, 2001 (the "Database Agreement"); (iv) the Marketing Services Agreement dated as of July 1, 2001 (the "Marketing Agreement" and together with the Guaranty Agreement, MSA, and Database Agreement, the "FMC Agreements");

WHEREAS, on April 7, 2008 (the "Petition Date"), TERI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court");

WHEREAS, TERI has informed FMC that it seeks to reject, pursuant to Section 365 of the Bankruptcy Code, the FMC Agreements and that TERI will request that the effective date of such rejection will be May 31, 2008, 11:59 p.m. (Eastern Time) and that this Agreement become effective as of June 1, 2008, 12:01 a.m. (Eastern Time) (the "Effective Date");

WHEREAS, upon the terms and subject to the conditions set forth herein, each of the parties hereto has agreed to provide or cause to be provided (in such capacity, the "Provider") to the other party (in such capacity, the "Recipient") certain transitional services on the terms set forth in this Agreement and the appendices hereto ("Appendices" and each an "Appendix");

WHEREAS, the parties seek for this Agreement to govern the provision of certain Services (defined below) for the term of this Agreement beginning on the Effective Date and agree that the parties shall cooperate with one another to have the Motion seeking rejection of the FMC Agreements and approval of this Agreement approved by the Bankruptcy Court as soon as practicable;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## SERVICES PROVIDED

1.1     Services.  Upon the terms and subject to the conditions set forth in this Agreement (including the Appendices hereto), Provider will provide or cause to be provided each of the services (collectively, the "Services") described in the Appendices hereto (each of which Appendix sets forth, among other things: (i) a description of the Services to be rendered, the provider of such Services and the recipient of such Services; (ii) the period during which such

Services will be provided (the "Time Period"); (iii) the cost or charges for providing such Services and the arrangements for payment thereof; (iv) the procedures necessary to cancel such Services; and (v) the person to whom notices and communications regarding such Services should be given).

      1.2    Level of Services. Provider shall generally provide the Services in substantially the same manner and of the same quality and standards as it generally performs comparable services consistent with past practices but shall not be obligated in connection with its performance of the Services to: (i) hire any additional employees, consultants or independent contractors; (ii) maintain the employment of any specific current employees, consultants or independent contractors; (iii) maintain any specific level of staffing; or (iv) purchase, lease, or license any additional equipment, software, facility or other asset or property. The Services shall be further subject to the terms and conditions of any agreements between Provider and any third party, as well as any terms and conditions set forth in the Appendices.

      1.3    Reimbursement for Services. In full compensation for the Services, Recipient shall pay Provider the charges and costs for providing Services (determined in accordance with the applicable Appendix) within fifteen (15) days after receipt of Provider's monthly invoice therefor unless payment is required more often or in advance pursuant to any such Appendix. The Recipient shall not be required to pay for any meetings with management, other assistance or consultation provided by any employees or consultants of the Provider during the terms of this Agreement unless the applicable Appendix specifically identifies and/or charges for the costs of such services. All payments will be made in U.S. dollars. Each invoice shall set forth in reasonable detail the calculation of the charges and costs upon which the amount to be reimbursed is based, broken down by the Services rendered during the period to which such invoice relates.

      1.4    Conditions Precedent. Notwithstanding anything herein to the contrary, the effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

      (a) TERI shall have paid to FMER all amounts due under the MSA through May 31, 2008 on or before June 23, 2008;

      (b) TERI will have obtained from the Bankruptcy Court no later than three (3) business days following the hearing date set by the Bankruptcy Court, and in no event later than June 30, 2008, a final order in a form and substance reasonably acceptable to FMC (i) acknowledging the first priority security interests of the Trusts (defined below) in the pledged accounts (including all assets and funds in such accounts) established for such Trusts pursuant to the various guaranty agreements and deposit and security agreements by TERI in favor of such Trusts, and (ii) authorizing and directing TERI to honor its obligations under such guaranty agreements and deposit and security agreements to purchase defaulted loans using cash collateral in the pledged accounts established for the benefit of the following securitization trusts (collectively, the "Trusts"): The National Collegiate Trust-2001-CP1; The National Collegiate Student Loan Trust 2001 AR 1, 2, 3; The National Collegiate Trust 2002-CP1; The National Collegiate Student Loan Trust 2003-1; The National Collegiate Student Loan Trust 2004-1; The National Collegiate Student Loan Trust 2004-2; The National Collegiate Student Loan Trust 2005-1; The National Collegiate Student Loan Trust 2005-2; The National Collegiate Student Loan

LIBC/3315992.1

Trust 2005-3; The National Collegiate Student Loan Trust 2006-1; The National Collegiate Student Loan Trust 2006-2; The National Collegiate Student Loan Trust 2006-3; The National Collegiate Student Loan Trust 2006-4; The National Collegiate Student Loan Trust 2007-1; The National Collegiate Student Loan Trust 2007-2; The National Collegiate Student Loan Trust 2007-3; and The National Collegiate Student Loan Trust 2007-4;

(c) The Bankruptcy Court shall have entered a final order in form and substance reasonably acceptable to FMC approving this Agreement, by June 30, 2008.

1.5    Term.  Subject to the terms hereof, this Agreement shall become effective as of the Effective Date and shall terminate on July 31, 2008 (or such later date specified in any Appendix), provided, however, that TERI shall have the right to extend this Agreement (a) for one additional 30 day period provided that it gives written notice of such election to extend in accordance with the provisions of Section 3.1 hereof no later than July 15, 2008 and (b) for a second 30 day period subject to the consent of FMC (not to be unreasonably withheld) provided that TERI gives written notice of such election to extend in accordance with the provisions of Section 3.1 hereof no later than August 12, 2008.  Notwithstanding the foregoing or any contrary language in this Agreement or any Appendix, TERI may, upon ten (10) business days notice to FMC, cancel and terminate any specific Service or all of the Services specified in any Appendix hereto with no effect on any other Service or Appendix.  FMC may, upon three (3) business days notice to TERI, terminate this Agreement or any Specific Service in the event of breach by TERI of Section 1.3 of this Agreement if such breach is not cured within three (3) business of receipt of such notice.  TERI shall not be excused from paying any monies due to or earned by Provider prior to the effective date of termination.

ARTICLE II

DATA TRANSFER

2.1  The FMC Entities agree, at TERI's sole cost determined according to Appendix D, and subject to the conditions set forth herein, to provide TERI with the data comprising the Loan Database (as defined in the Database Agreement) to the extent such data is or has been received by TERI solely in connection with its business as a loan guarantor and is stored, maintained or held by FMER and is data owned by TERI and a copy of the data identified on Appendix E hereto, certain of which data may be included in, and shall constitute a part of, the Loan Database.  FMER will provide such data as soon as practicable but in any event on or before July 31, 2008.  FMC and/or FMER will deliver the data in machine readable form where appropriate, otherwise in printed form.  TERI shall be responsible for any and all data transformation and transport within the TERI infrastructure to make the data usable for TERI's purposes.  TERI shall not be entitled to any software, application or other system owned or developed by or licensed by the FMC Entities, or any proprietary information of FMC.

Notwithstanding the rejection or other termination of the Database Agreement, (i) FMER shall continue to possess all right, title and interest in and to the Delivered Database (as defined in the Database Agreement), including the right to use and possess the Delivered Database and the right to share the data with FMC, to disclose the data to others, to copy and manipulate the data and generally to exercise ownership of the Delivered Database and all modifications and

3

enhancements thereof and (ii) the Loan Database transferred from FMER to TERI pursuant to
Section 2.1 of this Agreement shall remain subject to sections 2.01 (Grant), 2.02 (FMER
Restrictions) and 2.03 (TERI Restrictions) of such Database Agreement and any and all
additional terms of the Database Agreement that pursuant to section 10.01 of the Database
Agreement survive termination of such agreement and remain in full force and effect.

Subject to section 3.11, TERI hereby acknowledges and agrees that the FMC Entities have paid
all amounts due under the Database Agreement as of the date hereof and that no fees shall be due
after the date hereof for any Updates or Queries (each as defined in the Database Agreement),
and TERI is no longer obligated to furnish any.

2.2  To the extent not prohibited by applicable law, regulation, rule or contract-, and
notwithstanding the definition of Excluded Data under the Database Agreement, TERI hereby
grants to FMC and FMER-a non-exclusive, fully paid and perpetual right and license to use the
following data solely for "fraud prevention purposes" data in the case management systems, the
last 13 months of the "ALE" data and data in the internal fraud table from the Capstone system
(the "Fraud Data"). TERI will use reasonable efforts to (a) cooperate with any requests by
FMER to third parties for consent to the use of the Fraud Data and (b) to otherwise facilitate the
use of the Fraud Data by FMER.

## ARTICLE III

## MISCELLANEOUS

3.1.   Notices and Communications.  All notices and communications provided for
herein shall be deemed to have been duly given if delivered to the persons noted in the applicable
Appendix or by notification via electronic mail or overnight delivery, to Willis J. Hulings,
President and Chief Executive Officer (hulings@teri.org) and Amy W. Bizar, General Counsel
(bizar@teri.org) of TERI, Park Square Building, 31 St. James Avenue, 4th Floor, Boston, MA
02116 and Jack L. Kopinsky, President, Chief Executive Officer and Chief Operating Officer
(jkopnisky@firstmarblehead.com) and Peter B. Tarr, Chairman and General Counsel
(ptarr@firstmarblehead.com) of FMC, Prudential Tower, 800 Boylston Street, 34th Floor,
Boston, MA 02199.

3.2.   Successors and Assigns.  The provisions of this Agreement shall be binding upon
and inure to the benefit of the parties hereto and their respective successors and permitted
assigns, including any trustee appointed in TERI's chapter 11 or in any chapter 7 proceeding;
provided that neither TERI nor FMC may assign, delegate or otherwise transfer any of its rights
or obligations under this Agreement without the consent of the other; and provided further that
no permitted transfer or assignment will relieve the transferring or assigning party of its
obligations under this Agreement.

3.3.   No Third Party Rights.  Nothing contained in this Agreement is intended to confer
any rights or benefits on any Person other than the parties hereto.

4

3.4.    Governing Law and Jurisdiction.  This Agreement shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without giving effect to the conflicts of law rules of such state.

3.5.    Force Majeure.  Neither party shall be liable to the other party for its failure or delay in performing its obligations hereunder (other than its obligation to pay money) due to any contingency beyond such party's control including, without limitation, acts of God, fires, floods, wars, acts of war, sabotage, terrorism, accidents, labor disputes (whether or not such disputes are within the power of the party to settle), shortages, governmental laws, ordinances, rules or regulations (whether valid or invalid), inability to obtain power, materials, equipment or transportation and any other similar contingency (each a "Force Majeure Event").

3.6.    Headings.  The descriptive headings used in this Agreement are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify, or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement.

3.7.    Indemnity.  TERI and FMC respectively will indemnify, defend and hold each other harmless from and against any and all claims, demands or suits (by any person or entity), losses, liabilities, damages (but excluding any consequential, special, indirect, punitive or incidental damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance (each, an "Indemnifiable Loss"), asserted against (a) TERI or (b) FMER and/or FMC by an unrelated third party relating to, resulting from or arising out of any breach by TERI or FMER and/or FMC, respectively, of this Agreement; provided, however, that the indemnity provided to TERI by FMC shall not exceed in scope the indemnity provided under the MSA.

3.8.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the parties under this Agreement.

3.9.    Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon one and the same instrument.

3.10.    Amendments; No Waivers.

(a) Any provision of this Agreement may be amended or waived (including any term set forth in any Appendix hereto) if, and only if, such amendment or waiver is in

writing and signed, in the case of an amendment, by TERI and FMC, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)       No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

3.11    Reservation of Rights.  Notwithstanding anything herein to the contrary, nothing herein shall limit or otherwise affect any claims, rights or remedies of FMC, FMER, TMSI, or any of their affiliates that such entities may have against TERI or any of its affiliates, including without limitation all claims, rights or remedies arising from or in connection with the rejection of the FMC Contracts, all of which claims, rights and remedies are preserved.  TERI reserves any claims, rights or remedies that it may have against the FMC entities, including without limitation, its rights in respect of the balance of the Database Note, as defined in the Database Agreement, of approximately $3,168,000.

3.12    Non-Solicitation.  During the term of this Agreement and for a period of six (6) months thereafter, neither party shall hire or solicit the employment of a then-actively employed employee of the other who has participated in the provision of services hereunder (an "Engaged Party").  This prohibition shall not apply if such employment results from a general circulation advertisement.  If either party hires an Engaged Party in violation of the foregoing restriction, such party shall pay to the other party as liquidated damages an amount equal to three hundred and fifty (350) times the party's standard hourly billing rate (or hourly wage rate) for the Engaged Party, which amount is intended to compensate the party for its loss, including all costs and expenses that may be incurred by the party in replacing such employee.  Each party agrees and acknowledges that the restrictions and amounts of damages set forth in this Section are reasonable and necessary in order to protect the party's legitimate business interests.

3.13    Survival.  Article II shall survive termination of this agreement.

6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

THE EDUCATION RESOURCES INSTITUTE, INC.

By: s/William G. Davidson, Jr.
Name:  William G. Davidson, Jr.
Title:  Senior Vice President and CFO

THE FIRST MARBLEHEAD CORPORATION

By: s/Kenneth Klipper
Name: Kenneth Klipper
Title: Senior Vice President

FIRST MARBLEHEAD EDUCATION RESOURCES, INC.

By: s/Kenneth Klipper
Name: Kenneth Klipper
Title:  Senior Vice President

1

## Appendix A

### PIPELINE LOANS

DESCRIPTION:    Any and all services related to the collection, evaluation, administration,
approval or denial, processing and funding of student loans pursuant to
which an application was received pursuant to any existing loan program
on or before the later of (i) the termination of this Agreement pursuant to
Section 1.5 and (ii) the date that is 60 days after all lenders suspend or
terminate loan programs with TERI ("Pipeline Loans"). To the extent that
any such services are provided after the termination of this Agreement,
TERI will pay for those services on the same terms as if the Agreement
remained in effect.

PROVIDER:    FMER

TIME PERIOD:    The earlier of (i) the termination of this Agreement pursuant to Section 1.5
and (ii) the date that is 60 days after all lenders suspend or terminate loan
programs with TERI.

COST:    FMER will charge TERI a fee equal to the amount of the Origination Fee
that the lender is obligated to pay TERI pursuant to its existing agreement
with TERI.

CONTACT:    Anne P. Bowen

2

## Appendix B

## MULTIPLE DISBURSEMENTS

DESCRIPTION:     A portion of certain student loans are disbursed in multiple segments.
FMER tracks and ensures that multiple disbursements are made to the
proper borrower or educational institution at the proper time.

PROVIDER:        FMER

TIME PERIOD:     FMER has agreed to provide this service with respect to (i) any loan
which had its first disbursement prior to May 31, 2008 and (ii) any loan
for which an application is received on or after May 31, 2008 and for
which FMC has received the fee described in Appendix A to this
Agreement.  Such disbursements may extend beyond the termination of
the Agreement.

COST:            No Cost

CONTACT:         Anne P. Bowen

3

Appendix C

COLLECTION ACTIVITIES

FMER will perform certain activities with respect to collection of TERI-guaranteed loans
as set forth in this Appendix C.  TERI-guaranteed loans that have been purchased by the Trusts
prior to default are referred to herein as the "Securitized Loans".  All other TERI-guaranteed
loans are referred to herein as the "Non-Securitized Loans."   As a condition precedent to
FMER's obligations under this Appendix C,  TERI agrees that it will continue to remit payments
owed to collection agencies (i) for post-default services, which amounts the collection agencies
generally net out of recoveries being remitted to TERI; (ii) for loan rehabilitation services, which
amounts TERI withholds from the purchase proceeds for such loans (i.e. amounts paid by the
Trusts to TERI for the purchase of rehabilitated loans) and remits directly to the collection
agencies; and (iii) for default prevention services with respect to Non-Securitized Loans to the
extent such services are being managed by FMER pursuant to this Appendix C.

DESCRIPTION:    Claims Processing and Review

FMER will continue to review the claims packages to ensure that a
"Guaranty Event" has occurred, that the applicable lender has complied
with all of its obligations with regard to the servicing and origination of
the loan.

PROVIDER:    FMER

TIME PERIOD:    June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.5
hereof.

COST:    ████████████████████████████ Same charge
for Securitized Loans, but payable only by the offsets described in the
Debtors Motion for Order Pursuant to Sections 105, 362 and 363 of the
Bankruptcy Code Authorizing Debtor Honor Certain of its Guaranty
Obligations and Purchase Defaulted Loans Using Cash in certain Pledged
Accounts Established for the Benefit of the Trusts ("Motion to Pay Trust
Claims")

CONTACT:    Anne P. Bowen

4

DESCRIPTION:       Default Prevention

Refers to collection activities designed to prevent a loan from defaulting.

PROVIDER:          FMER

TIME PERIOD:      June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.5
hereof.

COST:               █████████████████████ Same charge for Securitized
Loans, but payable only by the Offsets described in the Motion to Pay
Trust Claims.

CONTACT:          Anne P. Bowen

DESCRIPTION:       Post-Default Collections

Costs of oversight and administration of the efforts to collect on defaulted
loans.

PROVIDER:          FMER

TIME PERIOD:      June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.4
hereof.

COST:

CONTACT:          Anne P. Bowen

Appendix D

INFRASTRUCTURE

The Information Technology services provided under this Appendix D shall be provided by FMC and/or FMER in a reasonable manner consistent with past service level agreements. Neither FMC nor FMER makes any further representation or warranty with regard to the services to be provided hereunder and specifically disclaims any implied warranty of fitness for a particular purpose.

"Acceptance" of FMC and/or FMER deliverables hereunder shall occur no later than the fifth business day following the date such deliverables are provided. In the event TERI notifies FMC or FMER of any deficiencies within five (5) business days of the date such deliverables are provided, FMC and/or FMER shall attempt to resolve such deficiencies, subject to the terms and conditions of the Agreement and Appendix D. In no event shall FMC and/or FMER have any obligation to TERI after the later of (i) "acceptance" of any deliverable hereunder and (ii) the expiration or termination of this Agreement.

Applications shall be maintained for TERI in a "Run Only" mode. Operating capacity shall be provided at the same level provided immediately prior to the effective date of this Agreement. Except as requested by TERI and agreed to in writing by FMC, neither FMC nor FMER shall be required to develop source code and system changes will be made only as necessary to fix malfunctioning or nonfunctioning systems or system components. FMC may in its sole discretion accept or reject any request for source code development or system enhancements. All services to be provided hereunder, including any agreed-upon projects requiring source code development or system enhancements, will be performed in accordance with the policies, procedures and processes of FMC and/or FMER.

TERI acknowledges and agrees that it shall be solely responsible for the provision of services from third parties following the term of this Agreement, including without limitation the identification of appropriate vendors, negotiation of agreements with such third parties and all related costs, including costs of purchase and transfer or delivery by FMC or FMER. Except as may otherwise be provided in this Appendix D, neither FMC nor FMER shall have any obligation or liability to TERI with respect to the provision of services from third parties by TERI, including without limitation with respect to software and equipment licensing, web hosting and domain name registration, networks, "Right to Use" agreements, outsourcing, ASP relationships, or timesharing. Neither FMC nor FMER shall be held responsible for any delays in transition service delivery caused by TERI or any third party providers to TERI, FMC or FMER.

Nothing in this Agreement or Appendix D shall require FMC or FMER to maintain permanent internal or external network connectivity on behalf of TERI, and TERI acknowledges that FMC and FMER intend to terminate any such connectivity following the termination of this Agreement (or upon termination of the Services listed in this Appendix D, if earlier). At all times during the term of this Agreement, TERI and each of its employees, consultants and agents shall (i) comply with all state, federal and local acts, statutes, rules, regulations and published

6

guidelines concerning the security, confidentiality, handling, disclosure, use and protection of consumer or customer information and (ii) adhere to FMC's policies and standards regarding information technology and security, including acceptable email and internet use and the Information Security Policy of FMC.

DESCRIPTION:     IT Support

TERI shall acquire and deploy all hardware and operating infrastructure related to operating its environment and shall not acquire any assets from FMC and/or FMER, including but not limited to desktops/laptops, WAN/LAN, switches, network services, PBX and phones, hand-held devices (including PDA devices and mobile phones), physical network, firewalls and security appliances, operating systems or office support software. Following the term of this Agreement (or upon termination of the Services listed in this Appendix D, if earlier), TERI shall return, or have returned, to FMER all equipment as to which FMC and/or FMER has an ownership or leasehold interest, including without limitation all desktops/laptops, phones, hand-held devices (including PDA devices and mobile phones), network equipment and computer peripherals.

During the term of this Agreement and subject to the terms of this Appendix D, FMC shall provide:

Continued availability of current internal and external network connectivity, including external access to the existing applications hosted for TERI back-office business processes, administrative and college access business processes

Continued availability of the following websites:

www.teri.org - S&M website hosted by FMER

www.tericollegeplanning.org - S&M website hosted by FMER

www.coachprogram.org - S&M website hosted by FMER

www.thinkcollegeearly.com - S&M website hosted by FMER

www.bhep.org - S&M website hosted by FMER

www.pathwaystocollege.net - College Access website hosted by web.com

http://teri.webexone.com/login.asp?loc=&link= - Intranet hosted by Webex

http://www.williamsprinting.com/admin/login.asp   - Fulfillment Website

7

1 wiki website at Brockton hosted by icdsoft.com

Continued availability of current Window's domain, services and server applications supporting user authentication, printing, file storage, intranet, email, backups and electronic fax

Continued availability of existing user workstations (and/or laptops) with their legally licensed software, to the extent previously installed and supported by FMC and/or FMER

Continued availability of existing internal and external (in bound and out bound) phone and fax service including toll free services

Continued availability of existing computer peripherals including network and local printers, directly attached scanners, and connectivity for printing/scanning for leased reprographic business hubs

Continued availability of current wireless service and associated wireless telephone and PDA devices – including replication with email and scheduling to Messaging server

Continued availability of current logical and physical security for the foregoing


PROVIDER:    FMC

TIME PERIOD:    June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:    Richard Ross

DESCRIPTION:    Business Applications

Continued availability, including maintenance of existing interfaces for, HR and Payroll transactions

Hosting of, and/or continued availability, including maintenance of existing interfaces for, Finance and Accounting software for transactions, reporting and budgeting

8

Continued availability, including maintenance of existing interfaces for, data and provision of files and systems in support of TERI's risk management function

Continued availability, including maintenance of existing interfaces for, college-related contact management data for the TERI sales force.

PROVIDER:        FMC

TIME PERIOD:    June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:         Richard Ross

DESCRIPTION:    Business Processes

Delivery by FMER and/or FMC to TERI in machine readable format or otherwise in printed form of:

- all file-server based TERI end-user electronic files
- all SharePoint based TERI end-user electronic files
- all MS Exchange Data (emails, contacts, calendars) of TERI employees, to the extent permitted by law.

FMC and FMER agree to the logical deletion by FMC and FMER of the foregoing TERI end-user electronic files and MS Exchange Data, to the extent permitted by law. TERI acknowledges and agrees that it shall have no right to request, and FMC or FMER shall have no further obligation to deliver, any such data following logical deletion by FMC and/or FMER.

FMER and/or FMC shall cooperate in good faith with TERI regarding the independent provision by TERI of:

- Voice and data service provided by Verizon
- Web hosting and domain name registration in situations in which FMC and/or FMER have agreements for websites that were procured for TERI's benefit including delivery in machine readable format of static web pages and client side scripts.
- Agreements for HRMS and Payroll services, including delivery in machine readable format or otherwise in printed form of all related current and historic TERI data

9

- Agreements for Finance and Accounting software, including delivery in machine readable format or otherwise in printed form of all related current and historic TERI data, accompanied by relevant file format descriptors, data dictionary and relevant end-user documentation necessary to consume the files, in each case to the extent such materials exist as of the date hereof and FMC and/or FMER has the right to transfer such materials.

FMC and FMER agree to the logical deletion by FMC and FMER of the foregoing current and historic TERI data, to the extent permitted by law. TERI acknowledges and agrees that it shall have no right to request, and FMC or FMER shall have no further obligation to deliver, any such data following logical deletion by FMC and/or FMER.

FMER and/or FMC shall cooperate in good faith with TERI regarding the independent provision by TERI of:

- Agreements for salesforce.com software, including delivery in machine readable format or otherwise in printed form of all related current and historic college-related contact management data, accompanied by relevant file format descriptors, data dictionary and relevant end-user documentation necessary to consume the files, in each case to the extent such materials exist as of the date hereof and FMC and/or FMER has the right to transfer such materials.

PROVIDER:        FMC

TIME PERIOD:     June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:         Richard Ross

COST:            The following shall apply to all services provided under this Appendix D:

███████████████████████████████████████

---

1 The monthly rate will be adjusted to reflect any termination of services or of the Agreement during a month."

LIBC/3315992.1



Neither FMC nor FMER shall engage any third parties with respect to services to be provided hereunder without (i) providing TERI with a written statement describing the nature and scope of such engagement, together with a cost estimate, and (ii) TERI's prior written approval. TERI shall provide any approval or disapproval of such engagement as soon as practicable and in no event later than the second business day following delivery by FMC and/or FMER of such written statement. TERI shall reimburse FMC and/or FMER for the costs of any third-party engagement approved by TERI, unless the parties otherwise agree in writing.

FMC and/or FMER shall provide services set forth in Section 2.1 of the Agreement on a time and materials basis.

FMC and/or FMER will provide enhancement services as requested by TERI and agreed to by FMC on a time and materials basis.

11

## Appendix E

Two years of data derived from AES's MR-50 and MR-53 reports, as well as comparable data from loan servicers other than AES to which TERI is entitled under its guaranty agreements with lenders

A copy of data housed in the ALE

A copy of data housed in the RMS

A copy of data housed in the Orig APP FMER systems

A final update to the Guaranty Access Database

A copy of the data and results of the validation study

1

## EXHIBIT 2

Disclosure Statement for February 2010 Plan Financial Projections

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| THE EDUCATION RESOURCES INSTITUTE, INC. | ) | Case No. 08-12540 (HJB) |
| | ) | |
| Debtor. | ) | |

### EXHIBIT D TO DISCLOSURE STATEMENT
### REORGANIZED TERI FINANCIAL STATEMENTS

1

## PROJECTIONS

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Bankruptcy Code 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

For the purpose of demonstrating the feasibility of the Plan, the following financial projections for each of the three years ended April 30, 2011, 2012 and 2013 (the "Projections") were prepared by the Debtor, assisted by its professional advisors. The Projections reflect the Debtor's results from operations of Reorganized TERI and reflect the Debtor's assumptions and judgments as to expectations of market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change, as discussed below.

The Projections present, to the best of the Debtor's knowledge and belief, Reorganized TERI's results from operations for the three years following the estimated date of emergence of May 1, 2010. Although the Debtor is of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including but not limited to, material changes to the economic environment, demand for its services, the competitive environment and other factors affecting the Debtor's business. The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Projections. The Projections assume that the Plan would be implemented in accordance with its stated terms and that consummation of the Plan would occur on May 1, 2010. The Projections should be read in conjunction with the assumptions and qualifications contained herein.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") IN THE U.S. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONSEQUENCES WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOUD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

## GENERAL ASSUMPTIONS

The Debtor prepared the Projections with the assistance of its professional advisors. The Projections represent, to the best of the Debtor's knowledge and belief, the Debtor's results from operations for the three years following the estimated date of emergence of May 1, 2010 and reflect the Debtor's assumptions and judgments considering information known as of February 8, 2010.

### Key Assumptions

i.    Revenues

Management's long range plan includes generating revenues from further developing its existing collection management services and offering portfolio management services, in addition to continuing its not-for-profit mission related to College Access, which will be primarily funded by grant income. The long range plan also contemplates that certain assets of the Debtor, including defaulted loans purchased by the Debtor, will be transferred to a Plan Trust and administered by the Plan Trustee for the benefit of Creditors. TERI anticipates receiving revenue from shared recoveries, which are based on the Collection Contract set forth in the Plan and described in the Disclosure Statement between Reorganized TERI and the Plan Trustee.

The revenue projections also include a fee for managing the collection of defaulted loans and reimbursements from the Plan Trust for back office or administrative expenses incurred while assisting the Plan Trustee in liquidating assets.

ii.    Employee Costs and Professional Services

Employee costs include, among other things, salaries, wages, payroll taxes, benefits, and outside contractors. Professional services include board of directors' compensation as well as bank, audit, and legal related fees. Medical expense, which makes up approximately 9% of total employee costs, is grown each calendar year by approximately 14%; an assumed expense increase correlated with historical trends. All other employee costs and professional services are grown by approximately 3% each fiscal year due to an assumed increase in costs and general inflation.

iii.    Selling, General and Administrative ("SG&A") and Other Expense

Consolidated SG&A expenses include rent, utilities, building maintenance, telephone, corporate insurance, office supplies, printing, advertising, and travel. Other expense includes dues, subscriptions and IT charges. SG&A and other expenses are forecast to increase by approximately 3% each fiscal year due to increase in costs and general inflation.

3

iv.    Interest Income

Interest income is expected to be generated from Retained Cash, the Restricted Charitable Gift Funds, endowments, and grants.

**The Education Resources Institute, Inc.**

Projected Income Statement
*(Unaudited, $ in whole amounts)*

| | Projected 12 Months Ended 4/30/2011 | Projected 12 Months Ended 4/30/2012 | Projected 12 Months Ended 4/30/2013 |
|---|---|---|---|
| **Revenue** | | | |
| Portfolio management | $ 1,100,000 | $ 2,800,000 | $ 4,960,000 |
| Grants | 1,958,484 | 2,087,101 | 2,060,669 |
| Collections | 2,075,193 | 1,393,768 | 666,212 |
| Shared recoveries | 1,000,000 | 1,000,000 | - |
| Other revenue | 193,939 | 198,108 | - |
| **Total Revenue** | 6,327,616 | 7,478,977 | 7,686,880 |
| **Expenses** | | | |
| Employee costs | (5,526,712) | (5,706,319) | (5,732,342) |
| SG&A | (1,321,773) | (1,354,817) | (1,395,461) |
| Professional services | (364,000) | (373,100) | (384,293) |
| Depreciation | (69,351) | (73,351) | (76,684) |
| TERI other income (expense) | (53,407) | (54,743) | (56,144) |
| **Total Expenses** | (7,335,243) | (7,562,329) | (7,644,925) |
| **Operating Income** | (1,007,627) | (83,352) | 17,018 |
| Interest income (expense) | 45,729 | 43,528 | 42,929 |
| **Net Increase (Decrease) in Assets** | $ (961,898) | $ (39,824) | $ 59,947 |

4

The Education Resources Institute, Inc.

Projected Cash Flow

*(Unaudited, $ in whole amounts)*

| | Projected 12 Months Ended 4/30/2011 | Projected 12 Months Ended 4/30/2012 | Projected 12 Months Ended 4/30/2013 |
|---|---|---|---|
| Net Increase (Decrease) in Assets | $ (961,898) | $ (39,824) | $ 59,947 |
| Depreciation | 69,351 | 73,351 | 76,684 |
| Change in Grants receivable | - | - | - |
| Change in Accounts receivable | (270,492) | (147,541) | (260,656) |
| Capex | (20,000) | (20,000) | (20,000) |
| Change in Prepaid expense and other assets | - | - | - |
| Change in Accounts payable and accrued expenses | 52,024 | 57,449 | 61,925 |
| Deferred grant revenue | - | - | - |
| Net change in cash | (1,131,015) | (76,565) | (82,100) |
| | | | |
| Beginning cash | 11,968,533 | 10,837,518 | 10,760,953 |
| Net change in cash | (1,131,015) | (76,565) | (82,100) |
| Ending cash | 10,837,518 | 10,760,953 | 10,678,853 |

5

**The Education Resources Institute, Inc.**

Projected Balance Sheet
*(Unaudited, $ in whole amounts)*

| | Projected 4/30/2011 | Projected 4/30/2012 | Projected 4/30/2013 |
|---|---|---|---|
| **Assets** | | | |
| Cash and marketable securities - unrestricted | $ 10,837,518 | $ 10,760,953 | $ 10,678,853 |
| Receivables | | | |
| Grants receivable | 116,509 | 116,509 | 116,509 |
| Accounts receivable | 270,492 | 418,033 | 678,689 |
| Property and equipment (net) | 277,403 | 224,052 | 167,368 |
| Prepaid expense and other assets | 190,913 | 190,913 | 190,913 |
| **Total Assets** | $ 11,692,834 | $ 11,710,460 | $ 11,832,331 |
| | | | |
| **Liabilities** | | | |
| Revolver | - | - | - |
| Accounts payable and accrued expenses | 1,657,802 | 1,715,252 | 1,777,176 |
| Deferred revenue | | | |
| Grants | 244,793 | 244,793 | 244,793 |
| **Total Liabilities** | 1,902,595 | 1,960,045 | 2,021,969 |
| | | | |
| **Net Assets** | | | |
| Net assets | 10,752,137 | 9,790,239 | 9,750,415 |
| Change in Net Assets | (961,898) | (39,824) | 59,947 |
| **Total Net Assets** | 9,790,239 | 9,750,415 | 9,810,362 |
| | | | |
| **Total Liabilities and Net Assets** | $ 11,692,834 | $ 11,710,460 | $ 11,832,331 |

6

**The Education Resources Institute, Inc.**

Projected Pro-Forma Balance Sheet

*(Unaudited, $ in whole amounts)*

| | Projected 4/30/10 | | Plan Settlement | | Transfer to Plan Trust | | Cancellation of Debt | | Pro-Forma 5/1/10 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and marketable securities - unrestricted | $ 48,074,220 | | $ 8,567,786 | B | $ (44,673,473) | C | $ - | | $ 11,968,533 | D |
| Cash and marketable securities - restricted | 364,612,649 | | (364,612,649) | E | - | | - | | - | |
| Receivables | | | | | | | | | - | |
| Fees | 38,876,525 | | (38,876,525) | F | - | | - | | - | |
| Grants | 116,509 | | - | | - | | - | | 116,509 | |
| Accrued interest | 632,104 | | (632,104) | G | - | | - | | - | |
| Student Loans | 232,401,886 | | (111,009,243) | H | (121,392,643) | I | - | | - | |
| Note | 3,100,680 | | (3,100,680) | J | - | | - | | - | |
| Other | 211,001 | | - | | (211,001) | | - | | - | |
| Property and equipment (net) | 326,754 | | - | | - | | - | | 326,754 | |
| Residual Interest | - | K | - | | - | | - | | - | |
| Prepaid expense and other assets | 190,913 | | - | | - | | - | | 190,913 | |
| **Total Assets** | $ 688,543,241 | | $ (509,663,415) | | $ (166,277,117) | | $ - | | $ 12,602,709 | |
| **Liabilities** | | | | | | | | | | |
| Accounts payable and accrued expenses | $ 1,605,778 | | $ - | | $ - | | $ - | | $ 1,605,778 | |
| Deferred revenue | | | | | | | | | | |
| Fees | - | | - | | - | | - | | - | |
| Grants | 244,793 | | - | | - | | - | | 244,793 | L |
| Loan Loss Reserve | - | | - | | - | | - | | - | |
| Liabilities Subject to Compromise | 683,264,564 | | (521,869,863) | M | - | | (161,394,701) | N | 1,850,571 | |
| **Total Liabilities** | $ 685,115,135 | | $ (521,869,863) | | $ - | | $ (161,394,701) | | $ 1,850,571 | |
| **Net Assets** | $ 3,428,106 | | $ 12,206,448 | | $ (166,277,117) | | $ 161,394,701 | | $ 10,752,138 | |
| **Total Liabilities and Net Assets** | $ 688,543,241 | | $ (509,663,415) | | $ (166,277,117) | | $ - | | $ 12,602,709 | |

**General Note** - TERI does not anticipate Fresh Start accounting to be applicable upon emergence

A  Reflects actual results through 1/31/10 and forecasted results through 4/30/10

B  Transfer from restricted cash to settle Make and Wait lien issues and post petition Trust recoveries

C  Amount represents unrestricted cash to be transferred to the Plan Trust. This amount represents projected cash available for distribution to Creditors and to pay accrued administrative expenses

D  Consists of $3.4 mil TERI settlement and approx. $8.6 mil ($8 mil in Restricted Charitable Funds, $0.3 mil in Restricted Grant Funds balance and $0.3 mil interest accrued on endowment funds) to be designated as Reorganized TERI restricted cash

E  Transferred to respective lender or Trust with exception of settlement for Make and Wait lien settlement

F  Included in claim settlement calculations for each respective lender or Trust

G  Included in reserve account balance and returned to respective lender or Trust

H  Estimated amounts to be recovered on defaults for Make and Wait lenders and pre-petition Trust

I  Estimated amounts to be recovered from TERI owned loans and Trust post-petition defaults

J  Notes receivable from FMC which will be set off against its claim

K  The value of the Residual has been adjusted to $0. Reorganized TERI will retain the Residual

L  Related to liability from Restricted Grant Funds received (included in note D) and yet to be disbursed

M  Estimated recovery from allowed claims (unsecured recovery from Decoder settlement amounts and secured recovery from restricted cash)

N  Calculated as variance between estimated recovery to creditors and accounting liability

# EXHIBIT 3

Disclosure Statement for August 2010 Plan Corrected Financial Projections

## **EXHIBIT 3**

Financial Projections

## PROJECTIONS

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Bankruptcy Code 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

For the purpose of demonstrating the feasibility of the Plan, the following financial projections for each of the three years ended September 30, 2011, 2012 and 2013 (the "Projections") were prepared by the Debtor, assisted by its professional advisors. The Projections reflect the Debtor's results from operations of Reorganized TERI and reflect the Debtor's assumptions and judgments as to expectations of market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change, as discussed below.

The Projections present, to the best of the Debtor's knowledge and belief, Reorganized TERI's results from operations for the three years following the estimated date of emergence of October 1, 2010. Although the Debtor is of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including but not limited to, material changes to the economic environment, demand for its services, the competitive environment and other factors affecting the Debtor's business. The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Projections. The Projections assume that the Plan would be implemented in accordance with its stated terms and that consummation of the Plan would occur on October 1, 2010. The Projections should be read in conjunction with the assumptions and qualifications contained herein.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") IN THE U.S. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONSEQUENCES WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOUD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

## GENERAL ASSUMPTIONS

The Debtor prepared the Projections with the assistance of its professional advisors. The Projections represent, to the best of the Debtor's knowledge and belief, the Debtor's results from operations for the three years following the estimated date of emergence of November 1, 2010 and reflect the Debtor's assumptions and judgments considering information known as of August 15, 2010.

### Key Assumptions

i.    Revenues

Management's long range plan includes generating revenues from further developing its existing collection management services and offering portfolio management services, in addition to continuing its not-for-profit mission related to College Access, which will be primarily funded by grant income. The long range plan also contemplates that certain assets of the Debtor, including defaulted loans purchased by the Debtor, will be transferred to a Plan Trust and administered by the Plan Trustee for the benefit of Creditors. TERI anticipates receiving revenue from shared recoveries, which are based on the Collection Contract set forth in the Plan and described in the Disclosure Statement between Reorganized TERI and the Plan Trustee.

The revenue projections also include a fee for managing the collection of defaulted loans and reimbursements from the Plan Trust for back office or administrative expenses incurred while assisting the Plan Trustee in liquidating assets.

ii.    Employee Costs and Professional Services

Employee costs include, among other things, salaries, wages, payroll taxes, benefits, and outside contractors. Professional services include board of directors' compensation as well as bank, audit, and legal related fees. Medical expense, which makes up approximately 9% of total employee costs, is grown each calendar year by approximately 14%; an assumed expense increase correlated with historical trends. All other employee costs and professional services are grown by approximately 3% each fiscal year due to an assumed increase in costs and general inflation.

iii.    Selling, General and Administrative ("SG&A") and Other Expense

Consolidated SG&A expenses include rent, utilities, building maintenance, telephone, corporate insurance, office supplies, printing, advertising, and travel. Other expense includes dues, subscriptions and IT charges. SG&A and other expenses are forecast to increase by approximately 3% each fiscal year due to increase in costs and general inflation.

3

iv.    Interest Income

Interest income is expected to be generated from Retained Cash, the Restricted Charitable Gift Funds, endowments, and grants.

**The Education Resources Institute, Inc.**

Projected Income Statement
*(Unaudited, $ in whole amounts)*

| | Projected 12 Months Ended 9/30/2011 | Projected 12 Months Ended 9/30/2012 | Projected 12 Months Ended 9/30/2013 |
|---|---|---|---|
| **Revenue** | | | |
| Portfolio management | $ 1,100,000 | $ 2,800,000 | $ 4,960,000 |
| Grants | 1,987,101 | 2,079,171 | 2,055,382 |
| Collections | 1,754,991 | 1,407,602 | 668,240 |
| Shared recoveries | 750,000 | 875,000 | - |
| Other revenue | 152,472 | 153,577 | - |
| **Total Revenue** | 5,744,564 | 7,315,350 | 7,683,622 |
| **Expenses** | | | |
| Employee costs | (4,763,281) | (4,906,277) | (5,066,234) |
| SG&A | (1,331,686) | (1,371,636) | (1,402,269) |
| Professional services | (297,213) | (306,129) | (312,966) |
| Depreciation | (69,351) | (73,351) | (75,851) |
| TERI other income (expense) | (53,062) | (54,654) | (55,874) |
| **Total Expenses** | (6,514,591) | (6,712,047) | (6,913,192) |
| **Operating Income** | (770,027) | 603,304 | 770,430 |
| Interest income (expense) | 43,204 | 42,614 | 45,393 |
| **Net Increase (Decrease) in Assets** | $ (726,823) | $ 645,918 | $ 815,823 |

## The Education Resources Institute, Inc.

### Projected Cash Flow
*(Unaudited, $ in whole amounts)*

| | Projected 12 Months Ended 9/30/2011 | Projected 12 Months Ended 9/30/2012 | Projected 12 Months Ended 9/30/2013 |
|---|---|---|---|
| Net Increase (Decrease) in Assets | $ (726,823) $ | 645,918 $ | 815,823 |
| Depreciation | 69,351 | 73,351 | 75,851 |
| Grants receivable | - | - | - |
| Accounts receivable | (270,492) | (147,541) | (260,656) |
| Capex | (20,000) | (20,000) | (20,000) |
| Prepaid expense and other assets | - | - | - |
| Accounts payable and accrued expenses | (55,864) | 50,908 | 53,762 |
| Deferred grant revenue | - | - | - |
| Net change in cash | (1,003,828) | 602,636 | 664,779 |
| | | | |
| Beginning cash | 11,480,179 | 10,476,351 | 11,078,987 |
| Net change in cash | (1,003,828) | 602,636 | 664,779 |
| Ending cash | 10,476,351 | 11,078,987 | 11,743,767 |

## The Education Resources Institute, Inc.

Projected Balance Sheet
*(Unaudited, $ in whole amounts)*

| | Projected 9/30/2011 | Projected 9/30/2012 | Projected 9/30/2013 |
|---|---|---|---|
| **Assets** | | | |
| Cash and marketable securities | $    10,476,351 | $    11,078,987 | $    11,743,767 |
| Receivables | | | |
| Grants receivable | 117,579 | 117,579 | 117,579 |
| Accounts receivable | 270,492 | 418,033 | 678,689 |
| Property and equipment (net) | 210,253 | 156,903 | 101,052 |
| Prepaid expense and other assets | 240,545 | 240,545 | 240,545 |
| **Total Assets** | $    11,315,220 | $    12,012,046 | $    12,881,631 |
| | | | |
| **Liabilities** | | | |
| Revolver | - | - | - |
| Accounts payable and accrued expenses | 2,098,717 | 2,149,625 | 2,203,387 |
| Deferred revenue | | | |
| Grants | 256,439 | 256,439 | 256,439 |
| **Total Liabilities** | 2,355,156 | 2,406,064 | 2,459,826 |
| | | | |
| **Net Assets** | | | |
| Net assets | 9,686,887 | 8,960,064 | 9,605,982 |
| Change in Net Assets | (726,823) | 645,918 | 815,823 |
| **Total Net Assets** | 8,960,064 | 9,605,982 | 10,421,805 |
| | | | |
| **Total Liabilities and Net Assets** | $    11,315,220 | $    12,012,046 | $    12,881,631 |

The Education Resources Institute, Inc.

Projected Pro-Forma Balance Sheet

*(Unaudited, US $ )*

| | Projected 9/30/10 A | Plan Settlement | Transfer to Plan Trust | Cancellation of Debt | Pro-Forma 10/1/10 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and marketable securities - unrestricted | $ 49,652,122 | $ 4,105,294 B | $ (42,277,237) | $ - | $ 11,480,179 C |
| Cash and marketable securities - restricted | 320,940,041 | (320,940,041) D | - | - | - |
| Receivables | | | | | - |
| Fees | 41,276,021 | (41,276,021) E | - | - | - |
| Grants | 117,579 | - | - | - | 117,579 |
| Accrued interest | 1,025,812 | (1,025,812) F | - | - | - |
| Student Loans | 216,567,183 | (100,236,830) G | (116,330,353) H | - | - |
| Other | 144,817 | - | (144,817) | - | - |
| Property and equipment (net) | 259,604 | - | - | - | 259,604 |
| Residual Interest | - | - | - | - | - |
| Prepaid expense and other assets | 240,545 | - | - | - | 240,545 |
| **Total Assets** | $ 630,223,724 | $ (459,573,410) | $ (158,752,407) | $ - | $ 12,097,907 |
| **Liabilities** | | | | | |
| Accounts payable and accrued expenses | $ 2,154,581 | $ - | $ - | $ - | $ 2,154,581 |
| Deferred revenue | | | | | |
| Fees | 237,587 | - | - | (237,587) J | - |
| Grants | 256,439 | - | - | - | 256,439 K |
| Loan Loss Reserve | - | - | - | - | - |
| Liabilities Subject to Compromise | 683,665,547 | (473,853,048) I | - | (209,812,499) J | - |
| **Total Liabilities** | $ 686,314,154 | $ (473,853,048) | $ - | $ (210,050,086) | $ 2,411,020 |
| **Net Assets** | $ (56,090,430) | $ 14,479,638 | $ (158,752,407) | $ 210,050,086 | $ 9,686,887 |
| **Total Liabilities and Net Assets** | $ 630,223,724 | $ (459,573,410) | $ (158,752,407) | $ - | $ 12,097,907 |

General Note  - TERI does not anticipate Fresh Start accounting to be applicable upon emergence

A  Reflect actuals through 8/1/10 and forecasted results through 9/30/10

B  Net transfer from restricted cash related to settlements (Ambac, Trust and Make and Wait Lien issues)

C  Consists of $2.9 mil TERI settlement and approx. $8.6 mil ($6 mil endowment, $2 mil grant, $0.3 mil interest accrued and $0.3 mil grant balance) to be designated as Reorganized TERI restricted cash

D  As per Plan settlement, transferred to respective lender or Trust with exception of settlement for Make and Wait lien issues above

E  Included in claim settlement calculations for each respective lender or trust

F  Included in reserve account balance returned to respective lender or trust

G  Amounts to be recovered on defaults for Make and Wait lenders and pre-petition Trust

H  Estimated receivable from recoveries on TERI owned loans and Trust post-petition defaults

I  Estimated recovery from allowed claims (unsecured recovery from Decoder settlement amounts and secured recovery from restricted cash)

J  Calculated as variance between estimated recovery to creditors and accounting liability

K  Related to liability from grant funds received (included in note C) and yet to be disbursed

## EXHIBIT 4

Supplemental Affidavit of James A. Peko

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 08-12540(HJB) |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**SUPPLEMENTAL AFFIDAVIT OF JAMES A. PEKO IN SUPPORT OF
CONFIRMATION OF THE MODIFIED FOURTH AMENDED JOINT PLAN OF
REORGANIZATION OF THE EDUCATION RESOURCES INSTITUTE, INC. AND THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS OF AUGUST 26, 2010**

I, James A. Peko, hereby depose and state as follows:

1.    I am a principal at Grant Thornton LLP ("Grant Thornton"). I have held that position since August, 2006. Prior to my employment at Grant Thornton I held positions at Navigant Consulting Inc., Deloitte & Touche LLP, Ernst & Young LLP and Nikko Securities Co., Ltd. I have over 19 years experience in business and finance.

2.    Shortly prior to the filing of The Education Resources Institute Inc.'s ("TERI" or the "Debtor") voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), Grant Thornton was engaged by the Debtor for the purpose of providing certain financial and business advisory services.

3.    I have made due inquiry or have personal knowledge of the facts set forth herein.

4.    I offer this affidavit in support of the Supplemental Memorandum in Support of Confirmation of the Modified Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the Official Committee of Unsecured Creditors as of August 26, 2010.

LIBC/3903327.4

5.     I have been personally involved in the negotiations and discussions

regarding the compromises and settlements embodied in the Modified Fourth Amended Joint

Plan of Reorganization (the "August 2010 Plan")[1] put forth by the Plan Proponents and I believe

that the August 2010 Plan is in the best interest of the Debtor's Estate.

6.     The August 2010 Plan builds on the February 2010 Plan and,

consequently, is the culmination of almost two years of negotiations among the major

constituencies in this Chapter 11 Case, including the Debtor and the Creditors' Committee, as the

Plan Proponents.  The August 2010 Plan is the result of hundreds of hours of effort by the

Debtor, the Creditors' Committee and the retained professionals for each of the Plan

Proponents.  The August 2010 Plan embodies several modifications from the provisions of

the Fourth Amended Joint Plan of Reorganization (the "February 2010 Plan"), including in

relevant part modifications to the Securitization Trust Settlement.  As a result of the length of

time that has passed since the confirmation hearing to consider the February 2010 Plan and

to take into consideration the impact of the modifications made in the August 2010 Plan, the

Debtor prepared, in consultation with Grant Thornton, an updated Best Interests Test,

attached as Exhibit 2 to the Supplemental Disclosure and updated Financial Projections,

attached as Exhibit 3 to the Supplemental Disclosure.

7.     On April 27, 2010, the Debtor submitted the Affidavit of James A. Peko

Relative to Confirmation of the Fourth Amended Joint Plan of Reorganization of The Education

Resources Institute, Inc. and The Official Committee of Unsecured Creditors [Docket No. 1083]

(the "First Peko Affidavit").  The First Peko Affidavit addressed, among other things; the

---

[1]     Capitalized terms not otherwise defined herein have the meanings ascribed to them in the August 2010 Plan.

LIBC/3903327.4

Debtor's Base Case, the "Decoder," the Make and Wait Lien Dispute, the Trust Adversary

Proceeding, the Best Interest Test, and Feasibility of the February 2010 Plan.

8.    Other than as updated or revised herein, the First Peko Affidavit is

incorporated herein and should be deemed as part of the record to support confirmation of the

August 2010 Plan.

## I.    Best Interests Test

9.    Pursuant to Section 1129(a)(7) of the Bankruptcy Code, each Holder of an

Impaired Claim or Equity Interest must either (a) accept the August 2010 Plan or (b) receive or

retain under the August 2010 Plan, property of a value, as of the Effective Date, that is not less

than the value such non-accepting Holder would receive or retain if the Debtor was liquidated

under Chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test"). In

connection with these requirements, the Debtor prepared, in consultation with Grant Thornton,

the hypothetical updated liquidation analysis (the "Liquidation Analysis") attached as Exhibit 2

to the Supplemental Disclosure, which shows that Holders of impaired Claims will receive or

retain property that is greater in value than the value such Holder of an Impaired Claim would

receive in a Chapter 7 liquidation.

10.    As set forth in the Liquidation Analysis, I estimate that, under a

hypothetical Chapter 7 liquidation, General Unsecured Creditors will receive approximately

14.5% - 16.7% of their total Allowed Claims, compared to the approximately 49% recovery such

Creditors with receive under the August 2010 Plan. Therefore, it is my opinion that the August

2010 Plan satisfies Section 1129(a)(7).

3

## II.    Feasibility

11.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the August 2010 Plan is "feasible," I have analyzed the ability of Reorganized TERI to operate post-emergence and to retain sufficient liquidity and capital resources to conduct its business.

12.    The Debtor prepared the updated Reorganized TERI Financial Projections, with the assistance of Grant Thornton, attached as Exhibit 3 to the Supplemental Disclosure. The Reorganized TERI Financial Statements are comprised of (1) a projected income statement, (2) a projected cash flow, (3) a projected balance sheet and (4) a projected pro forma balance sheet assuming emergence as of October 1, 2010 (the "Projections"). The Projections are based upon a variety of assumptions subject to significant business, economic and competitive uncertainties, contingencies and risks, many of which are beyond the control of the Debtor. The Projections were based on known information as of August 15, 2010. Actual results may vary materially from those presented and the variations may be adverse.

13.    As set forth therein, the Projections indicate that TERI will have sufficient cash to operate its business and collect the TERI Owned Loans pursuant to the Collection Contract for the length of such contract, and subject to certain assumptions embedded in the Projections, will be able expand its business post-emergence.

14.    It recently came to my attention that the Projections filed with the Supplemental Disclosure contain an arithmetic mistake in the calculation of "Net Increase (Decrease) in Assets" in Year 3 of the Projected Income Statement. This arithmetic mistake

4

impacts the "Ending Cash" in year 3 of the Projected Cash Flow, which in turn, impacts the "Total Net Assets" calculation in the projected balance sheet for the year ended September 30, 2013. The mistake is, in my view, immaterial, and results in an approximately 1% change to the "Total Net Assets" of Reorganized TERI in Year 3 of the Projections. A corrected version of the Financial Projections is attached to this Affidavit as Exhibit A.

15.    Grant Thornton, under the Debtor's direction, also prepared the spreadsheet attached hereto as Exhibit B (the "Worst Case Scenario Summary Spreadsheet"), which details a potential worst case scenario in which the Debtor is unable to generate any revenue other than from the Collection Contract after emergence from Bankruptcy. Pursuant to internal projections prepared with my assistance and pursuant to my review, and subject to the assumptions outlined herein, in the event that Reorganized TERI failed to develop new business, "it would still have sufficient cash to conduct its College Access" operations and collect the TERI Owned Loans pursuant to the Collection Contract for the length of such contract. Based on the attached projections, which show cumulative losses of approximately $2.3 million, as of September 30, 2012 Reorganized TERI will have nearly $600,000 remaining of its Retained Cash of $2.9 million.

16.    In addition, because the overwhelming majority of the Debtor's assets will be transferred to the Plan Trust, the ability of the Plan Trustee to make the distributions contemplated by the August 2010 Plan is independent of future earnings of Reorganized TERI. Due to these facts, I believe that the August 2010 Plan is feasible.

5

## CONCLUSION

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

James A. Peko
Principal, Grant Thornton LLP

Dated: October 15, 2010          THE EDUCATION RESOURCES INSTITUTE, INC.

By its attorneys,


   Daniel M. Glosband

Daniel M. Glosband (BBO No. 195620)
Gina Lynn Martin (BBO No. 643801)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231


E-mail:dglosband@goodwinprocter.com
gmartin@goodwinprocter.com

## EXHIBIT A

Corrected Financial Projections

## The Education Resources Institute, Inc.

### Projected Income Statement
*(Unaudited, $ in whole amounts)*

| | Projected 12 Months Ended 9/30/2011 | Projected 12 Months Ended 9/30/2012 | Projected 12 Months Ended 9/30/2013 |
|---|---|---|---|
| **Revenue** | | | |
| Portfolio management | $ 1,100,000 | $ 2,800,000 | $ 4,960,000 |
| Grants | 1,987,101 | 2,079,171 | 2,055,382 |
| Collections | 1,754,991 | 1,407,602 | 668,240 |
| Shared recoveries | 750,000 | 875,000 | - |
| Other revenue | 152,472 | 153,577 | - |
| **Total Revenue** | 5,744,564 | 7,315,350 | 7,683,622 |
| **Expenses** | | | |
| Employee costs | (4,763,281) | (4,906,277) | (5,066,234) |
| SG&A | (1,331,686) | (1,371,636) | (1,402,269) |
| Professional services | (297,213) | (306,129) | (312,966) |
| Depreciation | (69,351) | (73,351) | (75,851) |
| TERI other income (expense) | (53,062) | (54,654) | (55,874) |
| **Total Expenses** | (6,514,591) | (6,712,047) | (6,913,192) |
| **Operating Income** | (770,027) | 603,304 | 770,430 |
| Interest income (expense) | 43,204 | 42,614 | 45,393 |
| **Net Increase (Decrease) in Assets** | $ (726,823) | $ 645,918 | $ 815,823 |

## The Education Resources Institute, Inc.

### Projected Balance Sheet
*(Unaudited, $ in whole amounts)*

| | Projected | Projected | Projected |
|---|---|---|---|
| | 9/30/2011 | 9/30/2012 | 9/30/2013 |
| **Assets** | | | |
| Cash and marketable securities | $ 10,476,351 | $ 11,078,987 | $ 11,743,767 |
| Receivables | | | |
| Grants receivable | 117,579 | 117,579 | 117,579 |
| Accounts receivable | 270,492 | 418,033 | 678,689 |
| Property and equipment (net) | 210,253 | 156,903 | 101,052 |
| Prepaid expense and other assets | 240,545 | 240,545 | 240,545 |
| **Total Assets** | $ 11,315,220 | $ 12,012,046 | $ 12,881,631 |
| | | | |
| **Liabilities** | | | |
| Revolver | - | - | - |
| Accounts payable and accrued expenses | 2,098,717 | 2,149,625 | 2,203,387 |
| Deferred revenue | | | |
| Grants | 256,439 | 256,439 | 256,439 |
| **Total Liabilities** | 2,355,156 | 2,406,064 | 2,459,826 |
| | | | |
| **Net Assets** | | | |
| Net assets | 9,686,887 | 8,960,064 | 9,605,982 |
| Change in Net Assets | (726,823) | 645,918 | 815,823 |
| **Total Net Assets** | 8,960,064 | 9,605,982 | 10,421,805 |
| | | | |
| **Total Liabilities and Net Assets** | $ 11,315,220 | $ 12,012,046 | $ 12,881,631 |

**The Education Resources Institute, Inc.**

Projected Cash Flow
*(Unaudited, $ in whole amounts)*

| | Projected 12 Months Ended 9/30/2011 | Projected 12 Months Ended 9/30/2012 | Projected 12 Months Ended 9/30/2013 |
|---|---|---|---|
| Net Increase (Decrease) in Assets | $ (726,823) | $ 645,918 | $ 815,823 |
| Depreciation | 69,351 | 73,351 | 75,851 |
| Grants receivable | - | - | - |
| Accounts receivable | (270,492) | (147,541) | (260,656) |
| Capex | (20,000) | (20,000) | (20,000) |
| Prepaid expense and other assets | - | - | - |
| Accounts payable and accrued expenses | (55,864) | 50,908 | 53,762 |
| Deferred grant revenue | - | - | - |
| Net change in cash | (1,003,828) | 602,636 | 664,779 |
| | | | |
| Beginning cash | 11,480,179 | 10,476,351 | 11,078,987 |
| Net change in cash | (1,003,828) | 602,636 | 664,779 |
| Ending cash | 10,476,351 | 11,078,987 | 11,743,767 |

## EXHIBIT B

Worst Case Scenario Summary Spreadsheet

## The Education Resources Institute, Inc.

### Income Statement - TERI "Conservative Case" Scenario

($ in whole amounts)

| | Projected 12 Months Ended 9/30/2011 | Projected 12 Months Ended 9/30/2012 |
|---|---|---|
| **Revenue** | | |
| Collections revenue | 731,798 | 782,287 |
| Risk management revenue | - | - |
| Shared recoveries (agreed with the creditors) | 750,000 | 875,000 |
| Other revenue | - | - |
| **Total Revenue** | 1,481,798 | 1,657,287 |
| **Expenses** | | |
| Depreciation | (69,351) | (73,351) |
| Employee costs | (1,956,393) | (1,014,244) |
| Professional services | (275,048) | (260,581) |
| SG&A | (623,931) | (571,393) |
| TERI other income (expense) | (52,281) | (52,974) |
| Wind down costs | (493,960) | (32,692) |
| **Total Expenses** | (3,470,963) | (2,005,235) |
| Operating Income | (1,989,165) | (347,948) |
| Interest income (expense) | 8,781 | 5,808 |
| Net Increase in Assets | $ (1,980,385) | $ (342,140) |

## EXHIBIT 5

Excerpt from Transcript of April 28, 2010 Confirmation Hearing

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - SPRINGFIELD

| | | |
|---|---|---|
| IN THE MATTER OF: | . | Case #08-12540 |
| | . | |
| THE EDUCATION RESOURCES | . | Springfield, Massachusetts |
| INSTITUTE, INC. | . | **April 28, 2010** |
| Debtor. | . | 2:15:35 p.m. O'clock |

P.M. Session
Volume II

## TRANSCRIPT OF TELECONFERENCE HEARING ON:
### (#1011)  HEARING ON CONFIRMATION OF FOURTH AMENDED JOINT PLAN OF REORGANIZATION;
### (#1045)  DEBTOR'S MOTION FOR ORDER APPROVING REJECTION OF CERTAIN EXECUTORY CONTRACTS;
### (#1046) DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO REJECT AND TERMINATE EXECUTORY CONTRACTS;
### (#1066) JOINT MOTION FOR ORDER AUTHORIZING DEBTOR, RBS CITIZENS, N.A., AND THE CREDITORS' COMMITTEE TO ENTER INTO STIPULATION FOR THE SETTLEMENT OF GUARANTY CLAIMS RELATING TO THE TERMINATION OF CERTAIN LOAN GUARANTEES
### BEFORE THE HONORABLE HENRY J. BOROFF, J.U.S.B.C.

**APPEARANCES**:  (See next Page)

Electronic Sound Recording Operator:    Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ 08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

1  thought were the appropriate costs on the cost side of the

2  equation, as well as the appropriate level of projected

3  income on the income side.

4      Q.  If I can turn your attention to the projected income

5  statement on page 4 of the exhibit, I'm looking first at the

6  revenue.  Can you please explain what components go into the

7  revenue projections?

8      A.  Sure.  There are five revenue categories, including

9  portfolio management.  So included in portfolio management is

10  consulting, if you will, grant income, collections, shared

11  recoveries, which are the recoveries that TERI would earn

12  under the collections agreement with the plan trust, and a

13  small category of other revenue.

14      Q.  If you can turn to the first item, "portfolio

15  management," what do you understand to mean?

16      A.  Portfolio management in -- includes what I would

17  call risk management and risk modeling, transaction services,

18  as well as back-office administration, if you will.

19      Q.  Are these services that TERI currently offers?

20      A.  These are services that TERI -- TERI has

21  historically done for its own accounts, and more recently

22  they actually had a client signed up to do the transaction

23  services, if you will.  They were engaged by a fairly large

24  investment manager.  In fact, the -- I believe the investment

25  manager has in excess of 30 billion dollars under management.

1  This investment manager was looking to get into the student

2  loan, not business, but permanent -- to buy student loans

3  from an investment perspective and had engaged TERI to help

4  them evaluate a specific portfolio.

5      Q.  Are you aware of any other efforts by TERI to market

6  these services to a third party?

7      A.  When we developed this category of revenue we looked

8  at what was out in the marketplace, and clearly with the

9  disrupt -- disruption in the marketplace and some new

10 entrants, we felt that there were opportunities for TERI to

11 use its -- its fast and deep knowledge of private student

12 loans and capitalize on the market opportunity.

13         Frankly, what's hampered them a bit is the fact

14 that they're in bankruptcy.  There's been interest to sign

15 TERI up to these services, but a number of potential clients

16 wanted more certainty to see what TERI looks like out of

17 bankruptcy.

18     Q.  And how did you develop the projections -- projected

19 revenue for portfolio management?

20     A.  Projected revenue is really based on -- we did a

21 market survey relative to companies that were actually

22 providing similar services and found that on the -- in

23 particular, on the risk modeling and risk management side,

24 the companies would charged upwards of $250,000 per

25 engagement, plus additional services.  In fact, when TERI was

1 engaged by this large investment manager, although the

2 structure of -- the fee structure was a little bit different

3 than what had been -- being charged in the market, if the

4 investment manager was successful, TERI would have earned

5 approximately $250,000 for the services they provided.

6        So based on what we saw going on in the market, we

7 felt it reasonable that the 1.1 million dollar projection in

8 year one would be achievable, and that once TERI would sign

9 up those clients, there would be opportunity to go out to the

10 market with that experience, sell an additional work and not

11 only do that, but then do the more classic portfolio

12 management where TERI would get an annual fee, if you will,

13 for managing certain aspects of portfolios.

14     Q.   If we can turn quickly to the other elements of

15 revenue as well, looking first at grant revenue, what does

16 that include?

17     A.   Grant revenue are grants that are attached to TERI's

18 College Access mission.  The grant revenue numbers are actual

19 grants in-house, and these are grants that TERI is already

20 working toward, or working on, if you will.  TERI has been in

21 a non-for-profit business for the last 25 years, since 1985.

22 So this is not a new business for them at all.

23     Q.   I'm looking at the collections components, what does

24 that -- what is that comprised of?

25     A.   The collections include revenue from existing

1  clients, as well as additional projected revenues.

2      Q.  And I think you already explained that the shared

3  recovery is under the collection contract?

4      A.  Under the collections (unclear).

5          THE COURT:  I'm sorry.  I didn't -- I didn't

6  understand the -- Excuse me.

7          MS. FETOUH:  Sure.

8          THE COURT:  I didn't understand the last answer.

9  It sounded as if you said, collections, plus other revenues.

10          THE WITNESS:  No.  It -- it's from existing

11  collection clients.

12          THE COURT:  Yes.

13          THE WITNESS:  Plus projected add-ons.

14          THE COURT:  Add-ons in the collection area.

15          THE WITNESS:  Yes.  Yes.

16          THE COURT:  Okay.  Thank you.  Go ahead.

17  BY THE WITNESS:

18      A.  Like -- like the response that we received on the

19  portfolio management, there have been conversations with a

20  number of clients relative to collections where they were

21  unsure on whether or not they wanted to hire TERI.  TERI was

22  able to hire a number of clients during the pendency of the

23  case, but there were also clients who were shy to hire TERI

24  to do their collections.

25      Q.  And, I'm sorry, why were they shy to hire TERI?

1      A.   Because of the uncertainty of the outcome of the

2   bankruptcy.

3      Q.   We move down now to the expenses component of the

4   projected income statement.  Can you explain just generally

5   what components comprise the expenses?

6      A.   Expenses include employee costs, selling general

7   administrative expenses, professional services, depreciation

8   of the fixed assets, and other income and expenses.

9      Q.   Looking first at employee costs, what assumptions

10  did you make with respect to employee costs?

11     A.   The employee costs include wages, salary, payroll

12  taxes, benefits, and the use of outside contractors.

13     Q.   How did you --

14     A.   The --

15     Q.   -- determine what level of compensation to use for--

16     A.   The level of compensation that these -- this was

17  built up on a per-person basis.  So it was built again on a,

18  on a zero basis.  There are actual names attached to -- to

19  all the numbers that roll into the salaries, and they were

20  based on actual salaries.  There's a component that over time

21  we increased the salaries by three per cent, and actually the

22  medical benefits that are attached to the particular

23  employees are increased at 14 per cent a year.  That's based

24  on -- the 14 per cent is based on historical experience.

25     Q.   And the salaries that you used, were they -- as of

## EXHIBIT 6

Excerpt from transcript of October 18, 2010 Confirmation Hearing

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - SPRINGFIELD

IN THE MATTER OF:                    .    Case #08-12540

                                     .

THE EDUCATION RESOURCES              .    Springfield, Massachusetts
    INSTITUTE, INC.                  .    **October 18, 2010**
                    Debtor.          .    1:14:31 p.m. O'clock

### TRANSCRIPT OF TELEPHONIC HEARING ON:
### (#1011) EVIDENTIARY CONFIRMATION HEARING ON DEBTOR'S FOURTH AMENDED JOINT PLAN OF REORGANIZATION;
### (#1144)  FOURTH AND FINAL APPLICATION OF CRAIG AND MACAULEY FOR COMPENSATION AND EXPENSES AS SPECIAL COUNSEL TO THE DEBTOR;
### (#1151) JOINT MOTION FOR APPROVAL AND AUTHORIZATION OF STIPULATION RESOLVING CLAIMS OF FIRST MARBLEHEAD CORP. AND FIRST MARBLEHEAD DATA SERVICES, INC.
### BEFORE THE HONORABLE HENRY J. BOROFF, J.U.S.B.C.

**APPEARANCES**:

For The Debtor:                      DANIEL GLOSBAND, ESQ.
                                     GINA L. MARTIN, ESQ.
                                     Goodwin Procter, LLP
                                     Exchange Place
                                     Boston, MA  02109
                                            --------continued-------->

Electronic Sound Recording Operator:    Laura L. Chambers

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299        FAX 1-609-927-9768        1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1  satisfied 1129(a)(8),

2        1129(a)(9) deals with treatment of priority claims.
3  We're providing for all of those claims to be paid in full,
4  and therefore satisfying 1129(a)(9).  I'll skip the
5  subsections of 1129(a)(9).

6        1129(a)(10) would allow us to invoke the absolute
7  priority rule cramdown requirements if we needed to, but we
8  don't need to because every Class has accepted, so at least
9  one Class of claims that isn't -- that is impaired has
10 accepted the plan, and in fact, they all have.

11       1129(a)(11) is essentially the feasibility test that
12 confirmation of the plan is not likely to be followed by the
13 liquidation or need for further financial reorganization of
14 the company; and I'd like to refer to Mr. Peko's affidavit in
15 that regard.

16       There are updated financial projections attached
17 both to the supplemental disclosure and then also to Mr.
18 Peko's affidavit.  They would reflect that in the case where
19 TERI does succeed in generating post-confirmation business,
20 and with assumptions as detailed in the text of his affidavit
21 and in his testimony of the last time, TERI would expect to
22 lose money for the first twelve months, but then to turn a
23 profit in the second two years following the effective date.
24 But that does assume that they generate revenues from a
25 portfolio management business; and in part that's impacted by

1   the market and their ability, and in part it may be impacted
2   by the data base issue that we're going to bring before the
3   Court subsequently.

4        But with that in mind, I would refer the Court to
5   Exhibit B to Mr. Peko's affidavit, which is essentially a
6   worst-case scenario that assumes no additional revenues beyond
7   those generated from a collection contract.   This is a very
8   pessimistic scenario because it doesn't even assume interest
9   income; it doesn't assume any positive activity in the College
10  Access area, or it assumes that's neutral and lives within its
11  own finances.  And so it nonetheless shows the collections
12  revenue projected under the collections contract, and then
13  reduced and reducing operating expenses to reflect the absence
14  of any new business; and it shows a significant loss in the
15  first year -- almost two million dollars -- and a smaller loss
16  in the second year, in effect, recognizing cost reductions
17  made as a result of the failure to generate new business.

18       Up against those losses of about two million three,
19  you will recall that TERI is starting off with two million
20  nine, so while -- excuse me -- while it will not be a happy
21  scenario, TERI has a $600,000 cushion over what's likely to
22  occur if it doesn't generate any new business.

23       So in that regard we think, as I say, while not
24  wildly optimistic, it nonetheless renders TERI feasible to
25  survive for the duration of necessary collection activities