**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| In re: ) | Chapter 11 |
| ) | Case No. 08-12540-HJB |
| THE EDUCATION RESOURCES ) | |
| INSTITUTE, INC., ) | |
| ) | |
| Debtor ) | |
| _____ ) | |

**MEMORANDUM OF LAW**

Before the Court is a "Motion for Interpretation of Order" (the "Motion for Interpretation") filed by The Education Resources Institute, Inc. ("TERI"), through which TERI asks this Court to interpret its order dated June 23, 2008 granting TERI's "Motion . . . for Order (A) . . . Authorizing [TERI] to Reject Certain Contracts with The First Marblehead Corporation and (B) . . . Authorizing [TERI] to Enter into a Transition Services Agreement" (the "Contracts Motion" and "Contracts Order").  See Contracts Motion, June 5, 2008, ECF No. 238; Contracts Order, June 23, 2008, ECF No. 364.  Through its Motion for Interpretation, TERI asks this Court to "interpret the Contracts Order to preclude the First Marblehead Entities from asserting that restrictions on TERI's use of Data and TERI's obligations to indemnify the First Marblehead Entities have not expired and that the Court otherwise enforce the Contracts Order."  Motion for Interpretation, p.3 ¶ 3, ECF No. 1171.

TERI filed its Chapter 11 petition in April 2008 and filed the Contracts Motion two months later.  In the Contracts Motion, TERI sought authority to reject various pre-petition

1

contracts with First Marblehead Corporation, First Marblehead Education Resources, Inc., and TERI Marketing Services, Inc. (together or separately, "First Marblehead"), pursuant to which TERI, in 2001, outsourced substantially all of its loan-related and administrative services to First Marblehead (the "First Marblehead Contracts").

Included among the contracts to be rejected was a "Database Sale and Supplementation Agreement" (the "Database Agreement"), which provided for, among other things, (1) the transfer of a redacted version of TERI's Loan Database to First Marblehead and (2) continued updating of the Loan Database.[1]  Despite TERI's retention of ownership of its Loan Database, the Database Agreement restricted TERI's use of the data during the term of the Database Agreement, restrictions which would continue for two years in the event the Database Agreement was terminated (the "Data Use Restrictions"). See Database Agreement, Article I, p. 3 (defining "Retained Uses" and "Surviving Obligations"), §§ 2.01, 2.03, 10.01.

TERI's rejection of the First Marblehead Contracts was essential to its eventual reorganization, as TERI could no longer afford the fees required under those agreements. On the other hand, since First Marblehead had performed the bulk of TERI's services for many years, TERI was ill-equipped to immediately take over those functions upon rejection of the First Marblehead Contracts.  To address those difficulties, the Contracts Motion also asked the Court to grant TERI the authority to enter into a Transitional Services Agreement

---

[1] The Loan Database "consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor . . . ." Database Agreement, Article I, p. 2.  Under the Database Agreement, the copy of the database transferred to First Marblehead was deemed the "Delivered Database."  Because the distinction does not impact the Court's conclusions of law relative to the present dispute, the Court will hereafter refer generically to both as the "Loan Database."

(the "TSA"), pursuant to which First Marblehead would assist TERI in the transition of services from First Marblehead to TERI in exchange for payment far less than provided for under the original contracts. Importantly, the TSA also addressed the status of the Loan Database, as previously governed by the Database Agreement. Under the TSA, First Marblehead would retain perpetual rights to use of the Loan Database (in its redacted form), and would, in return for a fee to be paid by TERI, assist in rebuilding TERI's copy of the Loan Database. TSA, § 2.1.[2]

The TSA was limited in duration. The initial term of the agreement expired on July 31, 2008, subject to two 30-day extensions. TSA, § 1.5. According to First Marblehead, those extension periods were effected by TERI, with First Marblehead's approval, and the TSA terminated at the end of September 2008. Objection to Motion for Interpretation of Order, p.2 n.4, Nov. 22, 2010, EFC No. 1180.

On October 29, 2010, this Court entered an order confirming TERI's Modified Fourth Amended Joint Plan of Reorganization (the "Plan"). See Findings of Fact, Conclusions of Law, and Order . . . Confirming the Modified Fourth Amended Joint Plan of Reorganization . . .," ECF No. 1170. On November 2, TERI filed its Motion for Interpretation of the June 23, 2008 Contracts Order. The motion came as no great surprise, as TERI and First Marblehead had foreshadowed the existence of the present dispute (the "Database Dispute") in their stipulation resolving various claims prior to confirmation of the Plan. See Joint Motion for Order Authorizing and Approving Stipulation Resolving Claims of First

---

[2] According to First Marblehead, although TERI had the right to maintain an updated version of the Loan Database, it had failed to do so and TERI thus required First Marblehead's assistance to rebuild TERI's copy of the Loan Database. Hr'g Tr. 29:6-31:20 (Nov. 29, 2010), ECF No. 1184.

3

Marblehead Education Resources, Inc., The First Marblehead Corporation and First Marblehead Data Services, Inc., p. 5 ¶16 & n.5, Oct. 8, 2010, ECF No. 1151.

The Database Dispute centers around whether the TSA, in connection with the transfer of data from First Marblehead to TERI through the "rebuilding" of TERI's Loan Database, indefinitely extended the Data Use Restrictions or whether the TSA incorporated the Database Agreement's limitation of those restrictions to a period of two years after termination. TERI says that the TSA incorporated the two-year limit on the Data Use Restrictions provided in the Database Agreement. First Marblehead, however, maintains that the TSA extended those restrictions in perpetuity. TERI, feeling threatened by First Marblehead's assertion that TERI no longer has the right to use its Loan Database in any way it sees fit, filed the Motion for Interpretation seeking a ruling confirming its construction of the TSA.

A hearing on the Motion for Interpretation (the "Hearing") was initially set for November 15, 2010. At First Marblehead's request, however, the Court extended the deadline for First Marblehead to file a response to the motion and continued the Hearing to November 29, 2010. First Marblehead filed an objection to the Motion for Interpretation (the "Objection"), and TERI then filed a supplemental reply to the Objection (the "Reply"). At the conclusion of the Hearing, the Court took the matter under advisement. The following constitute the Court's conclusions of law, addressing each of First Marblehead's objections in turn.

### A.    Procedural Objection: Adversary Proceeding Required?

First Marblehead first says the Motion for Interpretation should be denied because it was not filed as an adversary proceeding. According to First Marblehead, TERI is

seeking, if not an advisory opinion, then declaratory and injunctive relief, which under the Federal Rules of Bankruptcy Procedure (the "Rules" or "Bankruptcy Rules") must be sought through an adversary proceeding. See Fed. R. Bankr. P. 7001. TERI says that it seeks neither declaratory nor injunctive relief, and, therefore, the matter was properly brought as a contested matter by the filing of the Motion for Interpretation. According to TERI, it asks only that the Court interpret the Contracts Order, and does not "seek to restrain any party from taking any action nor does it seek to require any party to take any action." Reply to Objection to Motion for Interpretation of Order, p. 6, Nov. 24, 2010, ECF No. 1181.

The Court agrees with First Marblehead that, to the extent TERI asks the Court to enjoin First Marblehead from doing anything or asks the Court to order First Marblehead to take a particular action, Rule 7001(7) requires the filing of an adversary proceeding. See Fed. R. Bankr. P. 7001(7) ("The following are adversary proceedings . . . (7) a proceeding to obtain an injunction . . . ."). But to the extent the motion asks the Court merely to interpret the Contracts Order, a request which *does* strike the Court as one for declaratory relief, an adversary proceeding is not required. As TERI noted in its Reply, Rule 7001(9) requires an adversary proceeding in order to obtain declaratory relief *only* when that request is related to one of the types of matters enumerated in Rules 7001(1) through (8). Fed. R. Bankr. P. 7001(9). Standing alone, TERI's request for an interpretation of the Contracts Order is not related to any of the types of relief listed in subsections (1) through (8) of that Rule and may be brought by motion as a contested matter pursuant to Bankruptcy Rules 9013 and 9014. See Fed. R. Bankr. P. 7001, 9013, 9014.

Moreover, First Marblehead has not been prejudiced by the procedure employed here. While First Marblehead complains of the Court's quickness to schedule the matter

5

for hearing, the Court notes that, upon First Marblehead's request, it rescheduled that hearing and extended the deadline for First Marblehead to respond. Furthermore, the Motion for Interpretation could not have taken First Marblehead by surprise. By its own admission, the Database Dispute has been festering since at least July 2009. See Objection, p. 31 ¶ 82. Finally, First Marblehead's thorough and well-prepared Objection belies any claim that First Marblehead has been afforded inadequate time to present its defense to the motion. There are no factual issues in dispute requiring an extended discovery period or evidentiary hearing and both parties have had a fair opportunity to fully address the relevant legal issues. Accordingly, requiring the filing of an adversary proceeding at this juncture would provide nothing other than fruitless delay.[3]

### B. Jurisdictional Objections

#### 1. Subject Matter Jurisdiction: 28 U.S.C. § 1334

First Marblehead's first jurisdictional attack is premised on its claim that this Court has no jurisdiction under 28 U.S.C. § 1334(b), focusing primarily on the contention that the Court has no related-to jurisdiction over the present dispute because TERI's Plan has been confirmed and the resolution of this matter will not impact the estate or TERI's creditors. The cases relied upon by First Marblehead are factually distinguishable from this case, however. In contrast to cases where courts have found no bankruptcy court jurisdiction over post-confirmation disputes, the dispute here (1) arose entirely pre-confirmation; (2)

---

[3] See, e.g., In re NSCO, Inc., 427 B.R. 165, 176 n.12 (Bankr. D. Mass. 2010) (failure to file adversary proceeding excused where parties given fair opportunity to address issues and no factual issues were in dispute); Aegean Fare, Inc. v. Massachusetts (In re Aegean Fare, Inc.), 33 B.R. 745, 746 n.1 (Bankr. D. Mass. 1983) (failure to file adversary proceeding excused where issues were clearly delineated in motion and non-moving party was able to draft detailed response).

directly effects the prospects for the newly reorganized TERI; (3) was specifically identified during the Plan confirmation process; and (4) was brought before the Court for resolution less than a week after the Confirmation Order entered.[4]

But it is unnecessary to wade into the murky waters of post-confirmation jurisdiction jurisprudence to conclude that the Court has jurisdiction over this matter, because the Contracts Order itself specifically reserved jurisdiction in this Court to adjudicate disputes such as the one presented here.[5]  First Marblehead argues, however, that the Contracts Order merely authorized TERI to execute the TSA, but did not retain jurisdiction in this Court to resolve disputes regarding the terms of the TSA itself, because the Contracts Order refers only to retention of jurisdiction to construe and enforce the *order*.

While First Marblehead's argument has a certain semantic appeal, it is blatantly contradicted by the terms of the TSA.  The TSA, which was attached to the Contracts

---

[4] Compare, e.g., Battle Ground Plaza, Inc. v. Ray (In re Ray), 624 F.3d 1124, 1136 (9th Cir. 2010) (where breach of contract claim was "predicated on evidence that had come to light after [the] bankruptcy case had closed, its creditors paid, and the debtor discharged," bankruptcy court no longer had jurisdiction over the dispute); Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.), 266 F.3d 388 (5th Cir. 2001) (bankruptcy court had no jurisdiction over suit filed eighteen months after confirmation and arising entirely from post-petition dispute unrelated to debtor's obligations under plan); Safety Med. Supply Int'l, Inc. v. Guardian Tech, Inc. (In re Safety Med. Supply Int'l, Inc.), 334 B.R. 13, 17, 19 (Bankr. D. Mass. 2005) (where adversary proceeding would have impact on creditors, court had "related to" jurisdiction, but would abstain, as that jurisdiction would soon terminate pursuant to the Chapter 11 plan, the issues involved questions of state law, and the court had no jurisdictional basis other than the limited "related-to" jurisdiction); see also Boston Reg'l Med. Ctr. v. Reynolds (In re Boston Reg'l Med. Ctr.), 410 F.3d 100, 106, 107 (1st Cir. 2005) (28 U.S.C. § 1334 "does not distinguish between pre-confirmation and post-confirmation jurisdiction," "related to jurisdiction must be determined case-by-case," and "there are . . . situations in which the fact that particular litigation arises after confirmation of a reorganization plan will not defeat an attempted exercise of bankruptcy jurisdiction").

[5] See, e.g, In re G.S.F. Corp., 938 F.2d 1467, 1475, 1476, 1477 (1st Cir. 1991) (where bankruptcy court had jurisdiction to approve settlement, jurisdiction over subsequent litigation involving settlement was based on the inherent power of the court to protect a federal judgment, and did not require showing an "effect on the debtor").

7

Motion and carefully reviewed by this Court before it entered the Contracts Order, provides that, as a condition precedent to the effectiveness of the TSA, this Court "shall have entered a final order in form and substance reasonably acceptable to [First Marblehead] *approving this Agreement . . . .*" TSA, § 1.4(c) (emphasis supplied). There is no question but that the Contracts Order did just that – it did not merely authorize TERI to enter into the TSA, but, as understood by the Court, TERI, *and First Marblehead*, it approved the terms of the TSA and retained jurisdiction to construe and enforce those terms.[6] Accordingly, the Court rules that it has jurisdiction to construe and interpret the terms of the TSA, such jurisdiction having been retained in the June 23, 2008 Contracts Order.

2. *Case or Controversy; Ripeness*

The second jurisdictional objection raised by First Marblehead is its contention that there is no case or controversy that is ripe for determination, see U.S. Const. art. II, § 2 (jurisdiction of federal courts limited to "cases" and "controversies"),[7] because the dispute "involves nothing more than a difference of opinion" and because TERI has demonstrated no harm or imminent threat of harm should the Court withhold a ruling. Objection, p. 14 ¶ 38, pp. 17-19.

Consistent with Supreme Court and First Circuit case law, the Court rules that there

---

[6] See Travelers Indem. Co. v. Bailey, – U.S. –, 129 S.Ct. 2195, 2205 (2009) (bankruptcy court had jurisdiction to interpret and enforce its prior order, particularly where the prior order explicitly retained jurisdiction); G.S.F. Corp., 938 F.2d at 1475, 1476, 1477; compare Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994) (where court entered order of dismissal without incorporating settlement agreement or retaining jurisdiction to enforce the settlement agreement, claim for breach of settlement agreement was a separate matter "requir[ing] its own basis for jurisdiction").

[7] See also, e.g., In re Melendez, 235 B.R. 173, 188 (Bankr. D. Mass. 1999) ("federal courts are prohibited from rendering advisory opinions").

*is* a case or controversy here – a dispute plainly stated and identified specifically in the parties' stipulation in connection with confirmation of the Plan – and that dispute is ripe for resolution. First Marblehead's interpretation of the TSA tightly circumscribes the uses to which TERI may put the Loan Database in its future business endeavors. Thus, TERI cannot freely plan its affairs or conduct business without the looming threat of litigation over the Loan Database. Resolution of the Database Dispute will put an end to that uncertainty and allow the reorganized TERI to realistically and practically assess the feasibility of its future business endeavors.[8] Accordingly, the Court rules that the Motion for Interpretation poses a genuine case or controversy ripe for determination.

### C.    Substantive Argument: Interpretation of the TSA § 2.1(ii)

The crux of the Database Dispute is the parties' opposing interpretations of § 2.1(ii) of the TSA. In relevant part, that section provides:

> Notwithstanding the rejection or other termination of the Database Agreement . . . (ii) the Loan Database transferred from [First Marblehead] to TERI . . . shall remain subject to section . . . 2.03 (TERI Restrictions) of such Database Agreement and any and all additional terms of the Database Agreement that pursuant to section 10.01 of the Database Agreement survive termination . . . and remain in full force and effect.

---

[8] See Abbot Lab., Inc. v. Gardner, 387 U.S. 136, 152-53 (1967) (where failure to comply with challenged regulation could result in criminal or civil penalties and regulation directly affected day-to-day business of company, purely legal issue of regulation's validity was case or controversy ripe for review); State of R.I. v. Narrangansett Indian Tribe, 19 F.3d 685, 692-93 (1st Cir. 1994), cert. denied, 513 U.S. 919 (1994) (declaratory relief can be granted where specific relief is requested and would resolve an underlying controversy; the "litigant does not have to await the consummation of threatened injury to obtain preventative relief"); Pustell v. Lynn Publ. Sch., 18 F.3d 50, 52 (where there was an "actual ongoing controversy between the parties" which had a "concrete impact on the parties," court had jurisdiction to resolve constitutional claim and alleviate the "harm of substantial uncertainty"); compare In re Space Bldg. Corp., 206 B.R. 269, 272, 274-75 (D. Mass. 1996) (no case or controversy ripe for resolution where withholding court determination would have no impact on any party and no adverse party was challenging debtor's conduct or interpretation of relevant law).

According to First Marblehead's interpretation of this provision, the Data Use Restrictions, as well as certain other obligations (the "Surviving Obligations"), continue in perpetuity, since § 2.1(ii) does not specify a temporal limit on those restrictions and obligations . Furthermore, says First Marblehead, this indefinite survival is indicated by § 3.13 of the TSA, which provides that the provisions of Article II (including § 2.1(ii)) survive the termination of the TSA.

While the Court agrees that § 2.1(ii) is inartfully drafted, it ultimately concludes that, when read in tandem with the Database Agreement to which it refers, the provision is not ambiguous and does not provide for the indefinite survival of the Data Use Restrictions and other Surviving Obligations.

Section 2.1(ii) of the TSA makes clear that the Data Use Restrictions, as defined by the Database Agreement, would remain binding on TERI despite the rejection of the Database Agreement. Section 2.1(ii) makes specific reference to §10.01 of the Database Agreement, seemingly to define which other "additional terms" survive termination. But § 10.01 of the Database Agreement does not define "Surviving Obligations." The *only* thing § 10.01 of the Database Agreement does is provide that the Surviving Obligations *as defined elsewhere in the agreement* survive termination of the agreement *for a period of two years*. See Database Agreement, § 10.01 ("The Surviving Obligations shall survive termination of this Agreement for a period of two years after the termination date.")

If the TSA were intended to continue the Data Use Restrictions and other Surviving Obligations in perpetuity, there would be no need to refer to §10.01 of the Database Agreement – the TSA could simply have provided that the Surviving Obligations (as defined in Article I of the Database Agreement) remain in full force and effect. Instead, the TSA

10

makes specific reference to the provision of the Database Agreement that imposes a two-year limitation on that survival. The Court is thus compelled to conclude that the only logical reading of § 2.1(ii) requires incorporation of the two-year limit on the applicability of the Data Use Restrictions and other Surviving Obligations.[9]

And § 3.13 of the TSA does not change this conclusion; that section does nothing more than make clear that Article II of the TSA survived the termination of the TSA. This too does not extend the Surviving Obligations indefinitely. Rather, since the TSA, by its terms, would terminate within four months at the most, § 3.13 merely clarifies that the two-year duration specified for the Data Use Restrictions and other Surviving Obligations would extend beyond the shorter term of the TSA.

Because the Court has determined that a plain reading of the TSA and relevant provisions of the Database Agreement compel the conclusion that the Data Use Restrictions and other Surviving Obligations would survive for two years after the termination of the Database Agreement, the Court finds it unnecessary to consider any extrinsic evidence.[10] See Boston Edison, 856 F.2d at 365, 367 (under Massachusetts law,

---

[9] See Boston Edison Co. v. Fed. Energy Regulatory Comm'n, 856 F.2d 361, 367 (1st Cir. 1988) (upholding "harmonious interpretation [of contractual language] derived from within the four corners of the Contract itself . . . [where interpretation] "comports with the parties' discernible intentions as mirrored by the text [and] brooks no ambiguity when applied to the subject under discussion").

[10] The Court notes, however, that not only is this conclusion compelled by the documents themselves, but is consistent with the Bankruptcy Code and Rules and the Local Rules. Had the Court ascertained that the parties intended, through the TSA, to trade away one of TERI's largest assets - the unrestricted use of its Loan Database – property which was in *custodia legis* at that time, then considerably more protection through proper sale bidding procedures and appropriate notice would have been required. See Thinking Mach. Corp. v. Mellon Fin. Serv. Corp. (In re Thinking Mach. Corp.), 67 F.3d 1021, 1025-26 (1st Cir. 1995) (emphasizing judicial oversight in Chapter 11 bankruptcy cases, where debtor's property is in *custodia legis* from the time petition is filed).

extrinsic evidence admissible only where disputed contractual language is ambiguous).[11]

In conclusion, the Court rules that it has jurisdiction to decide the Motion for Interpretation and to resolve the dispute over the proper construction of § 2.1(ii) of the TSA. That provision, which incorporates the Data Use Restrictions, expressly refers to the two-year limit on those restrictions and other Surviving Obligations under § 10.01 of the Database Agreement. Accordingly, the Court clarifies its Order of June 23, 2008, to the effect that nothing in that Order was intended to extend the Data Use Restrictions and other Surviving Obligations referenced in the TSA beyond two years following the termination of the Database Agreement.

Dated: December 14, 2010

Henry J. Boroff
United States Bankruptcy Judge

---

[11] See also Donoghue v. IBC USA (Publ'n), Inc., 70 F.3d 206, 212 (1st Cir. 1995) ("When a court looks to the words of a document to consider the meaning of those words in the context of the agreement, the search is for manifested meaning, not a privately held belief or intent of one party, not communicated to other parties to the bargain.") (citing Rose-Derry Corp. v. Proctor & Schwartz, Inc., 288 Mass. 332, 193 N.E. 50, 52 (Mass. 1934); Sergi v. Everett Sav. Bank (In re Sergi), 233 B.R. 586 (B.A.P. 1st Cir. 1999) ("If a contract is not ambiguous, the court need not look beyond the four corners of the document to determine the parties' intent. Ambiguity is not created simply because a controversy exists between the parties each favoring an interpretation contrary to the other's.").